**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE AUTHORS GUILD, WILLIAM GOLDSTEIN, ELIZABETH KADETSKY, VALERIE ORLANDO, KATALIN BALOG, BENJAMIN HOLTZMAN, LEE JASPERSE, and NICOLE JENKINS, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | Case No. 1:25-cv-03923 |
| | Consolidated with No. 1:25-cv-03657 |
| NATIONAL ENDOWMENT FOR THE HUMANITIES, et al., | |
| Defendants. | |

**OMNIBUS REPLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION AND
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 2

    I.    This Court Has Jurisdiction. .................................................................... 2

        A.    This Court Has Jurisdiction Over Plaintiffs' APA Claims. ......................... 2

        B.    This Court Has Jurisdiction Over Plaintiffs' Non-APA Claims. ................. 5

        C.    Defendants' Standing Argument Is Meritless. ............................................ 6

    II.    Plaintiffs' APA Claims Are Reviewable. ................................................. 6

        A.    Plaintiffs Challenge Discrete Agency Action. ............................................ 6

        B.    The Challenged Actions Are Not Committed to Agency Discretion. ....................................................................................................... 7

        C.    The Impoundment Control Act Does Not Preclude Judicial Review. ....................................................................................................... 8

    III.    Plaintiffs Are Entitled To A Preliminary Injunction ................................. 9

        A.    The Government Does Not Dispute that Plaintiffs are Likely to Succeed on The Merits. ............................................................................. 9

        B.    The Mass Termination Is Inflicting Irreparable Harm. .............................. 9

        C.    The Balance Of Equities And The Public Interest Overwhelmingly Favor Relief. ......................................................................... 12

        D.    The Court Should Enjoin the Mass Termination in Its Entirety And Should Not Grant A Stay or Require A Bond. ............................. 13

    IV.    The Amended Complaint States Claims For Relief on All Other Counts. ........... 15

        A.    Plaintiffs Plausibly Allege A First Amendment Violation. ...................... 15

        B.    Plaintiffs Plausibly Allege Violations of the 2024 Appropriations Act and the 2025 Continuing Resolution. ................................................. 19

        C.    Plaintiffs Plausibly Allege a Violation of the Impoundment Control Act. ........................................................................................... 22

        D.    Plaintiffs Plausibly Allege a Separation of Powers Violation. ................. 22

**TABLE OF CONTENTS**
(continued)

Page

  E. Plaintiffs Properly Allege *Ultra Vires* Claims. .......................................... 24

CONCLUSION ............................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*A.A.R.P. v. Trump*,
   145 S. Ct. 1364 (2025) .......................................................................................... 6

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) ...................................................................................... 17, 18

*AIDS Vaccine Advoc. Coal. v. United States Dep't of State*,
   2025 WL 752378 (D.D.C. Mar. 10, 2025) ............................................................ 24

*Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014) ............................................................................ 14

*Am. Bioscience, Inc. v. Thompson*,
   269 F.3d 1077 (D.C. Cir. 2001) ............................................................................ 14

*Am. Fed'n of Gov't Emps. v. O.P.M.*,
   2025 WL 996542 (S.D.N.Y. Apr. 3, 2025) ............................................................. 4

*Am. First Legal Found. v. Becerra*,
   2024 WL 3741402 (D.D.C. Aug. 9, 2024) ............................................................ 15

*Am. Meat Inst. v. United States Dep't of Agric.*,
   968 F. Supp. 2d 38 (D.D.C. 2013) ....................................................................... 11

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ............................................................................................. 25

*Ass'n of Am. Universities v. Dep't of Energy*,
   2025 WL 1414135 (D. Mass. May 15, 2025) ......................................................... 8

*Atterbury v. U.S. Marshals Serv.*,
   805 F.3d 398 (2d Cir. 2015) ................................................................................... 3

*Bailey v. Fed. Bureau of Prisons*,
   2024 WL 3219207 (D.D.C. June 28, 2024) ......................................................... 15

*Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984) ............................................................................................... 8

*Board of Education v. Pico*,
   457 U.S. 853 (1982) ................................................................................. 15, 16, 17

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) ............................................................................................... 4

*C.G.B. v. Wolf*,
    464 F. Supp. 3d 174 (D.D.C. 2020) ...................................................................... 13

*California v. Dep't of Educ.*,
    132 F.4th 92 (1st Cir. 2025) ................................................................................... 8

*California v. DOE*,
    2025 WL 760825 (D. Mass. Mar. 10, 2025) .......................................................... 4

*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ............................................................................. 23

*Chi. Women in Trades v. Trump*,
    2025 WL 1331743 (N.D. Ill. May 7, 2025) .......................................................... 23

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ............................................................................................... 7

*City of New Haven v. United States*,
    809 F.2d 900 (D.C. Cir. 1987) ............................................................................. 22

*Climate United Fund v. Citibank, NA.*,
    2025 WL 1131412 (D.D.C. Apr. 16, 2025) .......................................................... 15

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ............................................................................................. 24

*Crowley Gov't Servs. v. GSA*,
    38 F.4th 1099 (D.C. Cir. 2022) ............................................................................. 3

*Dalton v. Specter*,
    511 U.S. 462 (1994) ...................................................................................... 22, 23

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ............................................................................................... 7

*DOE v. California*,
    145 S. Ct. 966 (2025) ............................................................................................. 4

*Doe v. Musk*,
    2025 WL 840574 (D. Md. Mar. 18, 2025) .......................................................... 23

*DSE, Inc. v. United States*,
    169 F.3d 21 (D.C. Cir. 1999) ............................................................................... 15

*Gallagher v. New York State Bd. of Elections*,
    477 F. Supp. 3d 19 (S.D.N.Y. 2020) ..................................................................... 6

*Greater Chautauqua Fed. Credit Union v. Quattrone*,
  2023 WL 6037949 (S.D.N.Y. Sept. 15, 2023) ........................................................ 14

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) ............................................................ 23, 24

*J.W. Hampton, Jr., & Co. v. United States*,
  276 U.S. 394 (1928) ...................................................................... 21

*Kelly v. Evolution Mkts., Inc.*,
  626 F. Supp. 2d 364 (S.D.N.Y. 2009) ...................................................... 9

*Kusper v. Pontikes*,
  414 U.S. 51 (1973) ........................................................................ 16

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) ...................................................................... 25

*LeBlanc v. United States*,
  50 F.3d 1025 (Fed. Cir. 1995) ............................................................ 6

*Legal Servs. Corp. v. Velazquez*,
  531 U.S. 533 (2001) ...................................................................... 17

*Martin Luther King, Jr. Cty. v. Turner*,
  2025 WL 1582368 (W.D. Wash. June 3, 2025) .......................................... 4

*Maryland v. Corp. for Nat'l & Cmty. Serv.*,
  2025 WL 1585051 (D. Md. June 5, 2025) ................................................ 7

*Mass. Dep't of Educ. v. United States Dep't of Educ.*,
  837 F.2d 536 (1st Cir. 1988) .............................................................. 20

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ........................................................ 2, 3

*Nat'l Council of Nonprofits v. OMB*,
  2025 WL 597959 (D.D.C. Feb. 25, 2025) .............................................. 15

*Nat'l Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998) ...................................................................... 18

