# Exhibit 14

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE AUTHORS GUILD, WILLIAM GOLDSTEIN, ELIZABETH KADETSKY, VALERIE ORLANDO, KATALIN BALOG, BENJAMIN HOLTZMAN, LEE JASPERSE, and NICOLE JENKINS, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>    v.<br><br>NATIONAL ENDOWMENT FOR THE HUMANITIES, et al.,<br><br>            Defendants. | Case No. 1:25-cv-03923<br><br>Consolidated with No. 1:25-cv-03657 |

**PLAINTIFFS' FIRST REQUESTS FOR ADMISSION**

Pursuant to Federal Rules of Civil Procedure 26 and 36, Plaintiffs The Authors Guild, et al., by and through their undersigned counsel, request that Defendants separately respond to the following requests for admission ("Requests") within fourteen (14) days.

## **DEFINITIONS**

1. "Agency" means any department, office, bureau, division, commission, board, or other component or subdivision of the United States Government, whether permanent or temporary, formal or informal.

2. "Algorithm" means any set of coded or non-coded instructions, rules, or computational procedures used to process data, generate outputs, make recommendations, or otherwise guide decision-making, including but not limited to those used in Artificial Intelligence, machine learning, or automated text tools.

3. "Artificial Intelligence" means any software, program, system, or tool, whether commercial, open-source, or proprietary, that uses Algorithms, machine learning, neural networks, language learning models, or other computational methods to generate, analyze, predict, classify, summarize, or otherwise process text, images, data, or decisions.

4. "Communication" means any transmission of information by any means, including but not limited to written correspondence, electronic mail, text message, Signal, WhatsApp, other encrypted messaging applications, instant message, social media message, telephone call, voicemail, in-person conversation, teleconference, videoconference, or meeting, and includes but is not limited to drafts, notes, transcripts, minutes, and recordings of same.

5. "Criteria" means any standards, benchmarks, metrics, guidelines, rules, requirements, factors, or considerations used to evaluate, analyze, review, or decide upon any action, policy, program, or determination, whether written or unwritten.

6. "Data" means any information, numbers, text, statistics, figures, files, documents, code, or other recorded material, whether raw, processed, structured, or unstructured, recorded in any medium including physical or digital.

7. "Disciplined" means subjected to any form of reprimand, sanction, corrective action, adverse employment consequence, or penalty, formal or informal, oral or written.

8. "Document(s)" means the broadest possible sense of the term under Federal Rule of Civil Procedure 34(a), and includes, without limitation, the original (or identical duplicate when the original is not available) and all non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notation, or highlighting of any kind) and drafts of all writings, whether handwritten, typed, printed or otherwise produced, and includes, without limitation, letters, correspondence, memoranda, legal pleadings, notes, reports, agreements, calendars, contracts, diaries, travel or expense records, summaries, records, messages or logs of telephone calls, conversations or interviews, telegrams, instant messages, text messages (SMS or other), mailgrams, facsimile transmissions (including cover sheets and confirmations), electronic mail, minutes or records of meeting, compilations, notebooks, work papers, books, pamphlets, brochures, circulars, manuals, instructions, ledgers, graphs, charts, blue prints, drawings, sketches, photographs, film and sound reproductions, tape recordings, or any other tangible materials on which there is any recording or writing of any sort. The term also includes the file, folder tabs, and/or containers and labels appended to, or associated with, any physical storage device associated with each original and/or copy of all documents requested herein.

9. "DOGE" means the United States DOGE Service and all DOGE Teams established pursuant to Executive Order 14158, including their leadership, staff, contractors, consultants, special government employees, detailees, task forces, or any other affiliated persons or entities acting or purporting to act on their behalf.

10. "Draft" means any preliminary, incomplete, or non-final version of a document, including any mark-up, edited, annotated, or redlined version.

11. "Executive Office of the President" means all components of the Executive Office of the President, including, but not limited to, the White House Office, the Office of Management and Budget, and the United States DOGE Service.

12. "Implementation" means the carrying out, execution, application, enforcement, or practice of any policy, program, interpretation, decision, or procedure.

13. "In Connection With" means relating to, concerning, regarding, reflecting, constituting, referring to, arising from, connected to, embodying, or having any logical, factual, or causal relationship with.

