UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

THE AUTHORS GUILD, et al..

          Plaintiffs,

   -against-

NATIONAL ENDOWMENT FOR THE
HUMANITIES, et al.,

          Defendants.

———————————————————————— x

AMERICAN COUNCIL OF LEARNED
SOCIETIES, et al.,

          Plaintiffs,

   -against-

MICHAEL MCDONALD, in his official capacity as
Acting Chairman of the National Endowment for the
Humanities, et al.,

          Defendants,

———————————————————————— x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/18/2025

25-cv-3923 (CM)

25-cv-3657 (CM)

## OPINION

McMahon, J.:

    Plaintiffs The Authors Guild, Elizabeth Kadetsky, Dr. Valerie Orlando, Katalin Balog,

Benjamin Holtzman, Bill Goldstein, Lee Jasperse, and Nicole Jenkins (the "Authors Guild

Plaintiffs"), and Plaintiffs American Council of Learned Societies, American Historical

Association, and Modern Language Association of America (the "ACLS Plaintiffs"), move to

compel discovery from Defendants National Endowment for the Humanities; Michael McDonald,

Acting Chairman of the National Endowment for the Humanities; United States Department of

1

Government Efficiency ("DOGE"); Amy Gleason, Acting Administrator of the United States DOGE Service; Nate Cavanaugh, a member of DOGE and an employee of the General Services Administration; and Justin Fox, a member of DOGE and an employee of the General Services Administration ("Defendants").   Plaintiffs seek an order (1) compelling the Government to complete the Administrative Record; (2) overruling the Government's general objection to all discovery; and (3) overruling the Government's general objection to discovery on DOGE, the General Services Administration ("GSA"), and Defendants Fox and Cavanaugh.  For the following reasons, Plaintiffs' motions to compel discovery are GRANTED.

## I.     BACKGROUND

The suit arises from the April 2025 mass termination of previously awarded grants issued by the National Endowment for the Humanities ("NEH").  The surviving claims – principally under the Administrative Procedure Act and the First Amendment – are predicated on allegations that Defendants abruptly and unlawfully cancelled hundreds of congressionally funded grants without individualized review, pursuant to directives imposed by the United States DOGE Service, based on disfavored subject matter and viewpoints.

### a.  NEH's Statutory Authority to Award and Administer Grants

Congress established the National Endowment for the Humanities in 1965 as part of the National Foundation on the Arts and Humanities Act to promote scholarship, research, education, and public understanding in the humanities nationwide. 20 U.S.C. §§ 951–960.  In creating NEH, Congress expressly found that "the humanities belong to all the people of the United States," and that the federal government has an affirmative role in supporting humanities research and dissemination to foster "freedom of thought, imagination, and inquiry." 20 U.S.C. §§ 951(1), (7).

2

Congress structured NEH to function as the nation's largest and most prestigious federal funder of advanced humanities research, awarding billions of dollars in grants over six decades with bipartisan support. Congress further directed that the vast majority of NEH's annual appropriations be used for grantmaking and related assistance to scholars, authors, and institutions. AG Compl. ¶¶ 31–36.[1]

To insulate NEH's funding decisions from political interference, Congress imposed statutory safeguards on how grants are awarded and administered. By statute, the NEH Chair may not approve or disapprove grant applications without first receiving recommendations from the National Council on the Humanities, a body composed of private citizens with recognized expertise in the humanities who serve staggered terms across administrations. 20 U.S.C. §§ 957(c), (f). Congress also prohibited federal officials from exercising "direction, supervision, or control over the policy determination, personnel, or curriculum" of NEH grantees. 20 U.S.C. § 953(c).

Consistent with this statutory framework, grant applications were not decided unilaterally. NEH historically awarded grants through a multi-step, staff-intensive process involving expert peer-review panels, program officer evaluation, and National Council on the Humanities review prior to final approval by the Chair. AG Compl. ¶¶ 46–54; Dkt. No. 116 at 15–16. Once awarded, NEH grants were governed by written program terms and conditions. As the Court noted, those terms vested authority over awards, amendments, and terminations in NEH's Office of Grant Management and limited termination to defined circumstances, such as noncompliance or inability

---

[1] Citations to "AG Compl." are to the Amended Complaint filed by the Authors Guild Plaintiffs in *The Authors Guild v. National Endowment for the Humanities*, No. 25-cv-3923-CM (S.D.N.Y.). Citations to "ACLS Compl." are to the Complaint filed by the ACLS Plaintiffs in *American Council of Learned Societies v. McDonald*, No. 25-cv-3657-CM (S.D.N.Y.). These actions were coordinated for purposes of pretrial proceedings following the Court's Decision and Order resolving Defendants' motion to dismiss and Plaintiffs' motion for preliminary injunctive relief. *See* Dkt. No. 116.

to carry out the funded project. Dkt. No. 116 at 22–25. The terms further provided grantees with notice and appeal rights in the event of termination. AG Compl. ¶¶ 111–13; Dkt. No. 116 at 23.

Congress reaffirmed NEH's statutory mission and spending obligations in the most recent appropriations acts. In fiscal years 2024 and 2025, Congress appropriated $207 million per year to NEH, expressly designating $192 million each year for grants and related assistance pursuant to 20 U.S.C. § 956(c). Pub. L. 118-42, 138 Stat. 25, 282 (Mar. 9, 2024); Pub. L. 119-24, §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025). As the Court emphasized, these appropriations reflect Congress's continuing intent that NEH operate as a grantmaking agency and disburse funds to support humanities projects nationwide. Dkt. No. 116 at 15–16.

It is against this statutory and regulatory backdrop – one emphasizing expert-driven decision-making, viewpoint neutrality, and mandatory grant spending – that Plaintiffs challenge the mass termination of NEH grants and the related actions giving rise to the surviving claims now in discovery.

### b. Factual Background

The Authors Guild Plaintiffs consist of the Authors Guild, suing in an associational capacity, and individual authors and scholars who received NEH grants under various programs, including the Public Scholars Program, Fellowships Program, Summer Stipends Program, and Awards for Faculty. AG Compl. ¶¶ 11–24. Each individual plaintiff alleges that they were awarded a grant after a competitive review process and structured their professional obligations around the award, including by taking unpaid leave, foregoing other employment, or declining alternative funding. *See id.* ¶¶ 4, 14, 16, 18, 20–24.

