UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

THE AUTHORS GUILD, et al.,

        Plaintiffs,

  -against-

NATIONAL ENDOWMENT FOR THE
HUMANITIES, et al.,

        Defendants.

———————————————————————— x

AMERICAN COUNCIL OF LEARNED
SOCIETIES, et al.,

        Plaintiffs,

  -against-

MICHAEL MCDONALD, in his official capacity as
Acting Chairman of the National Endowment for the
Humanities, et al.,

        Defendants.

———————————————————————— x

25-cv-3923 (CM)

25-cv-3657 (CM)

**OPINION AND ORDER**

McMahon, J.:

    Plaintiffs The Authors Guild, Elizabeth Kadetsky, Dr. Valerie Orlando, Katalin Balog, Benjamin Holtzman, Bill Goldstein, Lee Jasperse, and Nicole Jenkins (the "Authors Guild Plaintiffs"), and Plaintiffs American Council of Learned Societies, American Historical Association, and Modern Language Association of America (the "ACLS Plaintiffs") (collectively, "Plaintiffs"), move to compel discovery from Defendants National Endowment for the Humanities ("NEH"); Michael McDonald, Acting Chairman of NEH; the United States Department of

1

Government Efficiency ("DOGE"); Amy Gleason, Acting Administrator of the United States DOGE Service; Nate Cavanaugh, a member of DOGE and an employee of the General Services Administration ("GSA"); and Justin Fox, a member of DOGE and an employee of GSA (collectively, "Defendants"). Plaintiffs' motions seek relief arising out of the Government's post–January 16, 2026 discovery production – specifically, an order compelling production of documents withheld or redacted on the basis of privilege and directing additional discovery concerning the adequacy of the Government's searches and responses to interrogatories. For the reasons set forth below, Plaintiffs' motion to compel is GRANTED and all asserted grounds for withholding are overruled, and the ACLS Plaintiffs' letter motion to compel is GRANTED IN PART.

## I.   BACKGROUND

### a.  Discovery Proceedings Following the September 25, 2025 Conference

During a conference held on September 25, 2025, the Court authorized Plaintiffs to serve discovery requests and directed the Government to respond within fourteen business days. On September 29, 2025, Plaintiffs served requests for production, interrogatories, and requests for admission, as well as deposition notices directed to four individuals, including Michael McDonald, Justin Fox, and Nate Cavanaugh, each named as a defendant in his official capacity. The Government served responses on December 2, 2025; these responses were timely due to extensions, which were partly occasioned by the lengthy government shutdown in the fall of 2025.

Subsequent disputes regarding the adequacy of the Government's searches and the completeness of the materials produced led to further motion practice. By Order dated December 22, 2025, the Court directed the Government to conduct thorough searches and to produce all responsive, non-privileged materials by January 16, 2026, and to make the four identified officials

available for deposition by January 30, 2026. Dkt. No. 169, at 2. In issuing that Order, the Court found that the administrative record previously produced was incomplete and that the Government had not undertaken a good-faith review of all files of persons and agencies involved in the grant-termination decisions. *See generally Authors Guild v. Nat'l Endowment for the Humanities,* 2025 WL 3678097 (S.D.N.Y. Dec. 18, 2025).

### b. The January 16, 2026 Production and Privilege Log

The Government produced approximately 3,700 documents on January 16, 2026. In connection with that production, the Government withheld or redacted certain documents on the basis of asserted privileges and produced a privilege log identifying approximately 400 entries. On January 20, 2026, the parties met and conferred regarding Plaintiffs' objections to the Government's privilege assertions. During that meet-and-confer, the Government agreed to re-review the challenged privilege claims and to provide additional information supporting those assertions.

As a result of meet-and-confer efforts, the Government agreed to produce certain documents and withdrew challenges to others. Thus, the scope of the privilege dispute narrowed substantially. The Government prepared a revised exhibit identifying 96 documents as remaining in dispute. *See* Dkt. No. 190, Ex. 1. The Court is grateful to the parties for their efforts to narrow this dispute.

### c. ACLS Plaintiffs' Separate Letter Motion to Compel

In addition to the formal motion to compel directed at the Government's privilege assertions, the ACLS Plaintiffs filed a separate letter motion seeking to compel additional discovery responses. Dkt. No. 179, ACLS' Letter Mot. to Compel.

