UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

American Council of Learned Societies, et al.,

Plaintiffs,

-against-

Michael McDonald, et al.,

Defendants.

No. 25 Civ. 3657 (CM) (BCM)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/25/2025

The Authors Guild, et al.,

Plaintiffs,

-against-

National Endowment for the Humanities, et al.,

Defendants.

No. 25 Civ. 3923 (CM) (BCM)

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND GRANTING IN
PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

McMahon, J.:

In 1965, Congress established the National Endowment for the Humanities (the "NEH"),

for the express purpose of assisting – primarily through funding – efforts by local state, regional

and private agencies and organizations to foster the learning and advancement of humanities in the

United States. 20 U.S.C. §§ 951 *et seq*. For six decades, with bipartisan support from Congress

and administrations of both political parties, NEH has been the largest and most prestigious funder

of advanced humanities research in this country. Since its founding, NEH has awarded over $6

billion in grants to museums, historic sites, colleges, universities, elementary and secondary

schools, libraries, public television and radio stations, research institutions and independent scholars. (Dkt. No. 75 (the "Am. Compl.") ¶ 39).[1]

In the 2024 Appropriations Act, Congress appropriated $207 million to NEH, of which $192 million was expressly to be used "for support of activities in the humanities, pursuant to section 7(c) of the Act [20 U.S.C. § 956(c)] and for administering the functions of the Act." Pub. L. 118-42, 138 Stat. 25, 282 (Mar. 9. 2024) (the "2024 Act"). In March 2025, by continuing resolution, Congress appropriated an additional $207 million, including $192 million in grant and administrative funding, to fund NEH's activities for the fiscal year ending September 30, 2025. Pub. L. 119-24, §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025) (the "2025 Continuing Resolution"). These funds were designated for disbursement to a number of recipients in the form of awards – some directly to scholars and authors, others to institutions that in turn passed through grant money to sub-recipients – pursuant to regulations that were promulgated pursuant to NEH's rulemaking authority, with notice and comment to affected communities. The terms and conditions of these awards provide that only the Office of Grant Management at the NEH has the power to issue Notices of Action (grant awards), to revise them and to amend funding levels thereunder. *See* NAT'L ENDOWMENT FOR THE HUMANITIES, *General Terms and Conditions for Awards to Organizations (for grants and cooperative agreements issued October 1, 2024, or later)*, https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024; *See also* NAT'L ENDOWMENT FOR THE HUMANITIES, *General Terms and Conditions for Awards to Individuals (for awards with start dates January 1, 2025, or later)*, https://www.neh.gov/general-terms-and-conditions-awards-individuals.

---

[1] Unless otherwise noted, references will be to the docket in Case No. 25-cv-03657.

Over the first three days of April 2025, at the behest of representatives of a newly-created office within the Executive Branch known as the Department of Government Efficiency ("DOGE"), identical emails, purportedly signed by Michael McDonald, the Acting Chairman of the NEH, were sent to at least 1,400 recipients of NEH grant funding, notifying them that their grants were being terminated, effective immediately. Am. Compl. ¶¶ 100-03.

Representatives of those recipients – including (i) individual grant recipients whose funding was cancelled; (ii) prestigious humanities organizations like the American Council on Learned Humanities (ACLS), which lost its own NEH funding; and (iii) associations (including ACLS) whose members were similarly defunded – have commenced two lawsuits in this Court (one a class action), challenging the mass grant termination (the "Mass Termination") and other administrative changes at the NEH as violative of the First Amendment to the United States Constitution, the NEH authorizing statute, 20 U.S.C. §§ 951 *et seq*, and regulations issued thereunder, and the Administrative Procedures Act (APA), 5 U.S.C. §§ 701 *et seq*.[2] In both actions, Plaintiffs seek preliminary and permanent declaratory and injunctive relief.

Several weeks after the filing of the lawsuits, Plaintiffs in both actions moved for preliminary injunctions. The Government has cross moved to dismiss both complaints on a variety of grounds. (*See* Dkt. No. 76). The Court ordered preliminary consolidation of the two cases for ease of administration. (*See* Dkt. No. 52).

---

[2] The Court is aware of three other lawsuits bringing substantially similar claims: *Porwancher v. National Endowment for the Humanities et al*, 1:25-cv-01180 (D.D.C.); *Thakur v. Trump*, No. 25-CV-04737-RFL (N.D. Cal.); and *San Francisco A.I.D.S. Found. v. Trump*, No. 25-CV-01824-JST (N.D. Cal.). So far, preliminary injunctions have been entered reinstating some terminated NEH grants to select LGBTQ-affiliated organizations, *San Francisco A.I.D.S. Found. v. Trump*, 2025 WL 1621636 (N.D. Cal. June 9, 2025), to select researchers at the University of California, *Thakur v. Trump*, 2025 WL 1734471 (N.D. Cal. June 23, 2025), and to Professor Andrew Porwancher of Arizona State University, *Porwancher v. NEH et al.*, 1:25-cv-01180 (D.D.C. July 25, 2025), ECF No. 22.

By this decision and order, the Court enters a preliminary injunction in *Authors Guild*, 25-cv-3923, staying the April 1-3 Mass Cancellation of grants previously awarded to putative class members in that case and directing *pendente lite* that any funds associated with those grants not be re-obligated until trial on the merits. The reason is that the class plaintiffs are likely to succeed in establishing that the class members' grants were terminated in violation of the First Amendment to the United States Constitution and the Administrative Procedure Act.[3]

## BACKGROUND

### A.    PARTIES

#### 1.    Plaintiffs in Case No. 25 Civ. 3657 ("ACLS Plaintiffs")

Plaintiff ACLS is a nonprofit organization whose members include 81 scholarly organizations. (Dkt. No. 1 (the "ACLS Compl.") ¶ 12). Its principal place of business is located at 633 Third Avenue, New York, New York. *Id* at 1. The mission of ACLS is to advance the understanding of humanity and human endeavors in an effort to improve the human experience. *Id*. ¶ 12. ACLS both conducts projects directly and funds the work of others. *Id.* ACLS has received a total of 144 direct grants from the NEH since that agency was founded. *Id*. ACLS member organizations have also received grants directly from the NEH. *Id*.

Plaintiff American Historical Association ("AHA") is a non-profit organization founded in 1884 and incorporated by Congress in 1889 for the promotion of historical studies. *Id*. ¶ 13. It is headquartered at 400 A Street SE, Washington DC 20003. *Id*. at 1. AHA is the largest membership association of historians in the world, with over 10,400 members. *Id*. ¶ 13. Both AHA and its members have received grants from the NEH; AHA members have received over 300 such award

---

[3] The injunction ordered today does not "reinstate" the grants; it simply stays the effectiveness of their termination. This will be explained more fully below. *See* Section III, *infra*.

over the last five years, while AHA itself has received nearly 50 NEH grants since the agency was founded. *Id*.

Plaintiff Modern Language Association of America ("MLA") is a non-profit organization founded in 1883. *Id*. ¶ 14. Its principal place of business is located at 85 Broad Street, New York, New York. *Id*. at 1. MLA serves as a leading advocate for the study and teaching of languages and literature, and it operates a publishing program in the humanities. *Id*. ¶ 14. MLA has over 20,000 members, whom it supports in a variety of ways, including through its Strategic Partnership Network, which brings together institutions with a proven commitment to the humanities to develop critical resources for responding and building a sustainable foundation for the future. *Id*. MLA itself has received nearly 50 grants from the NEH since the agency was founded, and MLA members have received over 180 such awards during the past three years. *Id*.

All three plaintiffs in the ACLS action had active NEH grants at the time of the Mass Termination, but only ACLS and AHA allege that their grants were terminated. All three plaintiffs allege that they have lost or will lose the opportunity to bring claims in the future. All three organizations bring claims in their own right, (ACLS Compl. ¶¶ 92-93; 98; 103), as well as in right of their members.

### 2.  Plaintiffs in Case No. 25 Civ. 3923 ("Authors Guild Plaintiffs")

Plaintiff The Authors Guild was founded in 1912 and is a national non-profit membership association of more than 14,000 professional, published writers of all genres. Am. Compl. ¶ 11. The Guild, which is headquartered in New York City, counts historians, biographers, academics, journalists and other writers of non-fiction and fiction as members. *Id*. Many Guild members earn their livelihoods through their writing. *Id*. Their work covers important issues in history, biography,

science, politics, medicine, business and other areas; they are frequent contributors to the most influential and well-respected publications in every field. *Id*.

The Guild works to promote the rights and professional interest of authors in various areas, including copyright, freedom of expression and fair contracts. *Id*. In addition, it assists members in seeking relief when those members do not receive agreed upon funds for their work. *Id*. The Authors Guild has many members who have received grants from the NEH, including grantees under the NEH's Public Scholars, Fellowship and Summer Stipend programs whose grants were purportedly terminated by Defendants as part of the Mass Termination. *Id*.

Unlike ACLS, AHA and MLA, the Authors Guild does not allege that it has ever received any grants from the NEH. It brings this case solely in its associational capacity, on behalf of a class whose members include Guild members whose grants were terminated in the recent "Mass Termination" of pending NEH grants. Am. Compl. ¶ 11.

Co-plaintiffs with The Authors Guild are a number of individual NEH grant recipients.

Plaintiff Elizabeth Kadetsky is a professor in the English Department at Penn State University. Am. Compl. ¶ 12. NEH awarded her a Public Scholars grant for $60,000 with a grant period scheduled to begin on May 1, 2025. NEH terminated the grant on April 3, 2025. *Id*.

Plaintiff Dr. Valerie Orlando is the Head of Department and Professor of French & Francophone Literatures and Cultures at the University of Maryland, College Park. Am. Compl. ¶ 13. Dr. Orlando was awarded an NEH Summer Stipend of $6,000. *Id*. ¶ 14. Her award, which was scheduled to have been dispersed on June 1, 2025, was terminated on April 3, 2025. *Id*.

Plaintiff Katalin Balog is a resident of this district and a professor of philosophy at Rutgers University-Newark. *Id*. ¶ 15. Professor Balog was awarded a $60,000 grant for the period January

1, 2025 through December 31, 2025. *Id*. ¶ 16. While a portion of the grant has already been received, the remainder of her grant was terminated on or about April 2, 2025. *Id*.

Plaintiff Benjamin Holtzman is a resident of this district and an Assistant Professor of History at Lehman College. *Id*. ¶ 17. Professor Holtzman was awarded a $60,000 grant under NEH's Awards for Faculty at Hispanic-Serving Institutions program. *Id*. ¶ 18. The grant, which had a period of performance from September 1, 2024, to August 31, 2025, was cancelled on April 3, 2025, before it was fully funded. *Id*.

Plaintiff William Goldstein was awarded a Public Scholars program grant to support him during the writing of a biography of Larry Kramer, the AIDS activist. *Id*. ¶ 20. Dr. Goldstein's Public Scholars award was for $60,000 and was scheduled to run from September 1, 2024 to August 31, 2025. *Id*. He has received $50,000 of the awarded funds; he was scheduled to receive the final $10,000 in July 2025, but his grant was terminated on April 3, 2025. *Id*.

Plaintiff Lee Jasperse is a Teaching Fellow in the Department of English Language and Literature at the University of Chicago. *Id*. ¶ 21. On February 19, 2025, Dr. Jasperse received a fellowship at the Massachusetts Historical Society ("the MHS"). His acceptance to the MHS Fellowship program was contingent on the receipt of a $30,000 NEH award under the Fellowship Programs at Independent Research Institutions Program. That funding was terminated effective April 2, 2025. *Id*. ¶ 22.

Plaintiff Nicole Jenkins is an Assistant Professor in the Department of Sociology and Criminology at Howard University in Washington, D.C., and a Visiting Faculty Fellow at Harvard University. *Id*. ¶ 23. On February 11, 2025, Defendant NEH awarded Prof. Jenkins a $60,000 grant under the Awards for Faculty at Historically Black Colleges and Universities Program so she could

complete a book. *Id*. The grant period was set to begin on August 1, 2025, and last through July 31, 2026. *Id*. Prof. Jenkins has not received any payments under the grant award to date. *Id*. In April 2025, NEH terminated her grant. *Id*. ¶ 24.

### 3. Defendants in Both Actions

Defendant NEH is a federal agency headquartered in Washington, DC, responsible for administering the NEH grants at issue in this litigation. *Id*. ¶ 25. Its history and statutory authorization are described more fully below.

Defendant Michael McDonald was the Acting Chairman of NEH at the time the Termination Notices were issued to NEH Grantees. *Id*. ¶ 26.

Defendant DOGE is an office within the Executive Office of the President. *Id*. ¶ 27.

Defendant Amy Gleason is the Acting Administrator of DOGE and is its highest ranking official. *Id*. ¶ 28. Before becoming a government official, Ms. Gleason was a healthcare technology executive. *Id*.

Defendant Nate Cavanaugh is a member of DOGE and an employee of the General Services Administration. *Id*. ¶ 29. Cavanaugh has reportedly operated on behalf of DOGE at multiple agencies, including NEH. *Id*. Cavanaugh is 28 years old and previously worked in legal technology and financial services. *Id*.

Defendant Justin Fox is a member of DOGE and an employee of the General Services Administration. *Id*. ¶ 30. Fox has reportedly operated on behalf of DOGE at multiple agencies, including NEH. *Id*.

**B.     Factual Background**

**1.  The National Endowment for the Humanities**

The National Endowment for the Humanities is an independent federal agency that supports the humanities in every state and U.S. jurisdiction. Am. Compl. ¶ 31.

The NEH was authorized by Congress to support high-quality projects and programs in the humanities and make the humanities available to all Americans. *Id*. ¶ 32. As Congress put it when creating the NEH in 1961, "the humanities belong to all the people of the United States," 20 U.S.C. § 951(1), and the NEH's mission is to promote that national asset. *Id*.

In enacting the NEH's founding legislation, Congress recognized that, "An advanced civilization must not limit its efforts to science and technology alone but must give full value and support to the other great branches of scholarly and cultural activity in order to achieve a better understanding of the past, a better analysis of the present, and a better view of the future." 20 U.S.C. § 951(3).

Congress further declared that "Democracy demands wisdom and vision in its citizens. It must therefore foster and support a form of education, and access to the arts and the humanities, designed to make people of all backgrounds and wherever located masters of their technology and not its unthinking servants." 20 U.S.C. § 951(4).

Justifying its decision to fund these efforts, Congress further declared that "it is necessary and appropriate for the Federal Government to help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent." 20 U.S.C. § 951(7).

When drafting the NEH's authorizing legislation, Congress quite explicitly stated that the NEH was supposed to serve both a "multicultural" and a novelty function, stating, "It is vital to democracy to honor and preserve its multicultural artistic heritage as well as support new ideas, and therefore it is essential to provide financial assistance to its artists and the organizations that support their work." 20 U.S.C. § 951(10)

To advance these ideals, Congress established the NEH and authorized it to provide funding for organizations and individuals involved in research, publication of scholarly works, and promotion of the humanities. *See* 20 U.S.C. § 956 *et seq*. Setting out the agency's mission as contemplated by Congress, the authorizing statute provides that NEH may "enter into arrangements," including "contracts, grants, loans, and other forms of assistance," to do any and all of the following:

(1) develop and encourage the pursuit of a national policy for the promotion of progress and scholarship in the humanities;

(2) initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities;

(3) initiate and support training and workshops in the humanities by making arrangements with institutions or individuals;

(4) initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural;

(5) foster international programs and exchanges;

(6) foster the interchange of information in the humanities;

(7) foster, with groups, education in, and public understanding and appreciation of the humanities;

(8)   support the publication of scholarly works in the humanities;

(9)   ensure that the benefit of its programs will also be available to our citizens where such programs would otherwise be unavailable due to geographic or economic reasons; and

(10)  foster programs and projects that provide access to, and preserve materials important to research, education, and public understanding of, the humanities.

