# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE AUTHORS GUILD, WILLIAM GOLDSTEIN, ELIZABETH KADETSKY, VALERIE ORLANDO, KATALIN BALOG, BENJAMIN HOLTZMAN, LEE JASPERSE, and NICOLE JENKINS, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ENDOWMENT FOR THE HUMANITIES; <br><br> MICHAEL MCDONALD, in his official capacity as Acting Chairman of the National Endowment for the Humanities; <br><br> UNITED STATES DOGE SERVICE; <br><br> AMY GLEASON, in her official capacity as Acting Administrator of the United States DOGE Service; <br><br> NATE CAVANAUGH, in his official capacity as an employee of the U.S. DOGE Service or the General Services Administration; and, <br><br> JUSTIN FOX, in his official capacity as an employee of the U.S. DOGE Service or the General Services Administration, <br><br> Defendants. | Case No.: 1:25-cv-03923 <br><br> Consolidated with No. 1:25-03657 <br><br> CLASS ACTION |

## [PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT

## I.     INTRODUCTION

1.     "For more than fifty years, our federal agency has underwritten hundreds of the nation's most significant humanities projects through its awards to individual scholars, writers, and other researchers." So wrote Defendant National Endowment for the Humanities ("NEH") when it awarded Plaintiff Elizabeth Kadetsky and 24 others prestigious "Public Scholars" grants in 2024. These Public Scholars grantees were among more than 1,400 recipients of NEH grants of various kinds for the 2024 grant cycle.

2.     NEH also told Prof. Kadetsky that, in that "highly competitive funding cycle," only 9 percent of applicants to her program were awarded NEH grants. The process involved "multi-step review," including outside subject-matter experts reviewing the application and advising NEH of its merit; NEH reporting those reviews to the National Council on the Humanities; and that Council then advising the NEH Director on the relative merits of the thousands of grant applications the agency had received that year. Prof. Kadetsky was to be awarded, the letter continued, $60,000 to complete her book *Theft of the Divine*: *Seven Goddesses, A Temple Heist, and Smuggling in Midcentury America*, which would use the case study of a 1962 temple theft to explore the cultural landscape in the US and India that led to a flourishing trade in antiquities that implicated America's top museums and most esteemed art collectors. Panelists on Prof. Kadetsky's review panel described her project as a "surprising, original, and compelling narrative about museums, ethics, and repatriation by an accomplished fiction writer with a journalistic bent" and predicted that "the topic of her project - who owns objects? - and the current debates

and efforts over repatriation would seem to ensure an audience for her book."

3.     For Prof. Kadetsky, like all NEH grantees, this was a hugely important milestone in her career. Scholars like her receive more from an NEH grant than just a financial stipend to support their project—they win scholarly prestige and new career opportunities. For Prof. Kadetsky, for example, an NEH grant is one of only four grants that her employer (Penn State University) considers to be a "prestigious fellowship," which means one for which the university will cover the difference between the grant amount and the grantee's salary. (The other three are grants from the National Endowment for the Arts, from the Guggenheim, and from the American Council of Learned Societies). Furthermore, NEH grants are an important consideration that universities like Penn State take into account when deciding whether to award tenure or other academic accolades like a distinguished professorship. Projects funded by NEH grants also enjoy an enormous advantage when it comes to publication and distribution, because publishers desire to publish works that have been vetted by expert committees like those NEH employed when evaluating grants.

4.     Prof. Kadetsky's grant period was set to begin on May 1, 2025, and last through April 30, 2026. Because hers was a "full-time" grant, as a condition of receiving the $60,000 in grant money she was required by NEH to take a year-long leave of absence from her employment to work on the project. Penn State happily permitted her to take leave (and, as noted above, would pay her $35,000 while on leave) in light of the benefit the university would receive from employing an NEH

grantee. The two parties made arrangements for Prof. Kadetsky to take a two-semester leave of absence during which she would write the book she was given a grant to complete.

5.    Then, on April 3, 2025, Prof. Kadetsky received a letter, purportedly drafted by NEH and signed by Defendant Michael McDonald, the newly appointed Acting Director of NEH. Addressed to "Dear NEH Grantee," the letter stated that Prof. Kadetsky's grant "no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes." The letter went on to note, "The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions." (citing *Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025)). (That Executive Order makes no mention of NEH or its grants.) "The termination of your grant," NEH's letter continued, "represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible. Therefore, the NEH hereby terminates your grant in its entirety effective April 3, 2025"—the date the letter was issued. The letter concluded by providing a non-government email address which Prof. Kadetsky could contact—but "with only urgent questions."

6.    Plaintiff Kadetsky was not the only grantee to receive this letter (hereinafter, "Termination Notice"). As part of a blanket campaign to cancel most or all NEH grants, Defendants sent at least 1,400 grantees the same Termination Notice

3

between April 1 and April 3, 2025, including other named Plaintiffs in this action, many of Plaintiff Authors Guild's members, and all members of the Proposed Grantee Class (the "Mass Termination"). According to public reporting, this amounted to a blanket cancellation of more than 85 percent of NEH's current grants—approximately $175 million of congressionally appropriated and already awarded money withheld from grantees like Prof. Kadetsky. NEH implemented the Mass Termination at the direction of Defendant United States DOGE Service ("DOGE"), whose employees—specifically Defendants Fox and Cavanaugh—had just days earlier obtained access to NEH's grant database and thereafter implemented the Mass Termination.

7.      Defendants' decision to implement the Mass Termination and issue the Termination Notices was not only utterly unexpected and unprecedented—it was flagrantly unlawful. The Mass Termination violated the Administrative Procedure Act, because (a) Defendants' unreasoned, unexplained departure from prior agency policy to cancel all grants regardless of circumstances was arbitrary and capricious, and (2) Defendants are withholding and redirecting money Congress appropriated for grantees like Plaintiffs, in violation of multiple statutes. The Mass Termination also violated the Impoundment Control Act and multiple appropriations statutes, which require the President to spend money Congress has appropriated for a particular program on that program, and not redirect that money to an unrelated program simply to better fit the President's preferences. Defendants' actions also violated the separation of powers, which similarly prohibits the Executive Branch from overriding

appropriations statutes simply because the President would prefer to spend the money differently. Defendants' Mass Termination also violated the First Amendment, because the Termination Notice and other evidence make clear that the Executive Branch disfavors the grantees' speech based on its assessment of that speech's content and viewpoint. As sparse as it is, the Termination Notice's citation to various executive orders relating to "Radical Indoctrination," "Biological Truth," and "DEI Programs" reveals that NEH canceled Plaintiffs' grants because it believes Plaintiffs' scholarship conflicts with the preferred viewpoint of the incumbent Administration. While the Administration is free to issue its own speech to forward its preferred narrative, it may not seek to drive ideas it disfavors from the marketplace. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) ("[E]ven in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.'" (alteration in original, citation omitted)). Defendants' Mass Termination also violated the Equal Protection component of the Fifth Amendment's Due Process Clause, because the Defendants selected grants to terminate based on blatantly discriminatory criteria relating to race, nationality, gender, sexuality, and other individual characteristics. For instance, Defendant Fox slated grants for termination because their description contained words such as "black," "LGBTQ," "Jew," "Native," and "immigrant." Finally, the Mass Termination was carried out by Defendant DOGE and employees, specifically Defendants Cavanaugh, and Fox, who lack statutory authority to terminate NEH grants or make other institutional decisions of NEH.

8.     Plaintiffs, on their own behalf and on behalf of those similarly situated, bring this action to request that the Court declare unlawful and set aside the Mass Termination and accompanying Termination Notices, and enjoin Defendants from further actions that violate NEH's governing statute, the Administrative Procedures Act ("APA"), the Impoundment Control Act, and the Constitution.

## II.    JURISDICTION AND VENUE

9.     This action arises under the APA, 5 U.S.C. §§ 701-706, federal statutory law, and the Constitution. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the APA.

10.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official capacity, and Plaintiff Authors Guild, many of whose members have had their NEH grants cancelled, is headquartered in this District. Further, Plaintiffs Katalin Balog and Bill Goldstein reside in this District. Moreover, a substantial part of the events or omissions giving rise to the claims occurred in this District.

## III.   PARTIES

11.    Plaintiff The Authors Guild was founded in 1912 and is a national non-profit membership association of more than 14,000 professional, published writers of all genres. The Guild, which is headquartered in New York City, counts historians, biographers, academics, journalists, and other writers of non-fiction and fiction as members. The Guild works to promote the rights and professional interest of authors in various areas, including copyright, freedom of expression, and fair contracts. In addition, it assists members who have not received agreed funds for their work seek

relief. Many Guild members earn their livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. The Authors Guild has many members who received grants from NEH, including grantees under NEH's Public Scholars, Fellowship, and Summer Stipend programs whose grants were purportedly terminated by Defendants as part of the Mass Termination. The Authors Guild brings this case in its associational capacity.

12.     Plaintiff Elizabeth Kadetsky is a professor in the English department at Penn State University. NEH awarded her a Public Scholars grant for $60,000 with a grant period scheduled to begin on May 1, 2025, but NEH terminated the grant on April 3, 2025.

13.     Plaintiff Dr. Valerie Orlando is the Head of Department and Professor of French & Francophone Literatures and Cultures at the University of Maryland, College Park. She is the author of six books, including *The Algerian New Novel: The Poetics of a Modern Nation, 1950-1979* (2017), *New African Cinema* (2017), and *Screening Morocco: Contemporary Film in a Changing Society* (2011). She publishes articles in French and English on a wide variety of subjects in the areas of Literary Studies, Women's Studies, African Cinema, and French and Francophone Studies, specifically focusing on Africa and the Caribbean. Since 2004, she has worked as Series Editor for *After the Empire: The Francophone World and Postcolonial France* with Lexington Books.

