UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————————— x

THE AUTHORS GUILD, et al.,

                  Plaintiffs,

      -against-                                              25-cv-3923 (CM)

NATIONAL ENDOWMENT FOR THE
HUMANITIES, et al.,

                  Defendants.
———————————————————————————— x

AMERICAN COUNCIL OF LEARNED
SOCIETIES, et al.,

                  Plaintiffs,

      -against-                                              25-cv-3657 (CM)

PRANITA RAGHAVAN, in her official capacity as
Acting Chairman of the National Endowment for the
Humanities, et al.,

                  Defendants.
———————————————————————————— x

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR RECONSIDERATION

McMahon, J.:

      Defendants Pranita Raghavan, in her official capacity as Acting Chairman of the National

Endowment for the Humanities; the National Endowment for the Humanities ("NEH"); the United

States DOGE Service ("USDS"); Amy Gleason, in her official capacity as Acting Administrator

of USDS; and the United States (substituted for former defendant officials Nate Cavanaugh and

1

Justin Fox)[1] (collectively, "Defendants" or the "Government") move for reconsideration of the Court's February 5, 2026 Opinion and Order granting Plaintiffs' motions to compel.  For the following reasons, Defendants' motion is DENIED.

## I.    LEGAL STANDARD

Reconsideration is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources."  *Merced Irrigation Dist. v. Barclays Bank PLC*, 178 F. Supp. 3d 181, 183 (S.D.N.Y. 2016) (citation omitted).  Whether to grant a motion for reconsideration is "committed to the sound discretion of the district court."  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 478, 483 (S.D.N.Y. 2012).

A court may grant reconsideration only when a movant demonstrates "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citation omitted).  The movant bears a heavy burden, as "reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  Moreover, a motion for reconsideration is not an opportunity to advance new arguments or legal theories that could have been raised earlier.  *See Cordero v. Astrue*, 574 F. Supp. 2d 373, 380 (S.D.N.Y. 2008).

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the United States has been substituted for former official-capacity defendants Nathan Cavanaugh and Justin Fox, and Pranita Raghavan has been substituted for Michael McDonald as Acting Chairman of the National Endowment for the Humanities.

## II.    DISCUSSION

At the outset, it is important to clarify what this case does – and does not – concern.  The privilege asserted here is the common-law attorney-client privilege.  It is not executive privilege. Executive privilege, including the presidential communications privilege, derives from Article II of the Constitution and protects certain communications made for the purpose of advising the President.  *See United States v. Nixon*, 418 U.S. 683, 705–06 (1974); *Blumenthal v. Drudge*, 186 F.R.D. 236, 242 (D.D.C. 1999).  Attorney-client privilege, by contrast, arises from the common law as incorporated through Federal Rule of Evidence 501, and depends on the existence of a defined attorney-client relationship and communications made for the purpose of obtaining legal advice.  *See Upjohn Co.*, 449 U.S. 383 (1981).  The Court's February 5th ruling addressed only the latter.  It did not purport to address, limit, or reinterpret executive privilege doctrines grounded in Article II.  This is hardly surprising, since Defendants did not invoke executive or presidential communication privilege and never argued that it should be applied to the documents at issue.  *See* Dkt. No. 100, Defs.' Mem. L. Opp'n to Pls.' Mot. to Compel.

### A.  No Clear Error or Manifest Injustice

In the common law, the attorney-client privilege "is the oldest of the privileges for confidential communications."  *Upjohn Co.*, 449 U.S. at 389.  "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  *Id.*  The privilege, however, "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege."  *Id.* at 395.  Accordingly, it applies only when the party asserting it establishes both (i) the existence of a bona fide attorney-client relationship, and (ii) confidential communications made for the purpose of seeking or rendering legal advice.  *See In re County of Erie,* 473 F.3d 413, 419 (2d Cir. 2007).

3

The Court's prior ruling did not question these settled principles. Rather, it held that Defendants failed to demonstrate that such a relationship existed between attorneys affiliated with USDS and the NEH or GSA personnel whose communications were withheld.