*Nat'l Urban League v. Trump*,
  2025 WL 1275613 (D.D.C. May 2, 2025) .............................................. 18

*New Mexico v. Musk*,
  2025 WL 1502747 (D.D.C. May 27, 2025) ............................................ 25

*New York v. Trump*,
    133 F.4th 51 (1st Cir. 2025) ............................................................................. 7, 22

*New York v. Trump*,
    2025 WL 715621 (D.R.I. Mar. 6, 2025) ................................................................ 9

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................................... 12, 14

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
    502 F. Supp. 3d 492 (D.D.C. 2020) .................................................................. 15

*Pennsylvania v. Weinberger*,
    367 F. Supp. 1378 (D.D.C. 1973) ..................................................................... 21

*Perry Capital LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ........................................................................... 3

*PFLAG, Inc. v. Trump*,
    2025 WL 685124 (D. Md. Mar. 4, 2025) ........................................................... 24

*Pol'y & Rsch., LLC v. HHS*,
    313 F. Supp. 3d 62 (D.D.C. 2018) ...................................................................... 8

*Pres. Gardens Assocs. v. United States*,
    175 F.3d 132 (2d Cir. 1999) ............................................................................... 2

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) ........................................................................ 11, 12

*Rodriguez v. Carson*,
    401 F. Supp. 3d 465, (S.D.N.Y. 2019) ............................................................... 2

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ......................................................................................... 17

*Shurtleff v. City of Bos.*,
    596 U.S. 243 (2022) ......................................................................................... 17

*Thompson v. Cherokee Nation*,
    334 F.3d 1075 (Fed. Cir. 2003) ........................................................................ 20

*Train v. New York*,
    420 U.S. 35 (1975) ........................................................................................... 20

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
    665 F.3d 1339 (D.C. Cir. 2012) ........................................................................ 20

*Webster v. Doe*,
   468 U.S. 592 (1988) ................................................................................................ 5

*Woonasquatucket River Watershed Council v. USDA*,
   2025 WL 1116157 (D.R.I. Apr. 15, 2025) ............................................................... 8

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) .............................................................................................. 24

**Statutes**

2 U.S.C. § 687 ............................................................................................................ 8

20 U.S.C. § 1225(b)(1) ............................................................................................. 20

20 U.S.C. § 951 ..................................................................................................... 1, 13

20 U.S.C. § 956 ......................................................................................................... 18

5 U.S.C. § 701(a)(1) ................................................................................................... 8

Pub. L. 118-42, 138 Stat. 25 (Mar. 9, 2024) ...................................................... 19, 20

Pub. L. 119-4, 139 Stat. 9 (Mar. 10, 2025) ........................................................ 19, 20

**Other Authorities**

2 Newberg and Rubenstein on Class Actions § 4:30 (6th ed.) .................................. 6

**Rules**

Fed. R. Civ. P. 8(d)(2) .............................................................................................. 25

**Regulations**

2 C.F.R. § 200.340 ..................................................................................................... 8

**INTRODUCTION**

Defendants' filings confirm the lawlessness of their actions. Across two briefs and 43 pages of argument, Defendants never dispute that they acted arbitrarily and capriciously when they terminated nearly 1,500 grants *en masse* without a modicum of individualized review or reasoned analysis. Defendants therefore concede for purposes of the preliminary-injunction test that Plaintiffs are likely to succeed on the merits. The other factors likewise favor injunctive relief, as Defendants' actions are harming Plaintiffs and the public—cutting off time-sensitive research opportunities, scaling back scholarly agendas, derailing professional advancement opportunities, and depriving the public of critical scholarship that NEH itself recognized would "encourage[] and support [] national progress and scholarship in the humanities." 20 U.S.C. § 951(2).

None of Defendants' grab bag of threshold arguments save it. The same Tucker Act arguments have been repeatedly rejected in cases involving similar mass grant terminations, and Defendants ignore the features of this case that dictate the same result here: this case involves grants rather than contracts; it alleges violations of statutes and regulations rather than contract terms; and it seeks injunctive and equitable relief rather than money damages. The government's other threshold arguments are weaker still. Most of them relate only to the *ACLS* action, which challenges things other than grant terminations, and the arguments that apply to this case have no merit. Defendants' arguments for dismissal of Plaintiffs' non-APA claims fare no better, as they mischaracterize Plaintiffs' arguments, ignore controlling authority, and rely on sweeping propositions with no support in logic or law. The motion to dismiss should be denied and the preliminary injunction granted.

**ARGUMENT**

## I.    This Court Has Jurisdiction.

### A.    This Court Has Jurisdiction Over Plaintiffs' APA Claims.

Defendants' Tucker Act arguments elide the key features making this a prototypical APA suit that belongs in district court: it involves grants, not contracts; it alleges violations of statutes and regulations, not contract terms; and it seeks injunctive and equitable relief, not money damages. The nature of the instruments, the "source of the rights," and the "relief sought" confirm this is a proper APA suit. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 966-68 (D.C. Cir. 1982).

For starters, the instruments here lack the necessary consideration to be "contracts." *See* PI Memo at 7-9. Defendants do not dispute that instruments are "contracts" for Tucker Act purposes only if they provide a "direct" benefit to the government. Plaintiffs showed that NEH grants do not provide any such "direct" benefit, *id.* at 8-9, and Defendants do not dispute this either. Indeed, other than conclusorily asserting that "the grants at issue in this case are contracts," MTD at 8, Defendants never address consideration or respond to Plaintiffs' arguments. Any such argument is therefore forfeited, *Rodriguez v. Carson*, 401 F. Supp. 3d 465, 470 (S.D.N.Y. 2019), and in any event would be wrong for the reasons outlined in Plaintiffs' opening brief. In fact, Defendants themselves consistently characterize the instruments as "grants," confirming their non-contractual nature. *See, e.g.*, MTD at 6 ("Plaintiffs' claims focus on the termination of grants."). Defendants cite *Pres. Gardens Assocs. v. United States*, 175 F.3d 132, 141 (2d Cir. 1999), for the proposition that "any agreement can be a contract within the meaning of the Tucker Act," *id.* at 141, but that case only confirms that a prerequisite to contract status is "consideration." *Id.* Because the lack of consideration makes the instruments grants rather than contracts, the Tucker Act does not apply.

Furthermore, even when an actual "contract" is involved, the Tucker Act precludes district court jurisdiction only when the plaintiff's claim "is at its essence a contract claim." PI Memo at

9 (quoting *Megapulse*, 672 F.2d at 968). Whether this is so turns on "the source of the rights upon which the plaintiff bases its claims, and … the type of relief sought (or appropriate)." *Id.* Defendants' arguments fail on both factors.

First, Defendants' contention that "Plaintiffs' claims to the grant funds [] derive not from [] statutory authorities, but from the grants themselves," MTD at 7, misses the mark. The relevant question is about "the source of the rights" that provide the cause of action, not the source of the parties' underlying relationship. *Megapulse*, 672 F.2d at 968; *accord Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 407 (2d Cir. 2015); *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017). In *Atterbury*, for example, the plaintiff claimed the government "acted arbitrarily and capriciously by terminating his employment." *Id.* at 401. The Second Circuit rejected a Tucker Act argument, holding that the "source of the rights [the plaintiff] is asserting" was not the underlying employment agreement, but the APA and the Due Process Clause. *Id.* at 406-09. Likewise here, Plaintiffs allege that Defendants violated the APA, the Impoundment Control Act, the NEH's organic statute, and the First Amendment, not the terms of any grant. Whether Defendants violated those statutes and provisions are "not questions the district court can answer by examining a contractual promise." *Crowley Gov't Servs. v. GSA*, 38 F.4th 1099, 1109 (D.C. Cir. 2022).