14. "Involved" means engaged in, consulted on, participating in, contributing to, informed of, or otherwise connected with an action, decision, program, or event.

15. "Interpretation" means any construction, understanding, explanation or application of a rule, statute, policy, criterion, guideline, or instruction, whether formal or informal.

16. "Invoke" means to cite, reference, apply, or rely upon any legal authority, including statutes, regulations, policies, executive orders, or other directives, as justification or support for an action, decision, or program.

17. "Keyword" means any term, phrase, symbol, number, or character string used in searching, analyzing, filtering, classifying, or otherwise processing documents, communications, or data, whether manually or through automated tools.

18. "Legal Authority" means any statute, regulation, executive order, policy, guideline, court decision, or other source of law.

19. "Mass Termination" means the termination, cancellation, pause, or rescission of NEH grants and awards in or around April 2025.

20. "Memorandum" means any written document, whether formal or informal, summarizing, analyzing, or communicating facts, opinions, or recommendations.

21. "NEH" means the National Endowment for the Humanities, including its leadership, staff, contractors, consultants, advisory bodies, and any persons or entities acting or purporting to act on its behalf.

22. "OMB" means the Office of Management and Budget, including its leadership, staff, contractors, consultants, and any persons or entities acting or purporting to act on its behalf.

23. "Output" means any result, product, text, data, image, classification, score, rationale, or recommendation generated by an Algorithm, Artificial Intelligence Tool, or program.

24. "Participant" means any person who attended, joined, or otherwise took part in a meeting, communication, or event, whether actively or passively.

25. "Personnel" means all employees, staff, and volunteers of the relevant organization, including, but not limited to, full-time employees, special government employees, and detailees.

26. "Program" means any software, application, or coded system, whether proprietary or open-source, that performs functions, executes Algorithms, or processes data.

27. "Redline" means any document marked with tracked changes, comments, annotations, or other indicators of edits or revisions.

28. "Recording" means the recording available at https://www.rev.com/app/transcript/NjgxMTE2MjgzOGFiYWRjZGM5NTIxYjk5ZEpYN0h BcVNYY0xJ/o/VEMwNDc3NTI1NjEz (last visited Sept. 27, 2025).

29. "Relating To" means concerning, reflecting, regarding, constituting, describing, evidencing, embodying, arising from, connected to, or having any logical or factual association with.

30. "Report" means any written, electronic, or oral account, statement, assessment, analysis, or summary, whether formal or informal.

31. "Spreadsheet(s)" means any document organized in tabular form, including, but not limited to, documents created with Microsoft Excel or Google Sheets.

32. "Tool" means any instrument, device, application or system, including but not limited to Artificial Intelligence, machine learning, Algorithms, or automated text analysis systems, whether commercial, proprietary, or open-source.

33. "You" or "Your" means NEH and its departments, divisions, affiliates, and/or agents, together with all present and former directors, officers, employees, agents, representatives, or any persons acting or purporting to act on behalf of NEH.

## INSTRUCTIONS

1. Each request for admission below asks for admission of the truth of the matter stated in the request.

2. If you do not specifically admit or deny the matter stated in a request for admission, you must set forth in detail the reasons why you cannot truthfully admit or deny the matter.

3. If good faith requires you to qualify a response or to deny only a part of the matter set forth in a request for admission, you must specify so much of the matter as is true and qualify or deny the remainder.

4. You may not refuse to admit or deny any matter set forth in a request for admission based upon lack of information or knowledge unless you also assert that you have made reasonable inquiry and that the information necessary to admit or deny the matter stated is not known or readily obtainable.

5. Each matter of which an admission is requested will be deemed admitted, and conclusively established for purposes of this litigation (unless the Court upon motion permits withdrawal or amendment of the admission), if you do not serve a written, signed answer or objection

addressed to the matter specified within fourteen (14) days after service of these requests for admission, or within such other time as the Court may allow.

6. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these requests for admission all information and documents that might otherwise be construed to be outside of its scope.

7. The singular includes the plural and vice versa. The past tense includes the present tense where the clear meaning is not distorted by change of tense.

## RELEVANT TIME PERIOD

Unless otherwise noted in the body of a Request, the Relevant Time Period for these Requests is January 20, 2025, through the present (the "Relevant Time Period" or "Relevant Period").