The ACLS Plaintiffs – the American Council of Learned Societies, the American Historical Association, and the Modern Language Association – are scholarly membership organizations

4

whose members include individual scholars and institutions that rely extensively on NEH funding. ACLS Compl. ¶¶ 10–14. ACLS and AHA also allege that they themselves held active NEH grants at the time of the challenged terminations, including multi-year cooperative agreements and research fellowships awarded following NEH's peer-review process. *Id.* ¶¶ 92–99.

According to both complaints, DOGE personnel began operating within NEH in March 2025, shortly after the White House directed the resignation of then NEH Chair Shelly Lowe. AG Compl. ¶ 96; ACLS Compl. ¶¶ 58–59. DOGE employees Nate Cavanaugh and Justin Fox allegedly gained access to NEH's internal grant records and identified approximately $175 million in awarded but not fully disbursed grant funds as targets for cancellation. AG Compl. ¶¶ 98–99; ACLS Compl. ¶¶ 62–63.

Plaintiffs allege that DOGE personnel directed NEH leadership to terminate the vast majority of grants awarded during the prior administration and that DOGE applied the same methodology at NEH that it had used at other federal agencies. AG Compl. ¶¶ 98–101, 108; ACLS Compl. ¶¶ 60–67. Between April 1 and April 3, 2025, Defendants sent termination notices to approximately 1,400 NEH grantees, including all individual Authors Guild Plaintiffs and numerous ACLS Plaintiffs (the "Mass Termination"). AG Compl. ¶¶ 6, 100–01; ACLS Compl. ¶¶ 64–65, 73. The termination notices were nearly identical, transmitted from a non-governmental email address, and were not processed through NEH's Office of Grant Management or its grant management system. AG Compl. ¶¶ 100–03; ACLS Compl. ¶¶ 64–66. The notices stated that the recipient's grant "no longer effectuates the agency's needs and priorities" and cited Executive Orders addressing issues such as "DEI," "gender ideology," and "radical indoctrination," while asserting that "due to exceptional circumstances, adherence to the traditional notification process is not possible." AG Compl. ¶ 105; *see also* ACLS Compl. ¶ 69.

5

Plaintiffs allege that Defendants did not conduct individualized assessments of grantee performance, consult program officers or the National Council on the Humanities, and did not evaluate compliance with grant terms before issuing the Mass Termination notices.  AG Compl. ¶¶ 101, 108; ACLS Compl. ¶¶ 67–68.  Plaintiffs allege that the Mass Termination constituted final agency action under the APA because it consummated Defendants' decision-making process and immediately extinguished both NEH's obligation to disburse funds and grantees' rights to receive them.  AG Compl. ¶ 115; ACLS Compl. ¶¶ 130–31.

Based on these allegations, Plaintiffs assert that Defendants' actions were arbitrary and capricious, exceeded statutory authority, and departed from binding regulations and grant terms, in violation of the APA.  AG Compl. ¶¶ 115–18; ACLS Compl. ¶¶ 8, 130–36.  Plaintiffs further allege that the Mass Termination was motivated by hostility to the subject matter and viewpoints of funded scholarship, thereby violating the First Amendment.  AG Compl. ¶¶ 7, 63–65, 105; ACLS Compl. ¶¶ 31–32, 69.  These factual allegations form the basis of the claims that survived dismissal and now define the scope of permissible discovery.

The parties' dispute has focused on the scope of Defendants' discovery obligations and, in particular, the completeness of the administrative record and the availability of extra-record discovery.  At a conference held on September 25, 2025, the Court addressed the parties' competing views regarding discovery, including the scope of the administrative record and whether Plaintiffs were entitled to additional discovery in light of the constitutional claims remaining in the case.  The Court indicated at the time that it believed extra-record discovery, especially of DOGE, was warranted.  *See, e.g.*, Dkt. No. 150, Sept. 25, 2025 Hr'g Tr., at 9.  Thereafter, Plaintiffs served written discovery requests and deposition notices.  Notwithstanding the preliminary guidance from the Court, the Government interposed objections inconsistent with

that guidance, which form the basis of the pending motions to compel. The parties have been unable to resolve their disputes through meet-and-confer efforts.

For the following reasons, Plaintiffs' motions to compel are GRANTED.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 26(b)(1), "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." In determining what information is discoverable, the court "consider[s] the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

For purposes of discovery under Rule 26(b), relevance is accorded a broad construction. *See, e.g.*, *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 CIV. 2106 (ER), 2019 WL 171987, at *2 (S.D.N.Y. Jan. 11, 2019). Relevance encompasses "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any party's claim or defense." *State Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14 Civ. 9792 (WHP) (JCF), 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015) (citation modified). The moving party "bears the initial burden of demonstrating that the information sought is relevant and proportional." *Sportvision, Inc. v. MLB Advanced Media, L.P.*, No. 18 Civ. 3025 (PGG) (VF), 2022 WL 2817141, at *1 (S.D.N.Y. July 19, 2022). Once the moving party has made this showing, "the burden shifts to the opposing party to justify curtailing discovery." *Id.*

When a party refuses or fails to respond to a discovery request, Federal Rule of Civil Procedure 37(a)(1) allows a party to move for an order compelling disclosure or discovery. Fed.

R. Civ. P. 37(a)(1). The party resisting discovery "must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each request is not relevant or how each question is overly broad, burdensome or oppressive." *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 561 (S.D.N.Y. 2013) (citation omitted). Federal district courts have broad discretion in ruling on a motion to compel discovery. *See EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012).

## III.   DISCUSSION

### a.   The Current Administrative Record Is Incomplete

Defendants are correct that, in an action governed by the APA, judicial review ordinarily proceeds based on the administrative record compiled by the decision-making agency. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973). Judicial review of agency action is generally "confined to the full administrative record before the agency at the time the decision was made." *Environmental Defense Fund v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981).