3

In that submission, ACLS argued that the Government failed to provide adequate responses to certain interrogatories, including interrogatories seeking the identification of individuals involved in the grant-termination process. *Id.* at 1–2. ACLS further contended that the Government's document searches were unreasonably limited, that the Government failed to use appropriate search terms, and that the Government did not provide sufficient information – such as hit counts or de-duplication data – to permit Plaintiffs to assess the adequacy of the searches conducted. *Id.* at 2–4.

In sum, Plaintiffs seek to compel (1) production of a narrowed subset of documents withheld or redacted on the basis of asserted privileges following the Government's January 16, 2026 production, and (2) additional discovery concerning the adequacy of the Government's searches and responses to certain interrogatories, as raised in the ACLS Plaintiffs' separate letter motion.

The Court has reviewed the parties' submissions and, where appropriate, the materials submitted for *in camera* review. For the following reasons, Plaintiffs' motions to compel are GRANTED, and the ACLS Plaintiffs' letter motion to compel is GRANTED IN PART.

## II.    DISCUSSION

The remaining privilege dispute concerns 96 documents identified in Plaintiffs' revised exhibit, many of which are duplicative. The Government withholds or redacts these documents principally on the basis of (1) attorney-client privilege (including the common-interest doctrine) and (2) the deliberative process privilege. For the reasons explained below, those privilege assertions do not apply to the documents on this record, and all asserted grounds for withholding are overruled.

### a. Attorney-Client Privilege

The attorney-client privilege exists to encourage "full and frank communication between attorneys and their clients, and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The privilege protects confidential communications between a client and an attorney made for the purpose of obtaining or providing legal advice or services. *See Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997).

Because the privilege renders otherwise relevant information undiscoverable, it is "applied only where necessary to achieve its purpose" and is construed narrowly. *In re County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007) (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)); *In re Lindsey*, 158 F.3d 1263, 1272 (D.C. Cir. 1998). The burden of establishing the applicability of the privilege rests with the party invoking it. *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000).

The privilege applies to communications between a government agency and its attorneys, including communications from attorney to client as well as from client to attorney. *See Bast v. I.R.S.*, 1978 WL 1213, at *1 (D.D.C. Apr. 28, 1978). However, it applies only where:

(1) the asserted holder of the privilege is or sought to become a client;

(2) the person to whom the communication was made is an attorney (or the attorney's subordinate) acting in a legal capacity;

(3) the communication relates to facts conveyed by the client, in confidence, for the primary purpose of obtaining legal advice or assistance; and

(4) the privilege has been claimed and not waived.

*In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984) (citation omitted).

The fact that an attorney serves as counsel to a government agency does not dilute the attorney-client privilege. *See In re Grand Jury Investigation*, 399 F.3d 527, 535 (2d Cir. 2005).

5

Where the elements of the privilege are satisfied, communications between government lawyers and their client agencies are entitled to the same protection as communications between private counsel and private clients. *See General Elec. Co. v. Johnson*, No. 00 Civ. 2855 (JDB), 2006 WL 2616187, at *14 (D.D.C. Sept. 12, 2006) ("[T]he contention that government lawyers are categorically less entitled than private lawyers to invoke the attorney-client privilege . . . is without merit"). Where government lawyers serve in dual legal and non-legal capacities, courts apply the Second Circuit's "predominant purpose" test, which asks whether the predominant purpose of the communication was to solicit or render legal advice. *In re County of Erie*, 473 F.3d at 420.

The common-interest doctrine – sometimes referred to as the joint-defense doctrine – is not a separate privilege, but rather an extension of the attorney-client privilege. *United States v. Schwimmer*, 892 F.2d 237, 243–44 (2d Cir. 1989). The doctrine permits parties who share a common legal interest to exchange otherwise privileged communications without waiving the underlying privilege, and thus serves as "an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege." *Sokol v. Wyeth, Inc.*, 2008 WL 3166662, at *5 (S.D.N.Y. Aug. 4, 2008).