20 U.S.C. § 956(c).

The Senate Committee that reported out the bill authorizing the NEH reiterated what Congress had written into the statute in no uncertain terms: "It is the intent of the committee that in the administration of this act there be given the fullest attention to freedom of . . . humanistic expression," and specified that "No undue preference should be given to any particular style or school of thought or expression." S. Rep. No. 80-300, at 3-4 (1965). To fulfill this goal, the authorizing statute provides that the NEH should fund a broad range of projects, including specifically projects representing traditionally underrepresented recipients. 20 USC § 956(c).

The statute also prohibits Federal employees and agencies from "exercise[ing] any direction, supervision or control of the policy determination, personnel, or curriculum" of any grantee organization. 20 USC § 953(c). Consistent with this, grant recipients are prohibited from using their funding for any political activity or to "promote any particular political, religious or ideological point of view." NAT'L ENDOWMENT FOR THE HUMANITIES, *An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders* (Apr. 24, 2025), https://www.neh.gov/news/update-neh-funding-priorities-and-agencys-recent-implementation-trump-administration-executive.

The authorizing statute provides that the activities of NEH are to be supervised by the National Council on the Humanities, which is made up of the Chairman of the agency and 26 "private citizens . . . . who are recognized for their broad knowledge of, expertise in, or commitment to the humanities." 20 U.S.C. § 957. The Chairman is appointed to a four-year term, *id.*, and is confirmed by the Senate; typically each new president appoints his own Chair, *see* WIKIPEDIA, *National Endowment for the Humanities* (last visited July 22, 2025, https://en.wikipedia.org/wiki/National_Endowment_for_the_Humanities. Members of the Council are appointed to staggered six-year terms; Congress' goal in so providing was to ensure that members would be appointed across presidential administrations. 20 USC § 957(c).

### 2. The NEH Grant Programs

Prior to the last few months, the NEH offered 47 different grant programs to support museums, historic sites, colleges, universities, K-12 teachers, libraries, public television and radio stations, research institutions, independent scholars, authors, writers, filmmakers and nonprofits nationwide. Am. Compl. ¶ 38. Over its history, the NEH has awarded over $6 billion to support museums, historic sites, universities, teachers, libraries, documentary filmmakers, public TV and radio stations, research institutions, scholars and local humanities programming. *Id.* ¶ 39. These grants allowed scholars, educators and authors to examine the human condition, promote civics education, understand our cultural heritage, foster mutual respect for diverse beliefs and cultures, develop media and information literacy, create documentaries and podcasts, facilitate groundbreaking research and preserve and expand access to cultural and historical artifacts. *Id.* ¶ 40. Many NEH grants have been used to support research for books that have won prestigious prizes, such as the Pulitzer Prize. *Id.* ¶ 41. Others have funded award-winning documentaries about

American history and life, including Ken Burns' famous television documentary series *The Civil War*.[4] *Id*. ¶ 42.

The NEH has also provided funding to humanities councils in every U.S. State and Territory. *Id*. ¶ 43. State and jurisdictional humanities councils tailor their grantmaking and programs to the needs, resources, and interests of their respective jurisdictions, while also extending the reach of NEH-funded projects and further strengthening the agency's connection to local communities. *Id*.

The NEH disburses grants through a competitive process that is tightly controlled by factors Congress has dictated. NEH typically received around 5,700 applications each year across more than 40 grant programs, and it typically awarded grants to only 16% of applicants. *Id*. ¶ 44. NEH affirmatively works – through its own employees, the National Council on the Humanities, and outside peer-reviewers – to support a wide variety of academic disciplines and viewpoints within those disciplines. *Id*.

Before April 2025, the NEH engaged in a rigorous process for selecting grantees among the many thousands of applicants it receives annually. *Id*. ¶ 46. Each year, the NEH recruits and organizes over 1,000 individual experts into more than 200 peer review panels to review each of the more than 5,500 grant applications the NEH receives annually. *See* NAT'L ENDOWMENT FOR

---

[4] Burns has a lengthy history of NEH support, dating back to the early 1980s and his first documentary film, *Brooklyn Bridge*. The Endowment has funded more than 15 of Burns' projects, including documentaries on controversial subjects like the Vietnam War, *See* Grant No. TR-228365-15, *The Vietnam War*, NAT'L ENDOWMENT FOR THE HUMANITIES, https://apps.neh.gov/publicquery/AwardDetail.aspx?gn=TR-228365-15, as well as the much beloved series *Baseball*, *see* NAT'L ENDOWMENT FOR THE HUMANITIES, *Ken Burns*, https://www.neh.gov/about/awards/jefferson-lecture/ken-burns-biography. It was recently reported that NEH provided funding to support Mr. Burns' latest endeavor, a documentary on the American Revolution. *See* Maureen Dowd, *Donald Trump, Our Foundering Father*, N.Y. Times (July 5, 2025), https://www.nytimes.com/2025/07/05/opinion/donald-trump-fourth-of-july.html.

THE HUMANITIES, *NEH's Application Review Process*, https://www.neh.gov/grants/application-process.

Peer review panels were organized and overseen by NEH program officers, who themselves were experts in the areas of scholarship for which they were asked to review grant applications. Am. Compl. ¶ 47. Program officers placed experts on review panels based on a variety of factors, including broad knowledge of the humanities and expertise in specific areas. *Id.* ¶ 48.

After a grant application was submitted, a relevant program officer reviewed it and, based on academic discipline, institutional type, project area, or project type, assigned it to a specific peer-review panel for the relevant program. *Id.* ¶ 49. Each grant application thus received rigorous review by experts in the applicant's field. *Id.* ¶ 50.

These procedures, which developed over many years, are/were memorialized in directives issue by the agency. *See, e.g.,* NAT'L ENDOWMENT FOR THE HUMANITIES, Public Scholars 2024–2025 Notice of Funding Opportunity (2024), https://www.neh.gov/sites/default/files/inline-files/Public%20Scholars%202024%20and%202025%20NOFO.pdf; *see also* NAT'L ENDOWMENT FOR THE HUMANITIES, *NEH's Application Review Process*, https://www.neh.gov/grants/application-process.

By statute, the NEH Chair must make all final funding decisions. 20 U.S.C. § 956(c). However, s/he is statutorily prohibited from doing so until the National Council on the Humanities reviews evaluations of grant applicants from NEH program officers and peer-review panels and submits its recommendations to the Chair, who must consider them but is not bound by them.

20 U.S.C. §§ 956(c), 957(f);  *See also* Nat'l Endowment for the Humanities, *NEH's Application Review Process*, https://www.neh.gov/grants/application-process.

### 3. Appropriations

Each fiscal year, Congress appropriates funds for the NEH to carry out its statutory functions, including to award grants. Am. Compl. ¶ 52.

In the 2024 Appropriations Act, Congress appropriated $207,000,000 to the NEH, of which $192,000,000 "shall be available for support of activities in the humanities, pursuant to section 7(c) [20 U.S.C. § 956(c)] of the Act and for administering the functions of the Act." *Id.* ¶ 53. $192,000,000 was designated for grants, loans, contracts, and other assistance to further the enumerated purposes set forth under the 2024 Act.

On March 15, 2025, Congress enacted the 2025 Continuing Resolution that re-appropriated all of the funds appropriated to NEH under the 2024 Act, with the same breakdown on how the money must be spent. Pub. L. 119-4, §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025). NEH thus received an additional $207 million that it must spend in 2025, including an additional $192 million that it must spend on grants and other assistance programs under 20 U.S.C. § 956(c). Am. Compl. ¶ 54.

Thus, the vast majority of these funds were appropriated by Congress for the express purpose of supporting NEH's various grant programs – which, at the time of funding, included:

- The Public Scholars Program, which supports the creation of nonfiction with stipends of $5,000 per month, or a maximum of $60,000 for a year, conditioned on foregoing all other major activities (including teaching). Am. Compl. ¶¶ 57, 60.

- The Fellowships Program, which gives individual scholars uninterrupted time to conduct and produce works of literature or scholarship. *Id.* ¶ 67. This program has facilitated the creation of approximately seven thousand books over the years. *Id.* ¶ 66. As with the Public

Scholars Program, the minimum stipend was for $5,000 a month for between six and twelve months. *Id*. ¶ 69.

- The Summer Stipends Program provided small grants (covering a period of two months) to individuals pursuing advanced research in the humanities at a funding level of $8,000 per stipend. *Id*. ¶ ¶ 73-74.

- The award for faculty at Hispanic-Serving Institutions, Historically Black Colleges and Universities, and Tribal Colleges and Universities provided stipends of $5,000 per month for up to one year for faculty members at these institutions who were conducting research and writing relating to the goals of those institutions. *Id*. ¶¶ 80, 82.

NEH grantees who participated in these programs were subject to the Program Terms and Conditions of their various programs, the most recently promulgate of which are found online at https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024. These terms and conditions were promulgated pursuant to the agency's rule-making authority; changes were posted publicly and were subject to a period of public comment prior to being adopted. *See* Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 88 Fed. Reg. 69,390 (Oct. 6, 2023) (proposed rule) (inviting public comment); *see also* 89 Fed. Reg. 30,046 (Apr. 22, 2024) (final rule adopting changes). Consistent with the authorizing statute, the terms and conditions prohibit using awards for promotion of a particular political, religious, or ideological point of view; advocacy for a particular program of social or political action; or support of specific public policies or legislation. *See* Nat'l Endowment for the Humanities, *General Terms and Conditions for Awards to Organizations*, https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024*; see also* nat'l endowment for the humanities, *General Terms and Conditions for Awards to Individuals (for awards with start dates January 1, 2025, or later)*, https://www.neh.gov/general-terms-and-conditions-awards-individuals.

2 CFR §200.340 – the provision in the Code of Federal Regulations applicable to federal grants generally – requires that a federal agency disclose, specifically and unambiguously, all applicable termination provisions in the terms and conditions of an award. The NEH terms and conditions relating to grant termination differ depending on whether the recipient of an award is an individual or an organization.

The terms and conditions for individuals provide that "NEH may terminate your fellowship or Award for Faculty if, for any reason, you choose to discontinue the proposed program before the end of the period of performance or fail to observe the award's terms and conditions. If you discontinue the proposed program before the end of your period of performance, you must return any funds received over and above those to which you are entitled." Am. Compl. ¶¶ 62, 71, 77, 85. The terms and conditions applicable to individual awards do not contain any language about termination predicated on changes in agency priorities.

The terms and conditions for grants to organizations, by contrast, provide that grants may be terminated if they are no longer consistent with agency priorities. "NEH may suspend or terminate an award in whole or in part if: an award no longer effectuates the agency's needs and priorities." *See* NAT'L ENDOWMENT FOR THE HUMANITIES, *General Terms and Conditions for Awards to Organizations*, https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024. This provision would impact individuals like Plaintiff Jasperse, who was slated to receive grant money that was awarded, not directly to him, but to the MHS, which in turn funded his fellowship. Am. Compl. ¶ 21.

A further limitation on the terms and conditions for termination is found at § 200.340(a)(4), which provides that the Federal agency or pass-through entity may terminate an award on the

ground that it no longer effectuates program goals or agency priorities "*to the extent authorized by law.*" (emphasis added).

A grantee whose funding is terminated is not supposed to be without recourse. The terms and conditions and associated regulations give said grantee the right to appeal that termination. Specifically, the NEH terms and conditions applicable to institutions provide that grantees have the right to appeal a termination and set out a procedure for taking such an appeal. *See* NAT'L ENDOWMENT FOR THE HUMANITIES, *General Terms and Conditions for Awards to Organizations (for grants and cooperative agreements issued October 1, 2024, or later)*, § XIII, https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024#XIII.[5] While the terms and conditions for individual grants do not contain a similar provision, *see* NAT'L ENDOWMENT FOR THE HUMANITIES, *General Terms and Conditions for Awards to Individuals (for awards with start dates January 1, 2025, or later)*, https://www.neh.gov/general-terms-and-conditions-awards-individuals, terminated awards are subject to an objections process, whereby the agency "must provide the recipient with an opportunity to object and provide information challenging the action." 2 C.R.F. § 200.342.

---

[5] "A recipient may appeal NEH's notice of termination. The IGA must submit the request through eGMS Reach no later than 30 calendar days after the date of the termination notice and should address it to the Senior Deputy Chairman, National Endowment for the Humanities. If appealing, the recipient must provide a full statement of its position, the pertinent facts, and reasons that support its position. OGM will promptly acknowledge the request and forward it to the NEH Senior Deputy Chair, who will consult with the program office, OGM, and the Office of General Counsel. Pending resolution, the notice of termination will remain in effect. OGM will send the recipient a Notice of Action with the Senior Deputy Chair's final administrative decision through eGMS Reach. The final administrative decision cannot be appealed." NAT'L ENDOWMENT FOR THE HUMANITIES, *General Terms and Conditions for Awards to Organizations*, § XIII, https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024#XIII.

**4.  Events Giving Rise to this Lawsuit: The Mass Termination of Previously-Awarded NEH Grants**

On March 13, 2025, NEH Chair Shelly Lowe was directed by the White House to resign from her position.[6] *See Shelly Lowe Exits Role Leading the National Endowment for the Humanities,* WASH. POST (Mar. 12, 2025), https://www.washingtonpost.com/style/2025/03/12/shelly-lowe-national-endowement-humanities/. Shortly thereafter, teams from DOGE began appearing at NEH offices and meeting with NEH leadership to discuss DOGE's plans for NEH's future. Am. Compl. ¶ 96. This followed a pattern of deploying DOGE teams to multiple agencies, in most cases to carry out mass terminations of staff, programs, and grants. *Id*. ¶ 97. According to the Authors Guild Complaint, other agencies similarly impacted in recent months include the National Labor Relations Board, the Inter American Foundation, the Millennium Challenge Corporation, the U.S. Institute for Peace, the African Development Foundation, and the National Endowment for the Arts. *Id*.

In or about March 2025 – after the awards of grants at issue in this lawsuit – the Notice of Funding Opportunity applicable to the various NEH grant programs was modified to include language that awards could not be made for projects that "promot[e] gender ideology;" "Promot[e] discriminatory equity ideology;" "support for diversity, equity, and including (DEI) or diversity, equity, inclusion and accessibility (DEIA) initiative or activities: or "environmental justice initiatives and activities." Am. Compl. ¶ 63.

---

[6] Lowe, the first member of a North American Indigenous Tribe to serve as Chair of the NEH, was confirmed by the Senate and sworn in for a four-year term on February 14, 2022. *See First Native American to lead National Endowment for the Humanities says the agency can strengten democracy,* WASH. POST (Feb. 25. 2022), https://www.washingtonpost.com/arts-entertainment/2022/02/25/shelly-lowe-chair-neh/. However, as noted above, it is customary for a newly inaugurated President to designate his own NEH Chair.

On April 1, 2025, NEH staff members were informed that DOGE sought reductions in NEH staff by 70-80%, as well as what could amount to a cancellation of all grants made under the Biden administration that had not been fully paid out. Am. Compl. ¶ 98. Acting NEH Chair Michael McDonald reportedly told senior staff that DOGE "wants to claw back $175 million' in grant money that has not yet been disbursed." *Id*. Defendants Nate Cavanaugh and Justin Fox accessed lists of open NEH grants and stated that cancelling at least $175 million in grant money was an imperative. *Id*. ¶ 99.

Additional evidence developed in *Thakur v. Trump,* No. 25-CV-04737-RFL (N.D. Cal.) supports these allegations. In a declaration filed in that case, McDonald stated that open grants were flagged for termination if they involved "diversity, equity, and inclusion," among other terms, and NEH staff were instructed to use spreadsheets assigning "High, Medium, Low, or No Connection" labels to outstanding awards to indicate whether and to what extent the grantee's project appeared to fall afoul of three recent executive orders – specifically Executive Order 14151, *Ending Radical And Wasteful Government DEI Programs and Preferencing*, issued on January 20, 2025; Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, issued on January 21, 2025; and Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, issued on January 20, 2025. *See* Declaration of Michael McDonald ¶¶ 6-9, filed in *Thakur v. Trump*, No. 25-CV-04737-RFL (N.D. Cal. June 19, 2025), ECF No. 48-3 (the "N.D. Cal. McDonald Declaration"). Agency defendants in that case acknowledged, via declaration or public statements, that they were implementing the executive orders when carrying out the Mass Termination. *Thakur*, No. 25-CV-04737-RFL, 2025 WL 1734471, at *10.