14.     After a highly competitive application process, Dr. Orlando was awarded an NEH Summer Stipend of $6,000 for research for a book project on the themes of history and memory in contemporary Algerian literature published in the 2000s. Her award was to be dispersed on June 1, 2025, and would have allowed her to travel to Algeria and France to conduct interviews and archival research to help launch the book project. However, on April 3, 2025, she received the Termination Notice. As a result of the termination, her book has had to be put on hold and, unless the termination is rescinded or invalidated, she will be unable to complete the necessary research during the summer, when she does not have teaching duties at her university and is able to travel. The termination of her Summer Stipend denies her a prestigious, highly competitive award and achievement that would have conferred professional benefits and helped with publication, promotion, and further funding of her book project.

15.     Plaintiff Katalin Balog is a professor of philosophy at Rutgers University-Newark. Her primary areas of research and teaching are the philosophy of mind and philosophy of psychology. She resides in this District. Prof. Balog was awarded a grant under NEH's Fellowships program to conduct research and writing leading to a book on philosophy and consciousness. The book, titled *What Is Left of the Mind*, would explore the changes in the concept of mind during the last 300 years, which have culminated in a current view of the mind that is hospitable to the idea that machines are not that different from humans. Her book would critique this view on both philosophical and moral grounds. Prof. Balog would make substantial

contributions to ongoing philosophical debates while also being accessible to a general audience on a timely, important topic.

16.     Prof. Balog's project was funded at $60,000 for the 12-month period from January 1, 2025, through December 31, 2025. She received a portion of this grant award, but NEH terminated her grant on or around April 2, 2025. The grant termination has disrupted Ms. Balog's life both financially and emotionally. As a condition of her grant, she was required to take a leave of absence from her teaching job, and she is now unsure whether she can continue to work on her book project and will have the financial means to do so, or whether she must return to full-time teaching without completing her book project.

17.     Plaintiff Benjamin Holtzman is an Assistant Professor of History at Lehman College. He studies the intersection of political and social history in the United States, with particular focus on politics, capitalism, race and class, cities, and social movements. His first book, *The Long Crisis: New York City and the Path to Neoliberalism,* uses the sweeping transformation of post-1960s New York City to trace how market-oriented policies have come to proliferate across American life for the past 50 years. His research has also appeared in *Modern American History*, the *Journal of Social History*, the *Journal of Urban History*, and several edited collections.

18.     Prof. Holtzman was awarded a $60,000 grant under NEH's Awards for Faculty at Hispanic-Serving Institutions program. The grant, which had a period of performance from September 1, 2024, to August 31, 2025, was funding his book

project, *Fighting the White Power Movement in the Late Twentieth Century*, which examines the activist network that took root in cities such as Atlanta, Durham, and Louisville to combat the national resurgence of white supremacist organizing in the late 1970s and 1980s. Prof. Holtzman received $50,000 of the award and was due to receive the final $10,000 on July 1, 2025—but on April 3, 2025, he received the Termination Notice. Prof. Holtzman's grant was intended to cover the bulk of his living expenses for the remaining months of the grant period, and as a condition of his grant, he was prohibited from teaching or engaging in "other major activities," leaving him without other income sources. Not receiving the grant means that he will incur a substantial financial burden and has left him scrambling to find a means to adequately cover his living expenses. The grant would have also helped to cover research expenses related to the project, including transcription expenses for interviews and archival research trips to Atlanta, Georgia and Kansas City, Missouri, which he anticipated taking this summer and which were necessary to moving his project forward, but may now no longer be possible.

19.     Plaintiff Bill Goldstein is the founding editor of the books website of *The New York Times* online; reviews books and interviews authors for NBC's "Weekend Today in New York"; and is the curator of public programs at Roosevelt House, the public policy institute of New York's Hunter College. He is the author of *The World Broke in Two: Virginia Woolf, T.S. Eliot, D.H. Lawrence, E.M. Forster, and the Year that Changed Literature*, which has been reviewed by National Public Radio (NPR), the New York Times, the Jewish Book Council, the Guardian, and other publications.

A graduate of the University of Chicago, Dr. Goldstein received a PhD in English from the City University of New York Graduate Center and has been awarded numerous grants supporting his scholarship over the years. He resides in this District.

20.    On August 13, 2024, NEH awarded Dr. Goldstein a Public Scholars program grant in support of his latest book project: a biography of Larry Kramer, who was among the first in the country to grasp the gravity of the impending AIDS crisis in the 1980s and begin organizing against it. Dr. Goldstein's Public Scholars award was for $60,000 and was scheduled to run from September 1, 2024 to August 31, 2025. He received $50,000 of the awarded funds and was scheduled to receive the final $10,000 in July 2025. However, on April 3, 2025, Dr. Goldstein received the Termination Notice, even though he was midway through the grant period. As a result, Dr. Goldstein was deprived of the critical financial and institutional support that he relied on to finalize his highly anticipated project. Because Dr. Goldstein is an independent scholar without university affiliation, termination of his grant will require him to find alternative work and a new income source sooner than planned and will divert him from his funded project.

21.    Plaintiff Lee Jasperse is a Teaching Fellow in the Department of English Language and Literature at the University of Chicago. In addition to teaching, Dr. Jasperse is working on two book projects, both exploring how literature responds to lives and bodies that don't follow typical ideas of desire or feeling – one focusing on early depictions of asexuality, the other on how writers have made art out of the

11

numbing experiences of illness. On February 19, 2025, Dr. Jasperse was accepted to a fellowship at the Massachusetts Historical Society ("the MHS") to support the pursuit of his projects. As part of the fellowship, Dr. Jasperse was awarded a six-month grant of $30,000 from the MHS that was entirely supported by a grant from NEH under the Fellowship Programs at Independent Research Institutions program. In MHS's acceptance letter to Dr. Jasperse, it noted: "[p]lease be aware that your fellowship offer is entirely contingent on funding availability from the NEH."

22.     On Tuesday, April 8, 2025, Dr. Jasperse received an email from the MHS informing him that NEH had "terminated its funding for the MHS's Long-Term Fellowship Program effective April 2, 2025." On information and belief, MHS had received the same or substantially the same Termination Notice that individual grantees received. As a direct result, the MHS rescinded the fellowship, including the $30,000 grant. The rescission of Dr. Jasperse's fellowship and grant is particularly difficult because a key condition of the fellowship, as noted by the MHS in its acceptance letter, is that "the NEH prohibits teaching or other major assignments during the term of your fellowship." In compliance with NEH prohibitions, Dr. Jasperse forewent taking on any other major assignments, leaving him almost entirely dependent on the NEH award for income.

23.     Plaintiff Nicole Jenkins is an Assistant Professor in the Department of Sociology and Criminology at Howard University in Washington, D.C., and a Visiting Faculty Fellow at Harvard University. On February 11, 2025, Defendant NEH awarded Prof. Jenkins a $60,000 grant under the Awards for Faculty at Historically

Black Colleges and Universities Program to complete her book examining Black women's navigation of beauty norms, family, and U.S. institutions through a Black feminist lens. The grant period was set to begin on August 1, 2025, and last through July 31, 2026, and Prof. Jenkins was approved for leave from Howard University for that period to focus on her research. Prof. Jenkins has not received any payments under the grant award to date.

24.    In April 2025, NEH terminated her grant. The termination of the grant has cost Prof. Jenkins more than just its dollar value. After she was notified of her award, Prof. Jenkins forwent other fellowship, funding, research, and professional development opportunities that were no longer available when her grant was terminated. And the loss of the prestigious award and unavailability of other opportunities for the 2025-2026 academic year has put at risk Prof. Jenkins's tenure preparation at Howard University, as the book she was to complete with the grant's support was a core part of her tenure file.

25.    Defendant National Endowment for the Humanities ("NEH") is a federal agency headquartered in Washington, DC, responsible for administering the NEH Grants at issue in this litigation.

26.    Defendant Michael McDonald is the Acting Administrator of NEH at the time the Termination Notices were issued to NEH Grantees.

27.    Defendant United States DOGE Service ("DOGE") is an organization within the Executive Office of the President.

28.    Defendant Amy Gleason is the Acting Administrator of the United

States DOGE Service and is its highest ranking official. Before becoming a government official, Ms. Gleason was a healthcare technology executive.

29.     Defendant Nate Cavanaugh is a member of DOGE and an employee of the General Services Administration. Cavanaugh has reportedly operated on behalf of DOGE at multiple agencies, including NEH. Cavanaugh is 28 years old and previously worked in legal technology and financial services,

30.     Defendant Justin Fox is a member of DOGE and an employee of the General Services Administration. Fox has reportedly operated on behalf of DOGE at multiple agencies, including NEH.

## IV.    FACTUAL BACKGROUND

### A.    Background on NEH

31.     The National Endowment for the Humanities is an independent federal agency that supports the humanities in every state and U.S. jurisdiction.

32.     NEH serves and strengthens our Nation by supporting high-quality projects and programs in the humanities and by making the humanities available to all Americans. As Congress put it when creating NEH in 1961, "the humanities belong to all the people of the United States," 20 U.S.C. § 951(1), and NEH's mission is to promote that national asset.

33.     In enacting NEH's founding legislation, Congress recognized that "[a]n advanced civilization must not limit its efforts to science and technology alone, but must give full value and support to the other great branches of scholarly and cultural activity in order to achieve a better understanding of the past, a better analysis of the present, and a better view of the future."

14

34.     Congress further declared that "Democracy demands wisdom and vision in its citizens. It must therefore foster and support a form of education, and access to the arts and the humanities, designed to make people of all backgrounds and wherever located masters of their technology and not its unthinking servants."

35.     Congress further declared that "it is necessary and appropriate for the Federal Government to help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent."

36.     Congress further declared that "[i]t is vital to democracy to honor and preserve its multicultural artistic heritage as well as support new ideas, and therefore it is essential to provide financial assistance to its artists and the organizations that support their work."