As the party asserting the privilege, Defendants bear the burden of establishing its essential elements. *See von Bulow ex rel. Auersperg v. von Bulow,* 811 F.2d 136, 144 (2d Cir. 1987). On the record before the Court, Defendants did not establish that attorneys affiliated with the USDS were acting as legal counsel either to NEH or to GSA personnel so as to give rise to attorney-client privilege. The absence of statutory authority for USDS to represent other agencies or their employees, the structure and mandate of USDS as created by Executive Order, and the nature of the communications themselves all undermined Defendants' assertion that a cognizable attorney-client relationship existed. *See Authors Guild v. Nat'l Endowment for the Humans.*, 2026 WL 309491, at *2 (S.D.N.Y. Feb. 5, 2026).

Even the Department of Justice's Office of Legal Counsel ("OLC") has described attorney-client protection within the Executive Branch as presupposing an identifiable governmental client, designated counsel, and legal advice rendered in that capacity. In advising the President about the reinstatement of a citizenship question on the census, the Attorney General explained that executive privilege (not attorney-client privilege) protected a memorandum drafted by an attorney in the Department of Commerce's Office of General Counsel, because it "contain[ed] legal analysis, recommendations, and advice," was transmitted to the Secretary of Commerce and to the Acting Assistant Attorney General for the Department of Justice's Civil Rights Division, "offered advice to a client regarding the legal authority and pertinent case law," and was prepared because the Departments "expected that litigation would follow." William P. Barr, Attorney General, *Executive Privilege Over Deliberative Materials Regarding Citizenship Question*, 43 Op. O.L.C.

3, 8–9 (2019).  That opinion itself concerned executive privilege.  But in explaining why the memorandum qualified for protection, OLC described the hallmarks of a traditional attorney-client relationship: identified counsel, identified client, legal analysis of governing law, and advice rendered in anticipation of litigation.  Those elements are absent from this record.

After *in camera* review, the Court concluded – and continues to conclude – that Defendants have made no comparable showing and have not met even the threshold requirement of demonstrating the existence of a defined attorney-client relationship.  *Authors Guild*, 2026 WL 309491, at *7–9.

Defendants insist that the Court's ruling would "upend the law of privilege across the Executive Branch," including the privilege that attaches to communications between the President and the White House Counsel's Office, the National Security Council, and the Office of Management and Budget.  Dkt. No. 112, at 10.  It does no such thing.

The Court did not hold that government attorneys must possess express statutory authorization in all circumstances for any privilege to attach to communications between attorneys and government officials.  Nor did the Court hold that communications between attorneys in one Executive Branch component and personnel in another can never be privileged.  The Court held only that, on the record before the Court, Defendants failed to carry their burden of establishing the existence of a legally cognizable attorney-client relationship between attorneys affiliated with USDS and NEH or GSA personnel.

Defendants attempt to resist that narrow holding by invoking various privileges that attach to communications with the Executive Office of the President components in which privilege is routinely recognized.  But in those settings, courts typically evaluate privilege claims under the

doctrine of *executive privilege* – not under a generalized cross-agency attorney-client privilege theory.

### National Security Council

The National Security Council ("NSC") is a statutory body within the Executive Office of the President and its function is to advise and assist the President in connection with national security matters.  *See* 50 U.S.C. § 3021(a)–(c).  Consistent with that structure, communications solicited by NSC legal advisers (or their staff) for the purpose of informing presidential decisionmaking are ordinarily protected by the presidential communications privilege.

This privilege attaches to legal memoranda prepared by interagency lawyers at the request of NSC legal staff, where the advice is sought to support the President's exercise of core national security authority.  *See Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 320 F. Supp. 3d 162, 172–76 (D.D.C. 2018) (holding interagency legal memorandum solicited by the Deputy NSC Legal Adviser protected by presidential communications privilege).  Because the Deputy NSC Legal Adviser has broad responsibility for formulating advice to the President in matters concerning national security, and otherwise had "no official role outside the walls of the White House," there is "no doubt" that such legal memoranda are protected by the presidential communications privilege.  *Id.* at 173–74.  That protection arises from Article II and the President's constitutional prerogatives – and not from the common-law attorney-client privilege.