Second, Defendants' argument that Plaintiffs seek "specific performance of the grant agreements" is also meritless. MTD at 8. Plaintiffs seek to enjoin Defendants from giving effect to the concededly arbitrary Mass Termination, not specific performance of any grant. *See* Mot. for PI at 1 (requesting order "enjoining Defendants from enforcing or giving effect to the mass termination notices"). Setting aside unlawful agency action is the quintessential APA remedy, not a contract remedy. The government will remain free to terminate grants on any lawful grounds that might exist. *See id.* (requesting order enjoining future action only to the extent such action is "contrary to statute, regulations, and the Constitution").

3

Defendants also ignore Plaintiffs' argument that district court jurisdiction is proper because "the doubtful and limited relief available in the Claims Court is not an adequate substitute for review in the District Court" given the nonmonetary harms Plaintiffs allege. PI Memo at 11 (quoting *Bowen*, 487 U.S. at 901). For this reason too, district court jurisdiction is proper. *Id.*; *see, e.g.*, *Am. Fed'n of Gov't Emps. v. O.P.M.*, 2025 WL 996542, at *18 (S.D.N.Y. Apr. 3, 2025).

Defendants rely heavily on *DOE v. California*, but they fail to address the distinctions between that case and this one. As the government itself emphasized in its *California* briefing, the *California* plaintiffs "alleged a breach of the grant agreements by the government"—a theory Plaintiffs do not pursue here. Application at 14, *DOE v. California*, 145 S. Ct. 966 (2025), 2025 WL 945313; *see also California v. DOE*, 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025) (district court order enjoining government from "terminating" grants except as consistent with "the grant terms and conditions"). Furthermore, as Defendants' brief acknowledges, *California* held only that "the District Court lacked jurisdiction *to order the payment of money*." MTD at 6 (quoting *California*, 145 S. Ct. at 968) (emphasis added). Here, Plaintiffs do not request "the payment of money," but only declaratory and injunctive relief. Accordingly, *California*'s narrow holding that the APA does not grant district courts jurisdiction "to enforce a contractual obligation to pay money," *DOE*, 145 S. Ct. at 968, is doubly inapplicable. *See* PI Memo at 10-11.

After *California*, courts have repeatedly rejected the government's similar attempts to overread the Supreme Court's narrow decision. *See* PI Memo at 6-7. Plaintiffs' brief cited nine such cases holding that the Supreme Court's emergency-docket ruling did not broadly eliminate district court jurisdiction over APA challenges to grant terminations. *Id.*; *see also Martin Luther King, Jr. Cty. v. Turner*, 2025 WL 1582368, at *14 (W.D. Wash. June 3, 2025). Defendants respond to exactly zero of those cases, never arguing that they are distinguishable and offering no reason why this Court should not follow them. Instead, Defendants misleadingly state that "[a]

4

panel of the D.C. Circuit recently came to the same conclusion [as the *California* court] in *Widakuswara v. Lake*," acknowledging only in a footnote that the *en banc* court *vacated* that order and ruled that the government "has not made the requisite strong showing of a likelihood of success" on its Tucker Act argument—the same argument it makes here. MTD at 6-7 n.2.

The mass termination of nearly 1,500 grants via form letters without individualized review represents quintessential agency action subject to APA review, not a contract dispute. These are, in essence, APA claims; they belong in this Court.

**B.    This Court Has Jurisdiction Over Plaintiffs' Non-APA Claims.**

Defendants offer no unique jurisdictional arguments with respect to Plaintiffs' non-APA claims, asserting only that they "should be heard in the Court of Federal Claims" for the same reasons as the APA claims. MTD at 9. That argument is flawed three times over. First, as just explained, Plaintiffs' APA claims are properly in this Court. Second, Defendants' argument is a non-sequitur. The premise of Defendants' argument is that the Tucker Act impliedly limits the APA's sovereign immunity waiver. But Plaintiffs' non-APA claims do not rely on the APA's sovereign immunity waiver; they proceed under the *Larson-Dugan* doctrine, pursuant to which officials have no sovereign immunity from suits to enjoin them from exceeding constitutional or statutory mandates. *See* PI Memo at 11-12. Defendants do not address *Larson-Dugan* or attempt to show why it would not apply here. The only case they cite, *see* MTD at 9, addressed only APA claims; it lends no support to divesting district courts of jurisdiction over non-APA claims.

Third, with respect to Plaintiffs' constitutional claims, Defendants' argument would leave Plaintiffs with no judicial forum in which to pursue those claims—a result that would likely be unconstitutional and cannot be inferred absent a clear statement. Under *Webster v. Doe*, 468 U.S. 592 (1988), courts may not read a federal statute to preclude all judicial review of constitutional claims absent a "clear" statement from Congress. *Id.* at 603. Here, it is well-established that the

5

Court of Federal Claims would lack jurisdiction to decide Plaintiffs' constitutional claims, *see generally LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995), and Defendants do not identify any clear statement or express jurisdiction-stripping provision.

### C.    Defendants' Standing Argument Is Meritless.

Defendants argue that Plaintiffs lack "standing" to challenge anything but "the termination of their own grants." MTD at 11-15. This argument is principally directed at claims relating to the mass firing of NEH employees, which Plaintiffs in this case do not bring (the *ACLS* Plaintiffs do). To the extent Defendants argue that the Court may grant preliminary injunctive relief only with respect to the named Plaintiffs' grant terminations, and not with respect to other grantees subject to the Mass Termination, Defendants are wrong. Plaintiffs bring their claims as a proposed class action, on behalf of all grantees and subrecipients whose funding was terminated in the Mass Termination. *See* Am. Compl. ¶¶ 135-143. It is well-established that courts may grant preliminary injunctive relief on behalf of a proposed class, as the Supreme Court did less than a month ago. *See A.A.R.P. v. Trump*, 145 S. Ct. 1364 (2025) (granting preliminary classwide relief and noting that "courts may issue temporary relief to a putative class"); *see also Gallagher v. New York State Bd. of Elections*, 477 F. Supp. 3d 19, 39 (S.D.N.Y. 2020) ("[T]he Court need not formally certify a class in order to issue the requested preliminary relief."); 2 Newberg and Rubenstein on Class Actions § 4:30 (6th ed.) ("The absence of formal certification is no barrier to classwide preliminary injunctive relief.").