## REQUESTS FOR ADMISSION

1. Admit that Nate Cavanaugh and Justin Fox were members of DOGE assigned to NEH.

2. Admit that Justin Fox emailed grant termination notices to NEH grantees and/or awardees whose grants or awards were terminated as part of the Mass Termination.

3. Admit that Nate Cavanaugh emailed grant termination notices to NEH grantees and/or awardees whose grants or awards were terminated as part of the Mass Termination.

4. Admit that Nate Cavanaugh, Justin Fox, or other DOGE personnel emailed grant termination notices to NEH grantees and/or awardees whose grants or awards were terminated as part of the Mass Termination.

5. Admit that Justin Fox chose the grants or awards considered for termination as part of the Mass Termination.

6. Admit that Nate Cavanaugh chose the grants or awards considered for termination as part of the Mass Termination.

7. Admit that Justin Fox, Nate Cavanaugh, or other DOGE personnel chose the grants or awards considered for termination as part of the Mass Termination.

8. Admit that Michael McDonald did not affirmatively choose the grants or awards considered for termination as part of the Mass Termination.

9. Admit that Justin Fox terminated grants or awards that were terminated as part of the Mass Termination.

10. Admit that Justin Fox terminated at least one grant or award that was terminated as part of the Mass Termination.

11. Admit that Nate Cavanaugh terminated grants or awards that were terminated as part of the Mass Termination.

12. Admit that Nate Cavanaugh terminated at least one grant or award that was terminated as part of the Mass Termination.

13. Admit that Justin Fox, Nate Cavanaugh or other DOGE personnel terminated grants or awards that were terminated as part of the Mass Termination.

14. Admit that Justin Fox, Nate Cavanaugh or other DOGE personnel terminated at least one grant or award that was terminated as part of the Mass Termination.

15. Admit that Michael McDonald did not terminate grants or awards that were terminated as part of the Mass Termination.

16. Admit that Michael McDonald did not email grant termination notices to NEH grantees and/or awardees whose grants or awards were terminated as part of the Mass Termination.

17. Admit that Michael McDonald did not want to terminate the grants or awards that were terminated as part of the Mass Termination.

18. Admit that Michael McDonald did not want to terminate all of the grants or awards that were terminated as part of the Mass Termination.

19. Admit that Justin Fox, Nate Cavanaugh, or other DOGE personnel notified Michael McDonald that Fox, Cavanaugh, or other DOGE personnel would make the decision on which NEH grants or awards to terminate.

20. Admit that Justin Fox, Nate Cavanaugh, or other DOGE personnel notified Michael McDonald that it was the decision of Fox, Cavanaugh, or other DOGE personnel on whether to discontinue funding of any of the projects listed in the spreadsheet that Michael McDonald emailed to Justin Fox on April 1, 2025 at 10:07 AM. See NEH_AR_000023.

21. Admit that it was Justin Fox's decision whether to terminate grants or awards that were terminated as part of the Mass Termination.

22. Admit that it was Justin Fox's decision whether to terminate at least one grant or award that was terminated as part of the Mass Termination.

23. Admit that it was Nate Cavanaugh's decision whether to terminate grants or awards that were terminated as part of the Mass Termination.

24. Admit that it was Nate Cavanaugh's decision whether to terminate at least one grant or award that was terminated as part of the Mass Termination.

25. Admit that it was the decision of Justin Fox, Nate Cavanaugh, or other DOGE personnel whether to terminate grants or awards that were terminated as part of the Mass Termination.

26. Admit that it was the decision of Justin Fox, Nate Cavanaugh, or other DOGE personnel whether to terminate at least one grant or award that was terminated as part of the Mass Termination.

27. Admit that it was Justin Fox's decision whether to discontinue funding on any of the projects listed in the spreadsheet that Michael McDonald emailed to Justin Fox on April 1, 2025 at 10:07 AM. See NEH_AR_000023.

28. Admit that it was Nate Cavanaugh's decision whether to discontinue funding on any of the projects listed in the spreadsheet that Michael McDonald emailed to Justin Fox on April 1, 2025 at 10:07 AM. See NEH_AR_000023.

29. Admit that it was the decision of Justin Fox, Nate Cavanaugh, or other DOGE personnel whether to discontinue funding on any of the projects listed in the spreadsheet that Michael McDonald emailed to Justin Fox on April 1, 2025 at 10:07 AM. See NEH_AR_000023.