But those principles do not end the inquiry. APA review must be based on "the whole record," 5 U.S.C. § 706, which includes all materials directly or indirectly considered by agency decisionmakers, *Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 77 (D.D.C. 2018); *see also Nat. Res. Def. Council, Inc. v. Train*, 519 F.2d 287, 291 (D.C. Cir. 1975). When the record produced does not reflect the full universe of materials that informed the agency's decision, supplementation is not only permissible – it is required. *See Tummino v. Hamburg*, 936 F. Supp. 2d 162, 196–97 (E.D.N.Y. 2013).

The Supreme Court's decisions in *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), and *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), together articulate the minimum requirements necessary for judicial review under the

APA. *Chenery* establishes the foundational rule that, "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." 318 U.S. 80, at 87. If those grounds are absent from the record, a reviewing court "is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Id.* at 88. As Justice Frankfurter emphasized, agency action "must be measured by what the [agency] did, not by what it might have done," and courts may not intrude upon "the domain which Congress has exclusively entrusted to an administrative agency." *Id.* at 88–89, 94.

*State Farm* builds directly on these principles and explains their operation under the arbitrary-and-capricious standard. While judicial review under § 706(2)(A) is "narrow" and courts are not permitted to substitute their judgment for that of the agency, *State Farm* makes clear that an agency must nonetheless "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An agency action will ordinarily be arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem," offered an explanation that "runs counter to the evidence before the agency," or failed to disclose the basis for its judgment in a manner that permits judicial review. *Id.*

Together, *Chenery* and *State Farm* require that agency action be reviewed on the basis of contemporaneous materials in the administrative record that disclose both the agency's reasoning and the information it considered. Courts may uphold agency action "of less than ideal clarity if the agency's path may reasonably be discerned," *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). But that principle presupposes the existence of a record from which such a path can in fact be discerned. Where the

record does not reveal the basis for the agency's decision, judicial review would devolve into speculation or reliance on post hoc rationalizations – an approach both *Chenery* and *State Farm* forbid.

Consistent with these principles, to prevail on a motion to compel completion of the administrative record, a plaintiff need only "put forth concrete evidence and identify reasonable, non-speculative grounds for its belief that documents were considered by the agency and not included in the record." *Charleston Area Med. Ctr. v. Burwell*, 216 F. Supp. 3d 18, 23 (D.D.C. 2016) (citation modified). Applying those standards here, the Court concludes that the administrative record produced by Defendants does not constitute the "whole record" of the April 2025 Mass Termination.

Defendants initially produced 23 documents in September 2025, all of them originating at NEH, which they identified as the administrative record underlying the Mass Termination. *See* Dkt. No. 140-1. After Plaintiffs objected to the completeness of that production, Defendants supplemented the record in December 2025 with four additional documents. Defendants nevertheless maintain that, even as supplemented, the 27-document administrative record is complete and that no broader search – either within NEH or across other government agencies or offices – is required. The Court rejects the Government's argument.

*First,* the record demonstrates that Defendants did not conduct a fulsome search when compiling the administrative record. Following the September 25, 2025 discovery conference – at which the Court advised Plaintiffs to serve discovery requests after hearing Defendants' administrative-record argument – Plaintiffs proceeded to do so, engaged in meet-and-confer efforts, and negotiated deposition logistics with the Government. *See* Dkt. No. 158 ¶¶ 6–10. Only weeks later, and shortly before discovery responses were due, did the Government advise Plaintiffs

that they intended to stand on an "administrative record only" position and would not respond substantively to the pending requests. *See* Dkt. No. 158-12, Ex. 11, at 2–3.

In response, Plaintiffs sought clarification about whether Defendants had, in fact, conducted the type of comprehensive search contemplated by the Court at the September 25 conference, or whether Defendants instead had declined to search beyond the limited set of NEH documents previously produced. *See id.* Plaintiffs specifically noted that the Government had produced only 23 documents at that point, which the Court had already indicated was insufficient, and asked whether Defendants had performed a broader search and were withholding materials, or had not searched for responsive documents at all. *See id.*; Dkt. No. 150, Sept. 25, 2025 Hr'g Tr., at 7 ("If the Government wishes to say that that's the administrative record, already you're in default.").

The Government did not represent that it had conducted any broader search. Rather, the Government reiterated its position that discovery was limited to the administrative record "as produced," proposed that Plaintiffs "set[] aside the discovery requests," and stated that it would not proceed with "searching for, reviewing, and producing documents" unless Plaintiffs first demonstrated an entitlement to extra-record discovery. Dkt. No. 158-10, Ex. 9, at 8–9; *see also* Dkt. No. 158-6, Ex. 5, at 3–5. This exchange confirms that Defendants' position throughout has been that they were not obligated to conduct a comprehensive search for materials bearing on the Mass Termination. Where, as here, an agency declines to search for potentially relevant materials and fails to explain how the record was assembled – even after Court guidance – the presumption that the record reflects the "whole record" does not apply. *See Oceana*, 290 F. Supp. at 77.

*Second,* the administrative record as produced contains no contemporaneous explanation of how grants were selected for termination, who applied any selection criteria, or what

11

information was reviewed in making those determinations. Instead, the record largely consists of termination notices and conclusory statements that the grants no longer aligned with agency priorities. *See, e.g.*, NEH_AR_000086; NEH_AR_000087. But as the Court previously observed, the Mass Termination involved the near-simultaneous termination of approximately 1,400 grants across multiple programs, without individualized findings of noncompliance or inability to perform. *See* Dkt. No. 116, at 20–25. In this posture, where Defendants undertook a single, centralized action affecting hundreds of awards at once, APA review requires that the administrative record disclose the contemporaneous reasoning and materials on which the agency relied in reaching such a sweeping determination. An administrative record that does not do so is insufficient to permit meaningful judicial review. *See Chenery*, 318 U.S. at 87–88; *State Farm*, 463 U.S. at 43.