To invoke the common-interest doctrine, the party asserting it must establish that the parties shared a common legal interest and that the communication was made in confidence and in furtherance of that shared legal interest. *Schwimmer*, 892 F.2d at 244. The doctrine applies only to communications that are otherwise privileged in the first instance; it does not cloak non-privileged communications with protection. *Smith v. Pergola 36 LLC*, 2022 WL 1783256, at *7 (S.D.N.Y. Dec. 21, 2022). A shared institutional, policy, or operational objective – even one undertaken with an awareness of legal constraints – is insufficient to justify invocation of the

common-interest doctrine; the common interest must be legal in nature. *Schwimmer*, 892 F.2d at 244.

Although an attorney need not have authored or received the communication for the doctrine to apply, the absence of an attorney underscores the need for careful scrutiny, and the doctrine is construed narrowly. The burden of establishing its applicability remains with the party invoking it. *Id.*; *In re Horowitz*, 482 F.2d 72, 82 (2d Cir. 1973).

### i. Communications With No Attorney Present

Applying these principles, the Court concludes that Defendants have not met their burden of establishing that the subset of documents consisting solely of communications among non-attorney officials are protected by either the attorney-client privilege or the common-interest doctrine.

As an initial matter, none of the 36 documents at issue includes either of the two attorneys identified by Defendants – Justin Aimonetti or Ashley Boizelle – as participants. Because the attorney-client privilege protects communications between attorney and client, the privilege does not attach to these communications unless Defendants can establish that they are shielded under the common-interest doctrine.

Defendants argue that these communications that do not involve attorneys are nonetheless privileged because they were exchanged among officials across NEH, DOGE, and GSA, who were jointly engaged in effectuating the termination of certain NEH grants, and who shared a common legal objective of ensuring that those terminations were carried out in a lawful manner. According to Defendants, the communications reflect coordination among agencies toward a shared legal enterprise and therefore fall within the scope of the common-interest doctrine even in the absence of counsel.

The Court does not question that Defendants were operating in a legally sensitive environment or that legal considerations loomed in the background of the grant-termination process. Nor does the Court dispute that agency officials were aware that the grant terminations would be subject to legal scrutiny and attempted, in a general sense, to avoid unlawful action.

But the common-interest doctrine requires more than a generalized awareness of legal risk or a shared desire to act lawfully. It requires that the communications themselves be made in furtherance of a common legal strategy, and that they convey or reflect otherwise privileged legal advice in anticipation of litigation "against a common adversary on the same issue or issues." *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980).

The documents here do not satisfy that standard. Rather, they reflect inter-agency coordination concerning the identification, categorization, and implementation of grant terminations. For example, several communications discuss how grants were to be grouped based on subject matter, how decisions were to be made under time constraints, and how recommendations were to be transmitted among agencies for final approval. In one representative document, PI767_010504.1, NEH leadership explains to DOGE officials that grants were reviewed in categories; acknowledges that certain grants did not receive individualized analysis; and frames the ultimate determination as a matter of executive discretion rather than legal judgment. Although the email suggests the possibility of later legal review, it neither solicits legal advice nor conveys legal analysis, and it does not reflect the formulation of a legal strategy shared among agencies.

The same is true of the remaining documents in this grouping. Across the subset, communications focus on compiling grant lists, coordinating agency roles, and communicating determinations internally. Where legality is mentioned, it is typically in a forward-looking or

conclusory manner. For example, in PI767_010499.1, NEH leadership states: "Will need our lawyers to review these ASAP." In PI767_009231.1, one participant notes that "our legal team recommended / requested" specific edits to draft language. This confirms that legal advice had already been sought and rendered elsewhere, and that the communication at issue reflects the downstream implementation of that advice by non-lawyers, rather than the confidential provision of legal advice itself.

Moreover, multiple other documents reflect that participants were "awaiting guidance from the Chairman/OGC" before proceeding on programmatic questions. *See, e.g.*, 9123.1; 9149.1; 9185.1; 9397.1, 3149.2. Such references confirm that legal advice was expected to come from elsewhere; they do not transform the communications themselves into legal advice or privileged material. A communication does not become privileged simply because it relates to a subject that may later be reviewed by counsel or because it precedes formal legal consultation. *See Gucci Am., Inc. v. Gucci*, 2008 WL 5251989, at *1 (S.D.N.Y. Dec. 15, 2008).