After reviewing the N.D. Cal. McDonald Declaration, I instructed the Government to provide me with the spreadsheets referenced therein. I received three Excel files: (i) "NEH-Awards-2025 Data Call," which the Government attests is the spreadsheet discussed at paragraphs 9 and 10 of the Declaration; (ii) "NEH.Award.Data.2021-2025.Final," which the Government attests is the spreadsheet discussed at paragraphs 13, 14, and 15 of the Declaration; and (iii) "Copy of NEH Active Grants (03.28.2025)," which the Government attests is the spreadsheet discussed at paragraphs 16 and 17 of the Declaration. These spreadsheets confirm that agency officials flagged grants for termination based on their ostensible connection to the study of "DEI," "gender ideology," or "environmental justice."

On or about April 1, 2 and 3, 2025, Defendants Cavanaugh and Fox emailed, or caused to be emailed, nearly identical messages to at least 1,400 NEH grantees, informing them that their grants were being terminated. Am. Compl. ¶ 6. Recipients of these notices included nearly all grantees whose grants were awarded during the Biden Administration. *Id*. ¶ 100. Plaintiffs refer to these notices as the "Mass Termination," and the Court finds that moniker appropriate in the circumstances.

The Mass Termination Emails stated as follows:

> Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in *2CFR§200.340*. For instance, NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities.... The termination of your grant represents an urgent priority for

the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible.

Am. Compl. ¶ 105. The Executive Order cited in the Termination Notice does not relate to the NEH or its grant-making function – a fact conceded by Defendants, who admit that the reference was "a mistake" – though one that was never corrected. (Dkt. No. 80 ¶ 13 n.1. (stating the reference should have been to E.O. 14222)).

The Termination Notice concluded by telling the recipients, "Please remember that your obligations under the Grant Application continue to apply. Additionally, an audit may be conducted by the NEH after the termination of your grant." Am. Compl. ¶ 106.[7]

In some instances, the Termination Notice also provided:

Any objections or appeals to this termination will be managed in strict accordance with the President's Executive Orders, including but not limited to: E.O. 14217 (Feb. 19, 2025), *Commencing the Reduction of the Federal Bureaucracy*; E.O. 14151 (Jan. 20, 2025), *Ending Radical and Wasteful Government DEI Programs and Preferencing*; E.O. 14168 (Jan. 20, 2025), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*; and E.O. 14190 (Jan. 29, 2025), *Ending Radical Indoctrination in K–12 Schooling*.

Am. Compl. ¶ 109. None of these Executive Orders contains any information about "objections and appeals" or set out any procedure for interposing such objection or taking such appeal. *Id.* Significantly, these Executive Orders provide that they will be implemented "consistent with applicable law." Am. Compl. ¶ 110.

---

[7] Among the possible consequences of termination of awards made to individuals is the following: "If during your period of performance you are unable to meet the terms of the award, then you are obliged to inform NEH immediately. Because stipend payments are made in advance, you may be required to return a portion of the stipend to NEH; if this is the case, NEH will inform you of the amount that you must repay, the basis for the calculation, and the date by which you must repay." Am. Compl. ¶ 71 (citing the "Termination" section of the Fellowship Program Terms and Conditions"). Thus, anyone whose partially funded grant was terminated and who cannot complete the funded project as a result appears to be in danger of having to repay money at the whim of the NEH.

Several individual grantees who had their grants terminated – including specifically Plaintiffs Kadetsky, Goldstein, Balog and Orlando – attempted to appeal the termination or sent inquiries to NEH regarding the process for appeals. (*See* Dkt. Nos. 68, 69, 71, 72). NEH responded to many of these inquiries by stating that "dispute resolution" was not available or that NEH "is unable to offer you a means of dispute resolution." Am. Compl. ¶ 114. On or about April 29, 2025, in a document titled "Guidance for Recipients of Terminated NEH Awards," NEH Organizational Grantees were advised that "NEH is not offering a means of dispute resolution," even though the terms and conditions applicable to such grants specifically provided for an appeal in the event of termination of a grant to an organization. *Id*. ¶ 112.

McDonald advised staff that the NEH's traditional termination process would not be adhered to in connection with the Mass Termination. And indeed, the Mass Termination and accompanying Termination Notices were not processed through NEH's grant management system, as required by internal agency policies. They did not emanate from the Office of Grant Management, which, according to the terms and conditions, has sole authority to make awards and to modify or reduce them. *See* NAT'L ENDOWMENT FOR THE HUMANITIES**,** *General Terms and Conditions for Awards to Organizations (for grants and cooperative agreements issued October 1, 2024, or later)*, https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024; *see also* NAT'L ENDOWMENT FOR THE HUMANITIES*, General Terms and Conditions for Awards to Individuals (for awards with start dates January 1, 2025, or later)*, https://www.neh.gov/general-terms-and-conditions-awards-individuals. The emails did not even come from an NEH server or email address, but from Grant_Notifications@nehemail.onmicrosoft.com, a non-governmental email account. *Id*. ¶ 102. The termination notices were purportedly signed by Defendant McDonald, the Acting Chair of

NEH, but Plaintiffs allege that the notices were neither hand-signed by McDonald nor digitally signed with a verifiable digital signature. *Id.* ¶ 103.

Neither did McDonald consult with or receive recommendations from the National Council on the Humanities or with program experts before authorizing this Mass Termination of previously awarded grants. Instead, the N.D. Cal. McDonald Declaration summarizes how the termination decisions were made as follows:

> On March 17 - 18, 2025, I worked with NEH Assistant Chairman for Programs Adam Wolfson to conduct a further individualized review of the spreadsheets to open grants created by program staff. . . . On March 26, 2025, Mr. Wolfson and I reviewed additional spreadsheets of grants that included those the program directors had initially listed as having no connection to the President's Executive Orders. On March 31, 2025, I sent NEH's DOGE contacts, Mr. Fox and Mr. Cavanaugh, the final results of NEH's review in which we identified grants that did not appear to be in conflict with the Trump Administration's priorities. On or about April 1 - 2, 2025 I terminated a number of, but not all, open NEH grants in compliance with Presidential Executive Order 14222 and in consultation with DOGE. . . . As noted above, the policy for selecting grants for termination at NEH focused first on identifying open grants that focused on or promoted (in whole or in part) "environmental justice," "diversity, equity, and inclusion" or "diversity, equity, inclusion and accessibility," and "gender ideology." Subsequently, and in consultation with DOGE, I more broadly chose grants for termination that did not contribute to the public's confidence in how NEH expanded its taxpayer funds as required by NEH's authorizing statute. *See* 20 U.S.C. § 951(5).

N.D. Cal. McDonald Declaration ¶ 13-21.[8]

Nearly identical versions of the Termination Notice were sent on April 1, 2 and 3, to both individual and organizational grantees. Am. Compl. ¶ 100. No individualized review was conducted before grants were cancelled, except to the extent that the aforementioned spreadsheets

---

[8] Plaintiffs plead that McDonald has acknowledged that he did not decide which grants to terminate, although that responsibility rests by statute with him. Am. Compl. ¶ 108**.** In response to a question from staff about the rationale for grant terminations, he replied that the "rationale was simply because that's the way DOGE had operated at other agencies and they applied the same methodology here." *Id.* However, the N.D. Cal. McDonald Declaration appears to indicate that McDonald did make the final determinations, or at least participated in making them. As the Court is deciding a Motion for a Preliminary Injunction, I am not limited to the allegations of the pleading or presuming them to be true.

were used to identify which grants might run afoul of the new Administration's restriction on awards that arguably relate to certain disfavored topics. *Id*. ¶ 101. Neither was there any finding that any grantee was unable to perform the services for which the grants had been awarded. *Id*.

Interestingly, McDonald claims that he chose for termination grants "that did not contribute to the public's confidence in how NEH expended its taxpayer funds *as required by NEH's authorizing statute. See* 20 U.S.C. § 951(5)." N.D. Cal. McDonald Declaration ¶ 21 (emphasis added). But the agency's authorizing statute specifically requires the NEH to support and subsidize activities that "reach or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community." 20 U.S.C. § 956(c)(4).

After the grants were terminated, the NEH put out a press release stating, "In collaboration with the Administration, NEH has cancelled awards that are at variance with agency priorities, including but not limited to those on diversity, equity, and inclusion (or DEI) and environmental justice, as well as awards that may not inspire public confidence in the use of taxpayer funds." Press Release, NAT'L ENDOWMENT FOR THE HUMANITIES, An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders (Apr. 24, 2025), https://www.neh.gov/news/update-neh-funding-priorities-and-agencys-recent-implementation-trump-administration-executive.

Plaintiffs allege that the Mass Termination was final agency action under the APA. *See* 5 U.S.C. § 704; Am. Compl. ¶ 115. The Mass Termination: (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) is action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted). In particular, the Mass Termination marks the

consummation of NEH's decision-making process with respect to terminated grants because it announces NEH's decision to immediately terminate those grants in their entirety and does not allow for any appeal or reconsideration. Am. Compl. ¶ 115. The Mass Termination is an action by which rights or obligations have been determined or from which legal consequences will flow because it purports to eliminate all government obligations to pay out grant awards and all grantees' rights to receive their grant awards. *Id.*

I agree with that assessment.

### 5.   Injury to Individual Plaintiffs as a Result of Grant Termination

The associational plaintiffs in the ACLS case, the members of those associations, the class plaintiffs in Authors Guild and other members of the classes have all pleaded facts concerning how the loss of NEH funding after a grant was awarded impacted them individually.

At the time of the Mass Termination, ACLS had two active awards: an award, funded by the Office of Challenge Programs in February 2025, for up to $ 500,000 in Federal matching funds to support a three-year cooperative agreement between ACLS and NEH, and an award of a $207,000 grant, and up to $105,000 in Federal matching funds, issued by NEH's Division of Research Programs in 2023. ACLS Compl ¶¶ 92-93. Both grants were terminated in April 2025. *Id.* ¶ 93. ACLS alleges that the grants of several of its members have been terminated, *id.* ¶¶ 95-97, and that it had intended to apply for upcoming grant opportunities that have been canceled, *id.* ¶ 94.

AHA also had two active awards: an award of $ 194,261, issued by the Division of Education Programs in March 2025 to fund a three-week program for higher education faculty on the history of U.S. environmental policy, and an award of $ 191,619, issued by the Division of

Education Programs in September 2024 to fund a three-week virtual institute for 30 secondary school teachers on Africa in world history. *Id.* ¶ 98. Both grants were terminated in April 2025. *Id.* ¶ 93. AHA alleges that the grants of several of its members have been terminated, *id.* ¶¶ 100-02, and that it had applied or intended to apply for upcoming grant opportunities that have been canceled, *id.* ¶ 99.

MLA had two active awards: a $58,201 "Spotlight in the Humanities" grant, issued by NEH's Division of Education Programs in June 2023 to support a two-year development workshop series for college faculty to reimagine humanities coursework for career readiness, and a grant of $30,000 issued by the Office of Data and Evaluation in February 2025 to support a two-day convening of humanities stakeholders to assess the current field of data projects and practices related to the humanities in higher education. *Id.* ¶ 103. MLA has not alleged that these awards were terminated. MLA alleges that the grants of several of its members have been terminated, *id.* ¶¶ 107-110, and that it had intended to apply for upcoming grant opportunities that have been canceled, *id.* ¶ 104.

Plaintiff William Goldstein received a Public Scholars program grant in support of his proposed biography of AIDS activist Larry Kramer and received his Termination Notice halfway through his grant period. Goldstein alleges that, as an independent scholar, he was immediately required to find alternative work and a new source of income.[9] Am. Compl. ¶ 20.

---

[9] Goldstein apparently has several other sources of income: as the founding editor of the books website of *The New York Times* online; as a book reviewer and interviewer for NBC's "Weekend Today in New York;" and as the curator of public programs at Roosevelt House, the public policy institute of New York's Hunter College. Am. Compl. ¶ 19. Which is not to say that he did not need to find a way to replace the income lost by the termination of his NEH grant.

Plaintiff Elizabeth Kadetsky, also recipient of a Public Scholars grant, planned to use her funding to complete a book about a 1962 antiquities theft in India as a case study about the flourishing trade in illegally acquired antiquities. *Id*. ¶ 2. As a condition of her grant, Professor Kadetsky was required to take a one-year leave of absence from her position on the faculty of the Pennsylvania State University – a leave Penn State was happy, not only to grant, but to subsidize, by paying the $35,000 difference between the $60,000 award and her Penn State salary. *Id*. ¶ 4. The reason Penn State was willing to subsidize its faculty who receive an NEH award is because the university considers an NEH grant to be a "prestigious fellowship." *Id*. ¶ 3. Without her grant, Professor Kadetsky has neither any "prestigious fellowship" nor a job for the next academic year.

Plaintiff Valerie Orlando received an NEH Summer Stipend to fund her travel to France and Algeria in connection with her work on a book on the themes of history and memory in contemporary Algerian literature. *Id*. ¶ 14. Her book project is now on hold, and the loss of summer funding means she has lost the opportunity to travel at a time when she does not have teaching duties. *Id*.

Plaintiff Katalin Balog received an NEH Fellowship to work on a book on philosophy and consciousness. *Id*. ¶ 15. When her grant was terminated after partial funding, she was already on a leave of absence from her teaching duties (a requirement of accepting the award), so she has at present neither a job nor income. *Id*. ¶ 16.

Plaintiff Benjamin Holtzman studies the intersection of political and social history in the United States, with particular focus on politics, capitalism, race and class, cities and social movements. *Id*. ¶ 17. His grant was intended to cover the bulk of his living expenses while he worked on his book *Fighting the White Power Movement in the Late Twentieth Century*, a study of extremist groups during the 1970s and 1980s. *Id*. ¶ 18. While he received the bulk of the award

before it was terminated in April, because he was prohibited from teaching or engaging in "other major activities," he is without an alternative source of current income, and is unable to fund archival research trips to Atlanta and Kansas City that are needed to continue work on his project. *Id*.

Plaintiff Lee Jasperse has lost the opportunity to become a Fellow of the Massachusetts Historical Society, which had agreed to fund his work on two books exploring how literature responds to persons whose ability to feel or experience sensation has been numbed by various incapacitating conditions. *Id*. ¶ ¶ 21-22. Because it was a condition of the Fellowship that he not teach or engage in other major work during the term of his fellowship, Dr Jasperse forewent taking on other major assignments or work for the six-month period covered by the grant – leaving him effectively without income for those months. *Id*.

Plaintiff Nicole Jenkins was awarded her grant to complete a book examining Black women's navigation of beauty norms, family and U.S. institutions through a Black feminist lens. *Id*. ¶ 23. She, too, was required to forego other work as a condition of her grant, and Howard University, where she is a non-tenured member of the faculty, gave her a oneyear leave of absence for the period covered by the grant (August 1, 2025-July 31, 2026). *Id*. Other funding for her work was no longer available by the time the grant was terminated, so loss of her grant endangers her ability to complete the project that was to have been a core part of her tenure file. *Id*. ¶ 24.

The individual impacts described above are not atypical of the injuries suffered by other members of the proposed class. *Id*. ¶ 139. Many NEH grants – including Public Scholars awards, Faculty awards, and Fellowship awards – require grantees to forgo teaching and other forms of employment during the grant period, to ensure full-time focus on the funded project. Accordingly, many members of the proposed class sought and obtained leaves of absence or sabbaticals from

their regular jobs to work on their funded projects. Termination of their grants potentially leaves such grantees with no source of income during their anticipated grant period. Other class members, whose grants were terminated midway through the grant period, have performed substantial work on their projects in reliance on the promised grant funds. Much of that work is at risk if the projects cannot be completed or if their planned workflows have to be altered due to lack of funds.