37.     To advance these ideals, Congress established NEH and authorized it to provide funding for organizations and individuals involved in research, publication of scholarly works, and promotion of the humanities. *See* 20 U.S.C. § 956. Specifically, Congress provided that NEH may "enter into arrangements," including "contracts, grants, loans, and other forms of assistance," to:

    a.  develop and encourage the pursuit of a national policy for the promotion of progress and scholarship in the humanities;

    b.  initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities;

c.  initiate and support training and workshops in the h-umanities by making arrangements with institutions or individuals;

d.  initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community;

e.  foster international programs and exchanges;

f.  foster the interchange of information in the humanities;

g.  foster, with groups, education in, and public understanding and appreciation of the humanities;

h.  support the publication of scholarly works in the humanities;

i.  ensure that the benefit of its programs will also be available to our citizens where such programs would otherwise be unavailable due to geographic or economic reasons; and

j.  foster programs and projects that provide access to, and preserve materials important to research, education, and public understanding of, the humanities.

## B.  NEH Grant Programs

38.  Prior to the actions at issue here, NEH offered 47 grant programs to support museums, historic sites, colleges, universities, K-12 teachers, libraries, public television and radio stations, research institutions, independent scholars, authors, writers, filmmakers, and nonprofits nationwide. Some of these programs are described in more detail below.

39.    Over its history, NEH has awarded over $6 billion to support museums, historic sites, universities, teachers, libraries, documentary filmmakers, public TV and radio stations, research institutions, scholars, and local humanities programming.

40.    NEH grants supported the building blocks of American civil society, helping to examine the human condition, promote civics education, understand our cultural heritage, foster mutual respect for diverse beliefs and cultures, develop media and information literacy, create documentaries and podcasts, facilitate groundbreaking research, and preserve and expand access to cultural and historical artifacts.

41.    NEH grants have supported dozens of authors who have won major prizes and profoundly influenced the way we understand history, politics, literature and society. NEH grants have supported research for numerous books that have been honored with either the Pulitzer Prize or the Bancroft Prize—two of the nation's most prestigious book awards—including: Kai Bird and Martin J. Sherwin's *American Prometheus: The Triumph and Tragedy of J. Robert Oppenheimer*, which inspired the 2023 Academy-Award winning film *Oppenheimer*; Ari Kelman's *A Misplaced Massacre: Struggling over the Memory of Sand Creek*; Louis Menand's *The Metaphysical Club: A Story of Ideas in America*; Stacy Schiff's *Vera (Mrs. Vladimir Nabokov)*; James M. McPherson's *Battle Cry of Freedom: The Civil War Era*; William Taubman's *Khrushchev: The Man and His Era*; Joan D. Hedrick's *Harriet Beecher Stowe: A Life*; and Gordon Wood's *The Creation of the American Republic, 1776-1787*.

42.    NEH grants don't only benefit the individuals and institutions that receive them; they also benefit the public at large by increasing access to scholarly and popular works that would not otherwise be created. For example, when Ken Burns conceived of his now-acclaimed documentary series *The Civil War* in the 1980s, NEH awarded him a grant of $1,349,100, which represented between 30 and 35 percent of the project's budget. "What the *Iliad* was for the Greeks," said Lynne Cheney, chairman of NEH in 1990, when the film first aired on PBS, "the Civil War is for Americans." On the night it first aired, just shy of fourteen million viewers sat down to watch it. NEH reported a spike in visits to Civil War battlefields following the series' release. In the intervening 35 years, thousands of classrooms have aired this American classic to schoolchildren, and millions more Americans have learned this vital piece of our country's history from Ken Burns' NEH-funded work. As NEH puts it, its beneficiaries "have shaped what we know about ourselves and our world."

43.    In addition to individual authors, filmmakers, and institutions, NEH also provided (before April 2025) funding to humanities councils in every U.S. State and Territory. State and jurisdictional humanities councils tailored their grantmaking and programs to the needs, resources, and interests of their state or jurisdiction, while also extending the reach of NEH-funded projects and further strengthening the agency's connection to local communities. These state humanities councils are not part of the Proposed Classes in this case.

44.    The grant money NEH disburses is highly sought after through a competitive process and tightly controlled by factors Congress has dictated. NEH

typically received around 5,700 applications each year across more than 40 grant programs, and it typically awarded grants to only 16% of applicants. NEH affirmatively works—through its own employees, the National Council on the Humanities, and outside peer-reviewers—to support a wide variety of academic disciplines and viewpoints within those disciplines.

45.     Given the highly competitive process for obtaining an NEH grant, the benefits of receiving a grant are not only financial: the grants are a career-defining accolade, and they can make the difference in whether or not a work is widely disseminated, read, and/or viewed. Winning and completing an NEH grant substantially increases (1) scholars' chances of receiving tenure at their academic institutions, (2) authors' chances of having their funded works published, and (3) filmmakers' chances of having their work produced and widely circulated.

46.     Before April 2025, NEH engaged in a rigorous process for selecting grantees among the many thousands of applicants it receives annually. Each year, NEH recruits and organizes over 1,000 individual experts into more than 200 peer review panels to review each of the more than 5,500 grant applications NEH receives annually.

47.     Peer review panels were organized and overseen by NEH program officers, who themselves were experts in the areas of scholarship for which they were asked to review grant applications.

48.     Program officers placed experts on review panels based on a variety of factors, including broad knowledge of the humanities and specific expertise.

49.    After a grant application was submitted, a relevant program officer reviewed it and, based on academic discipline, institutional type, project area, or project type, assigned it to a specific peer-review panel for the relevant program.

50.    Each grant thus received rigorous review by experts in the applicant's field. And while the NEH Chair ultimately made all final funding decisions, the Chair could not do so until the National Council on the Humanities—which reviews evaluations of grant applicants from NEH program officers and peer-review panels—submitted recommendations. On information and belief, before April 2025, this mandatory consultation with the National Council on the Humanities exerted substantial influence over the NEH Chair's decision to award a grant in most instances, and ensured that applicants who received grants were meritorious and reflected a wide diversity of viewpoints.

51.    Thus, a grant recipient that went through this process and was awarded a grant was recognized as an accomplished scholar or author. For example, in a typical grant award letter for individual grantees for 2025 awards, NEH noted that in a "highly competitive grant cycle" for Public Scholars applicants, only 9 percent of applicants received a grant.

52.    Each fiscal year, Congress appropriates funds for NEH to carry out its statutory functions, including to award grants.

53.    In the 2024 Appropriations Act, Congress appropriated $207,000,000 to NEH, of which $192,000,000 "shall be available for support of activities in the humanities, pursuant to section 7(c) [20 U.S.C. § 956(c)] of the Act and for

administering the functions of the Act." As such, $192,000,000 was designated for grants, loans, contracts, and other assistance to further the enumerated purposes set forth under 20 U.S.C. § 956(c). Pub. L. 118-42, 138 Stat. 25, 282 (Mar. 9, 2024) (the "2024 Act").

54.     On March 15, 2025, Congress enacted a continuing resolution that re-appropriated all of the funds appropriated to NEH under the 2024 Act, with the same breakdown on how the money must be spent. Pub. L. 119-4, §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025) (the "2025 Continuing Resolution"). NEH thus received an additional $207 million that it must spend in 2025, including an additional $192 million that it must spend on grants and other assistance programs under 20 U.S.C. § 956(c).

55.     The vast majority of these funds were appropriated to be spent on NEH's various grant programs, which included the programs described immediately hereafter. On information and belief, and in light of Defendants' actions from April 1, 2025 to the present, NEH no longer plans to support these programs in their intended manner but instead will divert the funds Congress appropriated to it for aims that do not comply with NEH's organic statute, 20 U.S.C. §§ 951-960, and instead comport with President Trump's and Defendants' own preferences.

### 1. *The Public Scholars Program*

56.     One of NEH's longstanding grant programs was the Public Scholars program. The Public Scholars program represented a vital investment in American intellectual life, providing essential funding that bridged the gap between academic research and public discourse. Established as part of "The Common Good: The

Humanities in the Public Square" initiative, the program specifically supported well-researched nonfiction books intended to reach broad audiences beyond academia. The Public Scholars program enabled writers to conduct deep research while making significant humanities topics accessible to general readers, ultimately serving the common good through the widespread dissemination of important knowledge.

57.    The Public Scholars program offered grants to individual authors for research, writing, travel, and other activities leading to the creation and publication of well-researched nonfiction books in the humanities written for the broad public. The program encouraged non-academic writers to deepen their engagement with the humanities by strengthening the research underlying their books, and it encouraged academic writers in the humanities to communicate the significance of their research to the broadest possible range of readers.

58.    The primary output of a successful Public Scholars award was a well-researched nonfiction book for general readers.

59.    To apply for a Public Scholars grant, applicants were directed to visit "Grants.gov" for application materials. On a page titled "View Grant Opportunity," applicants could access a "Notice of Funding Opportunity" for the Public Scholars program. The Notice's Executive Summary stated that the Public Scholars program "offers grants to individual authors for research, writing, travel, and other activities leading to the creation and publication of well-researched nonfiction books in the humanities written for the broad public." The Notice stated that the estimated number of awards each year is "approximately 25 grants." The Notice further stated

that "NEH will provide funding in the form of grants" to successful applicants. The Notice stated that awards would be administered by the NEH Office of Grant Management. The "Public Scholars" page on NEH's website, https://www.neh.gov/grants/research/public-scholar-program, describes the Public Scholars program as a "Grant Program."

60.    Public Scholars award recipients were awarded a stipend of $5,000 per full-time month, with a maximum award of $60,000 for a twelve-month period. The minimum award was $30,000, requiring a commitment to six months of full-time work or the equivalent in part-time work. As a condition of receiving an award, recipients with a full-time award were required to forgo all other major activities (including teaching), while recipients with a half-time award were required to carry a reduced teaching load.

61.    Public Scholar awards were subject to the NEH Public Scholar Program Terms and Conditions, which prohibited using awards for promotion of a particular political, religious, or ideological point of view; advocacy for a particular program of social or political action; or support of specific public policies or legislation.