Defendants' suggestion that the Court's analysis would threaten the privilege that attaches to interagency communications with NSC legal advisers is without merit.

**White House Counsel**

Similarly, communications involving the White House Counsel's Office are frequently protected under the presidential communications privilege.  The White House Counsel's Office operates within the White House Office, a component of the Executive Office of the President whose staffing is authorized by statute.  *See* 3 U.S.C. § 105(a)(1) (authorizing the President to "appoint and fix the pay of employees in the White House Office").  Although no statute specifically delineates the duties of the Counsel's Office, that Office functions as a legal adviser to the President and senior Executive Office officials.  Communications involving White House Counsel therefore typically arise in the course of advising the President.

The D.C. Circuit's decision in *In re Sealed Case (Espy)*, 121 F.3d 729 (D.C. Cir. 1997) illustrates how such White House communications are protected.  There, an independent counsel sought internal White House documents generated in connection with advice to the President concerning an ongoing investigation.  The court held that the presidential communications privilege (not the attorney-client privilege) applied to documents prepared by and for senior White House advisers, because they were created "in the course of preparing advice for the President." *In re Sealed Case*, 121 F.3d at 752.  The privilege extended beyond documents personally authored by the President to those "authored or solicited and received by those members of an immediate White House adviser's staff." *Id.*  The court emphasized that the privilege is "rooted in the constitutional separation of powers" and protects communications of "immediate White House advisers" who have "broad and significant responsibility for investigating and formulating the advice to be given the President." *Id.* at 743, 752.

Thus, when White House Counsel acts in its traditional role of preparing or soliciting advice for the President, the presidential communications privilege provides well-established

protection independent of the common-law attorney-client privilege.  *See id* at 758 n.23 ("We do not need to examine this [attorney-client privilege] claim because it is clear, based on our review of this document, that it should not be released [under the presidential communications privilege].").  In sum, when White House Counsel acts in an advisory capacity, privilege rests on executive privilege doctrines – not on the type of inter-agency attorney-client theory asserted here.

### Office of Management and Budget

The Office of Management and Budget ("OMB") derives from the Budget and Accounting Act of 1921, codified at 31 U.S.C. § 501 *et seq.*  Congress has charged OMB with assisting the President in the preparation of the budget and in supervising the administration of executive agencies.  *See* 31 U.S.C. §§ 501, 1104.  OMB thus occupies a defined statutory position within the Executive Office of the President, with established advisory and supervisory responsibilities.

Courts have analyzed privilege claims involving OMB communications under settled privilege principles, including the presidential communications privilege and the deliberative process privilege, depending on the function the communication serves.  When OMB communications are prepared for the purpose of advising the President and relate directly to presidential decisionmaking, they likely fall within the scope of privilege described in *In re Sealed Case*, which extends to communications authored or solicited by "immediate White House advisers" in the course of preparing advice for the President.  *See Prop. of the People, Inc. v. Off. of Mgmt. & Budget*, 330 F. Supp. 3d 373, 390 (D.D.C. 2018).  When OMB engages in policy development or budget formulation, deliberative process principles may apply.  *See id.* at 387.

In short, Defendants appear to invoke executive privilege principles to support a claim of common-law attorney-client privilege.  But this is unavailing.  This case does not involve communications prepared for the President or by immediate White House advisers formulating

advice for presidential decisionmaking.  *See Nixon v. Sirica*, 487 F.2d 700, 745 (D.C. Cir. 1973) ("There is a great distinction between the office of the President and the myriad other agencies and departments that comprise the executive branch.").  The Court's February 5th decision did not narrow executive privilege principles recognized in *United States v. Nixon* or *In re Sealed Case*. It held only that Defendants failed to establish a cross-agency attorney-client relationship on the record before the Court.

### B.  No Newly Discovered Evidence

Defendants principally rely on deposition testimony from Nathan Cavanaugh and Justin Fox, which they contend was not available to them when they filed their opposition to Plaintiffs' motion to compel.