## II.    Plaintiffs' APA Claims Are Reviewable.

### A.    Plaintiffs Challenge Discrete Agency Action.

Defendants argue that the APA prohibits review here because "Plaintiffs challenge a collection of personnel actions, programmatic activities, and funding delays or pauses." MTD at 16-17. This argument appears directed primarily at the *ACLS* Plaintiffs. While Plaintiffs here

*described* Defendants' wholesale "'dismantling' of the NEH," MTD at 17 (citing Am. Compl. ¶¶ 116-23), the claims in this action are based only on the Mass Termination of grants, not broader personnel actions. Defendants do not appear to argue that the Mass Termination itself was not a discrete agency action, and for good reason: The Mass Termination canceled grants *en masse*, across the course of only a couple of days, for identical, non-individualized reasons. *See* Am. Compl. ¶¶ 96-115. The Mass Termination was thus "categorical in nature" and is properly considered a discrete agency action. *Maryland v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1585051, at *12-14 (D. Md. June 5, 2025) (finding termination of grant funding and programs on the same day and for the same reason was discrete agency action); *New York v. Trump*, 133 F.4th 51, 64 (1st Cir. 2025) (finding discrete agency action because defendants' actions were "categorical in nature, rather than being based on individualized assessments").

**B.**    **The Challenged Actions Are Not Committed to Agency Discretion.**

Defendants are wrong to argue that the decision to implement the Mass Termination was "committed to agency discretion by law." MTD 18-20. This "very narrow exception" to the presumption of judicial review is limited to "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (noting that the Supreme Court has interpreted this exception "quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion'"). This is not such a case.

Most of Defendants' argument turns on the purported lack of standards governing NEH's *awarding* of grants. *See, e.g.*, MTD at 19-20 ("[T]he statute's authorization to *fund* grants encompasses broadly drawn topics and guidelines that would not provide a meaningful rubric for court review." (emphasis added)). But Plaintiffs challenge the *termination* of grants already

awarded, which, as Defendants themselves noted in the Mass Termination letters, is governed by 2 C.F.R. § 200.340. *See, e.g.*, Ex. B to Kadetsky Decl. That regulation—which lays out the reasons why a department may rescind or cancel grants—provides metrics against which the Court can adjudicate the Mass Termination's legality, as several courts have held. *See, e.g.*, *California v. Dep't of Educ.*, 132 F.4th 92, 97-98 (1st Cir. 2025) (same regulation "cabin[ed] the Department's discretion as to when it can terminate grants"), *overruled on other grounds*, 145 S. Ct. 966 (2025); *Ass'n of Am. Universities v. Dep't of Energy*, 2025 WL 1414135, at *10 & n.2 (D. Mass. May 15, 2025) (same). There is a fundamental difference between a grant applicant claiming an entitlement to funds she thinks she should win, and a grant awardee claiming that the termination of funds *already awarded* violates federal law. Plaintiffs are in the latter situation, and when an agency's discretion to terminate already-awarded funds is cabined by regulation, there is "law to apply." *See Woonasquatucket River Watershed Council v. USDA*, 2025 WL 1116157, at *16 (D.R.I. Apr. 15, 2025) ("[B]ecause the funds at issue here were already awarded to the Nonprofits, more obligations apply."); *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 75-78 (D.D.C. 2018) (K.B. Jackson, J.) (holding that agency's otherwise presumptively unreviewable decision to halt funding was reviewable under the APA because regulations cabined its termination authority).

### C.    The Impoundment Control Act Does Not Preclude Judicial Review.

Defendants argue that "APA review is not available with respect to Plaintiffs' allegations that Defendants violated the Impoundment Control Act," claiming that the Comptroller General has "exclusive[]" enforcement authority under 2 U.S.C. § 687. MTD at 15-16. This argument applies to only one subpart of Count II of the Amended Complaint, and in any event is meritless. While 2 U.S.C. § 687 gives the Comptroller General some enforcement authority, nothing in that statute expressly or impliedly "preclude[s] judicial review" under the APA. 5 U.S.C. § 701(a)(1); *see Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). For that reason, another court recently

rejected an identical attempt to evade review, "declin[ing] to adopt such a narrow view of what it may consider when determining whether an agency has acted 'not in accordance with law' under the APA." *New York v. Trump*, 2025 WL 715621, at *9 n.13 (D.R.I. Mar. 6, 2025).

### III.    Plaintiffs Are Entitled To A Preliminary Injunction.

#### A.    The Government Does Not Dispute that Plaintiffs are Likely to Succeed on The Merits.

Defendants do not deny that the Mass Termination was arbitrary and capricious under the APA. *Compare* PI Memo at 12-17 (arguing that "the Mass Termination several times over runs afoul of the APA's prohibition on arbitrary and capricious agency action"), *with* MTD at 1-25 (no argument on this point), *and* PI Opp. at 1-18 (no argument on this point). Defendants have therefore conceded that Plaintiffs are likely to succeed on Count I of the Amended Complaint. The Court need not go any further to find in Plaintiffs' favor on the "likelihood of success" factor, as a movant "only needs to demonstrate a likelihood of success on the merits of one claim to warrant injunctive relief." *Kelly v. Evolution Mkts., Inc.*, 626 F. Supp. 2d 364, 376 (S.D.N.Y. 2009).

#### B.    The Mass Termination Is Inflicting Irreparable Harm.

Plaintiffs' opening brief and declarations show that the Mass Termination is causing significant, imminent, and irreparable harm: it is cutting off time-sensitive opportunities for research; blocking career advancement; interfering with contractual obligations; eliminating opportunities for publication; jeopardizing the viability of critical scholarly work; disrupting families; and more. *See* PI Memo at 22-25; Kadetsky Decl. ¶¶ 3–14; Jasperse Decl. ¶¶ 3–10; Orlando Decl. ¶¶ 5–13; Goldstein Decl. ¶¶ 3–11; Jenkins Decl. ¶¶ 4–16; Holtzman Decl. ¶¶ 8–10; Balog Decl. ¶¶ 5–12; Authors Guild Decl. ¶ 4. Defendants' various attempts to downplay the immediacy and irreparability of this harm are all unavailing.

First, the bulk of Defendants' arguments do not apply to this case, as Defendants mainly question the cognizability of harms the *ACLS* Plaintiffs allege will result from Defendants' elimination of NEH programs and mass firing of NEH staff. *See* PI Opp. at 8-10. Because Plaintiffs here do not base their claims or their harms on that conduct, those arguments do not apply.

Second, Defendants mischaracterize Plaintiffs' injuries as "primarily economic in nature." PI Opp. at 11. That characterization simply ignores Plaintiffs' declarations, which lay out in extensive detail the non-economic harms Plaintiffs are already suffering and will continue to suffer. A few examples: Katalin Balog has "to return to teaching in the fall semester …, drastically curtailing the time [she] can devote to [her] project," preventing her from attending academic conferences that would advance her work, and causing delays that will "blunt the relevance of [her] work and diminish its contribution to current debates." Balog Decl. ¶¶ 6-11. Nicole Jenkins detailed how the termination of her grant will have far-reaching consequences for her tenure application, which is set for consideration in 2026, and has massively disrupted her personal and family life. Jenkins Decl. ¶¶ 14-15. And Lee Jasperse described the "devastating" professional consequences of termination, forcing him to "face the specter of entering the [upcoming] hiring cycle with no new or completed work to show and no grant to list, and no academic institutional affiliation to cushion the blow." Jasperse Decl. ¶ 9. These personal and professional harms are plainly non-economic and support entry of a preliminary injunction. *See* PI Memo at 22-25.