30. Admit that it was not Michael McDonald's decision whether to terminate grants or awards that were terminated as part of the Mass Termination.

31. Admit that it was not Michael McDonald's decision whether to terminate at least one grant or award that was terminated as part of the Mass Termination.

32. Admit that it was the decision of Justin Fox, Nate Cavanaugh, or other DOGE personnel to choose grants and awards for termination based on the Presidential administration in which the grants were issued.

33. Admit that it was the decision of Justin Fox, Nate Cavanaugh, or other DOGE personnel to use the list of all outstanding NEH grants and awards issued during the Biden administration as the baseline list of grants to terminate.

34. Admit that it was not the decision of Michael McDonald or any other NEH personnel to use the list of all outstanding grants and awards issued during the Biden administration as the baseline list of grants to terminate.

35. Admit that Justin Fox, Nate Cavanaugh, or other DOGE personnel drafted the termination letter template that was used for sending grant termination notices in April 2025.

36. Admit that Justin Fox, Nate Cavanaugh, or other DOGE personnel added Michael McDonald's signature to the termination letters sent in April 2025.

37. Admit that neither Michael McDonald nor any NEH personnel drafted the grant termination letters sent in April 2025.

38. Admit that Michael McDonald did not personally add his signature to the grant termination letters used in April 2025.

39. Admit that on April 3, 2025, Michael McDonald held a meeting with NEH staff in which he answered questions about grant terminations.

7

40. Admit that the Recording is a recording of part of the April, 3, 2025 meeting referenced in Request No. 39.

41. Admit that Michael McDonald is one of the individuals speaking in the Recording.

42. Admit that at the April 3, 2025 meeting, in response to a question about the rationale for grant terminations, Michael McDonald stated that the "rationale was simply because that's the way DOGE had operated at other agencies and they applied the same methodology here."

43. Admit that the statement referenced in Request No. 42 is a true and accurate statement of Michael McDonald's understanding of the rationale for the grant terminations.

44. Admit that the National Council on the Humanities was not consulted regarding the Mass Termination.

45. Admit that it was the decision of Justin Fox, Nate Cavanaugh, or other DOGE personnel to choose grants and awards for termination based on the content of the funded project.

46. Admit that it was the decision of Justin Fox, Nate Cavanaugh, or other DOGE personnel to choose grants and awards for termination based on the viewpoint of the funded project.

47. Admit that grants and awards terminated as part of the Mass Termination were terminated because they had been issued by the Biden administration.

48. Admit that grants and awards terminated as part of the Mass Termination were terminated, at least in part, because they had been issued by the Biden administration.

49. Admit that grants and awards terminated as part of the Mass Termination were terminated because of the subject matter of the project for which the grant or award was given.

50. Admit that grants and awards terminated as part of the Mass Termination were terminated, at least in part, because of the subject matter of the project for which the grant or award was given.

51. Admit that grants and awards terminated as part of the Mass Termination were terminated because of the viewpoint of the project for which the grant or award was given.

52. Admit that grants and awards terminated as part of the Mass Termination were terminated, at least in part, because of the viewpoint of the project for which the grant or award was given.

53. Admit that grants and awards terminated as part of the Mass Termination were identified as candidates for termination using Artificial Intelligence.

54. Admit that at least one grant or award terminated as part of the Mass Termination was identified as a candidate for termination using Artificial Intelligence.

55. Admit that grants and awards terminated as part of the Mass Termination were identified as candidates for termination using Algorithms.

56. Admit that at least one grant or award terminated as part of the Mass Termination was identified as a candidate for termination using an Algorithm.

|  |  |
|---|---|
| Dated: September 29, 2025 | By:  /s/ Jamie Crooks<br>Jamie Crooks (*pro hac vice*)<br>Michael Lieberman (*pro hac vice*)<br>Amanda R. Vaughn (*pro hac vice*)<br>Yinka Onayemi<br>FAIRMARK PARTNERS, LLP<br>400 7th Street, NW, Suite 304<br>Washington, DC 20004<br>Tel: 619.507.4182<br>jamie@fairmarklaw.com<br>michael@fairmarklaw.com<br>amanda@fairmarklaw.com<br>yinka@fairmarklaw.com<br><br>*Attorneys for Plaintiffs and the Proposed Classes* |