*Third,* Defendants' position that only documents physically located within NEH can be considered part of the administrative record is not supported by law. The relevant inquiry is not custodial location, but whether the materials were considered – directly or indirectly – by agency decisionmakers. *See Oceana*, 290 F. Supp. at 77. If NEH officials relied on analyses, directives, spreadsheets, or recommendations generated by other agencies, offices, or officials in deciding to terminate grants, which appears to be the case here, those materials fall squarely within the scope of the administrative record regardless of where they are housed. *See Tummino*, 936 F. Supp. 2d at 187–88; *see* Dkt. No. 140-2 (email from Defendant Justin Fox, identified as a DOGE and GSA-affiliated employee, stating to NEH leadership: "We need a game plan for effectuating . . . final grant terminations . . . We're getting pressure from the top on this"). And to the extent individuals outside NEH participated in or influenced the challenged decision, materials reflecting their

12

involvement are likewise properly subject to discovery. The Court therefore rejects the Government's effort to cabin record review to documents maintained solely within NEH.

Defendants' own sworn statements in related litigation, *Thakur v. Trump*, No. 3:25-cv-4737 (N.D. Cal.), and statements contained in the current administrative record support the Court's conclusion.

In a declaration filed in *Thakur*, Defendant McDonald acknowledged that the grant-termination decisions were not made by NEH in isolation, but instead emerged from a coordinated, inter-agency process. McDonald declared that, shortly after his appointment as Acting Chairman, "representatives from the Department of Government Efficiency ('DOGE'), Justin Fox and Nate Cavanaugh, contacted NEH to discuss and advise me on implementing the President's priorities," including terminating grants. Dkt. No. 158-4, McDonald Decl., Ex. 3, ¶ 12. He further stated that NEH transmitted spreadsheets identifying grants for termination to the Office of Management and Budget "as directed by the Presidential Executive Orders," *id.* ¶ 15; that he sent DOGE officials "the final results of NEH's review." *id.* ¶ 17; and that the April 2025 terminations were carried out "*in consultation with DOGE*," *id.* ¶ 18 (emphasis added). These sworn admissions confirm that materials generated, reviewed, exchanged, or relied upon by DOGE were integral to the decision-making process underlying the Mass Termination.

The administrative record likewise reflects that McDonald deferred ultimate decision-making authority to "DOGE-affiliated" Defendant Fox. McDonald stated in an April 1, 2025 email addressed to Fox that "it's your decision on whether to discontinue funding any of the projects on this list." NEH_AR_000022–23; Dkt. No. 165-1, at 1.

Where the agency head himself concedes that the challenged action was shaped through an inter-agency process and that decisional authority lay outside of the NEH – and indeed primarily

with DOGE – the administrative record cannot lawfully be confined to documents maintained within NEH alone. Defendants' assertion that Defendants Fox and Cavanaugh "were GSA employees," not official DOGE employees, does not alter this conclusion. Dkt. No. 163, Brennan Decl. ¶ 15. The APA turns on functional participation in the decision-making process, not formal job titles. And if the admitted involvement of Fox and Cavanaugh means that GSA records, in addition to DOGE records, must be searched, so be it.

In an email dated December 16, 2025, the Government stated unequivocally: "*We are not currently planning to search records of U.S. DOGE Service.*" Dkt. No. 165-1, at 1. The Government further asserted that such a search would not be "reasonable or proportionate," notwithstanding the fact that the available record shows DOGE's direct involvement in shaping, approving, and effectuating the Mass Termination. *Id.* That position is untenable. An agency may not evade its obligation to compile the "whole record" by declining to search repositories that its own evidence shows were central to the challenged action.

The Government's position is plainly unsupported when viewed against the unprecedented nature of the challenged action. As explained in the Court's decision on the motions to dismiss and for preliminary relief, the termination of more than 1,400 NEH grants was not alleged to be the product of routine, internal NEH deliberations. The Mass Termination and accompanying Termination Notices were not processed through NEH's grant management system, as required by internal agency policies, and did not emanate from the Office of Grant Management, which – under NEH's own terms and conditions – has sole authority to make awards and to modify or reduce them. *See* Dkt. No. 116, at 23.

Because the Mass Termination did not proceed through NEH's ordinary grant-administration channels, a 27-document record consisting entirely of documents generated within

NEH cannot possibly include "all documents and materials directly or indirectly considered" in connection with the cancellation of 1,400 grants. *See Oceana*, 290 F. Supp. 3d at 77. Where plaintiffs plausibly allege that agency action departed from ordinary processes and was influenced by considerations not reflected in the produced record, supplementing the administrative record is necessary to ensure that review proceeds on a complete factual basis. *See Tummino*, 936 F. Supp. 2d at 196–98; *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14–15 (2d Cir. 1997).

Plaintiffs are entitled to seek discovery from DOGE. This Court has already ruled that, given DOGE's admitted integral role in the NEH grant termination process, DOGE's records relating to that process must be searched and produced, because materials that DOGE relied upon, directly or indirectly, in shaping or effectuating the termination decision are necessarily part of the administrative record. Plaintiffs are also entitled to discovery from GSA, the Office of Management and Budget ("OMB"), and any other non-NEH agency, office, or official within the Executive Branch if analyses, directives, recommendations, or communications from those offices were before, informed, or influenced the purported NEH decisionmakers involved in the Mass Termination.

The Court thus concludes that the administrative record produced to date does not reflect the "whole record" within the meaning of the APA. *See* 5 U.S.C. § 706. There are "reasonable, non-speculative grounds" to believe "that [other] documents were considered by the agency and not included in the record." *Burwell*, 216 F. Supp. at 23. Defendants must therefore complete the administrative record by producing materials that were both "directly or indirectly" considered in connection with the Mass Termination.

The Government's reliance on *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367 (2004), to oppose Plaintiffs' discovery requests directed to non-NEH persons or

entities is misplaced. *Cheney* involved extraordinarily broad, free-ranging civil discovery directed at the Vice President and senior White House officials concerning a presidential advisory group created to advise the President on national energy policy – discovery that the Supreme Court held raised separation-of-powers concerns because it threatened to intrude upon "the process by which those in closest operational proximity to the President advise the President." *Id.* at 385. The Court emphasized that the discovery at issue sought "everything under the sky," *id.* at 387, was untethered to any final agency action subject to APA review, and risked compelling disclosure of confidential presidential communications at the highest levels of the Executive Branch.