Nor do the documents reflect a shared legal strategy within the meaning of the common-interest doctrine. At most, they demonstrate a shared institutional objective to implement grant terminations across agencies. While that objective may have legal implications, it is not itself a legal interest. The Second Circuit has made clear that the doctrine does not extend to communications driven by policy, even where those activities occur in a context with legal implications. *See Schwimmer*, 892 F.2d at 244. Accepting Defendants' position would effectively extend the doctrine to virtually all inter-agency coordination, since all agency actions invariably carry potential legal implications. Defendants' theory would render all routine inter-agency coordination into privileged material, a result inconsistent with the doctrine's narrow scope.

Finally, nothing in the documents indicates that the participants understood themselves to be engaging in confidential legal communications or that the exchanges were intended to further a joint legal defense or legal strategy. There are no indicia of confidentiality tied to legal advice, no invocation of shared legal representation, and no suggestion that the communications were undertaken to advance a coordinated legal position. The absence of any indicia of confidentiality tied to legal advice further undermines Defendants' assertions of privilege. *See In re Horowitz*, 482 F.2d at 82.

Accordingly, the Court concludes that Defendants have failed to establish that the common-interest doctrine applies to this subset of documents. Because the communications are not otherwise privileged and were not exchanged in furtherance of a shared legal strategy, the assertions of privilege are overruled as to the following documents: PI767_010504.1, PI767_009231.1, PI767_009245.1, PI767_009315.1, PI767_009316.1, PI767_010499.1, DOGE_28-1, DOGE_317-1, DOGE_338-1, DOGE_402-1, 8790.1, 9335.1, 755.1, 806.1, 813.1, 821.1, 827.1, 1737.1, 3149.1, 3655.1, 3659.1, 8784.1, 8798.1, 8804.1, 9123.1, 9143.1, 9149.1, 9185.1, 9291.1, 9397.1, 9412.1, 38157.1, 38171.1, 38224.1, and 38331.1.

### ii. Communications With an Attorney Present

Before the Court can determine whether any particular communication involving a U.S. DOGE Service ("USDS") employee reflects privileged legal advice, it must first resolve whether those communications were made within the scope of an attorney-client relationship in the first instance. The attorney-client privilege "only applies to communications that are the product of an attorney-client relationship and maintained as confidential between the attorney and the client," and the "mere fact that the person whose opinion is sought is an attorney does not create a

privileged communication." *Tri-State Hosp. Supply Corp. v. United States*, 2005 WL 3447890, at

\*3 (D.D.C. Dec. 16, 2005) (citing *Brinton v. Dep't of State*, 636 F.2d 600, 603 (D.C. Cir. 1980)).

Accordingly, the presence of an attorney on an email chain, standing alone, is insufficient

to establish the applicability of the privilege.  Rather, the party asserting the privilege bears the

burden of demonstrating (1) the existence of an attorney-client relationship, (2) that the attorney

was acting in a professional legal capacity on behalf of an identifiable client, and (3) that the

communication was made by or to that client for the purpose of obtaining or providing legal advice.

*See In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984).

These requirements apply with particular force in the government context, where

evidentiary privileges are "not lightly created nor expansively construed," and must be "strictly

confined within the narrowest possible limits consistent with the logic of [their] principle." *In re*

*Lindsey*, 158 F.3d 1263, 1269–70 (D.C. Cir. 1998) (quoting *United States v. Nixon*, 418 U.S. 683,

710 (1974)).  Government lawyers do not represent the Executive Branch writ large, nor do they

represent every federal employee with whom they interact; they represent specific government

clients pursuant to defined legal authority.  *See Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1114–

15 (D.C. Cir. 2004).

Defendants rely heavily on a line of Freedom of Information Act cases applying Exemption

5 – including *Hollar v. I.R.S.*, No. 95-1882 (RMU), 1997 WL 732542 (D.D.C. Aug. 7, 1997) – to

argue that communications between attorneys in one federal component and employees of another

are presumptively protected by the attorney-client privilege.  That reliance is misplaced.