In addition, all recipients of NEH grants derive non-financial benefits from their NEH awards, which have been lost as a result of the Mass Termination of funding: publication opportunities, including book deals, and honoraria; additional funding from other sources that becomes available because of the prestige of an NEH grant and the confidence that the project has been vetted by professionals; even job opportunities. These can be summed up in a word: prestige. NEH grants conferred prestige in the humanities community, allegedly as a result of the rigorous vetting that led to awards.

Finally, as noted above, the Termination Notices stated that the grantees' "obligations under the Grant Application continue to apply," even though the Government has rescinded funding. Am. Compl. ¶ 106. This requirement, Plaintiffs assert, prevents grant recipients from seeking to mitigates their losses – or provide for their support – by finding ways to return to work (assuming, of course, that their employers have not contracted for temporary replacements).

### 6.  Other Changes at the NEH

Simultaneously with the Mass Termination, on April 3, 2025, 145 NEH staff members – making up 80% of NEH's staff – were reportedly placed on administrative leave. Am. Compl. ¶ 116.

On April 9, 2025, NEH staff received a notice alerting them to an upcoming "multi-step approach to restructuring" that promised to include a Reduction in Force ("RIF"). *Id*. ¶ 117. The notice stated: "NEH is undertaking a multi-step approach to restructuring its internal organization. This restructuring will consolidate administrative and programmatic offices to enhance efficiency and streamline functions. As a result, the agency will be forced to reduce the total number of positions." *Id*.

The very next day, many NEH staff received RIF notifications that they would be terminated as of June 10, 2025. *Id* ¶ 118. Plaintiffs plead, on information and belief, approximately 70-80% of NEH staff received a RIF notification. *Id*.

As a result of the termination of staff, the NEH has effectively eliminated or nearly eliminated entire divisions and programs, including but not limited to the Office of Digital Humanities, the Office of Federal/State Partnerships, the Office of Data and Evaluation, the Office of Native and Indigenous Affairs, the Office of Outreach, and the Office of Partnerships and Strategic Initiatives. *Id* ¶ 119.

As a result of Defendants' actions, the NEH has terminated nearly all of its current grants and most of its future programs, despite having nearly $400 million in funding for programs over the last two years, including $192,000,000 it received for grant programs in March 2025. *Id* ¶ 120. It has also rendered it impossible for the agency to comply with the appeals process for terminated

institutional grantees as announced in the terms and conditions applicable to NEH grants. *See* NAT'L ENDOWMENT FOR THE HUMANITIES, *General Terms and Conditions for Awards to Organizations*, § XIII, https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024#XIII, or with the Objections process found in 2 C.F.R. § 200.342. There is simply no one at NEH who can performs these functions.

Days after the Termination Notices revoking tens of millions of dollars in NEH grants were sent to Plaintiffs and the Proposed Classes, NEH issued a Notice of Funding Opportunity to award up to $17 million in grants to build a "National Garden of American Heroes." Am. Compl. ¶ 121. Plaintiffs allege that this notice of funding is unusual because of its size and the lack of any of the rigorous standards for grant-awarding NEH had previously implemented. Plaintiffs also allege that it is unusual in that never before had the NEH – rather than the National Endowment for the *Arts* – funded the creation of public visual art.[10] *Id*.

On May 8, 2025, NEH announced that it awarded $ 9.55 million in grants for 68 humanities projects. *Id*. ¶ 122.

On May 16, 2025, NEH announced a new grant program "for museums, libraries, archives, and other cultural organizations to support public programs on the ideas of the American Revolution and the founding of the United States." Am. Compl. ¶ 123. The program is called *Public Impact Projects Celebrating America's 250th Anniversary*. *Id*. The announcement states

---

[10] The NEH had certainly funded the creation of works that promote public knowledge and awareness of the humanities using the arts and elements of artistic expression. *See, e.g.*, n.4 *supra*. The Court can find nothing in the NEH's authorizing statute that would prevent the agency from awarding grant money to projects that employ art (in this case, statuary) to memorialize, promote or teach history (one of the humanities) to the public. The proposed National Garden of American Heroes seems far more like the National Baseball Hall of Fame – which employs representational plaques (both artistic and informational in nature) to teach the public about the history of the game and honor its (arguably) greatest players – than it does the sort of works of visual art that falls traditionally within the purview of the National Endowment for the Arts. The decision by the NEH to fund such an endeavor would ordinarily be "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

that applications are due on July 9, 2025. *Id*. According to grants.gov, the total program funding is $4 million. *Id*. The Notice of Funding Opportunity states that projects must start between March 1, 2026, and May 1, 2026. *Id*.

### 7. Summary of Claims

Plaintiffs assert claims relating both to the termination of their grants (or their members' grants) and claims relating to the massive changes made at the NEH (the firing of staff, the elimination of programs, the redirecting of funds toward new priorities, including specifically the Garden of Heroes). I will refer to the former as "Grant Termination Claims" and to the latter as "Institutional Claims."[i]

**The ACLS Plaintiffs' Complaint**:

The ACLS Plaintiffs challenge both the termination of grants and the institutional changes at the NEH:

- **Count I**: Claim under the Administrative Procedure Act for violations of the Separation of Powers in connection with Plaintiffs' Institutional Claims;

- **Count II**: Direct claim for violations of the Separation of Powers in connection with both the Institutional and Grant Termination Claims;

- **Count III**: Claim under the Administrative Procedure Act for violations of the Impoundment Control Act and Appropriations Act in connection with Plaintiffs' Institutional Claims;

- **Count IV**: Direct claim for violations of the Impoundment Control Act and Appropriations Acts in connection with both Plaintiffs' Institutional and Grant Termination Claims;

- **Count V**: Claim under the Administrative Procedure Act for arbitrary and capricious agency action in connection with Plaintiffs' Institutional Claims;

- **Count VI**: Claim under the Administrative Procedure Act for statutory violations and arbitrary and capricious agency action in connection with Plaintiffs' Institutional Claims;

- **Count VII**: Claim under the Administrative Procedure Act for violations of the First Amendment in connection with Plaintiffs' Grant Termination Claims;[11]

- **Count VIII**: Direct claim for violations of the First Amendment in connection with both Plaintiffs' Institutional and Grant Termination Claims;

- **Count IX**: Direct claim asserting that DOGE took action without authority in connection with Plaintiffs' Institutional and Grant Termination Claims;

**The Authors Guild Plaintiffs' Amended Complaint**

All claims in this pleading are Grant Termination Claims. The Authors Guild Plaintiffs do not assert any Institutional Claims.

- **Count I**: Claim under the Administrative Procedure Act for arbitrary and capricious agency action in connection with the Mass Terminations;

- **Count II**: Claim under the Administrative Procedure Act for violations of the Impoundment Control Act, NEH Statute, and the First Amendment in connection with the Mass Terminations;

- **Count III**: Direct claim for violations of the Impoundment Control Act and Appropriations Acts in connection with the Mass Terminations;

---

[11] Although Count VII's title says that it is an "Institutional Claim," it is clear from the text of pleading that this is a mistake, and the count pertains only to Plaintiffs' Grant Termination Claims.

- **Count IV**: Direct claim for violations of the Separation of Powers in Connection with the Mass Terminations.

- **Count V**: Direct claim for violations of the First Amendment in connection with the Mass Terminations;

- **Count VI**: Direct claim asserting that DOGE took action without authority in connection with the Mass Terminations.

## DISCUSSION

### I.    Jurisdiction

The claims pleaded in these lawsuits arise under the APA, 5 U.S.C. §§ 701-706, the authorizing statute for the National Endowment for the Humanities, 20 U.S.C. § 956 et seq, and regulations promulgated thereunder, which can be found at Title 45, Chapter XI, Subchapter D of the Code of Federal Regulations (CFR); and the Constitution of the United States. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the APA. Plaintiffs have not asserted claims for breach of contract and so do not rely on the Tucker Act, 28 U.S.C. § 1491(a)(1), as a basis for federal jurisdiction.

Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C). This is an action brought against Government officials acting in their official capacity; several of the plaintiffs reside in this district and no real property is involved in this action. Specifically, Plaintiffs American Council of Leander Societies, the Modern Language Association and the Authors Guild have their principal places of business in this district and a significant number of their respective members reside in this district; individual plaintiffs Katalin Balog and Bill Goldstein reside in this District. The Government has not contested the propriety of venue.

The Government raises multiple jurisdictional challenges to Plaintiffs' ability to bring suit in this Court on these claims. Because challenges to the Court's jurisdiction must be disposed of before there can be any discussion of the merits, I turn first to those issues.

### a.  Standing

Whether a claimant has standing is the threshold question in every federal case, determining the power of the court to entertain the suit. *See United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526 (2d Cir. 1999).

To meet the constitutional requirement of standing, Plaintiffs must establish that they "suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri,* 603 U.S. 43, 57 (2024) (internal citations omitted). Plaintiffs seeking injunctive relief, moreover, must also show "substantial risk that, in the near future," the injury will occur. *Murthy,* 603 U.S. at 44. In sum, the injury-in-fact requirement "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

Causation and redressability, for their part, are usually "flip sides of the same coin." *Sprint Cmmc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008). The former requires the plaintiff to show that his "injury likely was caused or likely will be caused by the defendant's conduct." *Food and Drug All. for Hippocratic Med.*, 602 U.S. at 382. And when that is true, "enjoining the action or awarding damages for the action will typically redress that injury." *Id*. at 381. But if the "plaintiff is not himself the object of the government action or inaction he challenges, standing" – though "not precluded" – is "ordinarily 'substantially more difficult' to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (internal citations omitted).

Taken together, these bedrock requirements insist that a plaintiff "possess a personal stake" in the case, *All. for Hippocratic Med.*, 602 U.S. at 379, which "ensure[s] that courts decide litigants' legal rights in specific cases" rather than "in the rarified atmosphere of a debating society," *id.*

Moreover, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez,* 594 U.S. 413, 431 (2021).

With this in mind, "we proceed to untangle the mass of the plaintiffs' injuries." *Murthy,* 603 U.S. at 43. To aid us in this "untangling," I use a summary chart devised by the ACLS Plaintiffs that categorizes the claims asserted in both actions. (*See* Dkt. No. 86, at 3-4):

| Category of Claim | Conduct Challenged |
|---|---|
| Institutional (ACLS Plaintiffs) | Elimination of 22 programs |
| | Elimination of 6 divisions |
| | Firing 65-75% of employees via RIF |
| | Not spending appropriations |
| | Funding "Garden of Heroes" |
| | Elimination of programs and divisions, mass firing of staff, not spending appropriations |
| Grant Termination (Plaintiffs in Both Actions) | Grant Terminations |

### i.    Grant Termination Claims: Grant Recipients

Plaintiffs who are the direct recipients of NEH grants that have been terminated have standing to assert claims arising from those terminations. The Government has lodged no objection, (*see* Dkt. No. 77, at 12), nor could it. This includes ACLS, AHA and all the individual plaintiffs except Lee Jasperse.

Plaintiff Jasperse, although not a *direct* recipient of a NEH grant, has also plausibly alleged standing. Dr. Jasperse alleges that he was slated to be a Fellow at the Massachusetts Historical Society (MHS), the funding for which was entirely (and expressly) supported by a grant from the

NEH. He further alleges that, but for NEH's termination of the grant to MHS, he would have retained his grant from MHS. Am. Compl. at 11-12.

Therefore, ACLS, AHA, William Goldstien, Elizabeth Kadetsky, Valerie Orlando, Katalin Balog, Benjamin Holtzman, Lee Jasperse and Nicole Jenkins have standing with regard to claims stemming from their own grant terminations. These claims allege that the Mass Terminations violated the Administrative Procedure Act (ACLS Count VII, AG Counts I, II);[12] Separation of Powers (ACLS Count II; AG Count IV); the Impoundment Control and Appropriations Acts (ACLS Counts III, IV; AG Count III); and the First Amendment (ACLS Count VIII; AG Count V); and that DOGE's actions in connection with the Mass Termination were *ultra vires* (ACLS Count IX; AG Count VI).

### ii.    Grant Termination Claims: Associational Standing

Membership organizations can establish standing based on their own injury or based on their members' injuries; the latter standing basis is known as representational or associational standing. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). The Author's Guild, ACLS, AHA and MLA assert standing with respect to claims arising from the termination of NEH grants that were awarded to their members. An organization has associational standing to sue on behalf of its members where: "'(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires

---

[12] For future reference, "AG Count #" refers to the corresponding enumerated count in the Authors Guild Amended Complaint and "ACLS Count #" refers to the corresponding enumerated count in the ACLS Complaint.

the participation of individual members in the lawsuit.'" *Students for Fair Admissions*, 600 U.S. at 181 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

The Authors Guild, ACLS, AHA and MLA each satisfy the three prongs required for associational standing. The Authors Guild identifies itself as a non-profit membership association that "works to promote the rights and professional interests of authors in various areas," (Dkt. No. 75 ¶ 11), and counts among its members the above-mentioned Plaintiffs, who have standing in their own right to bring suit, as well as others who lost NEH grants in the Mass Termination and could similarly sue on their own behalf. All three ACLS Plaintiffs are nonprofit organizations whose missions advance the public's understanding of language, literature and the broader humanities. *See* ACLS Compl. ¶¶ 12-14. The ACLS Complaint sufficiently alleges that at least one member of each organization has suffered the termination of a NEH-awarded grant. *See id*. ¶¶ 95-110. Indeed, ACLS and AHA plead that they, as organizations, each lost two NEH grants in the Mass Termination. *See id.* ¶¶ 92-93; 98.

Claims for injunctive relief, relying on a sampling of evidence from association members – as we have here – generally satisfy *Hunt*'s third prong. *See, e.g., Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 551-53 (5th Cir. 2010). This is consistent with the holdings of other courts in recent weeks. *See, e.g., Am. Ass'n of Colleges for Tchr. Educ. v. McMahon,* 770 F. Supp. 3d 822, 844 (D. Md. Mar. 2025) (holding that the associational plaintiff established associational standing by alleging in its compliant that three of its members' received grants from the U.S. Department of Education, that were subsequently terminated and termination of said grants impacted the organization's core missions); *Ass'n of Am. Universities v. Dep't of Energy*, No. 25-CV-10912-ADB, 2025 WL 1414135, at *8 (D. Mass. May 15, 2025) (similar holding).

Accordingly, all Plaintiff organizations have associational standing to pursue the claims summarized in the prior subsection stemming from the termination of NEH grants awarded to their members.

### iii.    The ACLS Plaintiffs Lack Standing to Bring Their Institutional Claims

In addition to claims relating to the termination of grants on various grounds, the ACLS Plaintiffs (but not the Authors Guild Plaintiffs) assert a number of other claims – claims related to the cancellation of future grant opportunities, the placement of NEH employees on administrative leave or their ultimate firing, the NEH's discontinuation of certain programs and divisions, and the funding of the "Garden of Heroes." These "Institutional Claims" are brought pursuant to the Administrative Procedure Act (ACLS Counts I, V, VI) and Separation of Powers (ACLS Count II).

The ACLS Plaintiffs lack standing to pursue these Institutional Claims.

First, these governmental actions – which were not directly visited upon Plaintiffs – are not sufficiently traceable to the injury of the allegedly illegal termination of already awarded grants. Traceability requires a showing "that the [alleged] injury was likely caused by the defendant." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, (2021). If a plaintiff cannot show that the Government's action or inaction is "causally connected to the plaintiff's injury," s/he cannot demonstrate Article III standing. *California v. Texas*, 593 U.S. 659, 660 (2021).

Plaintiffs have not alleged facts tending to show that NEH would have to maintain its current staffing levels or continue all of the programs that were discontinued in order to redress the action that wronged them – the mass termination of awarded grants in violation of the Constitution and the APA.

Furthermore, the Institutional Plaintiffs (ACLS, AHA, MLA) cannot establish standing on the ground that they or their members were "planning on applying for upcoming grant opportunities that have been abruptly cancelled." ACLS Compl. ¶¶ 94, 99, 104. The ACLS Plaintiffs provide supporting declarations alleging that they or their members applied, or were preparing to apply, for specific grant programs that have been eliminated. (*See* Dkt. No. 86, at 13). But while the ACLS Plaintiffs frame this as a "loss of an opportunity to compete" of the sort recognized in *Mantena v. Johnson,* 809 F.3d 721, 731 (2d Cir. 2015), their reliance is misplaced.