62.    The "Termination" section of the Public Scholar Program Terms and Conditions stated, in its entirety: "NEH may terminate your Public Scholar award if, for any reason, you choose to discontinue the proposed program before the end of the period of performance or fail to observe the award's terms and conditions. If you discontinue the proposed program before the end of your period of performance, you must return any funds received over and above those to which you are entitled. If

during your period of performance you are unable to meet the terms of the award, then you are obliged to inform NEH immediately. Because stipend payments are made in advance, you may be required to return a portion of the stipend to NEH; if this is the case, NEH will inform you of the amount that you must repay, the basis for the calculation, and the date by which you must repay." Thus, NEH did not represent to Public Scholar grant recipients that it could rescind Public Scholar grants at will; rather, grants would be rescinded only if a Public Scholar grantee no longer could or would perform the work the grant was meant to support.

63.    In March 2025, Defendants modified the funding restrictions for future grants under the Public Scholars program. Specifically, Defendants added language to the operative Notice of Funding Opportunity stating that Public Scholar awards may not be used to promote viewpoints disfavored by Defendants, including the "promotion of gender ideology," the "promotion of discriminatory equity ideology," "support for diversity, equity, and inclusion (DEI) or diversity, equity, inclusion, and accessibility (DEIA) initiatives or activities," or "environmental justice initiatives or activities." On information and belief, these "new" restrictions reflect Defendants' view that prior Public Scholar grants, including the terminated grants at issue here, promoted viewpoints disfavored by Defendants.

64.    In April 2025, Defendants announced that Public Scholars grants for 2026 would be awarded only to projects that promote viewpoints favored by Defendants. Specifically, Defendants announced that grants will be awarded only to projects that "promote" the Nation's "record of advancing liberty, prosperity, and

24

human flourishing." The Notice of Funding Opportunity for the 2026 Public Scholars program states that applications will be "competitive" only if they "increase public knowledge of the 250th anniversary of American Independence and American exceptionalism." This change to the Public Scholar grant criteria was offered with no explanation.

65.    In April or May 2025, Defendants posted a statement on the NEH website stating that "NEH has cancelled awards that are at variance with agency priorities, including but not limited to those on diversity, equity, and inclusion (or DEI) and environmental justice."

## 2.    The Fellowships Program

66.    Another of NEH's grant programs was the Fellowships program. NEH Fellowships were competitive awards granted to individual scholars pursuing projects that embody exceptional research, rigorous analysis, and clear writing. Established over fifty years ago as the first award offered by NEH, the Fellowships program facilitated the creation of approximately seven thousand books, many of which were honored with Pulitzer Prizes, Bancroft Prizes, and other distinguished recognitions.

67.    The Fellowships program afforded scholars the uninterrupted time needed to conduct research or produce books, monographs, peer-reviewed articles, e-books, digital materials, translations, or critical editions that advance knowledge and understanding in their fields. The impact of the Fellowships program extended far beyond the individual recipients, with studies confirming that 96 percent of Fellows produce scholarly works that reach both academic and public audiences, and 77

percent directly incorporate their NEH-supported research into their teaching.

68.    To apply for a Fellowships grant, applicants were directed to visit "Grants.gov" for application materials. On a page titled "View Grant Opportunity," applicants could access a "Notice of Funding Opportunity: Fellowships." The Notice stated that the estimated number of awards each year is "approximately 80 grants." The Notice further stated that "NEH will provide funding in the form of grants" to successful applicants. The Notice stated that awards would be administered by the NEH Office of Grant Management. The "Fellowships" page on NEH's website, https://www.neh.gov/grants/research/fellowships, describes the Fellowships program as a "Grant Program."

69.    Grant recipients under the Fellowships program were awarded a stipend of $5,000 per month for full-time work. The minimum award was $30,000 for a six-month period of performance and the maximum award was $60,000 for a twelve-month period of performance.

70.    Fellowship awards were subject to the NEH Fellowships and Awards for Faculty Terms and Conditions, which prohibited using Fellowship awards for promotion of a particular political, religious, or ideological point of view; advocacy for a particular program of social or political action; or support of specific public policies or legislation.

71.    The "Termination" section of the Fellowship Program Terms and Conditions stated, in its entirety: "NEH may terminate your fellowship or Award for Faculty if, for any reason, you choose to discontinue the proposed program before the

end of the period of performance or fail to observe the award's terms and conditions. If you discontinue the proposed program before the end of your period of performance, you must return any funds received over and above those to which you are entitled. If during your period of performance you are unable to meet the terms of the award, then you are obliged to inform NEH immediately. Because stipend payments are made in advance, you may be required to return a portion of the stipend to NEH; if this is the case, NEH will inform you of the amount that you must repay, the basis for the calculation, and the date by which you must repay." Thus, NEH did not represent to Fellowship grant recipients that it could rescind Fellowship grants at will; rather, grants would only be rescinded if a Fellowship grantee no longer could or would perform the work the grant was meant to support.

72.     In March 2025, Defendants modified the funding restrictions for future grants under the Fellowships program. Specifically, Defendants added language to the operative Notice of Funding Opportunity stating that Fellowship awards may not be used to promote viewpoints disfavored by Defendants, including the "promotion of gender ideology," the "promotion of discriminatory equity ideology," "support for diversity, equity, and inclusion (DEI) or diversity, equity, inclusion, and accessibility (DEIA) initiatives or activities," or "environmental justice initiatives or activities." On information and belief, these "new" restrictions reflect Defendants' view that prior Fellowships grants, including the terminated grants at issue here, promoted viewpoints disfavored by Defendants.

### 3.     The Summer Stipends Program

73.     Another of NEH's grant programs was the Summer Stipends program.

27

The Summer Stipends program aimed to stimulate new research in the humanities and its publication by providing small awards to individuals pursuing advanced research that is of value to humanities scholars, general audiences, or both. The program principally supported early-stage research and late-stage writing projects in which small awards are most effective, including by providing funding to independent scholars, community college faculty, and non-teaching staff at universities.

74.     Summer Stipends supported continuous full-time work on a humanities project for a period of two consecutive months, at a funding level of $8,000 per stipend. NEH funds supported recipients' compensation, travel, and other costs related to the proposed scholarly research.

75.     To apply for a Summer Stipend grant, applicants were directed to visit "Grants.gov" for application materials. On a page titled "View Grant Opportunity," applicants could access a "Notice of Funding Opportunity" for the Summer Stipends program. The Notice stated that the Summer Stipends program "will provide funding in the form of grants." The Notice stated that the estimated number of awards each year is "up to 100 grants per deadline." The Notice stated that awards would be administered by the NEH Office of Grant Management. The "Summer Stipends" page on NEH's website, https://www.neh.gov/grants/research/summer-stipends, describes the Summer Stipends program as a "grant program."

76.     Summer Stipend Awards were subject to the NEH Summer Stipends Terms and Conditions, which prohibited using awards for promotion of a particular political, religious, or ideological point of view; advocacy for a particular program of

social or political action; or support of specific public policies or legislation.

77.     The "Termination" section of the NEH Summer Stipends Terms and Conditions stated, in its entirety: "NEH may terminate your Summer Stipend if, for any reason, you choose to discontinue the proposed program before the end of the period of performance or fail to observe the award's terms and conditions. If you discontinue the proposed program before the end of your period of performance, you must return any funds received over and above those to which you are entitled. If during your period of performance you are unable to meet the terms of the award, then you are obliged to inform NEH immediately. Because stipend payments are made in advance, you may be required to return a portion of the stipend to NEH; if this is the case, NEH will inform you of the amount that you must repay, the basis for the calculation, and the date by which you must repay." Thus, NEH did not represent to Summer Stipend grant recipients that it could rescind Summer Stipend grants of at will; rather, grants would only be rescinded if a Summer Stipend grantee no longer could or would perform the work the grant was meant to support.

78.     In or around early April 2025, Defendants announced that the Summer Stipends program "will not be reoffered" in future years.

### 4.     *Awards for Faculty at Hispanic-Serving Institutions and Historically Black Colleges and Universities*

79.     Two more of NEH's grant programs were the Awards for Faculty at Hispanic-Serving Institutions ("HSIs") program and the Awards for Faculty at Historically Black Colleges and Universities ("HBCUs") program. These awards strengthened the humanities at HSIs and HBCUs by encouraging and expanding

humanities research opportunities for individual faculty and staff members. Awards provided the individual recipient with time to write, conduct research, and pursue other project-related activities.

80.    Projects eligible for the Awards for Faculty at HSIs and HBCUs programs included research leading to the development of books, monographs, peer-reviewed articles, e-books, digital projects and resources, translations with annotations or a critical apparatus, critical editions, or other scholarly resources; research related to institutional or community goals or interests, such as projects that draw on archival collections, collection and interpretation of oral histories, or the development of materials in support of culture or language preservation and revitalization; and research leading to the improvement of a single existing undergraduate course, including the development of humanities resources (for example, oral histories, identification and preparation of archival sources, or newly compiled historical or literary collections).

81.    A similar program provided Awards for Faculty at Tribal Colleges and Universities (TCUs).

82.    Awards under these programs provide a monthly stipend of $5,000 per full-time month, with a maximum award of $60,000 for twelve full-time months. Grantees who work full-time on their projects are required to "forgo teaching and other major activities." Grantees who receive a part-time award "must carry a reduced class load during the period of performance."

83.    To apply for Awards for Faculty at HSIs or HBCUs grants, applicants

were directed to visit "Grants.gov" for application materials. On a page titled "View Grant Opportunity," applicants could access a "Notice of Funding Opportunity" for the program. The Notice stated that the program "will provide funding in the form of grants." The Notice stated that the estimated number of awards each year is "approximately 22 grants across the three Awards for Faculty programs." The Notice stated that awards would be administered by the NEH Office of Grant Management. The "Awards for Faculty at Hispanic-Serving Institutions" page on NEH's website, https://www.neh.gov/grants/research/awards-faculty-hispanic-serving-institutions, describes the program as a "grant program."