The Court is not persuaded that these transcripts qualify as "newly discovered evidence." Cavanaugh and Fox were originally named defendants and were represented by Government counsel in this action.  Government counsel attended and defended their depositions.  There is no doubt that government counsel prepared the witnesses in advance of their depositions.  The Government therefore had contemporaneous knowledge of the substance of the testimony on which it now relies; it cannot have come as a surprise.  If the Government believed that testimony it knew was coming would likely materially affect the pending motion to compel, it could have alerted the Court by supplemental submission or sought a brief extension of its opposition deadline. It did neither.

Under settled law, evidence is not "newly discovered" if it could have been obtained earlier through the exercise of due diligence.  *Pettiford v. City of Yonkers*, 2020 WL 1989419, at *2 (S.D.N.Y. Apr. 27, 2020).  Nor does evidence qualify as "new" where the underlying facts were available prior to the Court's ruling.  *Lima LS PLC v. Nassau Reinsurance Grp. Holdings, L.P.*,

160 F. Supp. 3d 574, 579 (S.D.N.Y. 2015). Because the Government knew – or, at a minimum, could have discovered through reasonable diligence – the substance of this testimony before the Court ruled, the deposition transcripts do not constitute "newly discovered" evidence. *See Castillo v. Altice USA, Inc.*, 2023 WL 8650270, at *4 (S.D.N.Y. Dec. 14, 2023); *cf. Moon Rocket Inc. v. City of New York*, 2025 WL 2324074, at *1 (S.D.N.Y. Aug. 12, 2025).

Even if the transcripts qualified as "newly discovered evidence," they do not support a legally cognizable attorney-client relationship. Cavanaugh testified that Justin Aimonetti was "an attorney at the US DOGE Service and provided us with legal counsel throughout all of our work with the small agencies." Dkt. No. 111-1, at 9. He further stated that communications with Aimonetti were "[p]rimarily around whether an action we were about to take with the agency head was appropriate, either by statute or form or otherwise" and that he and Fox sought "basically a lawyer's opinion on our actions." *Id.* at 10. Fox similarly described Aimonetti as "DOGE legal" who joined meetings and provided "the legal backdrop for every agency." Dkt. No. 111-2, at 7.

This testimony at most demonstrates that Fox and Cavanaugh believed Aimonetti was functioning as a lawyer on their team. But a unilateral subjective belief that a lawyer is acting as counsel does not, by itself, create an attorney-client relationship. *See Kubin v. Miller*, 801 F.Supp. 1101, 1115 (S.D.N.Y. 1992) ("[A]lthough the so-called client's subjective belief can be considered by the court . . . this belief is not sufficient to establish an attorney-client relationship."); *see also Stratavest Ltd. v. Rogers*, 903 F.Supp. 663, 667 (S.D.N.Y. 1995). The Second Circuit has made clear that the privilege attaches only where there is an objectively reasonable expectation that legal advice is being sought from a lawyer acting in that capacity within a recognized attorney-client relationship. *See In re County of Erie*, 473 F.3d at 419. Because the deposition excerpts cited by Defendants do not establish that NEH or GSA entered into an attorney-client relationship with

10

USDS, they do not constitute evidence that "might reasonably be expected to alter the conclusion reached by the court." *Shrader*, 70 F.3d at 257.

Defendants' remaining arguments largely reiterate the same legal theory advanced in their original opposition brief. The Court declines to revisit arguments it has already considered and rejected. Defendants' motion for reconsideration fails on the merits.

**Conclusion**

For the foregoing reasons, Defendants' motion for reconsideration is DENIED.

The Clerk of Court is directed to terminate the motions at Docket Number 110 in *The Authors Guild v. National Endowment for the Humanities*, No. 25-cv-3923 (CM), and Docket Number 209 in *American Council of Learned Societies v. McDonald*, No. 25-cv-3657 (CM), and to remove them from the Court's list of open motions.

This constitutes the decision and order of the Court. It is a written decision.

Dated: February 27, 2026

U.S.D.J.

BY ECF TO ALL COUNSEL