Defendants eventually concede that "harm [to] careers, including through the potential loss of good will in the academic community, … constitute irreparable harm" but claim that Plaintiffs' declarations are "conclusory and speculative." PI Opp. at 12. Defendants either did not read the declarations or are misrepresenting them. Plaintiffs' declarations extensively detail the projects for which they received grants, the actions they took in reliance on the grants, their research plans for the grant periods, the benefits the grants would deliver, and the ways in which termination would

undo those benefits and inflict egregious professional and personal harm. The declarations explain tenure processes, academic requirements, publication schedules, specific research opportunities, and more. They do not simply assert irreparable harm; they demonstrate it in detail.

Defendants argue that Plaintiffs' alleged harms are invalid because they "rel[y] on independent variables concerning both the projects at issue and their careers generally." PI Opp. at 12. This is wrong on the facts and the law. The harms result directly from grant terminations. It is those terminations that stripped them of the prestige and credential of an NEH grant and forced them to uproot their lives, abandon their research plans, alter their publication schedules, re-conceptualize or abandon book projects, and so on. Unlike the case Defendants cite, these consequences are not contingent on broad economic predictions about how an entire industry may react to new regulations. *Am. Meat Inst. v. United States Dep't of Agric.*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013). They are the direct effects of Defendants' termination of grants around which Plaintiffs had structured their research projects and academic paths. At any rate, Defendants' suggestion that irreparable harm cannot depend on "independent variables" is overstated. Defendants themselves acknowledge that "loss of reputation and goodwill may constitute irreparable harm," PI Opp. at 12, and those harms inherently depend on the reactions of others.

Finally, in addition to the personal and professional consequences detailed above, Plaintiffs will suffer economic harms that support injunctive relief. The general rule that economic harms are not "irreparable" applies only when monetary damages are quantifiable. As Defendants' own case explains, "injunctive relief is appropriate where it would be very difficult to calculate monetary damages that would successfully redress the loss." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (cited at PI Opp. at 12). Here, Plaintiffs will suffer consequential economic harms that would be "very difficult to calculate." *Id.* There are unquestionable financial consequences when an author's delayed book publication "diminish[es] its contribution to current

11

debates" and its relevance in the marketplace, Balog Decl. ¶ 11, when an author is forced to "scal[e] back elements of the book" that might have generated additional sales, Goldstein Decl. ¶ 11, when cancelled fellowships alter a young scholar's professional trajectory, Jasperse Decl. ¶¶ 6-9, or when lost research opportunities eliminate lines of inquiry that could have anchored follow-up scholarship, Orlando Decl. ¶¶ 8-10. Those harms, however, are not quantifiable, making it "impossible to estimate with any precision the amount of the monetary loss which has resulted," *Register.com*, 356 F.3d at 404, and making injunctive relief appropriate.

### C. The Balance Of Equities And The Public Interest Overwhelmingly Favor Relief.

The balance of the equities and public interest overwhelmingly favor an injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (factors "merge when the Government is the opposing party"). The Mass Termination will inflict significant harm on Plaintiffs and deprive the public of its access to scholarship and new ideas that NEH itself determined would bolster democracy, further educational endeavors, and celebrate the country's cultural heritage. PI Memo at 25-26.

Defendants contend that an injunction would "disrupt NEH's efforts to implement the President's directives while complying with the agency's statutory obligations." PI Opp. at 14. The premise of that argument, however, is wrong: as Defendants have conceded for purposes of this motion, NEH *did not* "comply[] with the agency's statutory obligations" in implementing the Mass Termination. NEH next claims that Plaintiffs ask the Court to "direct NEH as to which grants it may legally terminate and which grants it may legally fund." PI Opp. at 14. That is also wrong. Plaintiffs seek an injunction against the Mass Termination, which purported to terminate grants in violation of federal law. Nothing about such an injunction would prevent NEH from funding (or not funding) whichever grants it deems most meritorious (or non-meritorious), as long as it does so through a lawful process. "It is well established that the Government cannot suffer harm from

an injunction that merely ends an unlawful practice," *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020), and that is all an injunction here would do.

Defendants argue that an injunction "could irreparably harm the public fisc," PI Opp. at 15, but the funds will not just disappear if they are distributed to grantees: they will support the very scholarly works that NEH itself deemed meritorious and in the public interest when it awarded the grants in the first place. NEH's expert-led review process determined that awarding grant money to Plaintiffs and the proposed class members would *benefit* the public interest and "contribute to public support and confidence in the use of taxpayer funds." 20 U.S.C. § 951(5). The Court should reject Defendants' attempt to now argue the exact opposite—that allowing the money to sit unspent is better for the public—especially given Defendants' concession that the process that led to this about-face was arbitrary and capricious.

Finally, as for the argument that the Court should ignore conceded APA violations because of NEH's supposed "discretion to … terminate a grant award if it no longer effectuates … agency priorities," PI Opp. at 14-15, it is hard to imagine a proposition more at odds with our separation of powers than the claim that courts should withhold relief for conceded violations of the APA because the Executive Branch believes its violations will serve agency priorities.

**D.    The Court Should Enjoin the Mass Termination in Its Entirety And Should Not Grant A Stay or Require A Bond.**

Defendants' attempts to limit the scope or effectiveness of an injunction should be rejected. First, Defendants argue that "any preliminary injunction should be carefully tailored to apply only to the named *Authors Guild* Plaintiffs, and not to all members of the classes … , because no class has been certified to date." PI Opp at 17. The one case they cite, however, only confirms what Plaintiffs explained above—that preliminary injunctive relief on behalf of a class is appropriate even before class certification. *See supra* Part I.C. In the case Defendants cite, *Greater*

13

*Chautauqua Fed. Credit Union v. Quattrone*, 2023 WL 6037949 (S.D.N.Y. Sept. 15, 2023), the court did exactly what Plaintiffs here request: it "preliminary enjoined the [] Defendants [as] to *all* [putative class members], and not just the [] named Plaintiffs." *Id.* at *4. It was only "a year and a half" later, *id.*, after the plaintiffs expressly disclaimed any intent to seek class certification, *id.* at *5, that the court narrowed its preliminary injunction to "the parties before the court," *id.* at *6. Here, in contrast, this case remains in its early stages and Plaintiffs will seek class certification at the appropriate time. Accordingly, preliminary relief for the proposed classes is appropriate.

Even setting aside the class issue, the "normal remedy" for an APA violation is to vacate the challenged agency action with respect to all affected parties, not just the plaintiffs in the case. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014); *see Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (noting that a plaintiff that "prevails on its APA claim … is entitled to relief under that statute, which normally will be a vacatur of the agency's order"). Here, Defendants concede that the Mass Termination violated the APA; the "normal remedy" for that violation would set aside the illegal action as to all those affected.

Defendants next request that any injunction be stayed pending disposition of any future appeal. PI Opp. at 18. However, "[t]he party requesting a stay bears the burden of showing that the circumstances justify" that extraordinary relief, *Nken*, 556 U.S. at 433-34, and Defendants make no effort to satisfy that burden here. Regardless, if the Court concludes that Plaintiffs have met their burden to obtain injunctive relief, it could not conclude that the government can carry its burden to obtain a stay. Stays, moreover, are meant to preserve the status quo. Here, the status quo that should be preserved is the status quo that was in place before Defendants cast aside NEH's longstanding merit-based grantmaking process and terminated grants through their own concededly arbitrary and capricious "process."