None of those features is present here. Plaintiffs do not seek discovery into presidential deliberations, advisory processes, or the confidential communications of the President or Vice President. Nor do they seek to probe abstract policy formulation untethered from final agency action. Instead, Plaintiffs seek narrowly tailored discovery designed to identify materials that were actually before, considered by, or relied upon by the officials and personnel – whether within NEH or other Executive Branch agencies, principally but not exclusively DOGE – who participated in or influenced the decision-making process culminating in the Mass Termination of approximately 1,400 NEH grants, a final agency action subject to review under the APA.

Any suggestion that such discovery implicates separation-of-powers concerns is, therefore, unfounded. As *Cheney* – a mandamus action – makes clear, mandamus is not triggered by hypothetical or conjectural interbranch tensions, but by discovery orders that pose a real and imminent threat to core Article II functions. *See id.* at 381–82. This case presents no such threat. Invoking *Cheney* here stretches that decision well beyond its holding. Routine discovery designed to ensure that APA review proceeds on the "whole record" does not approach the extraordinary circumstances that justified interlocutory mandamus relief in *Cheney*.

16

Contrary to the Government's assertion, the Supreme Court's recent decision in *In re U.S. DOGE Service*, 145 S. Ct. 1981 (2025), does not counsel a different result. That decision did not hold that discovery involving DOGE was barred, did not hold that DOGE-related materials were categorically undiscoverable, did not arise in the context of APA "whole record" review, and did not involve a final agency action subject to judicial review under 5 U.S.C. § 706.

*In re DOGE* arose from a threshold FOIA dispute concerning whether DOGE qualified as an "agency" for purposes of the Freedom of Information Act, and whether limited, expedited discovery was warranted to probe the content of intra–Executive Branch recommendations and whether those recommendations were followed as a matter of influence or persuasion. The Supreme Court stayed the district court's discovery order because it was not "appropriately tailored" and impermissibly intruded into internal Executive Branch deliberations, cautioning that separation-of-powers concerns counsel judicial restraint where discovery seeks to probe internal recommendations and persuasive influence within the Executive Office of the President. *Id.* at 1982 (citing *Cheney*, 542 U.S. at 385).

That holding has no application here. Unlike *In re DOGE*, this case arises under the APA and squarely implicates the Court's obligation to review agency action on the "whole record." *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). Plaintiffs do not seek open-ended or intrusive discovery into deliberations at the highest levels of the Executive Office of the President or into internal policy discussions divorced from final agency action. Instead, Plaintiffs seek to learn what materials were actually before the relevant decisionmakers when they effectuated a final agency action, the Mass Termination of approximately 1,400 NEH grants to determine whether the agency's action was constitutional or arbitrary and capricious. Ensuring that the administrative record includes materials before and relied upon by agency decisionmakers

17

does not threaten separation of powers; it is, rather, the minimum predicate for meaningful judicial review under § 706.

### b. Discovery Beyond the Administrative Record Produced Thus Far Is Warranted

Defendants object to Plaintiffs' written discovery requests and deposition notices to the extent they seek information beyond what they call the "administrative record." Defendants contend that, because this action principally involves review of agency action under the Administrative Procedure Act ("APA"), that discovery should be confined to the administrative record as currently produced.

Defendants are correct that judicial review of agency action ordinarily proceeds on the administrative record and that extra-record discovery is the exception, not the rule. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973). This limitation reflects both the structure of the APA and separation-of-powers concerns – including the Supreme Court's admonition that probing "the mental processes of administrative decisionmakers" constitutes a "substantial intrusion" into the functioning of a coordinate branch of government. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977).

For the reasons discussed *supra* Section III(A), the Court has concluded that the administrative record here is not complete. Defendants have acknowledged that DOGE participated directly in the inter-agency decision-making process that culminated in the Mass Termination, yet have refused to search DOGE's records or include materials generated or reviewed outside NEH. Where an agency declines to search repositories that its own evidence shows were central to the challenged action, extra-record discovery is warranted in order to ensure that the "whole record" as required by the APA is before the Court.

Determining whether extra-record discovery is appropriate is rooted in the principle that meaningful judicial review requires that an agency "disclose the basis" of its action. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–69 (1962) (internal quotation marks omitted); *see also Chenery*, 318 U.S. at 94 ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."). That requirement would be for naught if an agency could withhold or obscure the materials that reveal the true grounds of its decision. Judicial review cannot be sustained where an agency's stated rationale does not reflect the basis on which it in fact acted, because a court may neither "substitute its discretion for that of the Commission" nor uphold agency action on grounds the agency itself did not invoke. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 248–49 (1972) (quoting *Chenery*, 318 U.S. at 88). Where, as in *Sperry & Hutchinson Co.*, the agency's opinion is "barren" of a reasoned explanation linking the facts found to the choice made, review on the existing record collapses, not because the court seeks to probe subjective motivations, but because it lacks the materials necessary to assess whether the agency engaged in reasoned decision-making at all. *Id.* at 249; *Burlington Truck Lines*, 371 U.S. at 168.

It is well-settled that courts may authorize extra-record discovery where plaintiffs make a showing of bad faith or improper behavior, or where other "unusual circumstances" demonstrate that the record before the court is insufficient to permit meaningful judicial review. *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (citation omitted). The D.C. Circuit, the court most familiar with APA-related matters, has articulated three circumstances that independently warrant extra-record discovery:

(1) where the agency deliberately or negligently excluded documents that may have been adverse to its decision;

(2) where background information is necessary to determine whether the agency considered all relevant factors; or

19

(3) where the agency failed to explain its action so as to frustrate judicial review.

*Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).