*First,* the FOIA cases Defendants cite involve attorneys operating pursuant to explicit

statutory authority to provide legal advice or representation to other agencies or federal employees

– most notably, attorneys within the Department of Justice.  *Hollar* itself concerned

communications between IRS personnel and DOJ attorneys. *See* 1997 WL 732542, at \*4–5. That context is key. Congress has expressly vested DOJ with exclusive authority to provide legal advice and conduct litigation on behalf of executive agencies, reserving to the Attorney General the supervision of all such matters. *See* 28 U.S.C. §§ 512, 516, 519; *see also* 28 C.F.R. § 50.15. Congress has not conferred comparable authority on attorneys employed by individual agencies, including NEH or GSA.

*Second, Hollar* and similar FOIA cases do not dispense with the foundational requirement that an attorney-client relationship actually exist. FOIA Exemption 5 does not create privilege; it merely preserves privileges that otherwise exist. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862–63 (D.C. Cir. 1980) (stating that "Exemption 5 protects, as a general rule, materials which would be protected under the attorney-client privilege"). The FOIA cases Defendants invoke presuppose legally authorized representational relationships and then ask whether the communications were confidential and legal in nature. They do not stand for the proposition that communications with any government attorney are presumptively privileged.

The U.S. DOGE Service stands on materially different footing. Defendants identify no statute, regulation, or binding precedent establishing that attorneys affiliated with the U.S. DOGE Service are authorized to act as legal counsel for NEH or GSA employees. Nor do Defendants cite any case holding that attorneys embedded in the Executive Office of the President – other than those who work for DOJ – can unilaterally assume an attorney-client relationship with employees of separate agencies for purposes of asserting privilege in civil litigation.

The text of the Executive Order establishing DOGE confirms this absence of legal authority. Executive Order 14158, *Establishing and Implementing the President's "Department of Government Efficiency"*, 90 Fed. Reg. 8441 (Jan. 20, 2025), publicly renames the United States

Digital Service as the United States DOGE Service and situates it within the Executive Office of

the President. E.O. 14158, § 3(a). It further makes clear that USDS is a temporary entity:

> There is further established within USDS, in accordance with section 3161 of title
> 5, United States Code, a temporary organization known as 'the U.S. DOGE Service
> Temporary Organization' . . . [which] shall terminate on July 4, 2026.

*Id.*, § 3(b). Nothing in the Order confers upon USDS attorneys the statutory authority to represent

other agencies or their personnel as legal counsel. To the contrary, the Order explicitly preserves

pre-existing agency authority and legal structures:

> Nothing in this order shall be construed to impair or otherwise affect: (i) the
> authority granted by law to an executive department or agency, or the head thereof.

*Id.*, § 5(a)(i). Defendants point to no language in the Executive Order – nor could they – that could

be read to establish an attorney-client relationship between USDS attorneys and NEH or GSA

employees. The Order defines DOGE's mission in operational and policy terms, such as

modernizing federal technology, improving efficiency, and coordinating inter-agency initiatives.

*See id.*, §§ 1, 4. It does not authorize USDS attorneys to provide legal representation to other

agencies or their employees, nor does it purport to transfer DOJ's exclusive litigating and advisory

authority under Title 28.

Unlike DOJ, USDS lacks organic statutory authority to represent executive agencies, to

conduct litigation on their behalf, or to provide binding legal advice to agency officials outside of

itself. The absence of such authority is dispositive. Without it, the Court cannot simply infer that

communications between USDS attorneys and employees of the NEH or GSA were made within

an attorney-client relationship. That inference is inconsistent with settled privilege principles and

the narrow construction afforded to government privileges. *See In re Lindsey*, 158 F.3d at 1269–

70. Executive Order 14158 cannot supply what Congress has not.

13

Applying the foregoing principles, the Court concludes that, while several communications involving USDS attorneys reflect legal considerations, Defendants have not carried their burden of establishing that those communications were made within an attorney-client relationship with NEH or GSA personnel. The documents instead reflect inter-agency coordination, advisory input, and policy implementation, not legally authorized representation. Given the common substance, participants, and asserted basis for privilege across the challenged materials, the Court addresses Defendants' privilege claims categorically rather than on a document-by-document basis. Many of the withheld documents are duplicative of one another.