In *Mantena,* the Second Circuit held that a petitioner had standing based on the Government's failure to notify a visa beneficiary of his pending revocation proceeding, in violation of regulatory requirements. The plaintiff in *Mantena* was already engaged in a formal adjudicatory process; he alleged the loss of a concrete opportunity resulting from a procedural defect. That is not what we have here. Here, we have the sort of "generalized grievance" about Government agency operations, which courts have consistently held does not, by itself, amount to an injury-in-fact under Article III. Plaintiffs have not established their standing to challenge the NEH's decision not to operate particular programs or offer particular opportunities in the future.[13]

The same problem arises with regard to the ACLS Plaintiffs' claim that the "mass firing of NEH staff" and the "loss of entire grant programs" will make it "more difficult for Plaintiffs and their members to benefit from the professional development and networking opportunities" that NEH has historically provided. ACLS Compl. ¶¶ 112-24. Here, the causal chain between the

---

[13] It is also likely that internal NEH decisions regarding what programs to run and what opportunities to extend would fall within the APA's prohibition against judicial review of agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). But the ACLS Plaintiffs' lack of standing disposes of these claims without the need to examine them further.

general termination of programs and firing of staff and the impact on the ACLS Plaintiffs' operations or on the careers of their members is far too attenuated to support standing.

Most befuddling is the ACLS Plaintiffs' challenge to NEH's decision to invest $17 million in the "Garden of Heroes" project. The ACLS Plaintiffs argue that this action will somehow impact them because "Money is zero-sum." (Dkt. No. 86, at 14). But the ACLS Plaintiffs have not identified any concrete, particularized harm to them resulting from the Government's decision to fund this particular project – nor can I.

As to the Institutional Claims, then, the Government's Motion to Dismiss the relevant counts in the ACLS Complaint is well taken.

### b. Ripeness

Plaintiffs' claims that the Mass Terminations constitute an improper deferral or rescission of Congressional funds in violation of the Administrative Procedure Act (ACLS Count I; AG Count II), the Separation of Powers (ACLS Count II; AG Count IV), and the Impoundment Control and Appropriations Acts (ACLS Counts III, IV; AG Count III) are not ripe for judicial review.

Congress appropriated $207 million to NEH, of which $192 million was designated "for activities in the humanities" and $ 15 million to carry out the NEH's grant program. Pub. L. 118-42, 138 Stat. 25, 282 (Mar. 9. 2024) (the "2024 Act"). In March of this year, Congress enacted a continuing resolution that re-appropriated the same amount of funding that had been appropriated to NEH under the 2024 Act, with the same breakdown on how the money was to be spent. *See* 2025 Continuing Resolution.

"Under Article II of the Constitution . . ., the President must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013); *see also Youngstown Sheet &*

*Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb[.]"). Thus, when Congress appropriates sums of money for certain purposes, the Executive must spend it. *See Train v. City of New York*, 420 U.S. 35, 42–44 (1975). The President cannot refuse to spend appropriated funds based on policy reasons alone, unless Congress explicitly approves the recission. *In re Aiken Cnty.*, 725 F.3d at 259, 261 n.1; *see also* Impoundment Control Act, Pub. L. No. 93-344, 88 Stat. 297 (1974) (appropriated funds "shall be made available for obligation" absent congressional recission).

However, the evidence before the Court suggests, not that Defendants are refusing to spend the money appropriated for NEH grants, but rather that they intend to re-obligate those funds to other grantees for different projects. (Dkt. No. 80 ¶¶ 19-22). In addition, the awards are sourced to "no year" appropriations, meaning Defendants are not required to expend the funds by the end of a particular fiscal year. Pub. L. 118-42, 138 Stat. 25, 281. NEH can still fulfill its statutory mandate by reallocating the cancelled grant money. "While the odds of that might appear slim . . ., plaintiffs have presented no evidence that this administration (or for that matter, a future administration) cannot, or will not, [spend the money]." *Harris Cnty., Texas v. Kennedy*, 2025 WL 1707665, at *10 (D.D.C. June 17, 2025); *Vera Inst. Of Just. V. United States DOJ*, 2025 WL 1865160, at *17 (D.D.C. July 7, 2025).

Therefore, these claims are not ripe. For this reason, the Government's Motion to Dismiss them will be granted.

### c. The Tucker Act

Defendants assert that the terminated NEH grants represent contracts between the grantees and the United States, and that Plaintiffs' claims are essentially claims for breach of those contracts.

Because the Tucker Act vests the Court of Federal Claims with exclusive jurisdiction "to render judgment upon any claim against the United States founded . . . upon . . . any express or implied contract with the United States," 28 U.S.C. § 1491(a)(1). The Government argues that this Court thus lacks subject matter jurisdiction over all of the Grant Termination claims and so should dismiss them as well. Specifically, Defendants argue that the Tucker Act divests this Court of jurisdiction over "all of Plaintiffs' claims relating to grant terminations, whether styled as claims under the APA, violations of the separation of powers, Impoundment Control Act or Appropriations Act, ultra vires claims, or something else." (Dkt. No. 77, at 17).

As to this, the Government is wrong.

Whether a claim is "founded . . . upon any express or implied contract with the United States" has long been understood to depend upon "the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022). While the pleadings (and so the introductory pages of this opinion) are replete with information about the terms and conditions of their grants, Plaintiffs have carefully and deliberately not alleged that their grants were terminated in violation of those terms and conditions. Instead, they assert that their grants were terminated in violation of their First Amendment rights, as well as for reasons that violate both the express terms of the NEH authorizing statute and the APA.

Defendants argue nonetheless that Plaintiffs' claims are "founded upon" the grant contracts. They rely principally on the Supreme Court's recent issuance of a stay on its Emergency Docket in the case *Department of Education v. California*, 145 S. Ct. 966 (2025). In that case, the Supreme Court stayed a temporary restraining order that had been issued by The Hon. Myong J. Joun of the District of Massachusetts. Judge Joun's TRO enjoined the Government both from

44

terminating various education-related grants and from "implementing [the grant] terminations . . . such as [by] suspension or withholding of any funds approved and obligated for the grants." *California v. United States Dep't of Educ.*, 769 F. Supp. 3d 72, 80 (D. Mass. 2025). Judge Joun held that the Tucker Act was no bar to his granting the requested relief because, "Plaintiff States have also sufficiently shown that the dispute does not hinge on the terms of a contract between the parties, but rather federal statute and regulations put in place by Congress and the Department." *Id.*, at 76.

In staying the District Court's decision pending appeal, the Supreme Court reasoned that the Government was likely to succeed in showing that the District Court lacked jurisdiction to order the payment of the terminated grants pursuant to the APA because, "The APA's waiver of sovereign immunity does not apply [(i)] if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought . . . [or (ii)] to claims seeking money damages." *Id.* (internal quotations omitted). By a 5-4 vote, the Court indicated that the Government's sovereign immunity waiver was unlikely to apply in *California* because "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212, (2002)). And indeed, Judge Joun did order the Department of Education not to hold up payment of the wrongfully terminated grant monies.

In an effort to distinguish this case from *California*, Plaintiffs argue that their grants are not "contracts" at all. But except as to Plaintiff Jasperse, who did not in fact have a contract with the Government (his fellowship sponsor, MHS, did), I cannot agree. The argument runs contrary to Federal Circuit precedent, which defines an enforceable contract for Tucker Act purposes as an agreement where there is "(1) mutuality of intent to contract; (2) offer and acceptance; (3)

consideration; and (4) a government representative having actual authority to bind the United States." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1339 (Fed. Cir. 2021). Federal grant agreements are treated "as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound." *Id*. at 1338.

Plaintiffs' contention that the grants are not contracts because they lack bargained-for consideration is also foreclosed by Federal Circuit precedent. Consideration in the context of federal grants "may consist of performance or a return promise to perform, and performance 'may be a specified act of forbearance, or any one of several specified acts or forbearances of which the offeree is given the choice, or such conduct as will produce a specified result.'" *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1340 (Fed. Cir. 2021) (quoting Restatement (Second) of Contracts § 71 cmt. d (1981)). In that case, the Federal Circuit found consideration present in a federal grant because the recipient "agreed to comply with an array of requirements attached to the receipt, use, and distribution of the grant money." *Id*. at 1340.

Here, Plaintiffs' Complaints cite to numerous conditions imposed by the NEH that the grantees accepted, such as where multiple grantees, "as a condition of receiving the [grant money]" were "required by NEH to take a year-long leave of absence from [their] employment to work on the project." Am. Compl. ¶ 4*; see also* ¶¶ 16; 18; 60. This requirement of forbearance is repeated in the NEH's General Terms and Conditions, which states, *inter alia*, that fellowship recipients, "must forego teaching, administrative assignments, and other major activities," faculty having been awarded grants "must not have course overloads or work overtime during the NEH period of performance," and public scholars "must reduce their teaching load proportionately" to their grant. NEH General Terms and Conditions for Awards to Individuals, at Section I.D., www.neh.gov/general-term-and-conditions-awards-individuals (last accessed July 11, 2025).

These requirements constitute the sort of forbearance that the Federal Circuit views as consideration.[14]

However, in the *California* decision, the Supreme Court acknowledged that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id*. (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)). The *Bowen* case, cited by the Court for this proposition, concerned whether "a federal district court ha[d] jurisdiction to review a final order of the Secretary of [HHS] refusing to reimburse a State for a category of expenditures under its Medicaid program." *Bowen*, 487 at 882. In *Bowen*, the Supreme Court emphasized that, "Although the Tucker Act is not expressly limited to claims for money damages, it has long been construed as authorizing [in the Court of Federal Claims] only actions for money judgments *and not suits for equitable relief against the United States.*" *Id*. at 914 (emphasis added). For that reason, the Court found that where the facts of the case, specifically a "Secretary's interpretation of his regulations" – "may make it appropriate for judicial review to culminate in the entry of declaratory or injunctive relief that requires the Secretary to modify future practices . . . We are not willing to assume, categorically, that a naked money judgment against the United States will always be an adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties." *Id*. at 905.

The most salient factor reconciling *California* with *Bowen* appears to be that the Court in *California* viewed the relief ordered by Judge Joun – specifically, his enjoining Defendants from "implementing [the grant] terminations . . . such as [by] suspension or withholding of any funds

---

[14] I am constrained to note that the Supreme Court in *California* could not have ruled as it did without concluding, albeit *sub silentio*, that the grants in that case were indeed contracts.

approved and obligated for the grants," *CA v. DOE*, 769 F. Supp. 3d at 72 – to be the sort of "naked money judgment" that could and should have been issued by the Court of Federal Claims. By contrast, the Court in *Bowen* viewed an action involving a more systemic and equitable remedy impacting an agency's "interpretation of [its] regulations" as falling comfortably within the jurisdiction of the District Court – even if it might impact some future agency action that would require the disbursement of funds.

I recognize that the Supreme Court's decision in *California* is not a final order, *see, e.g.*, *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) ("The principal dissent's catchy but worn-out rhetoric about the 'shadow docket' is similarly off target. The stay will allow this Court to decide the merits in an orderly fashion—after full briefing, oral argument, and our usual extensive internal deliberations—and ensure that we do not have to decide the merits on the emergency docket. *To reiterate: The Court's stay order is not a decision on the merits.*") (emphasis added)), therefore, *California* does not foreclose the possibility that the Court will someday conclude – if it ultimately takes the case on the merits – both that the APA was violated by the termination of the grants at issue, and that the claims asserted under that statute were not, as the majority originally supposed, Tucker Act claims. A number of my fellow jurists have seized on the preliminary nature of *California* – an interlocutory order if ever there was one – to enter preliminary injunctions that restore wrongfully terminated grants and/or order the payment of monies thereunder. *See, e.g.*, *Thakur v. Trump*, 2025 WL 1734471 (N.D. Cal. June 23, 2025); *San Francisco A.I.D.S. Found. v. Trump*, 2025 WL 1621636 (N.D. Cal. June 9, 2025); *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 2025 WL 1747128 (D. Mass. June 23, 2025), *stay denied*, *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 2025 WL 2017106 (1st Cir. July 18, 2025); *Widakuswara v. Lake*, 2025 WL 1166400, (D.D.C. Apr. 22, 2025), *Widakuswara v. Lake*, 2025 WL

1166400 (D.D.C. Apr. 22, 2025), *stay granted*, *Widakuswara v. Lake*, Nos. 25-5145; 25-5150; 25-5151, 2025 WL 1288817 (D.C. Cir. May 3, 2025), *on reconsideration en banc*, Nos. 25-5150; 25-5151, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (vacating the panel's decision for reasons articulated by Judge Pillard in dissent).

But I can take a hint. Unless and until the Supreme Court changes its preliminary views about the Tucker Act, it would be a futile gesture to ignore the Court's guidance in *California* and enter a preliminary injunction directing that NEH pay Plaintiffs' their grants *pendente lite* because the Government is obligated to make those payments. If Plaintiffs whose grants were terminated (or those representing their interests) really want a court to order that, "Defendants and their agents take all steps necessary to ensure that the National Endowment for the Humanities disburses funds on covered grants in the customary manner and in customary timeframes," (Dkt. Nos. 65, at 1-2; 65-2, at 2), it would appear to me that they need to seek relief in the Court of Federal Claims. I certainly think it is likely that the Supreme Court will so conclude.

But that does not mean that the Court lacks any jurisdiction over the Grant Termination claims. The Grant Termination Plaintiffs seek both equitable and monetary relief. In *Bowen* the Supreme Court permitted the district court to award relief that specifically did not "order [the at-issue] amount to be paid," and that "did not purport to be based on a finding that the Federal Government owed [Plaintiffs] that amount, or indeed, any amount of money." *Bowen*, 487 U.S. at 909-10. Instead, the relief in *Bowen* consisted of telling the Government that it "may not disallow the reimbursement on the grounds given." *Id*. at 910.

It thus appears to me that I have the power to tell the Government that it "may not terminate the grants on the grounds given." Indeed, I am required by my office to do exactly that:  to "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right," or "in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)-(C).

In this case, alternative relief of the sort authorized in *Bowen* is available to remedy any adjudicated violation of the Plaintiffs' constitutional rights – relief that does not involve the payment of money or even a finding that the Government owes money. That, of course, is an injunction setting aside any illegal grant terminations until such time as the Government conducts new termination process (if it chooses to go that route) in a constitutionally compliant manner. Put otherwise, I have to power to enter an order mandating that, if the Government wants to consider terminating all the grants issued by the Biden Administration, or grants that focus on particular subjects, they do so in a manner that complies with the law – and not for those reasons (assuming, of course, that those reasons violate the law – which will be discussed below). If Plaintiffs satisfy the standards for entry of an injunction on that basis, that seems to me a logical way to redress any violations of the Constitution, the APA or any other statute on which Plaintiffs rely.

Were Defendants' view of the limitations on this Court's jurisdiction correct, it would effectively eliminate Plaintiffs' ability to obtain any remedy for the violation of their constitutional and statutory rights, as alleged in the pleadings. This is particularly relevant in this case where we, unlike in *California*, are faced with constitutional claims as well as APA claims based on Defendants' alleged violation of Plaintiffs' constitutional rights.

"The Tucker Act does not itself provide the substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Samuels v. New York Dep't of Lab.*, 2025 WL 27737, at *8 (S.D.N.Y. Jan. 3, 2025) (internal citations omitted). "In the parlance of Tucker Act cases, that source must be 'money-mandating'." *Id.* Against this backdrop of

plaintiffs' needing to identify a "money-mandating" source of law to bring a claim within the jurisdiction of the Court of Federal Claims, the Federal Circuit has held seeking vindication for a violation of constitutional rights, which Plaintiffs seek here, "cannot be so interpreted to command the payment of money," *United States v. Connolly*, 716 F.2d 882, 887 (Fed. Cir. 1983). Constitutional principles like "The separation of powers doctrine does not man-date [sic] payment of money by the government and thus cannot confer jurisdiction upon the Court of Federal Claims," *Jaye v. United States*, 781 F. App'x 994, 997-98 (Fed. Cir. 2019) (internal citations omitted).