84.     Awards for Faculty at HSIs and HBCUs grants were subject to the NEH Fellowships and Awards for Faculty Terms and Conditions, which prohibited using awards for promotion of a particular political, religious, or ideological point of view; advocacy for a particular program of social or political action; or support of specific public policies or legislation.

85.     The "Termination" section of the NEH Fellowships and Awards for Faculty Terms and Conditions stated, in its entirety: "NEH may terminate your fellowship or Award for Faculty if, for any reason, you choose to discontinue the proposed program before the end of the period of performance or fail to observe the award's terms and conditions. If you discontinue the proposed program before the end of your period of performance, you must return any funds received over and above those to which you are entitled. If during your period of performance you are unable to meet the terms of the award, then you are obliged to inform NEH immediately.

Because stipend payments are made in advance, you may be required to return a portion of the stipend to NEH; if this is the case, NEH will inform you of the amount that you must repay, the basis for the calculation, and the date by which you must repay." Thus, NEH did not represent to NEH Fellowships and Awards for Faculty recipients that it could rescind grants of at will; rather, grants would only be rescinded if the grantee no longer could or would perform the work the grant was meant to support.

86.    In or around early April 2025, Defendants announced that the Awards for Faculty at HSIs program "is cancelled for FY2026 and not accepting applications."

### 5.    *Awards for Fellowship Programs at Independent Research Institutions*

87.    Another of NEH's grant programs was the Fellowship Programs at Independent Research Institutions ("FPIRI"). This program supported institutions that provide fellowships for advanced humanities research in the U.S. and abroad, fostered communities of intellectual exchange among participating scholars, and provided access to resources that might otherwise not be available to the participating scholars.

88.    Direct grant recipients included independent libraries, archives, museums, and centers for advanced study; American overseas research centers; and American organizations that facilitate humanities research in foreign countries. Individual scholars then applied directly to recipient institutions ("sponsors") for fellowships. Individual scholars who were awarded fellowships by recipient institutions are referred to here as "subrecipients" and are sometimes referred to as

"participants."

89.     Sponsor institutions were required to comply with various conditions in awarding fellowships, including that they consider all eligible applicants equally and did not restrict eligibility to members of a scholarly organization; to not accept applications from any of their own officers, employees, members of the board of trustees or advisers, or selection committee members; that they not require an administrative or application fee for NEH-funded fellowships; that they clearly and effectively publicize the availability and application procedures; and that they ensure the fair and informed selection of fellows by relying on the recommendations of an external committee composed of qualified scholars drawn from outside the institution's staff and governing bodies.

90.     Sponsor institutions were also required to comply with various conditions in administering fellowships, including that they grant the same benefits, services, and accommodations provided to other fellows to NEH-funded fellows, and that they ensure that fellowship tenures are full-time, continuous, and are between four and twelve months long.

91.     FPIRI awards supported fellowship stipends at a rate of $5,000 per month.

92.     To apply for an FPIRI award, applicants were directed to visit "Grants.gov" for application materials. On a page titled "View Grant Opportunity," applicants could access a "Notice of Funding Opportunity" for the program. The Notice stated that the program "will provide funding in the form of grants." The

Notice stated that the estimated number of awards each year is "approximately 10 grants per deadline." The Notice stated that awards would be administered by the NEH Office of Grant Management. The "Fellowship Programs at Independent Research Institutions" page on the NEH's website, https://www.neh.gov/grants/research/fellowship-programs-independent-research-institutions, describes the program as a "grant program."

93.    FPIRI awards were subject to the General Terms and Conditions for Awards to Organizations, which prohibited using awards for promotion of a particular political, religious, or ideological point of view; advocacy for a particular program of social or political action; or support of specific public policies or legislation.

94.    The "Termination" section of the NEH Fellowships and Awards for Faculty Terms and Conditions stated: "NEH may suspend or terminate an award in whole or in part if: a recipient materially fails to comply with the terms and conditions of an award; an award no longer effectuates the agency's needs and priorities; a recipient violates NEH's Research Misconduct Policy; a recipient or subrecipient is in violation of the requirement in paragraph (g) of Section 106 of the Trafficking Victims Protection Act of 2000 (TVPA) as amended (22 U.S.C. § 7104(g))[; or] NEH has other reasonable cause."

95.    In or around early April 2025, Defendants announced that "The Fellowship Programs at Independent Research Institutions funding opportunity is cancelled for FY26 and is not accepting applications."

### C.    DOGE AND NEH's MASS TERMINATION OF NEH GRANTS

96.    On March 13, 2025, NEH Chair Shelly Lowe was directed by the White

House to resign from her position. Shortly thereafter, teams from DOGE began appearing at NEH offices and meeting with NEH leadership to discuss DOGE's plans for NEH's future.

97.    DOGE teams have been deployed to multiple small agencies, in most cases to swiftly carry out mass terminations of staff, programs, and grants. In addition to NEH, DOGE teams have been deployed to the National Labor Relations Board, the Inter American Foundation, the Millennium Challenge Corporation, the U.S. Institute for Peace, the African Development Foundation, and the National Endowment for the Arts.

98.    On April 1, 2025, NEH staff members were reportedly informed that DOGE sought reductions in NEH staff by 70-80% and what could amount to a cancellation of all grants made under the Biden administration that have not been fully paid out. Acting Chair Michael McDonald reportedly told senior staff that DOGE "wants to claw back $175 million' in grant money that has not yet been disbursed."

99.    While at NEH, DOGE teams—and specifically Defendants Nate Cavanaugh and Justin Fox—accessed lists of open NEH grants and stated that cancelling at least $175 million in grant money was an imperative.

100.    Defendants used criteria to select grants for termination that blatantly discriminated on the basis of race, sex, gender, and other criteria.

101.    Initially, Defendant McDonald and other NEH officials selected grants to terminate based on whether the grants, in their view, related to DEI. That list of DEI-related grants, as determined by NEH, grew substantially when Defendants Fox

and Cavanaugh began reviewing NEH grants in mid-March 2025.

102.    Defendant Fox, an ultimate decisionmaker for which grants to terminate or keep, began selecting grants for termination by sorting them based on their relation to his conception of DEI. In doing so, Fox did not critically analyze the description or purpose of each grant. Instead, he used crude filtering techniques that searched for keywords in grant descriptions that related to the grant's application to individuals of a certain race, nationality, sex, gender, or other personal characteristic.

103.    For instance, Fox searched each grant's description for the use of key words that appeared in a "Detection List" that he created. Those key words included terms such as "LGBTQ," "homosexual," "tribal," "immigrants," "gay," "BIPOC (Black, Indigenous, People of Color)," "native," and so on. Terms like "white," "Caucasian," and "heterosexual" did not appear in the Detection List.

104.    Fox also organized certain grants into a spreadsheet with lists that he labeled "Craziest Grants" and "Other Bad Grants." Among the grants on those lists were those Fox described as relating to "experiences of LGBTQ military service," "oral histories of LatinX in the mid-west," "social and cultural context of tribal linguistics," and a "book on the 'first gay black science fiction writer in history.'"

105.    Fox also used the Artificial Intelligence ("AI") tool ChatGPT to search grant descriptions that purportedly related to DEI, but Fox did not direct the AI tool that it should not identify grants solely on the basis of race, ethnicity, gender, sexuality, or similar characteristic. The AI searches broadly captured all grants that referred to individuals based on precisely those characteristics. For example, the AI

searches flagged a grant described as concerning "the Colfax massacre, the single greatest incidence of anti-Black violence during Reconstruction," another concerning "the untold story of Jewish women's slave labor during the Holocaust," another that funded a film examining how the game of baseball was "instrumental in healing wounds caused by World War I and the 1980s economic standoff between the US and Japan," another charting "the rise and reforms of the Native Americans boarding school systems in the U.S. between 1819 and 1934," and another about "the Women Airforce Service Pilots (WASP), the first female pilots to fly for the U.S. military during WWII" and the "Black female pilots who . . . were denied entry into the WASP because of their race."

106.    To flag grants for their DEI involvement, Fox entered the following command into ChatGPT: "Does the following relate at all to DEI? Respond factually in less than 120 characters. Begin with 'Yes.' or 'No.' followed by a brief explanation. Do not use 'this initiative' or 'this description' in your response." He then inserted short descriptions of each grant. Fox did nothing to understand ChatGPT's interpretation of "DEI" as used in the command or to ensure that ChatGPT's interpretation of "DEI" matched his own.

107.    Grants identified this way were slated for termination—with only a handful of exceptions, staff at NEH, including the Acting Chair, were not permitted to remove them from the termination list.

108.    Cavanaugh worked closely with Fox in selecting which grants to terminate using this selection criteria.

109.    Fox and Cavanaugh sorted grants in lists labeled "to cancel" or "to keep."

110.    No grant relating to DEI as broadly conceived of by Fox and Cavanaugh appeared on the "to keep" list. Grants that Fox and Cavanaugh considered "wasteful" and thus slated for termination could be moved to the "to keep" list by Defendant McDonald only if they related to "America 250" or the "Garden of Heroes" initiatives based on the views of Defendants McDonald, Fox, Cavanaugh, and NEH staff member, Adam Wolfson.

111.    Approximately one day after receiving the list of open NEH grants, Defendants began implementing the Mass Termination. Defendants Cavanaugh and Fox emailed at least 1,400 grantees, sending them the Termination Notice and informing them that their grants were being terminated, including nearly all grants issued during the Biden Administration. The Mass Termination and accompanying Termination Notices were not processed through NEH's grants management system as required by internal agency policies. Nearly identical versions of the Termination Notice were sent on April 1, April 2, and April 3, to individual and organizational grantees.

112.    DOGE and NEH did not conduct an individualized review of grantees. Instead, they summarily terminated awards *en masse*, in the form of a near identical Termination Notice sent to all recipients.

113.    The emails sent to NEH grantees did not come from an NEH server or email address, but from Grant_Notifications@nehemail.onmicrosoft.com, a non-governmental email account.