14

The court should also reject the government's request for a bond. Courts have "broad discretion … to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020). Courts agree that a bond is inappropriate "where the government is alleged to have unlawfully withheld [millions] of dollars of previously committed funds," as "it would defy logic … to hold Plaintiffs hostage for the resulting harm." *Nat'l Council of Nonprofits v. OMB*, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025); *see also Climate United Fund v. Citibank, NA.*, 2025 WL 1131412, at *21 (D.D.C. Apr. 16, 2025) ("Requiring a bond in this context makes little sense."); *Am. First Legal Found. v. Becerra*, 2024 WL 3741402, at *16 n.11 (D.D.C. Aug. 9, 2024); *Bailey v. Fed. Bureau of Prisons*, 2024 WL 3219207, at *13 n.5 (D.D.C. June 28, 2024). Unsurprisingly, Defendants cite no cases in support of their argument and make no showing that a bond would be appropriate in the circumstances here. Defendant's request also rests on the false premise that "preliminary relief would potentially mandate that the Executive spend money." PI Opp. at 18. As discussed in the context of jurisdiction, an injunction would merely prohibit Defendants from giving effect to the Mass Termination; any requirement to spend money thereafter would arise from the grants, the Impoundment Control Act, and the Constitution—not the injunction.

## IV. The Amended Complaint States Claims For Relief on All Other Counts.

### A. Plaintiffs Plausibly Allege A First Amendment Violation.

Defendants argue that Plaintiffs' First Amendment claim should be dismissed because Plaintiffs do not identify the specific viewpoints Defendants favored or disfavored. MTD at 22-23. Defendants are wrong on the law and the facts. Plaintiffs' burden is to allege that the government's motivation was viewpoint-based; the specific viewpoint at issue is not an element of the claim. *Board of Education v. Pico*, 457 U.S. 853, 871 (1982) (plurality op.). In *Pico*, for

example, the plaintiffs adequately supported their claim of viewpoint discrimination with evidence that defendants removed books from a public library "based on [defendants'] personal values, morals and tastes" rather than neutral criteria. *Id.* at 872. Plaintiffs were not required to identify any specific viewpoints; it was enough that defendants were plausibly motivated by "disagreement with constitutionally protected ideas in those books." *Id.* at 875.

In all events, Plaintiffs do identify the relevant viewpoints. Defendants said them out loud, repeatedly. Defendants informed NEH staff that they would terminate grants inconsistent with the Trump Administration's views on "K-12 education, gender ideology, and DEI," PI Memo at 19; they stated in the termination letters that they were acting in accordance with executive orders expressing the Administration's views on those same topics, *id.*; they wrote on NEH's website that they terminated awards at variance with agency views on "diversity, equity, and inclusion, and environmental justice," *id.* at 20; and they specifically solicited new projects promoting viewpoints they favored, *id.* Defendants are also wrong in suggesting, *see* MTD at 23, that it would not be viewpoint discrimination if they terminated grants based on the grantees' association with the Biden Administration: "The right to associate with the political party of one's choice is an integral part of [] basic constitutional freedom." *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973).

Plaintiffs alleged ample factual detail to raise an inference that Defendants acted based on viewpoint rather than neutral criteria. Plaintiffs alleged—and Defendants do not dispute—that "Defendants eschewed the expert-guided process by which NEH typically acts, choosing instead to terminate grants *en masse* without expert guidance." Am. Compl. ¶ 151; *see also id.* ¶ 108. Plaintiffs further allege that after discarding the viewpoint-neutral criteria that typically govern NEH grantmaking, Defendants used their own viewpoint-based criteria for terminating grants. *See, e.g.*, *id.* ¶¶ 64, 72, 98,109, 181; Richard Roe Decl. ¶ 1; Lieberman Decl., Ex. D. These allegations of improper motive, paired with Defendants' conceded departures from "established, regular, and

16

facially unbiased procedures," *Pico*, 457 U.S. at 874 (plurality op.), easily raise an inference of improper viewpoint discrimination.

Defendants claim they have *carte blanche* to discriminate by invoking *Rust v. Sullivan*, 500 U.S. 173 (1991), which says that the government can "selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program." MTD at 23. But *Rust* is wholly inapplicable here—it applies only "when the government disburses public funds to private entities *to convey a governmental message*." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001) (discussing *Rust*) (emphasis added). It does not apply where, as here, the government "program was designed to facilitate private speech, not to promote a governmental message." *Id.* at 542. Accordingly, the Supreme Court has "repeatedly held" that "[w]hen the government's role is limited to applying a standard of assessment to determine a speaker's eligibility for a benefit, … ordinary First Amendment principles apply." *Shurtleff v. City of Bos.*, 596 U.S. 243, 271 (2022) (Alito, J., concurring). That describes this case to a tee: NEH's role is limited to assessing private proposals by non-governmental speakers based on each project's contributions to the humanities. When it conducts those assessments—and certainly when it abruptly decides to terminate awarded grants in an unprecedented manner— "ordinary First Amendment principles apply," including the ban on viewpoint discrimination.

Defendants next try to change the subject, invoking a separate line of cases dealing with unconstitutional funding conditions. MTD at 23-24. That doctrine is inapplicable here, as it deals with conditions on funding rather than viewpoint-based decisions about whether to revoke already-awarded funding. In any event, this doctrine likewise condemns Defendants' conduct. The unconstitutional conditions doctrine prohibits "conditions that seek to leverage funding to regulate speech outside the contours of the [federal] program." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013). Those unconstitutional conditions fall into two categories:

17

(1) conditions that are "not relevant to the objectives of the program," and (2) conditions that are relevant to the program's objectives but apply to conduct outside the government program, *i.e.*, conduct on the recipients' own "time and dime." *Id.*

Defendants' brief mentions only the second category, MTD at 23-24, but the funding condition here falls in the first category. Congress expressly enumerated NEH's objectives, including "promot[ing] progress and scholarship in the humanities," 20 U.S.C. § 956(c)(1), and "foster[ing] the interchange of information in the humanities," *id.* § 956(c)(6). While NEH could permissibly condition funding on the funded works being "scholarship in the humanities" rather than in the hard sciences, it may not discriminate against humanities scholarship solely because of the speaker's identity or perceived viewpoint, because viewpoint is "not relevant to the objectives of the program." *Agency for Int'l Dev.*, 570 U.S. at 214-15. The Amended Complaint alleges that Defendants did exactly that: Plaintiffs received their grants after a competitive, expert-led review process determined their projects would make significant contributions to the humanities; Defendants then terminated those grants not because they re-assessed each project's humanistic merit, but simply because they "believe[d] Plaintiffs' scholarship conflicts with the[ir] preferred viewpoint." Am. Compl. ¶¶ 7, 176-82.

Defendants' citation to *Nat'l Urban League v. Trump*, 2025 WL 1275613 (D.D.C. May 2, 2025) does not help them. As Plaintiffs explained in their opening brief, PI Memo at 21 n.7, that case involved a facial challenge to executive orders, requiring those plaintiffs to show the orders were unconstitutional in all or most applications. The court rejected that challenge but expressly "reserve[d] judgment on the merits of any as-applied challenges." *Id.* at *26. Here, Plaintiffs are not challenging the executive orders, or even their application. Instead, the executive orders simply provide evidence that Defendants used the Mass Termination "to suppress the expression of particular ideas or viewpoints." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998).