The Second Circuit's decision in *Dopico v. Goldschmidt*, 687 F.2d 644 (2d Cir. 1982) is particularly instructive with respect to the deliberate or negligent exclusion of documents. There, and as here, plaintiffs challenged federal agency action under the APA in the absence of a formal administrative proceeding and disputed whether the administrative record produced by the government reflected the full universe of materials before the agency at the time of decision. 687 F.2d at 654. The Second Circuit held that where record completeness itself was in dispute, a district court could not resolve that issue against plaintiffs without permitting at least limited discovery. *Id.*

The court emphasized that "determining what constitutes an agency's informational base is vital," and that this determination "may itself present a disputed issue of fact when there has been no formal administrative proceeding." *Id.* Critically, *Dopico* rejected the notion that an agency's assurances of completeness are sufficient to foreclose discovery. "Defendants' assurances that they have submitted the full record," the court explained, "will not substitute for the Court's independent consideration of that issue after some opportunity for discovery." *Id.* Nor does the production of some contemporaneous documents cure the problem, because "The fact that defendants presented documents that seemed to support the rationality of their actions does not mean that the same conclusion would have been reached if the Court had been aware of other information that was before the agency." *Id.*

Those concerns are squarely implicated here for the reasons set forth in the Authors Guild Plaintiffs' November 13, 2025 deficiency letter addressed to the Government. As noted in the letter, the materials Defendants have produced demonstrate that a shared, collaboratively editable spreadsheet was created and circulated on February 7, 2025 as the central tool for conducting an

inter-agency review of NEH grants pursuant to Executive Orders and the Office of Management and Budget ("OMB") Memorandum M-25-13. This memorandum required Federal agencies to pause all activities related to "Marxist equity, transgenderism, and green new deal social engineering policies." *Id.*; OMB, M-25-13, *Temporary Pause of Agency Grants, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025). In the February 7 email, NEH officials instructed program directors to use that shared spreadsheet, explicitly described as editable and still being refined, to review and annotate all awards dating back to 2021. *See* Dkt. No. 158-3, Ex. 2, at 2; NEH_AR_000001.

A March 13, 2025 email confirms that this same spreadsheet formed the substantive basis for cross-agency decision-making. In that email, NEH leadership transmitted to DOGE and OMB officials "the award spreadsheet created by [an NEH official] that the program directors used for their historical review," explaining that directors had entered ratings and comments that would be used to "finalize the list for OMB." NEH_AR_000004 ("A few of the directors still need to review awards made through their office for this tab and enter their comments."); NEH_AR_000021–22. This communication establishes that the spreadsheet first circulated on February 7 was actively modified, relied upon, and transmitted outside NEH during the formulation of the Mass Termination, and thus formed part of the "informational base" on which termination decisions were made across the agencies.

Yet the administrative record contains only a later-produced, and materially different, version of the spreadsheet, notwithstanding the Government's assertion that it is "identical" to the earlier shared version. *See* Dkt. No. 158-3, Ex. 2, at 2. The Government's assertion is belied by the record itself: the February 7 spreadsheet was expressly described as a live, collaboratively editable document undergoing ongoing revision, whereas the March 13 version appears as a static

transmission after weeks of editing, review, and additional annotation. This discrepancy places the completeness of the administrative record itself in genuine dispute.

The April 1, 2025 email chain further confirms that the administrative record omits contemporaneous decision-making materials that were actually before agency officials at the time of the Mass Termination. On April 1, Defendant Fox transmitted "updated" materials to NEH leadership and sought final approval to proceed with grant terminations, expressly referencing other attachments. *See* NEH_AR_000021. In response, Defendant McDonald confirmed that he had "looked over the two attachments" and had "no questions or concerns," demonstrating affirmative approval based on documents not included in the administrative record. *Id.*

Earlier that same day, Defendant McDonald advised Fox that NEH had completed its review and transmitted an "initialed version" of the materials, again by attachment. *Id.* These communications make clear that the attachments – not merely the text of the emails themselves – formed the basis for final approval of which grants would be terminated and which would be spared. Yet those attachments were omitted from the administrative record. Although the Government states that Fox's April 1, 2025 email at 7:56 p.m. was included in the administrative record, *see* NEH_AR_000025-84 and NEH_AR_000085, the Government continues to exclude from the administrative record Fox's April 1, 2025, email at 3:50 p.m., Fox's April 1, 2025, email at 4:17 p.m., and McDonald's April 1, 2025, email at 5:05 p.m., and the attachments contained therein, on the basis that they "were non-final, pre-decisional lists, reflecting deliberative material" not within the proper scope of the administrative record. Dkt. No. 163-1, at 2. This is not a proper basis to exclude the attachments from the administrative record for the same reasons the Government may not exclude earlier versions of the spreadsheet between February 7, 2025 and March 13, 2025 – namely, that materials actually before and relied upon by agency decisionmakers

are part of the "whole record" regardless of whether they are labeled "predecisional." *See infra* Section III(B) (discussing *Comprehensive Community Development Corp. v. Sebelius*, 890 F. Supp. 2d 305 (S.D.N.Y. 2012)).

The April 1 correspondence also reveals that earlier spreadsheet versions were not preserved, notwithstanding their central role in the review process. In a separate April 1 email, Defendant McDonald explained that NEH "didn't save the copy from yesterday" of a spreadsheet reflecting grant annotations and therefore had to "review the document again" and recreate it. NEH_AR_000022. He further stated that an earlier spreadsheet, described as the list "we sent to OMB," reflected two full days of review by senior NEH leadership and staff. *Id.* That admission confirms that a prior, decision-relevant version of the spreadsheet existed, was relied upon in communications with OMB, and is no longer available for judicial review.

These admissions are dispositive. They demonstrate not only that multiple spreadsheet iterations existed and were relied upon, but also that at least some contemporaneous versions were lost, overwritten, or never preserved. Where the administrative record contains references to attachments, annotated spreadsheets, and prior versions that shaped the final termination decisions – but those materials themselves are missing – the Court cannot accept the agency's certification of completeness at face value. *See Dopico*, 687 F.2d at 654.

Defendants' post-hoc supplementation of the administrative record only after Plaintiffs moved to compel production does not cure these deficiencies. In their opposition brief, Defendants themselves concede that certain attachments referenced in contemporaneous emails were omitted from the original record and were produced only after Plaintiffs raised the issue. *See* Dkt. No. 168, at 8–9. Defendants further acknowledge that additional attachments and spreadsheet iterations existed but were excluded because the Government now characterizes them as "pre-decisional

interim lists." *Id.* Where the Government itself acknowledges that contemporaneous materials were omitted and continues to withhold others based on its own unilateral assessment of their relevance, the completeness of the administrative record is no longer a matter of presumption but a disputed issue of fact. *See Dopico*, 687 F.2d at 654. The fact that Defendants continue to withhold materials concededly reviewed during the decision-making process underscores, rather than alleviates, the need for discovery.