### A. Drafts of NEH Press Releases

A first group of documents concerns draft press releases announcing NEH priorities or grant-termination actions, circulated among NEH leadership, GSA officials, and USDS attorneys. In DOGE_316-1, for example, Justin Fox forwards a draft NEH press release to USDS attorneys Justin Aimonetti and Ashley Boizelle, asking: "Do either of you have input or know someone that would have strong opinions about the attached press release for NEH?" DOGE_316-1. The communication is explicitly framed as a request for input, not as a request for legal representation or confidential legal advice.

Aimonetti's response in DOGE_860 underscores the absence of any attorney-client relationship with NEH. Rather than treating himself as NEH's counsel, Aimonetti asks whether NEH has consulted its own lawyers: "any idea whether he ran the release by NEH's general counsel?" DOGE_860. That question is incompatible with Defendants' theory that USDS attorneys themselves stood in NEH's shoes as legal counsel.

Boizelle's reply in DOGE_1442 makes the point even clearer. She states: "We don't see any legal issues with the press release but don't have a view on whether it should go through

whatever the WH policy process is for press releases." DOGE_1442. This language reflects informal legal spotting and policy coordination, not legal representation. It also expressly disclaims authority over NEH's internal approval processes.

These communications fail at the threshold. They do not evidence an attorney-client relationship between USDS attorneys and NEH, do not reflect confidential communications made by a client seeking legal advice from its lawyer, and instead affirmatively recognize the role of NEH's own general counsel. Accordingly, the attorney-client privilege does not attach.

### B. Drafts of Grant Termination Language

A second group of documents involves USDS attorneys providing input on termination language, appeal procedures, and litigation risk – communications that are plainly legal in character but nonetheless unprivileged for lack of an attorney-client relationship.

In PI767_015178, Justin Fox asks Aimonetti to "draft grant termination language for NEH's programs," and Aimonetti responds with proposed language addressing termination grounds and appeal rights. This exchange reflects legal drafting, but it does not establish that Aimonetti was acting as NEH's counsel. There is no indication that NEH retained USDS as its lawyer, no invocation of confidentiality, and no assertion of authority to represent NEH in litigation or administrative appeals.

Similarly, PI767_009444 contains a discussion between Fox and Aimonetti anticipating that grant recipients may appeal terminations and identifying areas of potential "reasonable cause." That exchange reflects legal risk assessment and strategy formation, but again, legal analysis alone is insufficient. The documents do not identify NEH or GSA as Aimonetti's client, do not suggest that the communications were made in confidence within a recognized attorney-client relationship, and do not overcome the absence of statutory authority for USDS to represent NEH or GSA.

As the Court explained above, legal advice is not synonymous with privileged legal advice. Where a lawyer provides legal input in an advisory or coordinating role – without authority to represent the agency and without a mutual understanding of an attorney-client relationship – the privilege does not attach.

### C. Inter-Agency Coordination

A third category includes documents such as DOGE_132-1, DOGE_176-1, DOGE_198-1, and DOGE_209-1, in which USDS attorneys are copied on or respond to emails involving "gut checks," line edits to templates, or alignment on messaging and coordination of grant-terminations.

These documents show awareness of litigation risk, but they also show editorial input, messaging coordination, and policy implementation across agencies. In several instances, USDS attorneys provide comments on draft language or confirm that certain approaches do not raise obvious legal red flags. Nothing in these communications demonstrates that USDS attorneys were acting as legal counsel to NEH or GSA, as opposed to inter-agency advisors supporting implementation of the DOGE agenda.

Nor do the documents contain indicia of confidentiality typical of attorney-client communications. To the contrary, they are widely circulated among non-lawyers across agencies and frequently contemplate further review by agency leadership or agency counsel.

In sum, the Court concludes that Defendants have failed to carry their burden of establishing that communications involving U.S. DOGE Service attorneys were made within the scope of an attorney-client relationship with the National Endowment for the Humanities or the General Services Administration. Because Defendants have not established the existence of an attorney-client relationship in the first instance, the attorney-client privilege does not attach, and Defendants' assertions of that privilege are overruled as to the following documents:

PI767_015179.1, PI767_015099.1, PI767_010221.1, PI767_013273.1, PI767_010498.1, PI767_010493.1, PI767_015178.1, PI767_015098.1, PI767_010220.1, PI767_011288.1, PI767_009259.1, PI767_013271.1, PI767_013301.1, PI767_011276.1, PI767_006186.1, PI767_006196.1, PI767_006198.1, PI767_006203.1, PI767_009507.1, PI767_009513.1, PI767_009515.1, PI767_009518.1, PI767_009491.1, PI767_009224.1, PI767_009225.1, PI767_009227.1, PI767_009229.1, PI767_009444.1, PI767_013957.1, PI767_010494.1, PI767_015173.1, PI767_010484.1, DOGE_1-1, DOGE_38-1, DOGE_158-1, DOGE_132-1, DOGE_27-1, DOGE_185-1, DOGE_235-1, DOGE_198-1, DOGE_209-1, DOGE_293-1, DOGE_309-1, DOGE_315-1, DOGE_365-1, DOGE_401-1, DOGE_392-1, DOGE_316-1, DOGE_337-1, DOGE_860, DOGE_1356, DOGE_1335, DOGE_1442, DOGE_216-1, DOGE_71-1, DOGE_58-1, DOGE_20-1, DOGE_176-1, DOGE_177-1, and 39086.1.

### b. Deliberative Process Privilege

Defendants also invoke the deliberative process privilege, contending that the remaining withheld documents consist of internal, predecisional communications reflecting governmental deliberations. That contention is not supported on this record.

The deliberative process privilege is a qualified common-law privilege that protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (citation omitted). The privilege rests on the premise that safeguarding predecisional deliberations encourages candid internal discussion and thereby improves the quality of agency decisionmaking. *Id.* Because it shields otherwise relevant evidence from disclosure, however, the privilege is narrowly construed and applies only where its underlying rationale is genuinely implicated.

The deliberative process privilege was "fashioned in cases where the governmental decisionmaking process is collateral to the plaintiff's suit." *In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*, 145 F.3d 1422, 1425 (D.C. Cir.), *reh'g in part*, 156 F.3d 1279 (D.C. Cir. 1998). Where, by contrast, a plaintiff's cause of action is directed at the government's intent, the privilege "does not enter the picture at all." *Id.* at 1425. In such circumstances, allowing the government to invoke the privilege would defeat its very rationale, because, "If Congress creates a cause of action that deliberatively exposes government decisionmaking to the light, the privilege's raison d'être evaporates." *Id.* at 1424.

Courts have applied this principle in discovery disputes where plaintiffs challenge governmental action on grounds that require examination of why and how the government acted. In *Tri–State Hospital Supply Corp. v. United States*, 2005 WL 3447890, at *8 (D.D.C. Dec. 16, 2005), for example, the court rejected the government's invocation of the deliberative process privilege in an action alleging abuse of process and malicious prosecution, holding that because the plaintiff's claims "place[d] the government's deliberative process squarely at issue," the privilege was simply inapplicable.

That reasoning applies here to the extent Plaintiffs seek documents whose relevance lies precisely in revealing the basis, purpose, or intent for the challenged grant-termination decisions. Plaintiffs' claims do not merely contest the fact that grants were terminated; they turn in substantial part on whether those terminations were undertaken pursuant to lawful criteria and reasoned decisionmaking, or instead reflected impermissible considerations. Where documents are probative precisely because they shed light on those questions, the deliberative process privilege cannot be invoked to shield the agency's reasoning from scrutiny. *See Subpoena Duces Tecum*, 145 F.3d at 1424–25; *Tri–State*, 2005 WL 3447890, at *8.

18

Moreover, the Court's *in camera* review independently confirms that a number of documents withheld on deliberative-process grounds do not reflect predecisional deliberation, or at minimum do not reflect deliberation of the kind the privilege is designed to protect, but instead concern ministerial tasks relating to determinations that appear to have already been reached.  Such materials fall outside the scope of the privilege as a matter of law.  *See Sears*, 421 U.S. at 151–52; *Coastal States*, 617 F.2d at 866.

For example, document 37974.1 reflects purely logistical communications dated April 22, 2025 – well after the relevant grant-termination decisions had already occurred between April 1 and April 3, 2025.  The email chain concerns two grant applications that had previously reached "Offered" status but were inadvertently omitted from DOGE's termination sweep, and addresses only how those already-approved applications should be processed administratively.  In that context, an NEH employee asks: "Do I need to send a memo to Michael through you, or will these be processed at some point once the freeze is lifted?"  The communication does not reflect any weighing of policy alternatives, evaluative judgment, or recommendation regarding agency action.  Communications of this kind fall outside the deliberative process privilege.  *See Sears*, 421 U.S. at 152.