On this basis, the D.C. Circuit has "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006). As the Ninth Circuit recently emphasized in a similar case, "The result requested by the Government would mean that *no court* has jurisdiction to hear plaintiffs' claims . . . [and is] contrary to common sense." *Cmty. Legal Servs.*, 137 F.4th 932, at * 9 (9th Cir. 2025) (emphasis added).

For the aforementioned reasons, I conclude that the Tucker Act does not deprive me of jurisdiction to hear the Grant Termination Claims. Whether Plaintiffs are likely to succeed on the merits of those claims is another question entirely. But they cannot be dismissed on jurisdictional grounds.

### d.  The Motion to Dismiss

For the reasons articulated in the section above, Defendants' Motion to Dismiss is GRANTED with respect to the following claims:

- For lack of standing – ACLS Counts I, II, III, V, VI, VII

- For lack of ripeness – ACLS Counts I, II, IV; AG Counts II (as it relates to the Impoundment Control Act); III; IV

The Government's Motion to Dismiss is DENIED with respect to the following claims:

- ACLS Counts VIII, IX

- AG Counts I, II (except as it relates to the Impoundment Control Act), V, VI

With that done, we turn to the Motions for a Preliminary Injunction.

## II.  Plaintiffs' Motions for Preliminary Injunctions[15]

A preliminary injunction is "an extraordinary remedy, which may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). To succeed on an application for a preliminary injunction, the moving party must show: (i) a likelihood of success on the merits; (ii) that they are likely to suffer irreparable harm absent a preliminary injunction; (iii) a favorable balance of hardships, and (iv) that a preliminary injunction is in the public interest. *Id*. at 20.

Plaintiffs who are seeking a mandatory injunction that requires defendants to act affirmatively face a higher burden still. "A mandatory preliminary injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (internal citations omitted).

---

[15] While Count I in the Authors Guild Amended Complaint (violation of the APA for arbitrary and capricious action, as opposed to Count II, which relies on violation of law) remains in this case, I do not rely on that claim in issuing a preliminary injunction. That claim is virtually identical to the claim underlying Judge Joun's preliminary injunction that was stayed in *California*, and as I previously stated, I do not intend to enter relief of the kind entered in that case – although it does not appear that Judge Joun (who was, after all, issuing the most preliminary of order, a TRO – not even a preliminary injunction) was focused on the possibility of alternative remedies. *See* Section I(c), *supra*.

For the below reasons, the Authors Guild Plaintiffs' Motion for a Preliminary Injunction is GRANTED IN PART AND DENIED IN PART. The ACLS Plaintiffs' more limited Motion for a Preliminary Injunction is DENIED because, after dismissing the majority of the ACLS Plaintiffs' claims on jurisdictional grounds, their Motion for a Preliminary Injunction rests *only* on their claim that DOGE acted beyond its authority; the ACLS Plaintiffs specifically did not seek the injunction on their First Amendment claims. (*See* Dkt. No. 86, at 3-4) (saying that a chart "summariz[ing] the claims pursued by each plaintiff group in seeking a preliminary injunction," which did not include either ACLS First Amendment claim, "does not include claims in the complaint for which plaintiffs are not seeking an injunction."

### a. Likelihood of Success on the Merits

On the existing record, the Authors Guild Plaintiffs have demonstrated that they are likely to succeed on the merits of their claims that the Mass Terminations violate the First Amendment, and therefore the APA. However, neither they nor the ACLS Plaintiffs have demonstrated that they are likely to succeed on the merits of their claims that DOGE's actions in connection with the Mass Terminations are *ultra vires* at this stage in the proceedings. Since the ACLS Plaintiffs' motion for preliminary relief rests solely on the "DOGE" claim, the motion must be denied.

### i. First Amendment

Count II of the Authors Guild Amended Complaint[16] alleges that Defendants acted contrary to law "by terminating Plaintiffs' and class members' grants based, at least in part, on Defendants' belief that the supported works promoted disfavored viewpoints and Plaintiffs' and class members' mere association, through the grant process, with the prior presidential administration," which unconstitutional action violates the APA. Am. Compl. ¶ 161. Count V of the Authors Guild

---

[16] Other aspects of Count II – specifically as it relates to the Impoundment Control Act – were dismissed on ripeness grounds. *See* Section I(b), *supra*.

Amended Complaint relies directly on the First Amendment, alleging that Plaintiffs' First Amendment rights have been violated by "Defendants' viewpoint discrimination and the burden Defendants' actions place on Plaintiffs' exercise of First Amendment rights." Am. Compl. ¶ 182. Specifically, the Authors Guild Plaintiffs assert that:

> Defendants' termination of nearly all NEH grants awarded during the prior Administration, and leaving in place existing and future grants that align with particular political and ideological viewpoints, is "the product of invidious viewpoint discrimination." *Finley*, 524 U.S. at 587.

> [(i)] Defendants terminated the grants based on the recipients' perceived viewpoint, in an effort to drive such views out of the marketplace of ideas. This is most evident by the citation in the Termination Notices to executive orders purporting to combat "Radical Indoctrination" and "Radical … DEI Programs," and to further "Biological Truth." It is evident from the Termination Notice that Defendants believe Plaintiffs' speech conflicts with the Administration's views [on certain subjects], and their grants were terminated at least in part for this reason.

> [(ii)] Defendants concluded Plaintiffs' speech conflicts with the Administration's views not based on any individual analysis of particular grants but based on Plaintiffs' mere association with the prior administration through the grant award process. Defendants' termination of grants therefore burdens Plaintiffs' exercise of their expressive association rights by creating conditions for federal funding that preclude individuals and organizations associated—no matter how minimally—with individuals and organizations whose speech Defendants disfavor.

(*Id*. ¶ 181). I interpret this as alleging both that the grants were selected for termination because the projects they funded were perceived as engaging in speech disfavored by the current Administration and because the funding was awarded by the prior Administration.

The First Amendment of the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. At its core, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972).

First Amendment violations can come in many forms. While the First Amendment can certainly be used to curtail the Government's straightforward criminalization of speech, *see Texas*

*v. Johnson*, 491 U.S. 397 (1989), courts have not hesitated to hold that the Government is also prevented "from doing indirectly what it cannot do directly." *EklecCo NewCo LLC v. Town of Clarkstown*, 2019 WL 2210798, at *12 (S.D.N.Y. May 21, 2019) (citing *U.S. v. Oliveras*, 905 F.2d 623, 628 n.8 (2d Cir. 1990)).

With respect to the First Amendment's application to the facts of this case, Plaintiffs rely heavily on language from the 1998 Supreme Court decision, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998). In *Finley*, the Supreme Court upheld, against a facial First Amendment challenge, the so-called "Williams/Coleman" amendment to the enabling statute of the National Endowment for the Arts, which directed the Chairperson, in establishing procedures to judge the artistic merit of grant applications, to "take into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id*. at 576. In upholding the amendment, the Court emphasized that "the 'decency and respect' criteria do not silence speakers by expressly threatening censorship of ideas," and that "the considerations that the provision introduces, by their nature, do not engender the kind of directed viewpoint discrimination that would prompt this Court to invalidate the statute on its face." *Id*. at 583 (internal quotations omitted). Since the Williams/Coleman amendment was not facing an as-applied challenge, the Court specified that it had "no occasion here to address an as-applied challenge in a situation where the denial of a grant may be shown to be the product of invidious viewpoint discrimination." *Id*. at 587. However, the Court was clear in articulating that "even in the provision of subsidies, the Government may not 'aim at the suppression of dangerous ideas,'" *id*. (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550 (1983)), and that "If the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on

disfavored viewpoints, then we would confront a different case," *id*. Plaintiffs claim that such a case has arisen.

Plaintiffs argue that Defendants violated their First Amendment rights by withdrawing funding that had previously been awarded to projects because they concluded that those projects promoted or were associated with viewpoints they disfavor. (Dkt. No. 65-1, at 19). Specifically, Plaintiffs claim that Defendants terminated the NEH grants "not based on a reassessment of their contributions to the humanities," but "on their perceived viewpoints and associations." (Dkt. No. 65-1, at 19).

There is certainly evidence to support that assertion. The Declaration of "Richard Roe" – a pseudonymous declarant who claims to be a current employee at NEH – states that, in early February 2025, NEH staff was informed that the Trump Administration "was planning to terminate grants made during the Biden Administration that violated the President Trump's Executive Orders on K-12 education, gender ideology, and DEI." (Dkt. No. 30 ¶ 1). Chairman McDonald's declaration in the parallel case in the Northern District of California largely corroborates Roe's testimony. McDonald states that "Between January 20 and February 7, 2025, Chair [Shelly C.] Lowe directed NEH program staff to review open grants in light of the new Executive Orders." N.D. Cal. McDonald Declaration ¶ 7.[17] McDonald further explains that, "the policy for selecting grants for termination at NEH focused first on first on [sic] identifying open grants that focused on or promoted (in whole or in part) 'environmental justice,' 'diversity, equity, and inclusion' or 'diversity, equity, inclusion and accessibility,' and "gender ideology.'" *Id*. ¶ 20. He adds that, "Subsequently, and in consultation with DOGE, I more broadly chose grants for termination that

---

[17] McDonald also submitted a declaration in this case, but its description of the grant termination process is limited to a single sentence: "I terminated a number of, but not all, open NEH grants in April 2025, in compliance with Presidential Executive Order 14222 and in consultation with the Department of Government Efficiency." (Dkt. No. 80, at 4). As evidence goes, this is manifestly insufficient to prove anything.

did not contribute to the public's confidence in how NEH expended its taxpayer funds as required by NEH's authorizing statute." *Id*. ¶ 21.

The N.D. Cal. McDonald Declaration includes an attached email from Brett Bobley (NEH's Chief Information Officer) to NEH Senior Management and Division Directors. The email sets out "the review criteria for reviewing all the awards from 2021 to the present: As per OMB's January 27, 2025 memo (M-25-13), please identify any funded projects that 'advance Marxist equity, transgenderism, or green new deal social engineering policies.' More specifically, following the descriptions provided in the Administration's recent Executive Orders, you should identify grants that focus on or promote (in whole or in part): (i) 'environmental justice'; (ii) 'diversity, equity, and inclusion ' or 'diversity, equity, inclusion, and accessibility' (even if these exact terms are not used); and (iii) 'gender ideology,' which, according to the Executive Order, replaces sex with 'an internal, fluid, and subjective sense of self unmoored from biological facts' or with 'an ever-shifting concept of self-assessed gender identity.'" N.D. Cal. McDonald Declaration, at 5.

The Declaration includes another attached email from Adam Wolfson (NEH Assistant Chairman for Programs) to two DOGE employees, saying, "I've copied below the link for the award spreadsheet created by Brett that the program directors used for their historical review of NEH's grants since January 2021. It's broken down by program office, each one having its own tab. The directors reviewed the grants made through their office and entered comments for the three relevant categories (i.e., DEI/DEIA; gender ideology; and environmental justice) and rated them based on level of involvement with any of the categories (high, medium, low, N/A)." *Id*., at 7.

This narrative is corroborated by the NEH's April 24, 2025 Press Release, saying, "NEH has cancelled awards that are at variance with agency priorities, including but not limited to those on diversity, equity, and inclusion (or DEI) and environmental justice, as well as awards that may not inspire public confidence in the use of taxpayer funds." Press Release, NAT'L ENDOWMENT FOR THE HUMANITIES, *An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders* (Apr. 24, 2025), https://www.neh.gov/news/update-neh-funding-priorities-and-agencys-recent-implementation-trump-administration-executive.

"[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.'" *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (quoting *Speiser v. Randall*, 357 U.S. 513, 526).

The process that Chairman McDonald describes for canceling the grants is a textbook violation of the kind described in *Perry*. McDonald straightforwardly admits that grants were terminated, not because the Plaintiffs' proposals were unworthy of NEH funding or reflected undistinguished scholarship, but because the matters they proposed to study ran afoul of the current Administration's beliefs or preferences. That is clear from the direction given to the NEH staff members, who were told to identify grants that purportedly advanced "Marxist equity, transgenderism, or green new deal social engineering policies," N.D. Cal. McDonald Declaration, at 5, or that "focused on or promoted (in whole or in part) 'environmental justice,' 'diversity,

equity, and inclusion' or 'diversity, equity, inclusion and accessibility,' and "gender ideology,'" *id.* ¶ 20.

The fact that this case involves the termination of grants already awarded, as opposed to the awarding of funding in the first place, renders the First Amendment viewpoint discrimination all the more transparent. The awards that were terminated had been made in conformity with a long-standing review process that was conducted pursuant to settled rules and procedures. The record discloses that everyone who was awarded funding from the NEH prior to the spring of 2025 emerged from a stringent vetting process that was conducted by experts in their respective fields. Grantees were chosen because of the rigor of their scholarship for inclusion in the "notable list" of "thousands of our nation's most significant humanities projects" that have been underwritten by the NEH over the past 50 years." (Dkt. No. 71-1, at 1). The already-allocated money was then peremptorily withdrawn because the new Administration was hostile to particular topics of study and points of view. It was withdrawn on this basis simultaneously, from literally hundreds of grant recipients, "eschew[ing] the expert-guided process by which NEH typically acts." Am. Compl. ¶ 151.

Compounding the transparency of the unconstitutional viewpoint discrimination is the fact that the NEH's Authorizing Statute specifically requires the agency to activities that "reach or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community." 20 U.S.C. § 956(c)(4). Yet defunding projects that referenced diversity, and minority/tribal culture – areas of study that the NEH was statutorily

required to support – was one of the primary drivers of the Mass Termination.[18]

There is also ample evidence that the terminations were motivated by a different but equally pernicious type of viewpoint discrimination – namely, associational viewpoint discrimination against grants that were awarded to scholars during the Biden Administration. Here, too, Plaintiffs have demonstrated a likelihood of success on the merits of a First Amendment claim.

The *Elrod/Branti* line of Supreme Court cases has made clear that the Government's withdrawal of a benefit because of the recipient's association with a political party is limited by the First Amendment. *See Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980). The current NEH employee writing under the name Richard Roe attests that after "The [NEH] staff spent weeks combing through thousands of grants and indicating which ones might be considered in violation of the new Eos . . . [they] estimated that roughly 25% of grants were in violation of the new EOs and would likely be terminated. (Dkt. No. 30 ¶ 1). Nonetheless, almost all Biden-era NEH grants were canceled. Another declarant, current or former NEH employee Mark Moe, claimed that, at an April 30, 2025 staff meeting, Acting Chairman McDonald told staff that DOGE was focused on terminating awards issued by the Biden administration. (Dkt. No. 50 ¶ 2). This is further corroborated by the email referenced above, in which Brett Bobley notes that the NEH grant review was structured around "all the awards from 2021 to the present," N.D. Cal. McDonald Declaration, at 6, and Adam Wolfson describes the "historical review of NEH's grants since January 2021," *id.*, at 7. It is no coincident that January 2021 was the month in which President Biden took office following the 2020 Election.

---

[18] Ironically, the E.O. that was mistakenly referenced in the Mass Termination Notices specifically speaks to the termination of "non-statutory components and functions". Executive Order 14217, *Commencing the Reduction of the Federal Bureaucracy*, issued on March 14, 2025

If Roe's testimony is correct – and I have no reason to disbelieve it, since the Government offered not a scintilla of evidence to suggest that animosity to the previous Administration's actions was not a principal driver of the Mass Termination – then the vast majority of grants terminated were defunded simply because they were awarded by the Democratic administration – a reason that blatantly conflicts with First Amendment principles.

Defendants counter by asserting the general principal that the Government's "decision not to subsidize the exercise of a fundamental right does not infringe the right." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). The case on which they rely, *Rust*, involved a facial challenge to regulations promulgated under Title X of the Public Health Service Act, Section 1008 of which provides that "none of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. The *Rust* petitioners claimed that the Department of Health and Human Services regulations under this statute – a statute specifying that Title X projects (i) may not provide abortion counseling or referrals; (ii) may not advocate for abortion; and (iii) must be physically and financially separate from prohibited abortion activities – constituted facial violations of the First Amendment rights of health care providers and women. The Court disagreed, reasoning that Congress had not discriminated against viewpoints on abortion, but had "merely chosen to fund one activity to the exclusion of the other." *Rust*, 500 U.S. at 193.