114.    Each of the more than 1,400 Termination Notices sent was purportedly signed by Defendant Acting Director of NEH Michael McDonald. The Termination Notices were not hand-signed by McDonald or digitally signed with a verifiable digital signature. Instead, the signature on the termination letters was simply typed by someone as "*/s/ Michael McDonald.*" On information and belief, the Termination Notices sent to all NEH grantees as part of the Mass Termination were nearly identical and lacked individualized analysis or discussion of each terminated grant.

115.    On information and belief, the Termination Notices received by Plaintiffs, their members, and all members of the Proposed Classes or their sponsoring organizations as part of the Mass Termination, stated: "This letter provides notice that the National Endowment for the Humanities (NEH) is terminating your federal grant."

116.    On information and belief, the Termination Notice received by Plaintiffs, their members, and all members of the Proposed Classes or their sponsoring organizations as part of the Mass Termination, provided the following explanation for the terminations:

> Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in *2CFR§200.340*. For instance, NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities…. The termination of your grant represents an urgent priority for the administration, and due to

exceptional circumstances, adherence to the traditional notification process is not possible.

117.    The Termination Notice concluded by telling the recipients, "Please remember that your obligations under the Grant Application continue to apply. Additionally, an audit may be conducted by the NEH after the termination of your grant." Defendants offered no explanation as to why they were obligated to uphold their obligations pursuant to the grants and Defendants were not.

118.    The Termination Notices issued as part of the Mass Termination state that Executive Order 14217 "mandates that the NEH eliminate all non-statutorily required activities and functions." However, NEH is not one of the agencies named in Executive Order 14217.

119.    According to public sources, in a meeting with staff to answer questions about the Mass Termination, McDonald appeared to acknowledge that he did not determine which grants to terminate nor did he draft the termination letters. First, he stated that he had explained NEH's traditional termination process but that "as they said in the notification letter...they would not be adhering to traditional notification processes" and "they did not feel those should be applied in this instance." Further, in response to a question about the rationale for grant terminations, he replied that the "rationale was simply because that's the way DOGE had operated at other agencies and they applied the same methodology here." McDonald also said that any statement about the number of grants terminated would be "conjecture" on his part, even though he purportedly signed each termination letter.

120.    In some instances, the Termination Notice also provided:

Any objections or appeals to this termination will be managed in strict accordance with the President's Executive Orders, including but not limited to: E.O. 14217 (Feb. 19, 2025), *Commencing the Reduction of the Federal Bureaucracy*; E.O. 14151 (Jan. 20, 2025), *Ending Radical and Wasteful Government DEI Programs and Preferencing*; E.O. 14168 (Jan. 20, 2025), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*; and E.O. 14190 (Jan. 29, 2025), *Ending Radical Indoctrination in K–12 Schooling*.

121.    None of the Executive Orders cited in the Termination Notice mention or relate to any topic relevant to NEH's grant-giving function. Nor do any of these Executive Orders contain any discussion of "objections and appeals." Moreover, each of these Executive Orders provides that they will be implemented "consistent with applicable law."

122.    The Termination Notices issued as part of the Mass Termination included no reference to any other method for appeal or to seek reconsideration, even though NEH's General Terms and Conditions state that grantees have the right to appeal a termination.

123.    For organizational grantees, NEH Office of Grant Management sent on April 29, 2025, a document titled "Guidance for Recipients of Terminated NEH Awards." Under the heading "Appeals," the document stated that "NEH is not offering a means of dispute resolution."

124.    Several individual grantees who had their grants terminated attempted to appeal the termination or sent inquiries to NEH regarding the process for appeals. NEH responded to many of these inquiries by stating that "dispute resolution" was not available or that NEH "is unable to offer you a means of dispute resolution."

125.    All Individual Plaintiffs had their grants terminated as part of the Mass

Termination, through the issuance of Termination Notices. Most or all open grants of Authors Guild members were also terminated as part of the Mass Termination, through the issuance of Termination Notices.

126.    The Mass Termination was final agency action under the APA. *See* 5 U.S.C. § 704. The Mass Termination: (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) is action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted). In particular, the Mass Termination marks the consummation of NEH's decision-making process with respect to terminated grants because it announces NEH's decision to immediately terminate those grants in their entirety. The Mass Termination is an action by which rights or obligations have been determined or from which legal consequences will flow because it purports to eliminate all government obligations to pay out grant awards and all grantees' rights to receive their grant awards.

### D.    DOGE AND NEH's DISMANTLING OF NEH

127.    On April 3, 2025 (the third of three days Defendants sent Termination Notices) 145 NEH staff members—making up 80% of NEH's staff—were reportedly placed on administrative leave.

128.    On April 9, 2025, NEH staff received a notice alerting them to an upcoming "multi-step approach to restructuring" that promised to include a Reduction In Force ("RIF"). The notice stated: "NEH is undertaking a multi-step approach to restructuring its internal organization. This restructuring will consolidate administrative and programmatic offices to enhance efficiency and

streamline functions. As a result, the agency will be forced to reduce the total number of positions."

129.    The very next day, many NEH staff received RIF notifications that they would be terminated as of June 10, 2025. On information and belief, approximately 70-80% of NEH staff received a RIF notification.

130.    As a result of the termination of staff and grants, NEH has effectively eliminated or nearly eliminated entire divisions and programs, including but not limited to the Office of Digital Humanities, the Office of Federal/State Partnerships, the Office of Data and Evaluation, the Office of Native and Indigenous Affairs, the Office of Outreach, and the Office of Partnerships and Strategic Initiatives.

131.    As a result of Defendants' actions, NEH has terminated nearly all of its current grants and most of its future programs, despite having nearly $400 million in funding for programs over the last two years, including $192,000,000 it received for grant programs in March 2025.

132.    Days after the Termination Notices were sent to Plaintiffs and the Proposed Classes as part of the Mass Termination, which terminated tens of millions of dollars of NEH grants, NEH issued a Notice of Funding Opportunity to award up to $17 million in grants to build a "National Garden of American Heroes." The notice was unusual, not only because of its size and the lack of any of the rigorous standards for grant-awarding NEH had previously implemented, but also because never before had NEH—rather than the National Endowment for the *Arts*—funded the creation of public visual art.

133.    On May 8, 2025, NEH announced that it awarded $9.55 million in grants for 68 humanities projects.

134.    On May 16, 2025, NEH announced a new grant program "for museums, libraries, archives, and other cultural organizations to support public programs on the ideas of the American Revolution and the founding of the United States." The program is called *Public Impact Projects Celebrating America's 250th Anniversary*. The announcement states that applications are due on July 9, 2025. According to grants.gov, the total program funding is $4 million. The Notice of Funding Opportunity states that projects must start between March 1, 2026, and May 1, 2026.

### E.    DEFENDANTS' CONDUCT HAS HARMED PLAINTIFFS, THEIR MEMBERS, AND THE GENERAL PUBLIC

135.    NEH grantees derive many financial and non-financial benefits from their NEH awards.

136.    First, NEH awards confer substantial prestige on grantees, marking a major professional accomplishment and providing a credential that can lead to numerous rewarding, lucrative, and/or prestigious opportunities.

137.    Second, NEH awards accelerate grantees' completion of the projects for which grant funds are awarded. Awards allow grantees to dedicate themselves full-time to the funded projects, allowing grantees to complete the projects on a far shorter timeline than if they had to maintain their teaching or other jobs while also working on their projects on their own time. In many cases, NEH grants make the difference between the project's completion or its abandonment. By accelerating the timeline for project completion, NEH grants offer to recipients like Plaintiffs myriad benefits that

result from project completion, including prestige, publicity, merit-based pay raises, advances and royalties from book deals, honoraria for speaking engagements about the project, among other benefits.

138.   Third, book projects or other projects attached to an NEH grant are more likely to attract interest from prospective publishers or producers because the award—which as detailed above resulted from a rigorous, competitive application process surveyed by a wide array of experts—sends a strong signal about the project's merit and appeal.

139.   Fourth, NEH grants can help recipients garner additional research grants by signaling to other funding bodies that the scholar produces work that, under rigorous vetting, is deemed worthy of financial and governmental support.

140.   Fifth, NEH awards help scholars on the job market and can facilitate career mobility in multiple ways. NEH grants serve as markers of status that (1) appeal to academic employers; (2) are strong indicators that the recipients are capable of winning additional awards; (3) facilitate the timely completion of a book, which matters because published books are the principal means by which scholars attract attention from prospective universities; and, (4) if the book receives favorable reviews, improve the author's job prospects even more.

141.   Defendants' conduct in unlawfully terminating the grants of Plaintiffs, Plaintiffs' members, and class members has destroyed, delayed, or diminished these benefits. Moreover, many NEH grantees turned down or did not pursue alternative opportunities for funding and scholarship in reliance on their NEH grants.

Termination of Plaintiffs' (and the Proposed Classes') grants not only destroys the benefits of the grants themselves, but also leaves Plaintiffs (and the Proposed Classes) without alternative funding sources or professional opportunities for the grant period, as the deadlines for those opportunities have now passed.

142.    Furthermore, many NEH grants—including Public Scholars awards. Faculty awards, and Fellowship awards—require grantees to forgo teaching and other forms of employment during the grant period, to ensure full-time focus on the funded project. Accordingly, many grantees sought and obtained leaves of absence or sabbaticals from their regular jobs to work on their funded projects. Termination of their grants leaves such grantees with no source of income during their anticipated grant period. Moreover, many grantees whose grants were terminated midway through the grant period have performed substantial work on their projects in reliance on the promised grant funds, and much of that work may go to waste if the projects are unable to be completed or if their planned workflows have to be altered due to lack of funds.

143.    Finally, the Termination Notices' conclusion, that "your [the grantee's] obligations under the Grant Agreement continue to apply," requires grantees to continue adhering to their obligations—including, in many instances, forgoing employment—even though the Mass Termination purported to absolve the government of any and all corollary obligations. This purported continuing obligation has prevented grant recipients, since the Mass Termination, from resuming their academic work and pursuits to the full extent they would have had they never been

issued an NEH grant.