**B.**  **Plaintiffs Plausibly Allege Violations of the 2024 Appropriations Act and the 2025 Continuing Resolution.**

Plaintiffs allege that Defendants have refused to spend monies Congress appropriated for fiscal years 2024 and 2025 in the Consolidated Appropriations Act, 2024, and the Full-Year Continuing Appropriations and Extensions Act, 2025. Am. Compl. ¶¶ 53-55, 157-67. While Defendants do not dispute that Plaintiffs plausibly allege that Defendants withheld appropriated funding via the Mass Termination, they nevertheless argue that withholding funds could never violate the Acts because the appropriations statutes do not set a precise time limit within which they must spend the funds. Mem. at 22. Defendants misread the appropriations statutes.

The Consolidated Appropriations Act, 2024, provided appropriations for NEH "for the fiscal year ending September 30, 2024." Pub. L. 118-42, 138 Stat. 25 (Mar. 9, 2024) ("the 2024 Appropriations Act"). It directed that, for that fiscal year, $192,000,000 "shall be available for support of activities in the humanities, pursuant to section [956(c)] of the Act and for administering the functions of the Act." *Id*. 138 Stat. 25, 281-82. Section 956(c) is the provision of NEH's organic statute that articulates the purposes for which the NEH Chairperson may issue grants or enter into other arrangements. *See* Am. Compl. ¶ 37. The Full-Year Continuing Appropriations and Extensions Act, 2025, appropriated $192,000,000 for the same purpose and with the same conditions for fiscal year 2025. Pub. L. 119-4, 139 Stat. 9, 10-11 §§ 1101(a)(7), 1102-09 (Mar. 10, 2025) ("the 2025 Continuing Resolution") ("collectively, the Appropriations Acts").

Despite the clear, mandatory language that the funds "shall" be available to support NEH activities in specific fiscal years, Defendants invoke a provision of the 2024 Appropriations Act that states the funds will "remain available until expended." Pub. L. 118-42, 138 Stat. 25, 281. But this language is regularly interpreted by courts to be nothing more than a carryover provision, allowing unexpended funds to be spent for the same purpose in the following fiscal year. *See, e.g.*,

19

*Thompson v. Cherokee Nation*, 334 F.3d 1075, 1090 (Fed. Cir. 2003) ("The phrase 'shall remain available' is a term of art in appropriations legislation that our sister circuits have consistently interpreted … as an authorization of 'carryover authority,' indicating that unexpended funds 'shall remain available' for the same purpose during the succeeding fiscal year."); *Mass. Dep't of Educ. v. United States Dep't of Educ.*, 837 F.2d 536, 538-39 (1st Cir. 1988) (interpreting 'shall remain available' language in 20 U.S.C. § 1225(b)(1) as preserving unexpended funds to state agencies for obligation and expenditure during the succeeding fiscal year).

As the Supreme Court has recognized elsewhere, such flexibility is perfectly consistent with requiring executive agencies to spend all appropriated funds in one fiscal year; it is nothing more than a reflection of the nature of grant programs: if NEH does not receive a sufficient number of applications or does not award a sufficient number of grants through the regular, lawful processes, NEH may not be able to spend all the money in one year. *See Train v. New York*, 420 U.S. 35, 43-44 (1975) (finding a similar provision only "reflects the realistic possibility that approved applications for grants from funds already allotted would not total the maximum amount authorized to be appropriated").

Defendants, on the other hand, advance a reading of this carryover provision that would, first, render the direction in the 2024 Appropriations Act and the 2025 Continuing Resolution that the funds are appropriated *for* fiscal years 2024 and 2025 meaningless, and second, allow the Executive to indefinitely sit on appropriated funds and spend them only when the Executive determines appropriate. But it is part of Congress's core powers to decide whether to spend money and when to spend it. *See U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346, (D.C. Cir. 2012) (Kavanaugh, J.) (Congress has "exclusive power over the federal purse."). Under Defendants' reading of the carryover provision, Congress has delegated that power entirely to Defendants with respect to hundreds of millions of dollars in 2024 and 2025—and billions of

dollars over NEH's history—without any requirement regarding when or whether to actually spend the money. Such a sweeping delegation would likely be unconstitutional, and there is no indication Congress intended it. *See J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928) (requiring Congress to "lay down by legislative act an intelligible principle to which the person or body authorized [to exercise the delegated authority] is directed to conform.").

Even to the extent the Appropriations Acts could be read as anything less than mandatory, Defendants' suggestion that Plaintiffs cannot state a claim would still fail. In *Pennsylvania v. Weinberger*, for example, a statute governing a federal grant program to state education departments directed that the U.S. Commissioner of Education "may" and "is authorized to" make grant awards. 367 F. Supp. 1378, 1381 (D.D.C. 1973). While acknowledging this language was not "the mandatory 'shall,'" the court found it "implicit in the statutory scheme ... that in providing the Commissioner with some discretion as to grant awards the Congress did not intend to allow him the opportunity to completely suspend or severely limit, for reasons unrelated to the program, the operations of an ongoing program reviewed, approved and fully funded by the Congress with Presidential approval. Such an approach would place administrative fiat above the law." *Id*.

For similar reasons, Defendants' claim that Plaintiffs' challenge is unripe because Defendants might still spend the appropriated funds, MTD at 14-15, fails. Plaintiffs have sufficiently alleged Defendants were required to fulfill the purposes of the NEH organic statute with appropriated funds in fiscal years 2024 and 2025 and that the Mass Termination was contrary to that requirement. *E.g.*, Am. Compl. ¶¶ 52-55, 158-61. Given the opportunity to show otherwise, Defendant McDonald instead boasts about his supposedly unbridled discretion "to terminate or rescind grant awards" and to decline "to disburse the entire [appropriated] amount in a given fiscal year." ECF No. 80, ¶¶ 9, 23. While he vaguely claims that he intends to award an unspecified number of grants for future years, he nowhere suggests he plans to spend all appropriated funds,

much less the specific funds appropriated for fiscal years 2024 and 2025. It is perfectly clear what is happening here; the Court is not required to "exhibit a naiveté from which ordinary citizens are free." *New York*, 133 F.4th at 69.

### C.    Plaintiffs Plausibly Allege a Violation of the Impoundment Control Act.

Defendants repeat the same arguments in seeking dismissal of Plaintiffs' Impoundment Control Act ("ICA") claims, again claiming that they were not required to spend the money appropriated by the Appropriations Acts. Mem. at 22. They appear to concede, therefore, that if Plaintiffs plausibly allege Defendants' withholding of funds is contrary to the Appropriations Acts then Plaintiffs have plausibly alleged ICA violations. For all the reasons just explained, Plaintiffs sufficiently alleged violations of the Appropriations Acts. The withholding of funds "designed to negate congressional budgetary policies," is what, through the ICA, Congress "was determined to forestall." *City of New Haven v. United States*, 809 F.2d 900, 908 (D.C. Cir. 1987).