The Government's refusal to provide all versions of the spreadsheet between February 7, 2025 and March 13, 2025 because they are purportedly "pre-decisional interim lists not reflecting the final termination decisions," is based on its reliance on *Comprehensive Community Development Corp. v. Sebelius*, 890 F. Supp. 2d 305 (S.D.N.Y. 2012). In advancing this argument, the Government removes *Comprehensive Community* from its factual and doctrinal context.

*Comprehensive Community* does not announce a categorical rule excluding all pre-decisional or deliberative materials from the administrative record. To the contrary, *Comprehensive Community* reaffirmed the settled principle under *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S. Ct. 980 (1977), that the "whole record" consists of the materials that were before the agency decisionmakers at the time the challenged action was taken. *See Comprehensive Cmty.*, 890 F. Supp. 2d at 309; *Overton Park*, 401 *U.S.* at 420. The court denied supplementation because the materials sought – draft reviewer worksheets, internal scoring notes, and deliberative exchanges among subordinate reviewers – were not relied upon by the ultimate decisionmaker and were superseded by a complete, formally articulated decisional record that disclosed the basis for the agency's action. 890 F. Supp. 2d at 312–14.

24

Similarly, *Tafas v. Dudas*, 530 F. Supp. 2d 786 (E.D. Va. 2008), in which the court denied plaintiff's request for extra-record discovery, arose in the context of a completed notice-and-comment rulemaking supported by a comprehensive Federal Register notice that fully articulated the agency's reasoning and expressly superseded internal drafts, emails, and reviewer notes. *Id.* at 790–94. The court excluded deliberative materials only because they were not relied upon by the ultimate decisionmaker and because judicial review could proceed entirely based on the agency's final, reasoned explanation.[2] *Id.*

This case presents the opposite circumstance. Here, the challenged action was a sweeping, inter-agency Mass Termination carried out through informal and evolving mechanisms, not through a closed, self-contained decisional process culminating in a comprehensive explanatory record. Contemporaneous emails and sworn admissions establish that shared spreadsheets and attachments were actually reviewed, approved, and transmitted among NEH, DOGE, and OMB officials to effectuate the Mass Termination, yet those materials are absent from the certified record. Where, as here, the materials sought were actually before the decisionmakers and structured the challenged Mass Termination, they fall squarely within the administrative record. Because their exclusion renders the so-called "administrative record" incomplete, extra-record discovery is warranted – indeed, is mandatory.

This conclusion follows directly from *Overton Park*, which makes clear that courts may not sustain agency action on the basis of "post hoc rationalizations," but must instead review the whole universe of records that informed the agency's choice. 401 U.S. at 419–20; *see also Burlington Truck Lines v. United States*, 371 U.S. 156, 168–69 (1962). Where the record omits

---

[2] The court in *Tafas* itself recognized that court may allow extra-record discovery where "those challenging agency action have contended the record was incomplete." 530 F. Supp. 2d at 794.

materials that were before the agency decisionmakers, the presumption of regularity gives way, and the court cannot meaningfully discharge its duty of review under the APA. *See Overton Park*, 401 U.S. at 415–16.

*United States v. Morgan*, 313 U.S. 409 (1941) does not compel a different result. *Morgan* stands for the narrow proposition that courts should not probe the mental processes of administrative decisionmakers or subject them to examination concerning their subjective reasoning. *Id.* at 422. But *Morgan* does not preclude inquiry into what materials were before the decisionmaker, how the record was assembled, or whether the administrative record omits documents that structured the challenged action. *Overton Park* – which carefully distinguished *Morgan* – explains that while inquiry into mental processes is ordinarily to be avoided, courts may require explanation or testimony where necessary to determine whether the agency acted within the scope of its authority. 401 U.S. at 420–21.

Read together, *Morgan* and *Overton Park* establish a limitation on judicial review of agency action under the APA: courts may not compel testimony or discovery aimed at reconstructing the subjective mental processes of administrative decisionmakers where the lawfulness of the action can be assessed on the basis of the contemporaneous record. *See Morgan*, 313 U.S. at 422; *Overton Park*, 401 U.S. at 420. That limitation governs the mode of judicial inquiry; it does not permit an agency to define the record so narrowly as to exclude the very materials on which its decision depended. Nor does it foreclose discovery or evidentiary inquiry relevant to independent constitutional claims, including First Amendment claims that turn on governmental purpose or viewpoint discrimination.

The foregoing discussion applies to cases brought under the APA. Here, of course, Plaintiffs have also asserted a First Amendment claim. Courts have repeatedly held that the

assertion of constitutional claims in connection with an alleged violation of the APA does not, standing alone, displace the APA's record-review rule. *See, e.g.*, *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021) ("Reviewing courts remain bound by traditional administrative law principles, including the rule that judges generally must assess the lawfulness of an agency's action in light of the explanations the agency offered for it rather than any ex post rationales."); *Almaklani v. Trump*, 444 F. Supp. 3d 425, 434 (E.D.N.Y. 2020) (holding that "the addition of constitutional claims does not alter the sufficiency of the administrative record"); *Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 43 (D.D.C. 2018). This is because a constitutional challenge that turns on the implementation of agency action "must [] be judged on the administrative record." *Bellion Spirits*, 335 F. Supp. 3d at 43. But that record must be complete.

The APA framework does *not* displace the ordinary means by which plaintiffs may prove a First Amendment claim. Where, as here, Plaintiffs also allege viewpoint-based discrimination, courts may consider objective, contemporaneous evidence bearing on governmental purpose – such as the criteria applied, the materials reviewed, the sequence of events, and contemporaneous communications – as long as review does not intrude into protected deliberations or probe the subjective mental processes of individual decisionmakers. *See, e.g., Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977) (explaining that intent may be inferred from "the historical background of the decision," "the specific sequence of events," and contemporaneous statements, even while cautioning against inquiry into mental processes); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–31 (1995) (assessing viewpoint discrimination by examining the criteria applied and the basis on which funding was denied).