Similarly, document 38360.1 consists of internal NEH communications that merely transmit a memorandum concerning "NEH matching funds for terminated awards."  The document does not reflect policy judgment or deliberation.  Communications of this kind that merely convey or implement a final decision are neither predecisional nor deliberative and thus fall outside the privilege.  *See Coastal States*, 617 F.2d at 866–68.  Taken together, these documents are illustrative of the common pattern in the materials reviewed.  Where communications concern the execution

and internal administration of agency action – rather than the weighing of policy consideration – the deliberative process privilege is unavailable.

Accordingly, Defendants have failed to carry their burden of establishing that the deliberative process privilege applies to the foregoing materials. To the extent the documents bear directly on the basis and intent behind the grant terminations, the privilege is inapplicable because Plaintiffs' claims place the government's decisionmaking squarely at issue. And to the extent the documents concern internal administration of agency action, they fall outside the substantive scope of the privilege in any event. The Court therefore overrules Defendants' assertions of deliberative process privilege as to the following documents: 37925.1, 37974.1, 37981.1, 37985.1, 38014.1, 38360.1, 38319.1, 38472.1, 38327.1, 38481.1, 38335.1, 38476.1, 37944.1, 38216.1, 37989.1, and 38333.1.

### c.  ACLS' Letter Motion to Compel

Plaintiff ACLS separately moved by letter to compel additional discovery responses from the Government. Dkt. No. 179. For the reasons set forth below, the motion is GRANTED IN PART.

*First,* the Government is directed to answer Interrogatory No. 1. That interrogatory seeks core factual information bearing on the challenged agency actions, and the Government has not demonstrated a sufficient basis for withholding a substantive response. The Government shall serve a full response to Interrogatory No. 1 by the close of business on Tuesday, February 10.

*Second,* the Court concludes that the Government's response to Interrogatory No. 2 is adequate. Plaintiffs' objections to that response are overruled, and no further supplementation is required.

*Third,* with respect to document discovery, the Court is not satisfied with the Government's explanation for its inability to de-duplicate the 6,298 documents identified on the "hit list" generated from the search terms "Fox," "Cavanaugh," "DOGE," and "USDS." The record contains no meaningful explanation as to why de-duplication is infeasible or unduly burdensome, particularly given the centrality of these custodians and terms to the case. The Government is therefore directed to explain why it cannot de-duplicate these materials, or alternatively, how it proposes to manage the production in a way that avoids unnecessary duplication. The Government shall provide that explanation by the close of business on Tuesday, February 10. Once that issue is resolved, the Court anticipates that fact discovery will be closed.

These rulings fully resolve Plaintiffs' motions to compel.

Any motion for summary judgment must be filed no later than March 6. Responsive papers shall be filed by March 27, and replies by April 10. If Plaintiffs intend to move to amend the complaint to assert an equal protection claim, any such motion must be filed by February 13. Likewise, any motion seeking spoliation sanctions must be filed by February 13.

## Conclusion

For the foregoing reasons, Plaintiffs' motion to compel is GRANTED. All asserted grounds for withholding or redaction – including attorney-client privilege, the common-interest doctrine, and the deliberative process privilege – are overruled as to the 96 documents identified in Exhibit 1 of Docket Number 190. The Court's ruling reflects a fact-specific application of settled privilege principles following *in camera* review. The Court directs Defendants to produce, in full, each of the 96 documents to Plaintiffs by the close of business on Tuesday, February 10.

The ACLS Plaintiffs' separate letter motion to compel is GRANTED IN PART to the extent set forth above.

The Clerk of Court is directed to terminate the motions at Docket Numbers 83 and 91 in *The Authors Guild v. National Endowment for the Humanities*, No. 25-cv-3923 (CM), and Docket Numbers 156, 179, 187, and 188 in *American Council of Learned Societies v. McDonald*, No. 25-cv-3657 (CM), and to remove them from the Court's list of open motions.

This constitutes the decision and order of the Court.  It is a written decision.

Dated: February 5, 2026

U.S.D.J.

BY ECF TO ALL COUNSEL