However, the Court subsequently "explained Rust" by noting that "the counseling activities of the doctors under Title X amounted to governmental speech." *Legal Servs. Corp. v. Velazquez,* 531 U.S. 533, 541 (2001). The distinction between governmental speech and private speech allowed the Court to distinguish between viewpoint-based funding decisions that can be sustained – when the Government is itself the speaker or is using private speakers to transmit information

pertaining to its own program – and funding decisions but that cannot be sustained if the Government program is "designed to facilitate *private speech*, not to promote a governmental message." *Id*. at 541-42 (emphasis added). As the Court previously established in *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995), "it does not follow . . . that viewpoint-based restrictions are proper when the [Government] does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Id*. at 834. That, of course, is precisely what the NEH does – expends funds to encourage a diversity of views (as statutorily mandated) from private speakers – speaker who are not delivering a message either for or from the Government.

There can be no question that the speech at issue in this case is private, not governmental speech. To determine whether contested speech is governmental or private, the Supreme Court has identified three primary factors: (1) whether the medium has historically been used to "communicate[] messages from the States"; (2) whether the medium is "often closely identified in the public mind with the State," i.e., whether it is reasonably interpreted as "conveying some message on the [Government's] behalf"; and (3) whether the government maintains direct, editorial control over the message's content. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 210-13, 219 (2015) (internal quotations and alterations omitted). None of these factors weighs in favor of finding the scholarly work in the humanities disciplines that is produced with the help of NEH grants to be governmental speech. The Government has not historically used independently published books about issues such as "philosophical consequences of the scientific worldview," (Dkt. No. 71, at 1), or "the entanglement of beauty work, racialized labor, and Black womanhood," (Dkt. No. 73, at 1) to communicate a message; the public does not closely associate such works with the Government; and with the exception of terms and conditions in the grant

agreements requiring NEH grant-holders to seek approval before making changes to their project scope, the Government cannot be said to maintain "direct, editorial control" over the content of the NEH grantees' work product. Indeed, the authorizing statute prohibits it from "exercise[ing] any direction, supervision or control of the policy determination, personnel, or curriculum" of any grantee organization. 20 USC § 953(c).

Defendants further insist that their actions do not reflect viewpoint discrimination but rather a re-prioritizing the NEH's focus on awarding grants to projects that "focus on topics in American history, culture, and government in any period from the Colonial Era to the present that increase public knowledge of the 250th anniversary of American Independence and American exceptionalism." NAT'L ENDOWMENT FOR THE HUMANITIES, Funding Opportunity for Individuals – Public Scholars, https://www.neh.gov/grants/research/public-scholar-program (last accessed July 14, 2025). But that statement is manifestly false. To illustrate the point, we need only consider the grant taken away from one of the named plaintiffs in *Authors Guild* – Benjamin Holtzman.

Dr. Holtzman is a Professor of History at Lehman College in New York City. He studies the intersection of political and social history in the United States, with particular focus on politics, capitalism, race and class, cities, and social movements. Am. Compl. ¶ 17. In other words, he studies American history from a particular point of view, one that takes a hard look at some of the less inspiring aspects of the 250-year journey we will commemorate next year. The book he is writing – the one that would have been subsidized by his NEH grant – focuses on something that really happened in recent American history: the re-emergence of racist extremist groups, including the Ku Klux Klan, during the 1970s and 1980s. *Id*. ¶ 18. So his project fell comfortably within the NEH's new "focus on topics in American history…. from the Colonial Era to the present…."

Nonetheless, Holtzmann's grant was terminated. The evidence suggests that this occurred solely and simply as part of an effort to eliminate NEH funding for projects that focus on historical, literary or cultural issues that the current administration finds unpalatable. We do not need to guess to reach this conclusion: In the Government's spreadsheet entitled "Copy of NEH Active Grants (03.28.2025),[19] Professor Holtzman's grant was flagged for a connection to DEI through a "Yes" having been entered into a column labeled, "Yes / No DEI?" In the subsequent column titled "DEI Rationale," the spreadsheet says, "This book project explores the grassroots activist network that challenged white power in the late 20th century US, highlighting diverse groups joining forces to challenge white supremacists and transform understandings of racism."

The spreadsheets reveal that numerous other grants having to do with American history – the ostensible new focus of NEH funding – were terminated, at least in part, for their connection to DEI-related topics. Examples include:  (i) an award to LaClaire Mizell, of the Dorchester Heritage Center, Inc., to fund an exhibit about the history of indigenous tribes in South Carolina, which was flagged in the above spreadsheet because, "Dorchester Heritage Center's collaboration with local Native American tribes and scholars in designing an exhibit, prioritizing accurate information and the tribes' storytelling preferences, aligns with DEI principles"; (ii) an award to Joseph Dorman, of the Foundation for Excellence in Louisiana Public Broadcasting, to create a documentary about the Reconstruction-era Colfax Massacre of Black Americans, which the same spreadsheet describes as "explor[ing] a historical event that significantly impacted Black civil rights, making it relevant to the topic of DEI"; and (iii) an award to Stephanie Halpern, of the YIVO Institute for Jewish Research, to process and digitize records of labor unions that were founded in large part by Jewish American immigrants, which was flagged in the spreadsheet

---

[19] This document appears to correspond to the spreadsheet referenced at N.D. Cal. McDonald Declaration ¶¶ 16-17.

because, "These collections represent Jewish labor unions that fought for workers' rights, showing the intersection of Jewish immigrant experiences and labor movements." The Termination Notices that alerted these grant recipients to the loss of their funding stated that the only reason why these grants were being terminated is the reason indicated by the record evidence – the nature of the speech being subsidized.

Far be it from this Court to deny the right of the Administration to focus NEH priorities on American history and exceptionalism as the year of our semiquincentennial approaches. Such refocusing is ordinarily a matter of agency discretion. But agency discretion does not include discretion to violate the First Amendment. Nor does not give the Government the right to edit history. Adopting a singular view about American history or American exceptionalism when awarding (or terminating the award of) public funds – while excluding whole aspects of that history solely because they relate to the ostensibly "divisive" topics of "diversity" or "equity" or "inclusion," *see, e.g.*, Executive Order 14151, *Ending Radical And Wasteful Government DEI Programs and Preferencing*, issued on January 20, 2025, – is a patent violation of the First Amendment.

In short, the Government cannot take away monies previously allocated in an effort to sanitize from our history matters that do not conform to some preferred, triumphalist version of the past. It cannot muzzle the dissemination of "accurate information" about the indigenous North American peoples, deemphasize or ignore historical events that "significantly impacted Black civil rights," or cast aside narratives that "show[] the intersection of Jewish immigrant experiences and labor movements" by removing funding for projects that explore such issues – certainly not on the basis that such things are not part of the 250-year history we plan to celebrate next year. Yet the

evidence in the record demonstrates beyond peradventure that this is precisely what occurred at the NEH.

Neither can the Government assert that such matters do not live up to taxpayer expectations about the expenditure of Government funds because such matters are "divisive" and so do not accord with taxpayer expectations about how Government funds should be spent. The statute is clear and unambiguous: Congress explicitly directed the NEH to support and subsidize activities that "reach or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community." 20 U.S.C. § 956(c)(4). Congress has not repealed that statute, and the Government has no more right to violate that authorizing statute than it does to edit history. The very fact that it is violating the authorizing statute by acting in this manner brings the constitutional violation into stark relief.

The official motto of the United States of American is *E pluribus unum* – out of many, one. Out of many peoples, from many backgrounds, holding many different viewpoints, one nation. Concepts that were deemed anathema for purposes of the Mass Termination – concepts like diversity (*out of many*), and inclusion (*one nation*) – are literally written into that motto. The American story simply cannot be told by suppressing all conversation about such matters – including especially conversation about past injustices that some, perhaps many, of us would rather forget. But for well over two centuries Americans have shown, again and again, that we can take a hard look at ourselves without falling apart. Indeed, not a few Americans believe that the most exceptional thing about this great country is the fact that we do not forget those things, but explore them and learn from them – even as we march ever onward toward the day when Jefferson's stirring creedal words "all men are created equal" can finally be said to be true. We are exceptional because the First Amendment prohibits our Government from acting, directly or indirectly, to control

speech even when the Government doesn't agree with that speech. It ill behooves Defendants to undermine that critically important aspect of our exceptionalism.

For these reasons, the Authors Guild Plaintiffs have demonstrated a likelihood of success on the merits of their claim for preliminary injunctive relief on the ground that the Mass Termination was carried out in violation of the First Amendment.

### ii.    Administrative Procedure Act

The Authors Guild Plaintiff further assert that, if they are likely to succeed on the merits of their First Amendment claim as pleaded in Count V, they are also likely to succeed on the merits of their APA claim as pleaded in Count II. They are correct. A court of law is required to "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right." 5 U.S.C. § 706(2)(B). If the Mass Terminations were unconstitutional, they necessarily violated the APA.

Therefore, Plaintiffs have also demonstrated a likelihood of success on the merits of AG Count II.

### iii.    *Ultra Vires* Actions Taken by DOGE

In addition to their claims predicated on violation of the First Amendment, Plaintiffs in both actions allege that "DOGE's termination of the grants was unconstitutional because DOGE has no legal authority to terminate another agency's grants." (Dkt. No. 25, at 18). They argue that DOGE terminated the grants and that in so doing it acted *ultra vires.* As noted above, this is the only ground on which the ACLS Plaintiffs have moved for preliminary relief that has not been dismissed on standing or ripeness grounds.

Plaintiffs have not demonstrated a likelihood of success on this issue.

An *ultra vires* claim is "essentially a Hail Mary pass – and in court as in football, the attempt rarely succeeds," *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (internal

citation omitted). "[A]n agency action allegedly 'in excess of authority' must not simply involve a dispute over statutory interpretation or challenged findings of fact." *Dart v. United States*, 848 F.2d 217, 231 (D.C. Cir. 1988). The agency must "plainly act[] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 26-27 (2d Cir. 2022) (cleaned up).

To satisfy this rigorous standard, Plaintiffs must prove that Cavanaugh and Fox effectively usurped the legal authority to terminate grants that Congress had expressly conferred on the NEH Chairperson.

The statute creating NEH states that "The Chairperson, with the advice of the National Council on the Humanities…, is authorized to enter into arrangements, including contracts, grants, loans and, other forms of assistance" to carry out the agency's humanities functions. *See* 20 U.S.C. Sec 956(c). The statute does not contain any express language about who can terminate awards. It seems that the terms and conditions of the grants provide that they can only be terminated by the Office of Grant Management, which is an office within the NEH. *See* NAT'L ENDOWMENT FOR THE HUMANITIES, *General Terms and Conditions for Awards to Organizations (for grants and cooperative agreements issued October 1, 2024, or later),* https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024; *See also* NAT'L ENDOWMENT FOR THE HUMANITIES*, General Terms and Conditions for Awards to Individuals (for awards with start dates January 1, 2025, or later)*, https://www.neh.gov/general-terms-and-conditions-awards-individuals. DOGE, obviously, is not part of the NEH. Hence the *ultra vires* argument.

The record evidence certainly indicates that persons associated with DOGE were involved in the Mass Termination. However, it does not indicate that DOGE did the terminating, or that the NEH was not involved. Acting NEH Chairman McDonald declares that *he* terminated the grants

"in consultation with [DOGE]." (Dkt. No. 80 ¶ 13). The anonymous declarations submitted by Plaintiffs are largely consistent with McDonald's account. Their testimony is to the effect that McDonald, Fox and Cavanaugh were all involved in the decision to terminate the grants of Plaintiffs and their members. (*See* Dkt. Nos. 30 ¶ 2; 31 ¶¶ 2-3; 32 ¶ 8). That the termination notices were "shared outside of the agency's grant management system," (Dkt. No. 32 ¶ 14), and that the notices were sent from a non-NEH email address, (*see* Dkt. No. 31 ¶ 3), is not inconsistent with McDonald's declaration that *he* made the final decision. And it is clear that NEH staff worked on the project.

Plaintiffs do refer to a weblink to something called the "NEH SLT Meeting Recording," which appears to be an unofficial recording of some type of meeting about which I know nothing. ACLS Compl. ¶ 67 n.12. This recording could be of the April 3, 2025, meeting referenced in the Jane Doe Declaration. (*See* Dkt. No. 32 ¶ 16), but I do not know that. In any event, to the extent this video might advance Plaintiffs' argument that DOGE did the dirty work here, I decline to enter the extraordinary remedy of preliminary injunctive relief on the basis of a leaked video is either the subject of anonymous testimony or no testimony at all – especially in view of the consistent testimony from witnesses for both sides that McDonald was very much involved in the decision-making process.

Plaintiffs also submit a Supplemental Declaration from John Doe. (*See* Dkt. No. 110-1). Doe, a current or former employee at NEH, claims that he has personal knowledge that Defendant Fox maintained his own spreadsheet showing which grants to terminate that was separate from the spreadsheets used at NEH to identify grants that were in conflict with the Administration's Executive Orders. (*Id*. ¶¶ 4-7). This, Doe asserts, demonstrates that Fox was operating outside the

standard NEH review process. Fox also attests that Chairman McDonald "confirmed that it was DOGE, not him, that chose the grants to terminate." (*Id.* ¶ 7).

Unfortunately for Plaintiffs, Doe's anonymous testimony is not sufficiently persuasive to get them over the likelihood of success threshold. McDonald has declared under oath that he made the final termination decisions; Roe's anonymous suggestion to the contrary at most creates an issue of fact of the sort that normally preclude entry of a preliminary injunction.[20]

### b. Irreparable Harm

Demonstrating irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "To satisfy their burden to show irreparable harm, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023).

The Plaintiffs that remain in this case have adequately demonstrated that they face irreparable harm from the Defendants' cancelation of their grants. Where, as here, plaintiffs have, *inter alia*, sufficiently alleged claims under the First Amendment, courts presume irreparable harm because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 127 (2d Cir. 1998) (internal citation and quotation marks omitted). *See also Amaker v. Fischer*, 453 Fed.Appx. 59, 63 (2d Cir. 2011) (*citing Bronx Household of Faith v. Bd. of Educ. of*

---

[20] At some point, all of these anonymous witnesses are going to have to come forward so that the Court knows who they are and how they came to have the information about which they attest – and, of course be subjected to cross examination.

*City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003)) ("Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed").

Further, the record is replete with evidence that the plaintiff grantees have experienced and will continue to experience harm from the cancelation of their grants, and that such harm will not be remediable by future monetary relief. Named plaintiffs have shown that the cancellation of their grants has caused them to seek new employment after having been deprived of large percentages of relied upon income and to face indefinite postponement, if not cancellation, of their publications, leading to serious reputational harm in fields that requires its academics to publish early and often throughout their careers. (*See* Dkt. Nos. 27-29, 33-49, 51, 68-74). As Plaintiffs noted in their briefing, numerous other courts have recently found that analogous grant terminations risk irreparable harm absent court intervention. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 763 F.Supp.3d 36, 57 (D.D.C. 2025); *Massachusetts v. N.I.H.*, 2025 WL 702163, at *1, *31 (D. Mass. Mar. 5, 2025); *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 2025 WL 752378, at *19 (D.D.C. Mar. 10, 2025); *Pacito v. Trump*, 2025 WL 893530, at *22–*23 (W.D. Wash. Mar. 24, 2025).

Plaintiffs have thus demonstrated an actual and imminent likelihood of irreparable harm that satisfies this element of their preliminary injunction motions.

### c. Balance of the Equities and Public Interest

Having established a likelihood of success on the merits and irreparable harm, Plaintiffs must finally demonstrate "that the balance of equities tips in [their] favor," and that "an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter*, 555 U.S. at 20). However, "When the government is a party to the suit, our

inquiries into the public interest and the balance of the equities merge." *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021).