144.   The general public will also bear many of the harms from Defendants' actions. As detailed above, Congress expressly declared that "the humanities belong to all the people of the United States," that "an advanced civilization must not limit its efforts to science and technology alone, but must give full value and support to the other great branches of scholarly and cultural activity in order to achieve a better understanding of the past, a better analysis of the present, and a better view of the future," and that "it is necessary and appropriate for the Federal Government to help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent." 20 U.S.C. § 951.

145.   The Mass Termination will deprive the general public of critical scholarly work in the humanities that would have enhanced public understanding of the past, present, and future, and would have made us all better Americans. Plaintiffs' and class members' funded projects were the best of the best in the humanities—projects that were funded because highly competitive, expert-led review processes found that they were intellectually significant, of high quality, and worthy of the honor and prestige of an NEH grant. As NEH itself has put it, the projects that receive NEH awards are "the nation's most significant humanities projects" and make "distinguished contributions to the humanities." Defendants' actions deprive the general public of the immense benefit of these humanities projects.

## V.    CLASS ACTION ALLEGATIONS

146.   Plaintiffs bring this action as a class action pursuant to Federal Rule of

Civil Procedure 23(b)(2) on behalf of the following two Proposed Classes:

### Grantee Class
All NEH grant recipients whose grants were terminated as part of the Mass Termination.

### Subrecipient Class
All NEH grant subrecipients whose sponsors' grants were terminated as part of the Mass Termination.

147. For purposes of the class definitions, "Mass Termination" refers to the actions described in Part IV.C of this Complaint, which were implemented through Termination Notices issued on April 1st through April 5th, 2025.

148. Excluded from the Grantee Class and Subrecipient Class are American Council of Learned Societies and its members; American Historical Association and its members; and Modern Language Association and its members.

149. NEH defines a "sponsor" as an organization that applies for a grant on behalf of an individual or organization that may not be eligible to apply directly to NEH for a grant. Such a sponsor organization may also be called a pass-through or umbrella organization. The "sponsored" individual or organization, who carries out the work of the project under the oversight of the sponsoring organization, is, for purposes of the class definitions, the "subrecipient."

150. The members of the putative classes are so numerous that joinder of all potential class members is impracticable. Plaintiffs do not know the exact size of the classes but are informed and believe that the Proposed Classes include hundreds of individuals.

151. Plaintiffs' claims are typical of the claims of other members of the

Proposed Classes. Specifically, the claims of Plaintiffs Kadetsky, Goldstein, Balog, Orlando, Jenkins, and Holtzman are typical of the claims of other members of the Grantee Class, and the claims of Plaintiff Jasperse are typical of the claims of other members of the Subrecipient Class. Plaintiffs' claims and the claims of all class members arise out of the same conduct as alleged herein, and all members of the classes have been similarly affected by Defendants' wrongful conduct.

152.  There are questions of law and fact common to both classes that predominate over any individual issues that might exist. Common questions include, but are not limited to: whether the Mass Termination violated the Administrative Procedure Act; whether Defendants acted arbitrarily and capriciously; whether Defendants acted unlawfully; whether the Mass Termination violated the First Amendment; whether the Mass Termination violated the Fifth Amendment; whether the Mass Termination violated the separation of powers; whether the Proposed Classes should be certified; and whether Plaintiffs and members of the classes are entitled to injunctive relief.

153.  Plaintiffs will fairly and adequately protect the interests of the class members. Specifically, Plaintiffs Kadetsky, Goldstein, Balog, Orlando, Jenkins, and Holtzman will fairly and adequately protect the interests of the members of the Grantee Class, and Plaintiff Jasperse will fairly and adequately protect the interests of the members of the Subrecipient Class. Plaintiffs have no interests antagonistic to those of other members of the classes, and they are committed to the vigorous prosecution of this action. In addition, Plaintiffs have retained counsel competent and

experienced in class-action litigation, administrative law, and constitutional law.

154.    Numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy and would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants.

155.    Defendants have acted on grounds that apply generally to the classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### Violation of Administrative Procedure Act—Arbitrary and Capricious Failure to Engage in Reasoned Decisionmaking
### (Against All Defendants)

156.    Plaintiffs reallege all paragraphs above as if fully set forth herein.

157.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Government agencies' and officers' actions act in an arbitrary and capricious manner if they fail to engage in "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citation omitted). Therefore, agency action, particularly action which represents a departure from prior agency policy, is lawful only if it rests "on a consideration of the relevant factors." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

158.    Defendants' Mass Termination was arbitrary and capricious for many

reasons, including (but not limited to) the following.

159.    First, the Termination Notices issued as part of the Mass Termination do not provide a reasoned explanation. This is evidenced by the fact that *every* Plaintiff and member of the Proposed Classes was sent the same explanation in a three-day period (April 1-3, 2025). Those Termination Notices stated only that the grant "no longer effectuates [NEH's] needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as is outlined in *2CFR§200.340*." That simple statement, and the Termination Notice's further blanket statement that "NEH has reasonable cause to terminate your grant in light of the fact that is repurposing its funding allocations in a new direction in furtherance of the President's agenda," are not reasoned explanations for NEH's action.

160.    Second, the Executive Order(s) Defendants cited in the Termination Notices as the basis for their decision to issue the Mass Termination do not mention NEH, nor do they relate to NEH grants or any valid reason for termination. That is not reasoned decisionmaking.

161.    Third, the Mass Termination ignores the reliance interests of grantees. For example, grantees who had already received some but not all of their awards had already spent significant time working on the projects funded by their grants. Similarly, many grantees—as their grants required—took leaves of absence from their jobs, cancelled teaching plans, or otherwise altered their employment status in reliance on the promise of receiving grant money to support them while they

completed their projects.

162.    Fourth, the Mass Termination departs from prior agency decisions without adequate explanation for the change in the agency's position. All class members received their grants after NEH's rigorous, objective, expert-guided application review process concluded that the project warranted funding and satisfied all relevant criteria. Defendants failed to provide any reasoned explanation for NEH's decision to change its position *en masse* with respect the terminated grants.

163.    Fifth, the Mass Termination is not the product of agency expertise. *See State Farm*, 463 U.S. at 43 ("An agency rule would be arbitrary and capricious if the agency has … offered an explanation for its decision that … is so implausible that it could not be … the product of agency expertise."). The Mass Termination was ordered and implemented by Defendants McDonald, Gleason, Cavanaugh, and Fox, none of whom have expertise in evaluating humanities projects, and none of whom actually evaluated the scholarly or artistic merit of any of the projects whose grants were terminated. To the contrary, Defendants eschewed the expert-guided process by which NEH typically acts, choosing instead to terminate grants *en masse* without expert guidance.

164.    Sixth, the Mass Termination "entirely failed to consider . . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. Among other things, Defendants ignored waste and inefficiency caused by the termination, as well as the reliance each grantee undertook, given the investment that taxpayers have already made in many of the projects. The Mass Termination also ignored the significant

consequences the termination will have on the individuals and organizations involved in creating the works, the state(s) and congressional district(s) in which the works are being produced, and the broader public that would benefit from completion and release of the funded works.

165.    Seventh, Defendants "offered an explanation for [the] decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. The evidence before the agency showed that each grantees' project was worthy of the honor and prestige of an NEH grant. No new evidence came before the agency; it simply ignored the evidence and terminated the grants *en masse*.

166.    Eighth, Defendants failed to consider whether, or to explain how, the Mass Termination would advance NEH's statutory purposes, 20 U.S.C. §§ 951, 956.

167.    Defendants have failed to adequately justify their actions; have not considered or addressed key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake; have relied on factors that Congress did not authorize them to consider; and have not acknowledged or justified their change from prior agency positions.

168.    The Mass Termination and accompanying Termination Notices should be set aside under the APA as arbitrary and capricious.

**COUNT II**
**Violation of Administrative Procedure Act—Contrary to Law**
**Illegal Departure from Impoundment Control Act, NEH Statute, and the**
**Constitution**
**(Against All Defendants)**

169.    Plaintiffs reallege all paragraphs above as if fully set forth herein.

170.    By delaying spending or outright refusing to spend money that Congress appropriated, eliminating or nearly eliminating entire divisions, shutting down entire programs, and mass firing staff, Defendants are violating the Impoundment Control Act of 1974 (ICA), and the appropriations statutes underlying NEH's funding scheme.    Under the ICA, a "deferral" includes any "withholding or delaying the obligation or expenditure of" appropriated funds, as well as "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" appropriated funds. 2 U.S.C. § 682(1). When the Executive Branch wishes to defer funds, it must send a special message to Congress detailing the money to be deferred and the reasons for deferral. There are only three permissible grounds for deferrals, none of which includes effort to ensure funds are spent consistent with the President's new policy priorities. *Id.* § 684(b).

171.    Defendants' actions constitute a "deferral" because they reflect a "withholding or delaying [of] the obligation or expenditure of" funds that Congress appropriated for NEH. 2 U.S.C. § 682(1). Defendants did not notify Congress of the deferrals as the ICA requires, nor did Defendants undertake the deferrals for reasons permitted by the ICA.

172.    Defendants' actions also constitute an unlawful "rescission" of the funds appropriated for NEH. Where the President seeks to "rescind" appropriated funds, the ICA requires, among other things, that the President send a special message to Congress specifying the funds he seeks to have rescinded and the reasons for his proposal. 2 U.S.C. § 683(a). The President did not do so.