### D.    Plaintiffs Plausibly Allege a Separation of Powers Violation.

Plaintiffs allege that the Mass Termination and NEH's subsequent refusal to issue grants to fulfill the purposes of the NEH's organic act usurped Congress's spending power and its power to legislate. Am. Compl. ¶¶ 168-75. Defendants make two arguments with respect to the separation-of-powers claim in Count IV of the Amended Complaint.[1] First, Defendants assert that the claim is unreviewable under *Dalton v. Specter*, 511 U.S. 462 (1994). MTD at 20-21. Second, Defendants contend that "Plaintiffs have not identified any actions taken by Defendants that violate any act of Congress." *Id*. at 21. Defendants are wrong on both fronts.

First, *Dalton* is inapplicable here. In *Dalton*, the Supreme Court held that the President's decision to close a military base under the Defense Base Closure and Realignment Act was not

---

[1] Defendants suggest that Count II of Plaintiffs' Amended Complaint raises separation-of-powers arguments, *see* MTD at 21, but it does not, *see* Am. Compl. at Count II.

reviewable as a constitutional claim because it was only a claim that he exceeded his statutory authority. 511 U.S. at 473-74. The Court's decision was based on its "interpretation of [the] Act," which "commits decisionmaking to the discretion of the President." *Id*. at 476-77. *Dalton*, therefore, "merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996). On the other hand, "*Dalton* is inapposite where the claim instead is that the presidential action … independently violates ... a statute that delegates no authority to the President." *Id*. at 1332; *see In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) (Kavanaugh, J.) (reviewing constitutionality of Executive Branch's refusal to engage in licensing process required by statute).

Here, Plaintiffs do not allege that Defendants exceeded specific authority delegated to them by Congress. To the contrary, Plaintiffs allege that Defendants exercised authority they never had by attempting to usurp the congressional spending and lawmaking power. *See, e.g.*, Am. Compl. ¶ 172 (alleging the Mass Termination "precluded NEH from carrying out its statutory functions"); *id*. ¶ 174 (alleging "Defendants' decisions to delay spending and outright refuse to spend the amounts Congress appropriated violates Congress's power of the purse and the separation of powers"). Where similar allegations are at issue, courts have routinely rejected *Dalton*'s application and found separation-of-powers claims reviewable—including in many cases challenging the current Administration's actions. *See, e.g., Chi. Women in Trades v. Trump*, 2025 WL 1331743, at *2-4 (N.D. Ill. May 7, 2025) (challenge to cancellation of grants as violation of appropriations statute and Spending Clause reviewable as separation-of-powers claim); *Doe v. Musk*, 2025 WL 840574, at *23-26 (D. Md. Mar. 18, 2025) (challenge to dismantling USAID as violation of enabling statute reviewable as separation-of-powers claim); *AIDS Vaccine Advoc.*

*Coal. v. United States Dep't of State*, 2025 WL 752378, at \*17 n.17 (D.D.C. Mar. 10, 2025) (challenge to cancellation of foreign aid funding reviewable as separation-of-powers claim); *PFLAG, Inc. v. Trump*, 2025 WL 685124, at \*10-12 (D. Md. Mar. 4, 2025) (challenge to orders placing conditions on government funding reviewable as separation-of-powers claim).

Second, Defendants' assertion that Plaintiffs have not plausibly alleged a violation of any statute is incorrect. As an initial matter, Plaintiffs' separation-of-powers claim is not limited to statutory violations, but is also founded on Defendants' usurpation of Congress's Spending Clause power and its power to make laws. Am. Compl. ¶ 174. Moreover, by violating the Appropriations Acts and ICA, "the President takes measures incompatible with the expressed or implied will of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Accordingly, "his power is at its lowest ebb," and "he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* Defendants have no independent spending power on which to rely and no power to refuse to carry out duly enacted laws. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."); *Aiken*, 725 F.3d at 261 n.1 ("[T]he President does not have unilateral authority to refuse to spend the funds.").

### E.    Plaintiffs Properly Allege *Ultra Vires* Claims.

Defendants assert that Counts III, IV, V, and VI should be dismissed because Plaintiffs' allegations are insufficient to support *ultra vires* claims. MTD at 25. With respect to Counts IV and V, Defendants argue that constitutional challenges cannot be brought as *ultra vires* claims. *Id.* This is nothing but a quibble with the Amended Complaint's headings. Those headings describe Counts IV and V as "Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions." Am. Compl. at 54-55. There is no dispute that Plaintiffs may bring an implied right of action to

vindicate their constitutional rights, and likewise no dispute that courts have power to enjoin constitutional violations by federal officials. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Accordingly, even if Defendants were correct that Counts IV and V cannot *also* be pursued as "*ultra vires*" claims, that would not provide any basis to dismiss them, as they can undoubtedly be pursued regardless. *See generally* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim … alternatively or hypothetically … in a single count.").

Defendants' arguments about the *ultra vires* claims in Counts III and VI fail too. Defendants claim "specific statutes provide remedies for parties to challenge grant terminations" and so *ultra vires* claims are unavailable. MTD at 25. As relevant to this case, Defendant appears to be referring to the Tucker Act, but as explained *supra* Part I.A, that statute does not apply here. Defendant also suggests that Plaintiffs could seek review directly under the ICA, MTD at 25, but that statute has no private right of action. Defendants next claim that "an officer may be said to act *ultra vires* 'only when he acts without any authority whatever,'" MTD at 25, failing to recognize that this is exactly what Plaintiffs allege—*i.e.*, that Defendants acted without authority by illegally withholding grant funding and that DOGE has no congressionally conferred authority to terminate NEH grants. Am. Compl. ¶¶ 163-67, 183-89; *see La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act … unless and until Congress confers power upon it."). This is sufficient to plausibly allege that the individual Defendants' actions were *ultra vires*. *See New Mexico v. Musk*, 2025 WL 1502747, at *18 (D.D.C. May 27, 2025) (denying motion to dismiss *ultra vires* claim alleging DOGE acting in excess of authority).

## CONCLUSION

The Court should deny the motion to dismiss and issue a preliminary injunction.

Respectfully submitted,


By:    */s/ Jamie Crooks*
Jamie Crooks (*pro hac vice*)
Michael Lieberman (*pro hac vice*)
Amanda R. Vaughn (*pro hac vice*)
Yinka Onayemi
FAIRMARK PARTNERS, LLP
400 7th Street, NW, Suite 304
Washington, DC 20004
Tel: 619.507.4182
jamie@fairmarklaw.com
michael@fairmarklaw.com
amanda@fairmarklaw.com
yinka@fairmarklaw.com

*Attorneys for Plaintiffs and the Proposed Classes*


Dated:  June 13, 2025

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 7.1

I hereby certify that this Omnibus Reply In Support Of Plaintiffs' Motion For Preliminary Injunction And Opposition To Defendants' Motion To Dismiss complies with Local Civil Rule 7.1. The brief is no longer than 25 pages, in compliance with the Court's Order of June 6, 2025. ECF No. 84. Per Local Rule 7.1, this count does not include the caption, table of contents, table of authorities, signature block, or this certification.

Signed this 13th day of June, 2025.

/s/ *Jamie Crooks*
Jamie Crooks

27