Here, because the administrative record is demonstrably incomplete, the presence of a constitutional claim makes it all the more imperative that the record be completed to include the materials relied upon by all agencies and officials who participated in the ultimate decision. Plaintiffs are entitled to understand what criteria were applied in terminating their grants, what materials were reviewed in applying those criteria, and how the decision unfolded over time. That necessarily includes access to the sequence of events and the contemporaneous communications of agency decisionmakers. As explained above, completing the record to include decision-critical spreadsheets, attachments, and communications does not intrude into protected deliberations because these materials were not merely antecedent thoughts or internal musings, but the operative instruments through which the challenged action was formulated and executed. Completing the administrative record to reflect the reasons for the decision does not probe the subjective thought processes of individual officials. *See Arlington Heights*, 429 U.S. at 266–68; *Rosenberger*, 515 U.S. at 829–31.

Accordingly, the Government's attempt to exclude prior versions of the spreadsheets on the ground that they are "deliberative" misconstrues *Comprehensive Community* and misreads *Morgan*. *Morgan* bars inquiry into subjective decisionmaking. It does not permit the Government to withhold objective, contemporaneous materials that structured and informed the Mass Termination, including materials that bear directly on the intent element of Plaintiffs' viewpoint-discrimination claim.

The Supreme Court's decision in *Department of Commerce v. New York*, 588 U.S. 752 (2019), further reinforces – at a structural and procedural level – the propriety of limited extra-record discovery under these circumstances. There, the Government initially produced an administrative record purporting to reflect the Secretary of Commerce's decision to reinstate a

28

citizenship question on the decennial census. *Id.* at 764–65. After litigation commenced, however, the Secretary submitted a supplemental memorandum disclosing that he had been considering the citizenship question well before the stated triggering request from another agency. *Id.* at 765. That disclosure revealed gaps in the record and prompted plaintiffs to seek both completion of the administrative record and limited extra-record discovery – relief the district court ordered and the Supreme Court ultimately affirmed. *Id.* at 765–66.

The Government contends that *Department of Commerce v. New York* is inapposite because, in its view, extra-record discovery is warranted under that case only where plaintiffs demonstrate a "mismatch" between the agency's stated rationale and its true motivations. According to the Government, discovery in *Department of Commerce* was justified because the record suggested that decisionmakers had "carefully curated" the administrative record to conceal their real intent, thereby revealing evidence of hidden or pretextual motivations. Dkt. No. 162, at 27 (citations omitted). Under the Government's view, *Department of Commerce* authorizes extra-record discovery only where plaintiffs have already shown pretext or a mismatch between the agency's stated rationale in the first instance and, here, Plaintiffs have not done so.

The Supreme Court's holding was more nuanced and procedural. *Department of Commerce* does not condition extra-record discovery on a fully developed showing of pretext at the outset. *See* 588 U.S. at 781–82. Although the Court cautioned that discovery should not be reflexive or "premature," it affirmed extra-record discovery once the administrative record itself revealed gaps, omissions, or reasons to doubt candor. *Id.* Critically, the "mismatch" ultimately identified by the Court emerged only *after* record supplementation – not before. *See id.* Thus, *Department of Commerce* recognizes a sequencing principle: where the administrative record reveals gaps, inconsistencies, or omissions that prevent a court from assessing the "whole record"

that was before the agency decisionmakers at the time the challenged action was taken, limited extra-record discovery is warranted to permit meaningful judicial review. *Id.* at 780–81.

That principle applies here. Here, Plaintiffs do not seek discovery to uncover hidden motivations untethered from the agency's explanation. They seek discovery because the record affirmatively demonstrates that decision-critical materials – shared spreadsheets reviewed and approved by Defendant McDonald and inter-agency communications with DOGE and OMB – were before the decisionmakers but are missing from the certified record. Indeed, that record affirmatively demonstrates that DOGE and OMB personnel were among the actual decisionmakers. The "mismatch" in this case is between the Government's unfounded assertion that the administrative record is limited to NEH materials and the undisputed reality that NEH was but one player in this broader, multi-agency administrative decision.

Where the record itself shows that the materials considered by those who made the decision have not been produced, judicial review cannot proceed on the "whole record" as required by the APA. *See Overton Park*, 401 U.S. at 420; *Dopico*, 687 F.2d at 654. As in *Department of Commerce*, the problem for the Government lies in the fact that the administrative record, as currently designated, does not reflect "all documents and materials directly or indirectly considered" in connection with the cancellation of 1,400 grants. *See Oceana*, 290 F. Supp. 3d at 77.

Whether the current 27-document "administrative record" reflects all documents and materials that Defendants directly or indirectly considered is not an inquiry that ends with mere record certification. Consistent with *Dopico* and *Department of Commerce*, the Court concludes that discovery beyond the administrative record is warranted. The Court cannot meaningfully discharge its duty of review under the APA by accepting at face value an administrative record

whose completeness or candor is in genuine doubt. *See* 5 U.S.C. § 706; *Dep't of Commerce*, 588 U.S. at 780–81; *Dopico*, 687 F.2d at 654.

### Conclusion

For the foregoing reasons, Plaintiffs' motions to compel are GRANTED. Defendants' objections to Plaintiffs' written discovery requests and deposition notices on the ground that discovery is limited to the administrative record are OVERRULED. The scope of Defendants' discovery obligations, including the entities, custodians, and categories of materials to be searched and produced, is set forth in a separate Order entered contemporaneously with this Opinion.

The Court reminds the parties that compliance with discovery obligations "is not optional or negotiable; rather, the integrity of our civil litigation process requires that the parties before us . . . carry out their duties to maintain and disclose the relevant information in their possession in good faith." *Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*, 880 F.3d 620, 630–31 (2d Cir. 2018). It is also well-recognized that, "Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses." *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999). The Court will not hesitate to impose sanctions should any party fail to comply with its discovery obligations or the Court's discovery directives.

The Clerk of Court is directed to terminate the motions at Docket Numbers 65 and 66 in *The Authors Guild v. National Endowment for the Humanities*, No. 25-cv-3923 (CM), and Docket Numbers 156 and 157 in *American Council of Learned Societies v. McDonald*, No. 25-cv-3657 (CM), and to remove them from the Court's list of open motions.

This constitutes the decision and order of the Court. It is a written decision.

Dated: December 18, 2025

U.S.D.J.

BY ECF TO ALL COUNSEL