While Defendants counter that "the injunctions Plaintiffs seek would disrupt NEH's efforts to implement the President's directives while complying with the agency's statutory obligations" and "would disrupt NEH's lawful execution of that process," (Dkt. No. 81, at 14), there is "no public interest in the perpetuation of unlawful agency action." *See Planned Parenthood of N.Y. City, Inc. v. United States HHS*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) There is, on the other hand, substantial public interest in "having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

The scholarship that NEH's cancellations have imperiled includes works ranging from the aforementioned book about the southern resistance to the Ku Klux Klan, written by Professor Holtzman, (*see* Dkt. No. 70), to the creation of public databases dedicated to preserving and ensuring access to great works of art, a project of Professor Eric Hoyt at the University of Wisconsin-Madison and Associate Professor Mattie Burkert at the University of Oregon, (*see* Dkt. Nos. 38; 45). After extensive review, the NEH determined, and I have no reason to disagree, that these works were among "our nation's most significant humanities projects" and deserved to be added to "this list of distinguished contributions to the humanities," (*see, e.g.*, NEH Offer Letters, Dkt. Nos. 68-1; 69-1; 71-1; 72-1; 73-1), because each of these scholars had the potential to contribute something great to his or her respective field and to our shared knowledge of America and the world. Then, seemingly without adequate administrative process and for reasons that are plausibly alleged to have infringed on the grantees' First Amendment rights, the NEH reversed course, pulled funding, imperiling the prospect that these contributions to our understanding of

history, sociology, and literature, would not see the light of day. On these facts, the balance of equities and public interest tilt in favor of granting plaintiffs a preliminary injunction – to preserve the possibility that we may yet get the opportunity to see what these scholars have to teach us.

### III.    Preliminary Injunctive Relief

Having found that Authors Guild has sufficiently demonstrated irreparable harm and its likelihood of success on the merits of its remaining APA claim and First Amendment claim, it is entitled to preliminary injunctive relief. What that relief can be is informed first and foremost by the Supreme Court's recent decision in *Trump v. CASA, Inc.*, __ S. Ct. __, 2025 WL 1773631 (June 27, 2025).

In *CASA*, the Supreme Court stayed three so-called "universal injunctions" that district court judges had issued to enjoin the implementation and enforcement of President Trump's Executive Order No. 14160, which purports to identify circumstances in which a person born in the United States is not recognized as an American citizen. *Id.*, at *4. The Court described these universal injunctions as "prohibit[ing] the enforcement of a law or policy against *anyone*," which it held exceeded the court's maximal authority to provide "complete relief *to the plaintiffs before the court.*" *Id.*, at ** 4, 11 (emphasis in original).

So, who is *before the court* today, and how broad of an injunction is necessary to provide complete relief to those individuals? Authors Guild claims to bring its action on behalf of, not just the named plaintiffs whose grants were terminated, but two proposed classes. The first, the "Individual Grantee Class," is defined as "All individual NEH grant recipients whose grants were terminated as part of the Mass Termination." Am. Compl. ¶ 135. The second, the "Subrecipient Class," is defined as "All NEH grant subrecipients whose sponsors' grants were terminated as part of the Mass Termination." *Id*. The question, then, is whether "complete relief" should be awarded

only to named plaintiffs Authors Guild, William Goldstein, Elizabeth Kadetsky, Valerie Orlando, Katalin Balog, Benjamin Holtzman, Lee Jasperse, and Nicole Jenkins, or also to the "at least 1,400 [other] grantees" who received "the same Termination Notice between April 1 and April 3, 2025." *Id*. ¶ 6.

"Whether the issues framed by the named parties before the court should be expanded to encompass the individual claims of additional class members is a matter of judicial administration that should be decided in the first instance by the District Court." *Cooper v. Fed. Res. Bank*, 467 U.S. 867, 881 (1984). While *CASA* did away with district courts' ability to issue universal injunctions that enjoin a defendant's actions against *anyone*, the class-wide relief that Plaintiffs are seeking in this case appears to have been largely blessed by the Court's majority opinion. The opinion emphasizes that unlike universal injunctions, class actions have a "founding-era forebear" in the historical bill of peace, which "involved a group [that] was small and cohesive, and the suit did not resolve a question of legal interpretation for the entire realm." *CASA*, 2025 WL 1773631, at \*9. Likewise, Justice Kavanaugh's concurring opinion explained that "To be sure, in the wake of the Court's decision, plaintiffs who challenge the legality of a new federal statute or executive action and request preliminary injunctive relief may sometimes seek to proceed by class action under Federal Rule of Civil Procedure 23(b)(2) and ask a court to award preliminary classwide relief that may, for example, be statewide, regionwide, or even nationwide." *Id*., at \*19 (Kavanaugh, J. concurring). *CASA's* recency means that the permissible contours of such "preliminary classwide relief" and "whether a narrower [than universal] injunction is appropriate" remains for district court judges to decide "in the first instance." *Id*., at \*3.

So, must the Authors Guild classes must be formally certified before we can grant preliminary relief to the putative class members pending further proceedings? The answer is no. We are so informed by yet another of the Supreme Court's recent decisions from this term.

In *A. A. R. P. v. Trump*, 145 S. Ct. 1364 (2025), the Court granted an application for an injunction *pendente lite* brought by members of a putative class of detainees who faced an imminent threat of irreparable harm to their constitutional rights. *Id.*, at 1367. The Court's grant of injunctive relief to the putative class-members came after the District Court had denied class certification "as to the detainees' underlying habeas claims challenging the validity of removal under the AEA." *Id.* at 1369 n.1. While the Court dismissed the import of the District Court's denial of class certification because, "in any event, the District Court's order primarily addressed the detainees' ability to challenge the validity of AEA removal on a classwide basis," while "The application before this Court seeks only to vindicate notice rights on a classwide basis," *id.*, Justice Alito's dissent emphasized his objection to the Court's issuance of "'preliminary relief' to a putative class that the District Court has explicitly refused to certify . . . without providing any substantive analysis suggesting that the District Court's analysis of the class certification issue was incorrect." *Id.*, at 1377. The majority opinion's response to Justice Alito explicitly addressed how the Court views the intersection of necessarily quick and responsive preliminary relief with the deliberative and fact-intensive class certification process:

> District courts should approach requests for preliminary relief with care and consideration, but exigent circumstances may impose practical constraints. Preliminary relief is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. The purpose of such relief is merely to preserve the relative positions of the parties pending further proceedings.
> . . .
> *And because courts may issue temporary relief to a putative class*, we need not decide whether a class should be certified as to the detainees' due process claims in order to temporarily enjoin the Government from removing putative class members while the question of what notice is due is adjudicated.

*Id.*, at 1368–69 (emphasis added) (internal citations omitted).

There is no reason for me to assume that the Court in *CASA* intended to walk back a pronouncement it made the previous month in *A.A.R.P.* In fact, *CASA's* emphasis on the distinction between equitable relief that historically applied to "a group [that] was small and cohesive," and universal injunctions, which resolved "a question of legal interpretation for the entire realm," counsels us that limited preliminary relief for a purported but still defined class of individuals is not the type of relief "prohibit[ing] the enforcement of a law or policy against *anyone*," to which the decision in *CASA* applied. *CASA*, 2025 WL 1773631, at ** 4, 9.

Therefore, preliminary injunctive relief that relates solely to the pleaded classes – consisting only of individual grant recipients and sub-recipients who received grant termination notices as part of a Mass Termination at NEH that appears to have been conducted in a manner that violates the First Amendment – is not "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.*, at *15.

*CASA* was decided after briefing closed on the original motion, so I reopened it to give the parties an opportunity to explain how the decision impacted my ability to issue relief in this case. (*See* Dkt. No. 105). In its response, Authors Guild argued that CASA endorsed district courts' ability to provide class-wide relief, and explained why its class-members were entitled to preliminary relief. Specifically, it argued that the members of the proposed classes would likely satisfy the Rule 23(a) requirements of (i) numerosity – with over 1,400 grantees impacted by the unconstitutional NEH grant terminations; (ii) commonality – with common questions including whether the grant terminations were carried out in a manner that violated the First Amendment; (iii) typicality – with named plaintiffs having had their grants terminated in nearly identical manners to the other class-members; and (iv) adequacy – with no known conflicts preventing the

named plaintiffs or their counsel from representing the broader class-members. (*See* Dkt. No. 107, at 7-9). Plaintiffs further explained that their class-members would satisfy Rule 23(b)(2) because Defendants acted against all members in the same manner through the terminations and enjoining that agency action would appropriately grant relief.

In responding to these arguments, (*See* Dkt. No. 114), Defendants countered that the purported class-members failed to meet Rule 23's commonality and typicality requirements, and that certification would not be proper under Rule 23(b)(2). As applied to the Grant Termination Claims, this boils down to an argument that Plaintiffs do not allege that all class members suffered the same First Amendment injury and therefore lack commonality/typicality.

The Government's position is singularly unpersuasive.

Defendants claim that "an analysis of whether a member of a putative class would suffer irreparable harm, absent such relief . . . requires . . . individualized considerations" that are not suited to class-wide adjudication. Not so here. The Court has concluded that Plaintiffs are entitled to preliminary injunctive relief solely because they are likely to succeed on the merits of demonstrating that the Mass Termination pursuant to which their grants were terminated was carried out in violation of the First Amendment. This, in turn, constitutes a violation of the APA that must be held unlawful and set aside as contrary to constitutional right. *See* 5 U.S.C. § 706(2)(B).

Plaintiffs allege, and the evidence supports a preliminary finding, that the grants terminated as part of the Mass Termination were selected for termination for one of two reasons – either because the matter under study touched on a subject that the current Administration disfavors (environmental justice, DEI, or gender ideology), or because the grant was awarded by the previous Administration (the current Administration's political opponents). Either ground violates

the First Amendment. There is no need for any individualized assessment of whether each class member suffered the same First Amendment injury; the evidence presently before the court (including evidence produced by the Government) demonstrates that all putative class members had their grants terminated in the same way, at the same time, and for the same unconstitutional reasons (they promoted a disfavored viewpoint or were awarded by the Biden administration). It might be the case that individual members of the class *could have* had their grants terminated for some perfectly constitutional reason, but at the moment there is no evidence in the record that their grants *were actually terminated* for such reason. There is, therefore, no basis on which the Government can assert that the nature of various class members' First Amendment injury is likely to differ.

Similarly, there is no need to explore irreparable harm on any individualized basis. As explained above, "Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003). The nature of Plaintiffs' common constitutional injury preempts the need to individually evaluate the irreparable nature of any other consequential harms that Plaintiffs have suffered or likely will suffer – though I am assured by the many moving declaration that I have received that such harms are very real and very damaging to people who have had their grants summarily terminated for unconstitutional reasons.

Defendants insist that Plaintiffs do not claim "that every grant implicated by the Mass Termination was terminated because it related to 'K-12 education,' 'gender ideology,' or 'DEI,' or that every grant was terminated because of its association with the Biden administration." (Dkt. No. 114, at 5). But that is manifestly not the case. In Authors Guild's Memorandum in support of its Motion for a Preliminary Injunction, it argues that the absence of any individualized analysis,

the termination of almost every grant issued during the Biden Administration, and the repeated references to disfavored viewpoints that the current administration associates with its predecessor, (*see* Dkt. No. 65-1, at 20), taken together, strongly suggests that that Defendants took as their lodestar the position that any grant (1) that appeared to have anything to do with diversity, equity, inclusion, gender or environmentalism, or (2) that was awarded during the Biden administration should be defunded. The record evidence outlined above certainly supports that position. For the Government to say that Plaintiffs do not assert this is absurd.

The only evidence offered by Defendants to counter the showing made by Plaintiffs is Acting Chairman McDonald's averral that he selected some grants that might otherwise have been terminated to keep in place "as important for the nation's semiquincentennial celebrations." (Dkt. No. 30, at 2). But that does not affect Plaintiffs' argument that the grants that *were* terminated were chosen because of their content or their association with the prior administration. As illustrated above, McDonald most certainly did not spare from termination every grant relating to American history in his effort to continue funding for the nation's 250th birthday party – the Administration's ostensibly preferred subject of study. Grants supporting historical research that does not accord with the Administration's sanitized view of our history were axed for that very reason.

At this stage, this argument appears sufficient, on its own, to provide a common legal question to all purported class-members, on which the named plaintiffs' claims are typical, and in connection with which Defendants acted against all members in the same manner.

Of course, discovery may well lead to the conclusion that some persons who received Termination Notices as part of the Mass Termination ought not be part of a fully certified class – even though, for purposes of the Mass Termination, they all appear to have been treated identically, right down to the termination notice they received. But that is for another day. As the Supreme

Court explained in *A.A.R.P.*, "Preliminary relief is customarily granted on the basis of procedures that are *less formal* and evidence that is *less complete* than in a trial on the merits. The purpose of such relief is merely to preserve the relative positions of the parties pending further proceedings." *A. A. R. P.*, 145 S. Ct. 1364, 1368 (emphasis added). There will be further proceedings, including full briefing on a motion for class certification, as well as full discovery into the process that was used to select grants for termination – a process that, aside from the few damning facts discussed above, remains opaque.

Which brings us to our final question – how to structure this preliminary class-wide relief.

The Authors Guild Plaintiffs have asked that the Defendants be enjoined from giving effect to the grant terminations of April 1-3, 2025; that they be enjoined from future constitutional or statutory violations; that the monies awarded in those grants not be re-obligated; and that the NEH pay out monies on the ascribed time frames.

Starting at the end, any order directing the NEH to pay out monies previously awarded in accordance with their schedules necessarily rests on the terms and conditions of the grant contracts; that is relief that can only be awarded by the Court of Federal Claims. I cannot and will not enter any such injunction.

I can, however, direct that the grant terminations be temporarily set aside – be placed on hold, as it were – until we can hold a trial on the merits. This is not any sort of "universal injunction;" it applies only to the members of the two plaintiff classes pleaded in Authors Guild (approximately 1400 persons) and does not in any way restrict the NEH from taking action with respect to anyone else.

Similarly, while I cannot order that the withdrawn grant funding be paid out, I can certainly direct that those funds not be re-obligated *pendente lite* – essentially, I can enter an order that these

funds be "escrowed" until we can hold a trial. Enjoining the re-obligation of funds means that money will be available should (for example) the Government conclude that the better part of valor is to conduct a constitutionally compliant "do over" – a process that could lead to the reinstatement of some or all of the grants. We have not yet had nearly adequate briefing on final remedies; I merely make this observation to note, as I stated earlier, that the payment of money does not appear to be the only or even the most likely way to redress the injury suffered here. However, I again note that the fact that the Government may at the end of the day be required to pay out money does not automatically implicate the Tucker Act. *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988).[21]

The injunction is narrowly tailored to maintain the status quo until we can decide whether Plaintiffs are entitled to ultimate relief. It does nothing more. It will be entered only in the Authors Guild case and not in the ACLS case, because the ACLS Plaintiffs did not move for preliminary injunctive relief on First Amendment grounds – although they asserted First Amendment claims (Counts VII and VIII) which remain in the case to be adjudicated.

The Authors Guild Plaintiffs should provide the Court with a proposed order implementing this decision.

## CONCLUSION

Authors Guild's Motion for a Preliminary Injunction is GRANTED to the extent described above, ACLS's Motion for a Preliminary Injunction is DENIED, and the Government's Motion to Dismiss is GRANTED to the extent of dismissing ACLS Counts I, II, III, IV, V, and VI, and

---

[21] Note that, just as we were going to press, we learned that the judge in *Porwancher* reached the same conclusion in that case.

Authors Guild Counts II (as it relates to the Impoundment Control Act), III, and IV, and is otherwise DENIED.

This constitutes the decision and order of the court. It is a written decision. The Clerk should remove the motions in Case No. 25-cv-03657 located at Docket Numbers 24, 65, and 76 and the motion in Case No. 25-cv-03923 located at Docket Number 23 from the Court's list of open motions.

Dated: July 25, 2025

_____
U.S.D.J.