173.    Defendants also violated NEH's authorizing statute, 20 U.S.C. §§ 951-960, by implementing the Mass Termination, sending the Termination Notices, and notifying Plaintiffs and class members that NEH would be "repurposing its funding allocations in a new direction in furtherance of the President's agenda." As noted above, in creating NEH and appropriating it money with which to make grants, Congress identified 10 missions that NEH grants should further, including "the promotion of progress and scholarship in the humanities," supporting "programs to strengthen the research and teaching potential of the United States in the humanities," and "initiat[ing] and support[ing] programs and research which have substantial scholarly and cultural significance." 20 U.S.C. § 956(c)(1)-(10). The work Plaintiffs and the Proposed Classes were awarded grants to do furthers these missions; the withholding of appropriated funds (or the misappropriation of these funds to the proposed Garden of Heroes project) do not.

174.    Defendants also violated the First Amendment by terminating Plaintiffs' and class members' grants based, at least in part, on Defendants' belief that the supported works promoted disfavored viewpoints and Plaintiffs' and class members' mere association, through the grant process, with the prior presidential administration.

175.    Defendants also violated the Fifth Amendment by terminating Plaintiffs' and class members' grants based, at least in part, based on their grants' perceived focus on race, nationality, sex, gender, sexual orientation, or other characteristics without any rational basis.

**COUNT III**
**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions**
**Violation of Impoundment Control Act and Appropriations Acts**
**(Against Individual Defendants)**

176.    Plaintiffs reallege all paragraphs above as if fully set forth herein.

177.    Plaintiffs may bring a nonstatutory claim to enjoin Defendants McDonald, Gleason, Cavanaugh, and Fox from acting *ultra vires* in violation of statutory commands.

178.    Defendants' delay in spending or outright refusal to spend money that Congress appropriated, elimination or near elimination of entire divisions, shutting down of entire programs, and mass firing of staff are without statutory authority and violate the Impoundment Control Act, the 2024 Appropriations Act, and subsequent Continuing Resolutions.

179.    Defendants' termination of grants, including the grants to Plaintiffs and their members, is without statutory authority and violates the Impoundment Control Act, the 2024 Act, and 2025 Continuing Resolutions, because the individual grant terminations were a primary means by which Defendants carried out their deferral of appropriated funds and their outright refusals to spend appropriated funds.

180.    Because Defendants' actions violate statutory commands and are *ultra vires*, they should be enjoined and declared unlawful.

## COUNT IV
## Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions
## Violation of Separation of Powers
## (Against Individual Defendants)

181.    Plaintiffs reallege all paragraphs above as if fully set forth herein.

182.    This Court has jurisdiction to enjoin Federal officials from violating  the Constitution, including the separation of powers. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

183.    The Constitution empowers Congress to make laws, U.S. Const. art. I, § 1, and requires the President to faithfully execute those laws, *id*. art. II, § 3. Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco*, 897 F.3d at 1238.

184.    The Executive Branch has no constitutional authority to refuse to carry out laws enacted by Congress, and it has no constitutional authority to block, amend, subvert, or delay spending appropriations based on the President's own policy preferences.

185.    Defendants' decisions to unilaterally cancel duly awarded grants and withhold funding Congress has appropriated precisely to fund such grants violates the separation of powers by precluding NEH from carrying out its statutory functions and purposes under 20 U.S.C. §§ 951 and 956.

186.    Defendants' decisions to delay spending and outright refuse to spend the amounts Congress appropriated violates Congress's power of the purse and the separation of powers.

187.   Defendants' termination of grants, including the grants of Plaintiffs and Plaintiffs' members, violates the separation of powers, because the mass termination of grants and the individual terminations of the grants awarded to Plaintiffs, Plaintiffs' members, and the Proposed Class are a primary means by which NEH has failed to carry out its statutory functions and purposes, and by which Defendants have unlawfully deferred spending and outright refused to spend appropriated funds.

188.   Because Defendants' actions violate the separation of powers and are *ultra vires*, they should be enjoined and declared unconstitutional.

## COUNT V
### Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions
### Violation of First Amendment
### (Against All Defendants)

189.   Plaintiffs reallege all paragraphs above as if fully set forth herein.

190.   The First Amendment provides that the Federal government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

191.   The First Amendment prohibits the government from "regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* at 828.

192.   "[E]ven in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550 (1983) (alteration in original)). In the grant-making context, the

government may not reject "a whole class of projects" based on "viewpoint alone," or use Federal funding to "impose a disproportionate burden calculated to drive certain ideas or viewpoints from the marketplace." *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, No. 25-cv-79-WES, 2025 WL 1009026, at *12 (D.R.I. Apr. 3, 2025) (quoting *Finley*, 524 U.S. at 587).

193.    Further, the First Amendment includes an implicit "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)

194.    Defendants' termination of nearly all NEH grants awarded during the prior Administration, and leaving in place existing and future grants that align with particular political and ideological viewpoints, is "the product of invidious viewpoint discrimination." *Finley*, 524 U.S. at 587. Defendants terminated the grants based on the recipients' perceived viewpoint, in an effort to drive such views out of the marketplace of ideas. This is most evident by the citation in the Termination Notices to executive orders purporting to combat "Radical Indoctrination" and "Radical … DEI Programs," and to further "Biological Truth." It is evident from the Termination Notice that Defendants believe Plaintiffs' speech conflicts with the Administration's views, and their grants were terminated at least in part for this reason. Defendants concluded Plaintiffs' speech conflicts with the Administration's views not based on any individual analysis of particular grants but based on Plaintiffs' mere association with the prior administration through the grant award process. Defendants' termination of grants therefore burdens Plaintiffs' exercise of their expressive

association rights by creating conditions for federal funding that preclude individuals and organizations associated—no matter how minimally—with individuals and organizations whose speech Defendants disfavor.

195. The First Amendment does not tolerate Defendants' viewpoint discrimination and the burden Defendants' actions place on Plaintiffs' exercise of First Amendment rights. Accordingly, Defendants' actions are not in accordance with law and contrary to constitutional right or power.

## COUNT VI
### Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions
### Violation of Fifth Amendment
### (Against All Defendants)

196. Plaintiffs reallege all paragraphs above as if fully set forth herein.

197. The Fifth Amendment's Due Process Clause forbids discrimination by the federal government on the basis of classification such as race and gender. *Bolling v. Sharpe*, 347 U.S. 497, 498 (1954); *Sessions v. Morales-Santana*, 582 U.S. 47, 48 (2017).

198. Federal actions that discriminate on the basis of race are subject to strict scrutiny, *Adarand Constructors, Inc. v. Pena*, 515 U.S. at 217, while those that discriminate on the basis of sex or gender are subject to heightened scrutiny, *Sessions*, 582 U.S. at 57.

199. All federal action that distinguishes based on characteristics must be justified by at least a rational basis. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439-42 (1985).

200. Defendants' actions terminating grants on the basis of perceived grant

focus on race, nationality, sex, gender, sexual orientation, or other characteristics lack any rational basis and cannot satisfy any applicable standard of review under the Fifth Amendment's Equal Protection principles.

201.    Accordingly, Defendants' actions are not in accordance with law and contrary to constitutional right or power.

## COUNT VII
### Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions
### Actions Without Authority
### (Against Individual Defendants)

202.    Plaintiffs reallege all paragraphs above as if fully set forth herein.

203.    Under the Constitution, Congress has the authority to set the powers and duties of Federal agencies. U.S. const. art. I, § 8, cl. 18.

204.    Federal agencies "possess only the authority that Congress has provided." *Nat'l Fed. of Indep. Bus. v. OSHA* , 595 U.S. 109, 117 (2022). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC* , 476 U.S. 355, 374 (1986).

205.    Congress has not authorized DOGE to conduct the business of another congressionally authorized agency such as NEH.

206.    According to former or current NEH staff, and a recording of McDonald's statements to NEH staff on April 3, 2025, Defendants Cavanaugh and Fox of DOGE directly carried out the termination of NEH grants, including the grants of Plaintiffs and their members, by selecting the grants to be terminated, drafting the termination letters, and emailing out the termination notice to grantees from a non-NEH email address and server.

207.    According to former or current NEH staff, Cavanaugh and Fox were also the driving force behind mass staff firings at NEH, which have resulted in the elimination or near elimination of entire NEH divisions and programs.

208.    Because DOGE does not possess any congressionally conferred authority to terminate NEH grants or make other institutional decisions of NEH, the actions of McDonald, Gleason, Cavanaugh, and Fox, are *ultra vires* and should be enjoined and declared unlawful.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court certify the Proposed Classes, enter judgment in favor of Plaintiffs, and award Plaintiffs and the Proposed Classes the following relief:

A.    Declare as unlawful and set aside Defendants' Mass Termination and accompanying Termination Notices that terminated the grants awarded to Plaintiffs, Plaintiff The Authors Guild's members, and the members of the Proposed Classes, as in violation of the Administrative Procedure Act, the Impoundment Control Act, the NEH organic statute and Appropriations Acts, the separation of powers, the First Amendment, and the Fifth Amendment;

B.    Declare as *ultra vires* Defendants' decision to implement the Mass Termination and its transmittal of the Termination Notices to Plaintiffs, Plaintiff Authors Guild's members, and the members of the Proposed Classes;

C.    Enjoin Defendants from giving effect to the Mass Termination and accompanying Termination Notices or any similar future action effectively terminating, contrary to statute and the Constitution, duly awarded NEH grants;

D.    Certify undersigned counsel as class counsel upon certification of the Proposed Classes

E.    Award Plaintiffs and counsel for the Proposed Classes reasonable costs and attorneys' fees;

F.  Award any other such relief that the Court may deem just and proper.


Respectfully submitted,

By:      /s/ Jamie Crooks
         Jamie Crooks* (*pro hac vice*)
         Michael Lieberman (*pro hac vice*)
         Amanda Vaughn (*pro hac vice*)
         Yinka Onayemi (Bar No. 5940614)
         FAIRMARK PARTNERS, LLP
         400 7th Street, NW, Ste. 304
         Washington, DC 20004
         Tel: 619.507.4182
         jamie@fairmarklaw.com
         michael@fairmarklaw.com
         amanda@fairmarklaw.com
         yinka@fairmarklaw.com

*Attorneys for Plaintiffs and the Proposed Class*

  * *Counsel of Record*