# **EXHIBIT 1**

1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

THE AUTHORS GUILD, et al.,      )
                                )
          Plaintiffs,      )
                                )
     vs.                   ) Civil Action No.
                           ) 25-cv-3923
NATIONAL ENDOWMENT FOR THE      )
HUMANITIES, et al.,             )
                                )
          Defendants.      )
_____  )


VIDEO-RECORDED DEPOSITION OF

JUSTIN FOX

New York, New York

Wednesday, January 28, 2026


Reported Stenographically By:
PATRICIA A. BIDONDE
Registered Professional Reporter
Realtime Certified Reporter
JOB#:  2026-1011068

Justin Fox - January 28, 2026

## 2

January 28, 2026
9:59 a.m.

Videoconference Video-Recorded
Deposition of JUSTIN FOX, held
at the offices of Schindler, Cohen
& Hochman, 100 Wall Street, New York,
New York, before Patricia A. Bidonde,
Stenographer, Registered Professional
Reporter, Realtime Certified Reporter,
Certified eDepoze Court Reporter, Notary
Public of the States of New York, New
Jersey, and Connecticut.

## 3

A P P E A R A N C E S

FAIRMARK PARTNERS, LLP
Attorneys for Plaintiff The Authors Guild
400 7th Street, NW
Suite 304
Washington, D.C. 20004
BY:   YINKA ONAYEMI, ESQ.
yinka@fairmarklaw.com

Via Videoconference:

BY:   AMANDA VAUGHN, ESQ.
amanda@fairmarklaw.com
BY:   SARAH MARTIN, ESQ.
sarah@fairmarklaw.com
BY:   JAMIE CROOKS, ESQ.
jamie@fairmarklaw.com

## 4

A P P E A R A N C E S (CONTINUED)
JACOBSON LAWYERS GROUP PLLC
Attorneys for Plaintiff ACLS
Via Videoconference:
5100 Wisconsin Ave. NW, Suite 301
Washington, D.C. 20016
BY:   KYLA SNOW, ESQ.
kyla@JacobsonLawyersGroup.com
BY:   JOHN ROBINSON, ESQ.
john@JacobsonLawyersGroup.com
BY:   LYNN EISENBERG, ESQ.
lynn@JacobsonLawyersGroup.com

U.S. ATTORNEY'S OFFICE FOR THE SOUTHERN
DISTRICT OF NEW YORK
Attorneys for Defendants
86 Chambers Street, 3rd Floor
New York, New York 10007
BY:   RACHAEL DOUD, ESQ.
rachael.doud@usdoj.gov

ALSO PRESENT:
CHRISTIAN BIDONDE, Legal Video Specialist
Via Videoconference:
JACOB FIGUEROA, Lexitas Document Tech
- - -

## 5

- - -
PROCEEDINGS
- - -
THE VIDEOGRAPHER:  We are now
on the record.  The time is
9:59 a.m. on January 28, 2026.
Audio and video recording will
continue to take place until all
parties agree to go off the record.
Please note that microphones are
sensitive and may pick up whispering
and private conversations.
This is the video-recorded
deposition of Justin Fox in the
matter of The Authors Guild, et al.,
plaintiffs, versus National
Endowment for the Humanities, et
al., defendants.  This deposition is
being held at Schindler, Cohen &
Hochman, LLP, New York, New York.
My name is Christian Bidonde.
I am the legal video specialist.
The certified stenographer is
Patricia Bidonde on behalf of

10

J. Fox
1
2    A.  I'm not sure.
3    Q.  What's your understanding of your
4    relationship with Ms. Doud?
5    A.  She's representing DOJ and
6    assisting me with the deposition today.
7    Q.  Okay.  Great.  So when you say
8    assisting you, I'll ask you some questions
9    about that.  Have you met with Ms. Doud before
10   today?
11   A.  Yes.
12   Q.  When was that?
13   A.  Yesterday.
14   Q.  Any time besides that?
15   A.  Not in person but a few phone
16   calls.
17   Q.  Okay.  I'll ask about the phone
18   calls in a second.  But yesterday, you said,
19   you met with her?
20   A.  Mm-hmm.
21   Q.  And of course she might speak up
22   then and mention that there's some privilege
23   concerns, but -- so I'd advise you to
24   obviously listen to her representations.
25       But how long did you two meet

11

J. Fox
1
2    yesterday?
3    A.  Four hours.
4    Q.  And where was that?
5    A.  Chambers Street, 86 Chambers
6    Street at their offices.
7    Q.  Okay.  Was anyone else in that
8    meeting?
9    A.  For the entirety, no.  I met Mary
10   Ellen and one other lady.
11   Q.  Okay.  Do you remember the other
12   one's name?
13   A.  I don't.
14   Q.  Okay.  And you said that was
15   around four hours?
16       Did you review any documents
17   during that meeting?
18   A.  Mm-hmm.
19   Q.  Did those documents help to
20   refresh your recollection?
21   A.  They helped.
22   Q.  They helped.  Okay.  What kinds of
23   documents did you review?
24   A.  E-mails, communication mostly.
25   Q.  Sorry.  Can you give me some more

12

J. Fox
1
2    color there.  E-mails about what?
3    A.  Yeah, e-mails about NEH, my
4    relationship with Mike, sort of, timeline
5    procedurally our interaction with Mike and
6    NEH.  And by "our," I mean Nate and myself.
7    Q.  So Nate -- documents, kind of,
8    showing communications between you, Nate
9    Cavanaugh, Mike McDonald and others?
10   A.  Yes.
11   Q.  During your time at NEH?
12   A.  Yes.
13   Q.  Did you see any spreadsheets
14   yesterday?
15   A.  Yes.
16   Q.  Could you describe generally what
17   those spreadsheets were?
18   A.  Coordinating feedback on grants
19   primarily, if not exclusively.
20   Q.  And those were NEH grants?
21   A.  Mm-hmm.
22   Q.  Have you talked to anyone besides
23   Rachael, Marie Ellen, and the other attorney
24   about this deposition?
25   A.  No.

13

J. Fox
1
2    Q.  And I want to make a distinction.
3    I asked what -- how you prepared with them.
4    Now I'm asking if you've talked about it
5    generally with anyone.
6    A.  I told my mom this morning.  And I
7    know Nate got deposed or was here last Friday.
8    That's the extent of that.
9    Q.  How do you know Nate was here last
10   Friday?
11   A.  We work together and he was
12   out of -- he was held up here for the day.
13   Q.  How do you know he was here?
14   A.  Well, we work together, so he said
15   he got deposed, we're in the same case.
16   Q.  Yeah, I'm just.
17   A.  Yeah.
18   Q.  Not every time someone doesn't
19   show up to work it means they're being
20   deposed.
21       MS. DOUD:  Objection.
22   A.  Yeah.
23   Q.  How did he tell you that he was
24   being deposed?
25   A.  I don't remember, honestly.

Justin Fox - January 28, 2026

14

J. Fox
1
2      Q.   Did he tell you in person?
3      A.   Yeah.
4      Q.   Did you text about it?
5      A.   No.
6      Q.   Did you communicate about it via
7  any mediums, Signal, WhatsApp, Telegram?
8      A.   No, we work together so we're in
9  person every day.
10      Q.   Do you remember what he said in
11  person to you?
12      A.   No, something close to, I'm
13  getting deposed.
14      Q.   Okay.
15      A.   Yeah.
16      Q.   Sorry.  These are pro forma
17  questions.  So --
18      A.   What do you mean by "pro forma
19  questions"?
20      Q.   I just mean that, you know, these
21  are questions that are, kind of, are usually
22  asked in a deposition.
23      MS. DOUD:  Objection.
24      Q.   So I'm just saying I'm not trying
25  to be invasive.  I'm just asking you about

15

J. Fox
1
2  that.
3      A.   Okay.
4      Q.   So when -- do you remember
5  generally when that was?
6      A.   No.
7      Q.   Have you talked to him since
8  Friday?
9      A.   Yeah.
10      Q.   Okay.  Did you talk to him about
11  his deposition on Friday?
12      A.   No.
13      Q.   Do you have any engagement letter
14  or any formal agreement with Ms. Doud or any
15  other attorneys that you met with?
16      A.   Not that I'm aware of.
17      Q.   Okay.  So I assume you're aware
18  that you helped to gather documents in
19  relation to this case.  Is that right?
20      MS. DOUD:  Objection.
21      Q.   You can answer.
22      A.   I don't know, honestly.
23      Q.   Did you -- I guess, let me ask the
24  question straightforward.
25      A.   Yeah.

16

J. Fox
1
2      Q.   Did you gather any documents for
3  this case?
4      MS. DOUD:  Objection.
5      Q.   You can still answer the question.
6      MS. DOUD:  You can answer.
7      A.   Personally?
8      Q.   Yes.
9      A.   So did I gather documents for the
10  binder that you guys have and we're going to
11  be walking through?  That's the question?
12      Q.   I'm asking whether you engaged in
13  any searches and the gathering of documents
14  for production in this lawsuit?
15      A.   No.  I don't have my laptop, and
16  all of my equipment is turned in.  I'm no
17  longer an employee in the government, so I
18  don't have access to anything.
19      Q.   So dating back to the commencement
20  of this lawsuit, you never engaged in the
21  search for documents related to this case?
22      A.   Not that I'm aware of.
23      Q.   Did you search anything on your
24  personal phone, for instance, in relation to
25  this case?

17

J. Fox
1
2      A.   I didn't need to.
3      Q.   Did you search anything on your
4  laptop or laptops in relation to this case?
5      A.   I don't have access to my laptops
6  anymore.
7      Q.   Okay.  And when you say your
8  laptops, you mean -- what do you mean?
9      A.   NEH and GSA laptops.
10      Q.   Do you have a personal laptop?
11      A.   Yeah.
12      Q.   Would those -- would that laptop
13  have ever stored documents related to your
14  time at NEH?
15      A.   No.
16      Q.   So you turned over -- excuse me --
17  you gave back your work phone after leaving
18  NEH?
19      Approximately when was --
20      A.   Yes.
21      Q.   Sorry.  Go ahead.
22      A.   That's it.  Yes.  I just wanted to
23  verbally respond.
24      Q.   I appreciate that.
25      A.   Yeah.

18

```
1              J. Fox
2       Q.   And you turned over your work
3    laptop as well upon leaving?
4       A.   Yes.
5       Q.   Did you ever use your personal
6    phone to do any work or talk about any of your
7    work related to NEH?
8       A.   Related to NEH work, no.
9       Q.   What about related to any of your
10   work with any DOGE teams or GSA?
11      A.   Coordinating locations and meeting
12   in person, yes.
13      Q.   But you never searched that phone
14   for communications related to this case?
15      A.   There was nothing on my personal.
16   I had experience previously in finance.
17   Everything needed to be kept on a separate
18   phone. All of the tangible work-related
19   communications were done over my GSA.
20      Q.   So you didn't turn over any
21   documents, any communications in relation to
22   this case?
23      A.   There was nothing on there.
24      Q.   Did anyone ask you to do that?
25      MS. DOUD:  Objection.
```

19

```
1              J. Fox
2       A.   I don't remember.
3       Q.   Sorry?
4       A.   I don't remember.
5       Q.   You don't remember if anyone asked
6    you to turn over documents and communications?
7       MS. DOUD:  Objection.
8       A.   Yeah, I don't remember.
9       Q.   Did Ms. Doud ask you to turn over
10   any communications or documents in relation to
11   this case?
12      A.   I remember her asking if I had
13   documents to turn over, of which I have
14   nothing.
15      Q.   Okay. And you told her no?
16      A.   I have nothing.
17      Q.   Did you search when she asked you
18   that question?
19      A.   I don't have anything on my
20   personal because I never used my personal
21   for --
22      Q.   Okay. I understand.
23      MR. ONAYEMI:  I forget his
24   name.
25      Jacob, are you still there?
```

20

```
1              J. Fox
2       DOCUMENT TECH:  Yes.
3       MR. ONAYEMI:  Great. If you
4    could pull up Tab 1-A for
5    presentation.
6       DOCUMENT TECH:  Is this
7    Exhibit 1 or Exhibit 1A?
8       MR. ONAYEMI:  It's Exhibit 1.
9    It's called Tab 1-A in the folder.
10   And we'll call this Fox Exhibit 1.
11      (Fox Exhibit 1, Subpoena for
12   Justin Fox, marked for
13   identification, as of this date.)
14   BY MR. ONAYEMI:
15      Q.   The text is a little small. Can
16   you see that?
17      MR. ONAYEMI:  I think Jacob
18   could probably figure it out. I see
19   it up there. It's okay. I think if
20   he just zooms in, we'll be okay.
21      Q.   Can you guys see it?
22      A.   Yeah, for the most part.
23      MR. ONAYEMI:  I think we can
24   probably do a few more clicks on the
25   plus, and then we'll be perfect.
```

21

```
1              J. Fox
2    Nice. There we go. I think that's
3    okay. We can see that. We
4    appreciate it.
5       Q.   Can you see that?
6       A.   Yeah.
7       Q.   Okay. Can you read the text?
8    That's what's important.
9       A.   Yes.
10      Q.   Yes? Okay.
11      Have you seen this document
12   before? You can scroll through it if you'd like
13   to see more of it. There's several pages.
14      A.   Yeah, I don't know honestly.
15      MR. ONAYEMI:  Jacob, could
16   you, like, toggle downwards a little
17   bit and just, kind of, show some
18   more pages of the document for the
19   witness. You can keep going faster
20   than that. There's -- are a lot of
21   pages.
22      A.   (Document review.)
23      Q.   Does this look familiar?
24      A.   Yeah, I think so.
25      Q.   So you can -- would you say that
```

22

```
1              J. Fox
2   you've seen this document before?
3        A.  Yes.
4              MR. ONAYEMI:  Okay.  Thank
5   you.
6        Q.  Who showed you this document?
7        A.  Rachael had sent it to me.
8              MR. ONAYEMI:  You can stop
9   there, Jacob.  Thank you.  So if you
10  could go up, Jacob, just to, maybe,
11  yeah, scroll up a little bit.
12       A.  What is Exhibit A?  It said -- if
13  you scroll down, it says "see attached Exhibit
14  A. " Is that?
15             MR. ONAYEMI:  Yeah, right
16  here.  You can stop there, Jacob.
17  Thanks.  That's good.  So yeah, if
18  you just scroll down a little bit
19  more Jacob, we're going to go to
20  page 3.  Actually keep going, like,
21  maybe page 4.  Great.  Okay.  So you
22  can stop there.
23       Q.  "Instructions."  Great.
24             So you see this instructions
25  section?  Have you seen this before?
```

23

```
1              J. Fox
2        A.  Yes.
3              MR. ONAYEMI:  And if you could
4   keep scrolling down, Jacob, to the
5   part -- just scroll down and I'll
6   tell you when to stop.
7        Q.  Okay.  "Relevant time period,"
8   right here.  All right.  So this says:
9             "Relevant time period, unless
10            otherwise noted in the body of a
11            request, the relevant time period
12            for these requests is November 1,
13            2024, through the present.  These
14            requests seek all responsive
15            documents created or generated
16            during the relevant time period as
17            well as responsive documents created
18            or generated outside the relevant
19            time period, but which contain
20            information concerning the relevant
21            time period."
22             So when Ms. Doud asked you to
23  search for documents and communications
24  related to your time at NEH, did you search
25  documents and communications dating back to
```

24

```
1              J. Fox
2   November 1, 2024?
3              MS. DOUD:  Objection.
4        A.  I didn't have any government
5   laptop or computer, and there was nothing in
6   my personal.
7        Q.  Okay.  How do you know there was
8   nothing on your personal, did you look?
9        A.  I never used it.
10       Q.  You noted earlier that you spoke
11  with some of your DOGE and GSA colleagues via
12  your personal phone.
13             Did you search those
14  communications for relevant information?
15       A.  There's nothing on my personal
16  related to NEH communication.  I had no need
17  to search my personal.
18       Q.  How do you know there was nothing
19  on your personal related to NEH?
20       A.  I never used it for NEH purposes.
21       Q.  Okay.  But you used it for DOGE
22  purposes?
23       A.  For coordinating where people
24  were, meeting in person, yes.
25       Q.  So we're going to run through the
```

25

```
1              J. Fox
2   request for production really quickly.  So can
3   you see that there's the first bullet there?
4   It says:
5             "All documents and
6             communications relating to your
7             deployment to NEH and any
8             assignments or instructions given to
9             you relating to your work at NEH."
10             Do you see that?
11       A.  Mm-hmm.
12       Q.  Okay.  Is it your testimony that
13  you don't have any documents in your
14  possession that are responsive to Subject
15  Number 1?
16       A.  Yes.
17       Q.  Okay.
18             MR. ONAYEMI:  You can scroll
19  down, Jacob, to just, yeah, so 2 is
20  at the top.  Thanks.  Okay.
21       Q.  This is searching -- asking for
22  documents related to the mass terminations
23  and -- with respect to NEH.  None of those
24  communications on your phone or laptop?
25             MS. DOUD:  Objection.
```

26

J. Fox

1           J. Fox
2       A.   (Document review.)
3           Could you repeat the question.
4       Q.   I can change the question.  Did
5   you do anything to search for anything related
6   to these subjects under Number 2 in
7   particular?
8       A.   I had no need to.
9       Q.   Okay.
10          MR. ONAYEMI:  Let's go down to
11  number 3, Jacob.
12      Q.   So Number 3 and 4, those are both
13  with respect to NEH.  Did you do anything
14  to search for those documents?
15      A.   (Document review.)
16          Number 3?
17      Q.   And Number 4.
18      A.   (Document review.)
19          Again, there was no work I was
20  doing with NEH on my personal.
21      Q.   That's okay.  Number 6 is about
22  DOGE.  Did you do anything to search for any
23  documents related to Request Number 6?
24      A.   (Document review.)
25          The mass termination, I presume

27

J. Fox

1           J. Fox
2   this is NEH.  Is that right?  It says --
3       Q.   I think that's correct.
4       A.   -- "execution of mass
5   termination."  All of that communication was
6   done via my GSA laptop, phone.
7       Q.   Okay.  Thanks.  All right.
8           MR. ONAYEMI:  If you could
9   slowly scroll down, Jacob, just to
10  the end.  I think the last one is
11  Number 10, Request Number 10.  Okay.
12      Q.   And is it fair to say, looking at
13  this, and given that NEH is listed in 8, 9,
14  and 10, that your response to those would be
15  the same as the prior responses with respect
16  to your communications and searching for them?
17          MS. DOUD:  Objection.
18      A.   Could I clarify, when Rachael says
19  "objection"?
20          MS. DOUD:  You still answer,
21  unless -- yeah.  You generally still
22  answer.
23          THE WITNESS:  Okay.
24          MS. DOUD:  So you can --
25  that's for the record.

28

J. Fox

1           J. Fox
2           THE WITNESS:  Okay.
3           MS. DOUD:  So just allow a
4   little bit of time for me to object,
5   but then you just answer.
6           THE WITNESS:  Okay.
7       A.   Could you repeat the question.
8       Q.   Did you do anything to search for
9   documents or communications responsive to
10  requests Number 8, 9, and 10?
11      A.   (Document review.)
12          Okay.  One more time.  I'm sorry.
13  I just read through those bullets.  Could you
14  repeat the question.
15      Q.   Did you undergo any efforts to
16  identify, gather, or produce documents that
17  would have been responsive to Requests 8, 9,
18  and 10?
19      A.   My personal phone was used for no
20  NEH communication work.  Yeah.
21      Q.   I want to talk a little bit about
22  the extent of your conversations with DOGE
23  people on your personal phone.
24          Who would you have been
25  communicating with on your personal phone at

29

J. Fox

1           J. Fox
2   DOGE or GSA?
3       A.   Nate, the team members on my team,
4   Ethan Shaotran, Justin Aimonetti, a few
5   others.
6       Q.   Michael McDonald?
7       A.   No.
8       Q.   Did you ever call him from your
9   personal phone?
10      A.   No.
11      Q.   Never text him from your personal
12  phone?
13      A.   No.
14      Q.   Okay.  Do you remember when you
15  were given a government phone, a work phone?
16      A.   My first day.
17      Q.   Before your first day, were you in
18  touch with anyone from DOGE or the government?
19      A.   Yeah.
20      Q.   How did you communicate with them
21  before you got your government phone?
22      A.   Signal.
23      Q.   Anything else?
24      A.   No.
25      Q.   And who was it that you were

30

J. Fox

1  communicating with before you were issued a
2  government phone?
3  government phone?
4      A.  Anthony Armstrong, Josh Gruenbaum,
5  Nate Cavanaugh.
6      Q.  Anyone else?
7      A.  Ethan Shaotran.
8      Q.  Who were the first two people?
9      A.  Anthony Armstrong.
10     Q.  Who is that?
11     A.  One of the leadership within DOGE
12 that I initially communicated with.
13     Q.  Okay.  And who is the second name?
14     A.  Josh Gruenbaum.
15     Q.  Who is that?
16     A.  Head of federal acquisition
17 services for GSA.
18     Q.  Okay.  Thank you.  And how -- you
19 said you were communicating with them via
20 Signal?
21     A.  Signal.
22     Q.  And nothing else besides Signal?
23     A.  No.
24     Q.  Was that group chat or were they
25 individual communications with each one of

31

J. Fox

1  them?
2      A.  Some group chat, some individual.
3      Q.  Okay.  And then once you were
4  hired by the government, did you migrate all
5  of those communications to your government
6  phone?
7      MS. DOUD:  Objection.
8      A.  With those individuals, no.
9      Q.  Okay.  So you were still
10 communicating with Nate Cavanaugh, Ethan
11 Shaotran, and the other two on your personal
12 phone after being hired.  Is that right?
13     A.  Yes.
14     Q.  Okay.  And did you do anything to
15 search those communications in response to any
16 of those requests that we've gone through from
17 your subpoena?
18     A.  They were all deleted
19 automatically.  That's the default setting in
20 Signal.
21     Q.  And you don't think that you ever
22 spoke to them on any other service beyond
23 Signal, including Nate, for instance?
24     A.  No.

32

J. Fox

1      Q.  The Signal platform, can you tell
2  me a little bit about it.  You mentioned auto
3  delete, can you explain what you mean.
4      MS. DOUD:  Objection.
5      A.  It's a messaging and calling
6  platform that everybody was using that I
7  downloaded to communicate with Nate, Josh,
8  Anthony.
9      Q.  Okay.  Did you download it
10 specifically to communicate with those people?
11 How did they tell you to download Signal?
12     A.  Download Signal and call me there.
13     Q.  Okay.  But did they tell you that
14 in person?
15     A.  Anthony Armstrong, I had -- he was
16 a mentor of mine.  And he said, Download
17 Signal, I want to talk to you about
18 potentially joining.  So all of our
19 communications were on Signal.
20     Q.  Okay.  How did Mr. Armstrong tell
21 you that?
22     A.  In person.
23     Q.  In person.  Okay.  Were you
24 sharing text messages with Mr. Armstrong
25

33

J. Fox

1  before you downloaded Signal?
2      A.  Yes.
3      Q.  Ever about DOGE?
4      A.  No.
5      Q.  Did you search those texts to come
6  to the understanding that you never texted him
7  about DOGE?
8      A.  I remember him being very focused
9  on switching to Signal to talk about anything.
10     Q.  Okay.  Thank you.  I appreciate
11 that.  So stepping back from all these
12 communications.
13     MR. ONAYEMI:  And we can pull
14 down Exhibit 1, thank you, Jacob.
15     Q.  Did you bring any documents with
16 you today to the deposition?
17     A.  No.
18     Q.  When did you first become aware of
19 this lawsuit?
20     A.  At some point in government.  I
21 don't remember when exactly.
22     Q.  Do you remember how you became
23 aware of it?
24     A.  Like, a letter came addressed to

34

J. Fox

1  me and Nate. I don't remember when, but it
2  was printed out, physical form.
3      Q.  Okay. Great. And was that sent,
4  you said while you were at government, I
5  think. You were still working for the
6  government when you received that?
7      A.  Which one?
8      Q.  Sorry. When you received the --
9  when you learned, I presume through the
10  complaint, that there was a lawsuit that had
11  your name on it.
12      MS. DOUD: Objection.
13      A.  Yes.
14      Q.  Have you read the complaint?
15      A.  Yes.
16      Q.  Okay. Do you understand the
17  nature of the allegations in the complaint?
18      A.  I think so.
19      Q.  What's your understanding of the
20  allegations?
21      A.  I honestly could not articulate.
22  It's -- there are a few. So you'd have to be
23  specific about which one.
24      Q.  So let's start with the Authors

35

J. Fox

1  Guild's complaint. Do you -- are you aware of
2  that complaint?
3      A.  I'm aware of it, yeah.
4      Q.  Do you understand the nature of
5  the allegations in it?
6      MS. DOUD: Objection.
7      A.  Not -- not to the level that you
8  might. But yes, for the most part.
9      Q.  Could you describe your
10  understanding of those allegations?
11      MS. DOUD: And I'm just going
12  to caution that if your
13  understanding is informed by things
14  that attorneys told you --
15      THE WITNESS: Yes.
16      MS. DOUD: -- to be aware of
17  that, and to not reveal privileged
18  communications.
19      THE WITNESS: Okay.
20      MS. DOUD: But otherwise you
21  can answer.
22      A.  Could you repeat the question.
23      MR. ONAYEMI: Do you mind
24  reading back the question for the

36

J. Fox

1  witness.
2      (Record read by the certified
3  stenographer as follows:
4      "QUESTION: Could you describe
5  your understanding of those
6  allegations?")
7      A.  Grants were terminated by Michael
8  at the same time we were working with him.
9  And Authors Guild disagrees with the method
10  and reason these grants were terminated, and
11  they want to learn more --
12      Q.  Sure.
13      A.  -- about the process. And that's
14  my understanding.
15      Q.  Thank you. Is that your
16  understanding of the nature of the ACLS
17  complaint as well?
18      A.  That would be my understanding.
19      Q.  Okay. Thanks. Are you currently
20  employed?
21      A.  Yes.
22      Q.  Who is your employer?
23      A.  A company that Nate and I started.
24      Q.  What's it called?

37

J. Fox

1      A.  Special.
2      Q.  Special? Since when have you been
3  at Special?
4      A.  October 1.
5      Q.  2025?
6      A.  2025.
7      Q.  And you said you and Nate started
8  it. Is that right?
9      A.  Yes.
10      Q.  So are you like a co-founder of
11  the company?
12      A.  Yes.
13      Q.  What's your role within the
14  company?
15      A.  Co-founder.
16      Q.  What do you do as the co-founder?
17      A.  Anything that needs to be done.
18  That's hard to --
19      Q.  It's okay. I'll ask more pointed
20  questions.
21      What's the nature of the service
22  that Special provides?
23      A.  We are buying businesses in senior
24  care, adopting technology to pay the nurses

38

J. Fox

1 and caregivers more so that the aging
2 population has enough nurses to meet demand.
3
4 Q. Okay. And sorry, when did you say
5 that you started there? October 2025? Is
6 that right?
7 A. Yes.
8 Q. And where were you employed prior
9 to that?
10 A. GSA.
11 Q. GSA. When did you start at GSA?
12 A. March 3, I believe.
13 Q. That's 2025?
14 A. 2025.
15 Q. And how long did you stay at GSA?
16 Sorry, strike that. Better question.
17 When did you leave GSA?
18 A. Mid September.
19 Q. Okay. 2025?
20 A. Yes.
21 Q. So give or take six months at GSA?
22 A. Yes.
23 Q. What was your job title, official
24 title at GSA?
25 A. Senior advisor to Stephen Ehikian.

39

J. Fox

1
2 Q. To who?
3 A. Stephen Ehikian, head of GSA at
4 the time.
5 Q. Okay. We'll come back to that.
6 And before March 3, 2025, where
7 were you employed?
8 A. Financial firm in Los Angeles.
9 Q. Was that Nexus Capital?
10 A. That's right.
11 Q. That's a private equity firm?
12 A. Yes.
13 Q. And that was based in Los Angeles?
14 A. Yes.
15 Q. What was your title there?
16 A. Associate.
17 Q. Okay. And when did you leave
18 Nexus?
19 A. The end of September, the Friday
20 before I started at GSA.
21 Q. Okay. So left on Friday, joined
22 GSA Monday. Is that fair to say?
23 A. Yes.
24 Q. Okay. Honestly, I'm not too
25 familiar with how private equity works. Are

40

J. Fox

1
2 there groups? Specialties within private
3 equity? Were you doing anything in
4 particular?
5 A. Sometimes there are groups. I was
6 generalist, meaning no specific group.
7 Q. And roughly what was your income
8 at Nexus Capital?
9 A. I don't remember.
10 Q. Ballpark?
11 A. 130,000.
12 Q. Okay. Is that prebonus?
13 A. Prebonus.
14 Q. And then with the bonus, generally
15 what would be added to that?
16 A. Anywhere from zero to 100.
17 Q. And before then you were an
18 investment banking analyst at Jefferies. Is
19 that right?
20 A. Yes.
21 Q. Sorry. When did you start at
22 Nexus? Do you remember that?
23 A. 2023.
24 Q. Okay. And before that you were at
25 Jefferies?

41

J. Fox

1
2 A. Yes.
3 Q. Okay. And I'm skipping back to
4 GSA very quickly. Do you remember your salary
5 at GSA?
6 A. 150.
7 Q. Okay. So you were making more in
8 base rate for GSA than you were for your
9 private equity firm?
10 A. I believe so.
11 Q. Okay. Thank you.
12 You attended University of
13 Virginia. Right?
14 A. Yes.
15 Q. When did you graduate from there?
16 A. 2020.
17 Q. What was your major?
18 A. Commerce.
19 Q. Did you have any minors while you
20 were at UVA?
21 A. German.
22 Q. German, okay. Commerce major,
23 German minor? All right. And graduated in
24 2020.
25 Did you belong to any clubs at

42

```
1          J. Fox
2   UVA?
3      A.  Yeah.
4      Q.  Which ones?
5      A.  An investment club.  A community
6   service club called Lions Club.  TEDx club.
7          (Stenographer clarification.)
8      A.  TEDx, like Ted talks.  Yeah,
9   that's it.
10     Q.  Any clubs or organizations outside
11  of UVA that you were a part of while you were
12  studying there?
13     A.  No.
14     Q.  Any internships while you were
15  there?
16     A.  Yes.
17     Q.  Was one with Jefferies?
18     A.  No.
19     Q.  Can you briefly tell us what --
20  where you interned while you were at UVA?
21     A.  In Arlington doing wealth
22  management at Morgan Stanley, and then in
23  Atlanta at VRA Partners, and then full time
24  started at Jefferies.
25     Q.  Okay.  Great.  Do you have any
```

43

```
1          J. Fox
2   graduate degrees?
3      A.  No.
4      Q.  And no PhDs, doctorates, anything
5   like that?
6      A.  No.
7      Q.  Before joining the government in,
8   I think it was March of 2025, did you have any
9   experience in government?
10     A.  No.
11     Q.  Okay.  Were you ever part of any
12  political campaigns?
13     A.  No.
14     Q.  Did you ever engage in any public
15  grant administration before you joined
16  government?
17     A.  No.
18     Q.  Private grant administration?
19     A.  No.
20     Q.  Had you ever engaged in anything
21  that required you to review scholarship for
22  scholarly merit before you joined the
23  government?
24     A.  I can't remember.  There may have
25  been a few scholarship grants that we awarded
```

44

```
1          J. Fox
2   at, for example, TEDx.
3      Q.  Did you ever review any humanities
4   projects for scholarly merit prior to joining
5   the government?
6      A.  No.
7      Q.  Did you ever have any relation or
8   involvement with the National Endowment for
9   the Humanities before joining government in
10  March of 2025?
11     A.  No.
12     Q.  Were you familiar with the NEH
13  before you joined the government?
14     A.  No.
15     Q.  Were you familiar with the
16  Administrative Procedures Act before you
17  joined the government?
18     A.  No.
19     Q.  So let's switch gears to the
20  process of you joining the government.
21         You noted that you had a
22  conversation with someone that you knew.
23  Could you remind me of that name?
24     A.  Anthony Armstrong.
25     Q.  Anthony Armstrong.  And you
```

45

```
1          J. Fox
2   testified that Anthony Armstrong told you to
3   download Signal.  Is that right?
4      A.  Yes.
5      Q.  And that was to discuss an
6   opportunity in joining the government.  Is
7   that right?
8      A.  Yes.
9      Q.  Prior to that, had you had any
10  conversations with anyone about joining the
11  government?
12     A.  No.
13     Q.  Okay.  How did you know Anthony
14  Armstrong?
15     A.  He's the father of one of my
16  friends.
17     Q.  Okay.
18     A.  We worked in the same field.  He
19  was a mentor to me.
20     Q.  What field is that?
21     A.  Investment banking.
22     Q.  Okay.  Did you work with him
23  actually?
24     A.  No.
25     Q.  Where did he work?
```

46

J. Fox

1
2    A.   Morgan Stanley.
3    Q.   And so he told you to download
4    Signal.  And why did he tell you to download
5    Signal?
6         MS. DOUD:  Objection.
7    Q.   Strike that.  Sorry.
8         Do you have an understanding of
9    why he asked you to download Signal?
10   A.   No.
11   Q.   But he asked you to download
12   Signal to communicate about government work.
13   Right?
14        MS. DOUD:  Objection.
15   A.   About an opportunity for me to
16   join the government, yes.
17   Q.   And can you describe what that
18   opportunity was?
19   A.   They were recruiting for
20   hardworking individuals to join GSA and find
21   government efficiencies.  My background suited
22   well.  Move as soon as you can.  That was the
23   scope of it.
24   Q.   Did he tell you anything else in
25   those conversations about the nature of the

47

J. Fox

1
2    role?
3    A.   Just that it was going to be a lot
4    of really hard work, and that was -- he
5    honestly was not sure where I would go, but to
6    talk with Josh Gruenbaum, see if there's a fit
7    with his team.  And that was when I spoke with
8    Josh.  But no, otherwise, the nature of the
9    work, no.
10   Q.   Okay.
11        Do you have any understanding of
12   how Mr. Armstrong knew Mr. Gruenbaum?
13   A.   No.
14   Q.   Okay.  How did he put you in touch
15   with him?
16   A.   Signal.
17   Q.   Through, like, a group chat or
18   something?
19   A.   Yes.
20   Q.   How did you feel being reached out
21   to about joining the government while you were
22   at Nexus Capital?
23   A.   Interested.
24   Q.   What made you interested in that?
25   A.   I hated private equity.

48

J. Fox

1
2    Q.   Fair enough.  Anything else?
3    A.   An opportunity to work with other
4    hardworking people and address the spending
5    deficit.
6    Q.   Was that something that you were
7    particularly interested in, the spending
8    deficit?
9    A.   Not until Anthony reached out had
10   I -- that I dug into it, really, and yes, it
11   seemed like a very pressing issue.
12   Q.   What made you feel like it was a
13   pressing issue or -- strike that.
14        Prior to you digging in, while you
15   were digging in, what did you see that made
16   you think that it was a pressing issue?
17   A.   There's a spending deficit of
18   $2 trillion.  Part of that is related to
19   government spending in excess of the income
20   that it's generating, and government spend has
21   done nothing but go up to the right, and it's
22   the most controllable piece of the equation,
23   in my opinion, of the spending deficit, and
24   the group that was being recruited for this
25   was meant to address that problem.  And I felt

49

J. Fox

1
2    compelled to help.
3    Q.   Okay.  Do you feel that you've
4    succeeded, looking back now, in achieving that
5    goal?
6    A.   In some ways, yes.
7    Q.   Did the deficit go down during
8    your tenure at the government?
9    A.   In other ways, no.  I think having
10   somebody check to see where taxpayer dollars
11   were going that was an unbiased third-party
12   auditor of commonsense approach to spending
13   has never happened before in the history of
14   the government, and now we've established that
15   it's possible.
16        I do feel it was a success in the
17   sense that people will be more understanding
18   that these aren't just numbers on a page, that
19   they add up into something that's bigger than
20   what they're working on.  And I think that, in
21   that way it was successful.
22   Q.   So we'll review some of the
23   methods that your team used to attempt to
24   reduce the deficit later in the deposition.
25        But for now, let's stick on, kind

50

J. Fox

1    of, how you joined GSA and how you got
2    involved with DOGE.
3
4        So Mr. Armstrong reached out, and
5    this was specifically about the GSA. Is that
6    right?
7        MS. DOUD: Objection.
8        A. I don't remember.
9        Q. Did he mention DOGE at any point
10   during these conversations?
11       A. Yes.
12       Q. What did he say about DOGE?
13       A. A group of people being onboarded
14   into agencies to partner with leaders and find
15   efficiencies.
16       Q. And how did you understand the
17   relationship between GSA and DOGE while you
18   were in these conversations with
19   Mr. Armstrong?
20       A. I didn't give it much thought.
21       Q. Understandable. So you were still
22   at Nexus and looking at government, and it
23   all, kind of, blended together.
24       Is that fair to say?
25       MS. DOUD: Objection.

51

J. Fox

1    A. No, I had known about the distinct
2    parts of government. I knew that GSA was the
3    closest to a business side focused on
4    contracts and government services, yeah.
5        Q. And so after Mr. Armstrong
6    introduced you to Mr. Gruenbaum, did you
7    continue communicating with Mr. Armstrong
8    about GSA and DOGE issues?
9        A. No, not about GSA. Josh connected
10   me with the White House liaison for GSA that
11   I'm blanking on the name for, Ryan -- Ryan
12   Leppert.
13       Q. So at this point, Mr. Armstrong
14   was your first point of contact into the
15   government. Is that right?
16       A. Yes.
17       Q. And then he introduced you to
18   Mr. Gruenbaum --
19       A. Yup --
20       Q. -- is that right? And
21   Mr. Gruenbaum introduced you to Mr. Ryan
22   Leppert. Is that right?
23       A. Yes.
24       Q. Was there anyone else at the time

52

J. Fox

1    that you were talking to about government
2    work?
3        A. Not that I can remember.
4        Q. Did you learn anything from
5    Mr. Gruenbaum that Mr. Armstrong hadn't told
6    you?
7        A. Yes, about federal acquisition
8    services, but I'm also remembering that Mike,
9    the head of GSA buildings, I also spoke with.
10   I forget his last name. But he's -- I think
11   he's still the head of GSA buildings. But
12   that was another short conversation.
13       Q. Who is this person?
14       A. Mike is the head of buildings at
15   GSA.
16       Q. Okay.
17       A. And forgive me, I don't remember
18   his last name.
19       Q. How were you communicating with
20   Mike?
21       A. Again, another group chat in
22   Signal.
23       Q. Okay.
24       A. After that, Ryan Leppert began my

53

J. Fox

1    onboarding forms.
2        Q. Okay.
3        A. And Ryan was over e-mail.
4        Q. Over e-mail?
5        A. Yes.
6        Q. So that was not over Signal?
7        A. Yes.
8        Q. Did you do anything to search for
9    those communications in preparation for this
10   litigation?
11       A. Yes, although none related into my
12   NEH work.
13       Q. Okay. So just so I understand,
14   you were looking at your e-mails and making a
15   call on your own about what related and what
16   didn't relate to the nature of the litigation?
17       MS. DOUD: Objection.
18       A. Could you repeat.
19       Q. I can ask it differently.
20       How were you assessing what was
21   responsive to what was being requested in this
22   litigation?
23       A. NEH-related directions and, sort
24   of, what brought me to NEH in the first place,

54

J. Fox

1    and the scope of that as opposed to GSA.
2    Q.   Okay.  So who is Mr. -- who is
3    Josh?
4    A.   Josh Gruenbaum.  GSA's head of
5    federal acquisition services.
6    Q.   Okay.
7    A.   He's one of the lead guys at GSA,
8    I think still.
9    Q.   Did you have any formal
10   conversations and interviews -- strike that
11   actually.
12        Did you formally interview for
13   your role with GSA?
14   A.   I don't remember.  The answer is I
15   don't remember.  There were others in GSA
16   security and background check individuals,
17   yeah, I don't remember.
18   Q.   This was less than a year ago.
19   You don't remember if you had any interviews
20   to start working in government?
21        MS. DOUD:  Objection.
22   A.   I don't remember specifically.  I
23   couldn't give you exactly one interview.
24   Q.   You can give me many.  Who are the

55

J. Fox

1    people you talked to in the run-up to being
2    hired by GSA?
3    A.   Ryan Leppert.
4    Q.   Who else?
5    A.   I don't remember the names.
6    Q.   But you talked to other people?
7    A.   I -- I don't remember exactly.
8    There were so many conversations going on then
9    that some of them may have been GSA, some of
10   them may have been affiliates of other
11   agencies.
12   Q.   Like DOGE?
13   A.   For example, like DOGE.  But there
14   were many conversations.
15   Q.   Okay.
16   A.   A lot of onboarding, a lot of
17   background checks.
18   Q.   Okay.  So let's just take a step
19   back then.  It sounds like what you're
20   describing is, kind of, chaotic.  There were a
21   lot of background checks, lots of interviews.
22        That's what you're describing?
23        MS. DOUD:  Objection.
24   Q.   You can answer.  I mean --

56

J. Fox

1    A.   It was chaotic personally, I was
2    leaving my existing job.  I may be conflating
3    the conversations, like, the chaos that was
4    ensuing from moving across the country.  I
5    don't remember is the honest answer.
6    Q.   Okay.
7    A.   It's been a year and change, now.
8    Q.   Well, not a full year yet?
9    A.   A year.
10   Q.   I'm sorry.  I just need to gather
11   some names.  So Anthony Armstrong, Josh
12   Gruenbaum, Ryan Leppert.
13   A.   Mm-hmm.
14   Q.   You mentioned earlier that you
15   might have had conversations via Signal with
16   Nate Cavanaugh for instance.
17        Were you in conversations with him
18   before joining?
19        MS. DOUD:  Objection.
20   A.   No.  Before joining GSA on
21   March 3?
22   Q.   Yes.
23   A.   Yes.
24   Q.   And I'm sorry if you said this

57

J. Fox

1    already, do you remember when Mr. Armstrong
2    actually reached out to you and asked you to
3    move on to Signal?
4    A.   Some point in January.
5    Q.   In January?  Okay.
6    A.   Yeah.
7    Q.   Was this before the inauguration
8    on January 21?
9    A.   Shortly thereafter, if not, all on
10   Jan 20.
11   Q.   Okay.  So he reached out to you on
12   January -- well, not reached out, but asked
13   you to move on to Signal on January 20 or
14   thereabouts.  You ended up officially joining
15   GSA in March.
16        Talk to me about the time in
17   between.  What was going on?
18        MS. DOUD:  Objection.
19   A.   I was still working at my existing
20   job and had a few conversations with the folks
21   that I already mentioned, Anthony Armstrong,
22   Josh Gruenbaum, Mike Sullivan I believe is the
23   name of the head of buildings for GSA.
24   Q.   Okay.

58

J. Fox

1
2    A.   All of them were looking for
3    hardworking individuals.  I was still working
4    my existing job.  So it was just a lot going
5    on.
6        Q.   Okay.  And would you have been
7    communicating with all of these individuals
8    with the exception of Ryan Leppert via Signal
9    exclusively?
10       A.   Yes.
11       Q.   Is there any possibility you spoke
12   with any of them off of Signal?
13       A.   Possibility.  I have Anthony's
14   personal number but we only spoke on Signal.
15       Q.   Okay.  Did you meet anyone that
16   might have been a higher up at DOGE in the
17   lead up to being hired by GSA?
18       A.   Not that I can remember.  Not that
19   I can remember.  Those guys were leadership.
20       Q.   So did you ever -- so upon
21   starting at GSA, what did you understand your
22   role was going to be with government?
23       A.   To help Nate with whatever he was
24   working on.
25       Q.   And that's Nate Cavanaugh?

59

J. Fox

1
2    A.   Yes.
3        Q.   Who told you that would be your
4    role with the government?
5        A.   Anthony Armstrong.
6        Q.   Anyone else?
7        A.   Not that I can remember.
8        Q.   Did you meet Steve Davis before
9    you joined the GSA on March 3rd?
10       A.   No.
11       Q.   Do you know who Steve Davis is?
12       A.   Yes.
13       Q.   Did you meet Amy Gleason before --
14       A.   No.
15       Q.   -- joining GSA?
16       A.   No.
17       Q.   Okay.  What about Ethan Shaotran?
18       A.   Yes.
19       Q.   How did you meet Ethan Shaotran?
20       A.   Over Signal, the same as I'd met
21   with Nate.
22       Q.   So was there -- it sounds like
23   you're meeting a lot of people via Signal at
24   this time.  Is that right?
25       MS. DOUD:  Objection.

60

J. Fox

1
2    A.   Most of the DOGE affiliates, yeah.
3        Q.   Tell me who these DOGE affiliates
4    were.
5        A.   You've just listed them.
6        Q.   Anyone else?
7        A.   Not that I can remember, prior to
8    DOGE -- prior to joining, those were the
9    folks.
10       Q.   Nate Cavanaugh?
11       A.   Nate Cavanaugh, Ethan Shaotran,
12   Anthony Armstrong, Josh Gruenbaum, Mike
13   Sullivan, I believe is his last name, head of
14   GSA buildings.
15       Am I missing anybody?
16       Q.   You tell me.  This is your life.
17       A.   I don't remember.  These are the
18   names that I remember being early in the
19   conversations.  After joining, you can imagine
20   it's a mess.
21       Q.   Right.
22       A.   But those are the folks that were
23   core communications.
24       Q.   Okay.
25       MS. DOUD:  Could we take a

61

J. Fox

1
2    quick break?
3        MR. ONAYEMI:  Definitely.  Why
4    don't we go off the record for a few
5    minutes.
6        THE VIDEOGRAPHER:  The time is
7    11:07 a.m.  This concludes Media 1.
8    Off the record.
9        (Recess taken from 11:07 a.m.
10   to 11:21 a.m.)
11       THE VIDEOGRAPHER:  The time is
12   11:21 a.m.  This begins Media 2.  On
13   the record.
14   BY MR. ONAYEMI:
15       Q.   Hi Justin.
16       A.   Hey.
17       Q.   Let's pick up where we left off.
18   Did you ever receive an official offer to join
19   government?
20       A.   Yes.
21       Q.   Okay.  And what was the form of
22   that official offer?
23       A.   A PDF document.
24       Q.   Who sent that to you?
25       A.   I don't remember.

62

J. Fox

1
2       Q.   Was that sent to your personal
3   e-mail address?
4       A.   Yes.
5       Q.   Okay.  Do you remember generally
6   what the offer said -- strike that.
7           Do you remember what kind of
8   details were on that PDF?
9       A.   Position, location of work, salary
10  were effectively the things that stood out to
11  me.
12      Q.   Okay.  What was the position?
13      A.   Senior advisor to Stephen Ehikian.
14      Q.   What was the location of work?
15      A.   GSA.
16      Q.   And what was the salary?
17      A.   150.
18      Q.   Were you ever paid -- were you
19  ever paid anything beyond that 150 in relation
20  to your work for DOGE or GSA?
21      A.   No.
22      Q.   By anyone?
23      A.   No.
24      Q.   Inside of government or outside of
25  government?

63

J. Fox

1
2       A.   Could you repeat the question
3   again.
4       Q.   Were you ever paid anything on top
5   of that $150,000 by anyone inside or outside
6   of government in relation to your work with
7   the GSA?
8       A.   No.
9       Q.   What about with respect to your
10  work for DOGE?
11      A.   No.
12      Q.   And the start date was March 3,
13  2025.  Is that right?
14      A.   Yes.
15      Q.   You noted before that you
16  interpreted your role to be to help Nate with
17  whatever he was working on.
18          Do you remember testifying to
19  that?
20      A.   Yeah.
21      Q.   Okay.  Was that on the PDF that
22  was sent to you?
23      A.   My role was senior advisor to
24  Stephen Ehikian who was the head of GSA.  And
25  Nate was an employee of GSA.

64

J. Fox

1
2       Q.   So to understand the atmospherics,
3   you understood your role to be with the GSA,
4   and your, kind of, mission at GSA to be to
5   help Nate with whatever he was doing.
6           MS. DOUD:  Objection.
7       Q.   Is that fair to say?
8       A.   Not exclusively Nate, no.
9       Q.   Okay.  So what else did you
10  interpret your mission to be?
11      A.   Stephen Ehikian was my boss, and
12  it was my understanding that Nate was working
13  with Steve -- or Stephen, and I was just meant
14  to start with Nate.
15      Q.   Who did you communicate with more,
16  Nate or Stephen?
17      A.   I sat very close to Stephen, but
18  dialogue more so with Nate.
19      Q.   So when did you meet Nate
20  Cavanaugh?
21      A.   March 3.
22      Q.   Was that in person?
23      A.   Yes.
24      Q.   Were you communicating with him,
25  though, before March 3?

65

J. Fox

1
2       A.   Yes.  To coordinate what to do
3   with the first day I showed up.
4       Q.   Okay.  Do you remember when that
5   conversation took place?
6       A.   The week before.  So late
7   February.
8       Q.   You're no longer employed by the
9   GSA.  Is that right?
10      A.   Yes.
11      Q.   Why did you leave?
12      A.   I just felt it was time.
13      Q.   What made you feel like it was
14  time?
15      A.   There was more opportunity for me
16  elsewhere.
17      Q.   After six months of work for the
18  GSA?
19      A.   Yes.  Stephen had been fired.
20  Yeah.
21      Q.   And that affected your calculous
22  in whether to stay in the GSA?
23      A.   Yes, it did.
24      Q.   Had Nate already left government
25  when you left government?

66

J. Fox

1  
2    A.  I think so.
3    Q.  Was there any other reason that
4  you left GSA?
5    A.  It was better for me
6  opportunistically to leave.  That was the crux
7  of it.
8    Q.  But I'm just, kind of, asking for
9  the atmosphere there.
10    A.  Sure.
11    Q.  What makes you say that?
12    A.  Well, Nate had left.  He was a
13  close friend at that point.  And I felt my
14  time was better served leaving GSA.
15    Q.  Okay.  Do you feel like there was
16  mission misalignment at the time that you
17  decided to leave?
18    A.  Misalignment, no.  Anthony had
19  also left.  I was working with him.
20    Q.  Who?  Sorry.
21    A.  Anthony Armstrong.
22    Q.  Anthony Armstrong.  Okay.  So a
23  lot of people you were working with previously
24  had left.
25    A.  Yes.

67

J. Fox

1  
2    Q.  And so you decided it was time for
3  you to leave as well?
4    A.  Yes.
5    Q.  Were there culture changes
6  associated with your leave?
7        MS. DOUD:  Objection.
8    A.  Like you said, most of the folks
9  that I was working with had left.
10    Q.  Yeah.  But I guess I'm asking,
11  like, besides the people, was there a change
12  in direction that you saw at DOGE or GSA that
13  you didn't agree with?
14    A.  No.
15    Q.  So generally same mission,
16  different people, and you wanted to leave on
17  that basis?
18    A.  Yes.
19    Q.  So tell me about DOGE versus GSA,
20  because we've been talking about both of them.
21  How do you interpret them to be different?
22        MS. DOUD:  Objection.
23    A.  GSA was where I worked.  And DOGE
24  felt more like a club of folks with a
25  different mission than traditional folks that

68

J. Fox

1  
2  were career employees.
3    Q.  Okay.  How would you describe that
4  different mission?
5    A.  Find savings and optimization,
6  implement technology, streamline processes.
7    Q.  So would it be fair to say that
8  you were a member of the DOGE team working
9  within GSA?
10    A.  Yeah, that's fair.
11    Q.  So tell me about this DOGE team.
12  Who else was on this DOGE team?
13    A.  Everyone that I had mentioned
14  before, Josh, Nate, Ethan, Mike, Anthony,
15  Stephen.
16    Q.  And when you say Stephen?
17    A.  Ehikian.
18    Q.  Okay.  How did you gain an
19  understanding of the mission of DOGE, this
20  DOGE team or DOGE club as you described it
21  earlier?
22    A.  I understood it as find the
23  savings, sorry.
24    Q.  I just --
25        MS. DOUD:  Just let him finish

69

J. Fox

1  
2  his answer, though.
3    Q.  Sure.  Yeah.
4    A.  I understood it as find the
5  savings in the government that otherwise was
6  being overlooked, implement technology to
7  streamline processes so that the government
8  could be more efficient.  And look out for the
9  direction of executive orders and make sure
10  that they're implemented.  It was really a
11  broad mandate and I was working with Nate.
12    Q.  And sorry, I think we, kind of,
13  walked past each other there.  I meant how did
14  you gain that understanding, not what the
15  understanding was.
16        Did someone tell you that that was
17  your mission?
18    A.  Yeah, in the interviews.
19    Q.  Okay.  What did they tell you?
20    A.  Just that.  Go in, find savings,
21  optimize where you can, introduce technology,
22  streamline processes.
23    Q.  Who told you that in interviews?
24    A.  Anthony, Josh, Mike.
25    Q.  Anyone else?

Justin Fox - January 28, 2026

70

J. Fox

1
2    A.   Maybe Ryan.
3    Q.   Is that Ryan --
4    A.   Ryan Leppert.
5    Q.   Okay.  Ryan interviewed you?
6    A.   Yes.
7    Q.   This is before you joined on
8  March 3?
9    A.   Yes.
10    Q.   Were these conversations that you
11  were having through which you gained an
12  understanding for DOGE's mission taking place
13  in person?
14    A.   The interviewers, like I said,
15  were on Signal.
16    Q.   The interviews were on Signal?
17    A.   Yes.
18    Q.   Through phones?
19    A.   Yes.
20    Q.   Right?  I don't really know how
21  Signal works, through tech, like phone calls
22  through Signal?
23    A.   Yes.
24    Q.   FaceTimes, is that possible on
25  Signal?

71

J. Fox

1
2    A.   I think so.
3    Q.   But were they phone calls without
4  visual?
5    A.   If I remember correctly, yeah.
6    Q.   Okay.  Got it.
7    A.   There may have been some video but
8  I don't remember.
9    Q.   Who did you report to within the
10  DOGE team?
11    A.   Josh, Stephen.
12    Q.   And Nate?
13    A.   Not as much as I viewed Josh and
14  Stephen.
15    Q.   So you, kind of, viewed them as
16  your proper, kind of, bosses at DOGE?
17    A.   Yes.
18    Q.   And Nate was less of a boss in
19  that respect?
20    A.   Yes, more of the same as you would
21  look to a colleague that's been on the job
22  longer.
23    Q.   Okay.  How often were you talking
24  to Steve and Josh?
25    A.   Two-three times a week.

72

J. Fox

1
2    Q.   Okay.  And so would they have been
3  aware of the kind of work you were doing for
4  DOGE at GSA?
5    A.   Yes.
6    Q.   Were they giving you direction at
7  DOGE and GSA?
8    A.   Not that I remember.
9    Q.   Okay.  I mean, what kinds of
10  things would you talk about when you touched
11  base with them two or three times a week?
12    A.   Contracts, grants.
13    Q.   Okay.  Who did you understand to
14  be the top people at DOGE at the time of your
15  employment?
16    A.   Stephen, Josh, Anthony, yeah.
17    Q.   Elon Musk?
18    A.   Yes, although I had limited
19  interaction with him.
20    Q.   But you interacted with him?
21    A.   Only very briefly.
22    Q.   Tell me about that.
23    A.   There was meetings in EEOB to just
24  talk about initiatives and progress.
25    Q.   These were meetings with several

73

J. Fox

1
2  people or just you and Elon Musk?
3    A.   50 or 80 people.  Yeah.
4    Q.   So pretty sizable meetings?
5    A.   Yes.
6    Q.   And at these meetings you said you
7  were -- you would talk about progress.  Is
8  this progress as it relates to savings, grant
9  terminations, things of that nature?
10    A.   Yeah, streamlining, adopting new
11  tech.
12    Q.   Right.
13    A.   Yes, that is updates of the DOGE
14  leads at some of the biggest agencies.
15    Q.   When you say DOGE leads, you mean
16  DOGE team members detailed to different
17  agencies?
18    A.   Or onboarded through agencies that
19  they were hired into.
20    Q.   Okay.  So at these meetings, would
21  you talk about, let's say, the work that you
22  were doing at the National Labor Relations
23  Board for instance?
24    A.   Our team, not as much, no.  We
25  were very much a small team.  And frankly the

74

J. Fox

1
2     government is very big and we were a small
3     team.
4          Q.   Okay.  Did anyone from your team
5     ever present to this larger group -- strike
6     that, actually.
7               When you say "from our team," can
8     you clarify what that means?
9          A.   Myself, Nate Cavanaugh, Ethan
10    Shaotran, Marshall Wood, Jack Stein, Jonathan
11    Mendelson.
12         Q.   And what was the purpose of that
13    team or that group?
14         A.   There's a long tail of independent
15    agencies that don't report into a bureau
16    level, and every agency needed a DOGE lead.
17    And our team was meant to be detailed on to
18    every small agency to find optimization
19    efforts, implement technology, streamline.
20         Q.   Did everyone on that team report
21    to Steve and Josh like you did?
22         A.   Yes.
23         Q.   So they were overseeing your team.
24    Is that fair to say?
25         A.   We reported back to them.

75

J. Fox

1
2          Q.   Okay.
3          A.   But our team was focused again on
4     the 150 small agencies.  So our progress was
5     just more of an update.  They weren't pointing
6     and saying "go."
7          Q.   How did you determine as a group
8     what agencies to work with?
9          A.   There's a long list of -- this is
10    all publicly available.  There's a long list
11    of agencies and their spend, their annual
12    spend and the congressional appropriated spend
13    that do not report into a bureau-level agency,
14    as in they don't have a DOGE lead yet.
15              And so we went down the list by
16    appropriation and onboarded to each one.
17         Q.   And how did you get a sense of
18    that mission?
19         A.   Executive order dropped that said
20    every agency needed a DOGE lead.  Our team was
21    focused on, again, the independents, because
22    all the bureau-level agencies already had DOGE
23    leads.  So based on the executive order, our
24    team onboarded to those agencies.
25         Q.   Who put the team together?

76

J. Fox

1
2          A.   Nate, Josh, Stephen, Anthony.
3          Q.   How do you know that?
4          A.   We were reporting in to them, they
5     seemed to be the leads.
6          Q.   Do you have an understanding
7     for -- about who was creating the directives
8     and the priorities for your team to address?
9          A.   Elon had made it clear that there
10    was a number of small agencies that needed
11    DOGE leads.  So him.
12         Q.   So Elon Musk, your understanding
13    is that Elon Musk, kind of, created the idea
14    for the work that your team was engaged in?
15         A.   Based on the executive order.
16         Q.   Right.  Okay.  Was he getting
17    updates on your work?
18         A.   Maybe.  He's -- I don't know.  I
19    don't know for sure.
20         Q.   Yeah.
21         A.   I know that he was getting updates
22    on progress with contracts and grant
23    terminations to see how much we were saving.
24         Q.   And throughout this time that you
25    were working with this team, did you have a

77

J. Fox

1
2     group chat that all of you were in and
3     communicating on?
4          A.   Signal.
5          Q.   Did it ever leave Signal, these
6     communications?
7          A.   No.
8          Q.   Okay.  And so, for instance if you
9     had to call Nate, you would call him via
10    Signal?
11         A.   Yes.
12         Q.   Same with, like, Ethan, Steve, and
13    Josh, everyone else?
14         A.   Yes.
15         Q.   Okay.
16              MR. ONAYEMI:  Okay.  So are
17    they still there?
18              THE VIDEOGRAPHER:  Yeah.
19              MR. ONAYEMI:  So they can hear
20    me?
21              I think Jacob was the doc
22    tech's name?
23              THE VIDEOGRAPHER:  Yes.
24              MR. ONAYEMI:  Jacob, can you
25    hear me?

78

J. Fox
1       DOCUMENT TECH: Yes.
2       MR. ONAYEMI: Can you pull up
3   Tab 2. This will be Exhibit 2.
4       (Fox Exhibit 2, E-mails
5   including Justin Fox, Bates Number
6   US-000061501, marked for
7   identification, as of this date.)
8       MR. ONAYEMI: And this is a
9   document Bates-stamped US-000061501.
10  BY MR. ONAYEMI:
11      Q. Can you see that?
12      THE WITNESS: Could you zoom
13  in a bit, Jacob? It's Jacob, right?
14  Thank you.
15      Q. That should be good. Can you see
16  that now?
17      A. Yes.
18      Q. Let's take it in and if you want
19  to have him scroll so you can read anything,
20  you know, feel free to do that.
21      Do you recognize this document?
22      A. It looks like I was on the e-mail
23  chain.
24      Q. Do you recognize the document?

79

J. Fox
1       A. Yeah.
2       Q. Okay. And this was that first
3   e-mail on March 10, Monday, was sent, it looks
4   like exactly a week after you joined the
5   government. Is that right?
6       A. Yup.
7       Q. Okay. And so at this point you
8   had met Mr. Cavanaugh. Right?
9       A. Yes.
10      MR. ONAYEMI: And could you
11  scroll up really quickly, Jacob.
12  Great.
13      Q. So if we look at the top e-mail,
14  it says from Nate Cavanaugh to Ryan Leppert.
15  It's cc'ing Ethan Shaotran and Justin Fox,
16  which is you. Right?
17      If we scroll down to the first
18  e-mail. That one there, yup. Okay.
19      Did you receive this entire chain
20  in the ordinary course of your work at GSA?
21      A. I don't remember.
22      Q. Does it appear to be authentic?
23      A. Yeah, it appears to be authentic.
24      Q. Okay. Great. So let me read the

80

J. Fox
1   first e-mail sent by Nate Cavanaugh to Ryan
2   Leppert. It says:
3       "Can you help draft three
4       detail agreements for Ethan, Justin,
5       and I for the below agencies? The
6       first four are priorities (tomorrow)
7       given an upcoming EO."
8       Did I read that correctly?
9       A. Yes.
10      Q. Okay. Can you describe what you
11  understand this to -- well, strike that.
12      Do you understand what
13  Mr. Cavanaugh is saying here?
14      A. He's saying the first four
15  agencies, we would like detail agreements for
16  myself and Ethan.
17      Q. And detail agreements are what, in
18  your understanding?
19      A. To be onboarded as pseudo
20  employees under, just, contractual language
21  that we are GSA employees who are now under
22  the authority of whomever is countersigning on
23  the agency's behalf.
24      Q. Do you understand -- do you have

81

J. Fox
1   an understanding for why the first four were
2   priorities here?
3       A. Nate says "given an upcoming EO."
4       Q. Okay. And do you have an
5   understanding of how you knew that an upcoming
6   EO was imminent?
7       MS. DOUD: Objection.
8       A. I didn't. Nate did.
9       Q. Okay.
10      A. Apparently.
11      Q. So you didn't know that there was
12  an upcoming EO upon receiving this e-mail?
13      A. Upon receiving this e-mail, I
14  wasn't on the initial one. We were following
15  EOs before this. The EO was to go to every
16  agency.
17      Q. Okay. To go to every?
18      A. Every small agency to be onboarded
19  as a DOGE lead.
20      Q. Okay. And the first four agencies
21  there are Institute of Museum and Library
22  Services, National Endowment for the
23  Humanities, National Endowment for the Arts,
24  and the Minority Business Development Agency."

82

1          J. Fox
2          Did I read that correctly?
3      A.  Yes.
4      Q.  And do you understand that there
5  was something about those four agencies that
6  were specifically -- that made them
7  specifically attached to the upcoming EO that
8  Nate references?
9          MS. DOUD:  I'm just going to
10         caution you to be aware of privilege
11         concerns and not answer in a way
12         that would reveal privileged
13         discussions.
14         THE WITNESS:  Okay.  Could you
15         quickly explain privilege to me
16         again like I'm --
17         MS. DOUD:  Can we go off the
18         record.
19         MR. ONAYEMI:  That's okay.
20         THE VIDEOGRAPHER:  The time is
21         11:48 a.m.  This concludes Media 2.
22         Off the record.
23         (Recess taken from 11:48 a.m.
24         to 11:51 a.m.)
25         THE VIDEOGRAPHER:  The time

83

1          J. Fox
2  now is 11:51 a.m.  This begins Media
3  3.  On the record.
4  BY MR. ONAYEMI:
5      Q.  All right.  We're back.  What's
6  your understanding of privilege, Mr. Fox?
7          MS. DOUD:  Objection.
8          I mean, you can attempt to
9          answer, but it seems to be directly
10         attempting to solicit what I just
11         said to you.  So ...
12         MR. ONAYEMI:  I don't see what
13         would be stopping him from answering
14         how he understands privilege.
15     A.  There are certain things that I
16  have privilege or other parties have privilege
17  to that do not need to be discussed here.
18     Q.  I guess you, kind of, used the
19  word "privilege" in defining "privilege."
20     A.  Sure.
21     Q.  What do you mean by that?
22     A.  There are certain things that some
23  parties have the right to know related to
24  what's being discussed.  And yeah, that's my
25  understanding.  I mean --

84

1          J. Fox
2      Q.  Anything to do with attorneys,
3  communications with attorneys?
4      A.  Sometimes.
5          MS. DOUD:  Objection.  That is
6          not a question.
7      Q.  Is it your understanding that
8  privilege is triggered by your communications
9  with attorneys?
10         MS. DOUD:  Objection.
11     A.  Could you rephrase.
12     Q.  Do you understand that -- strike
13  that.
14         Is it your understanding that a
15  communication with an attorney with whom you
16  have an attorney-client privilege is what
17  creates a privilege?
18         MS. DOUD:  Objection.
19     A.  Could you restate without using
20  "privilege," I guess.
21     Q.  Well, I'm trying to define the
22  term, or at least get your understanding --
23     A.  Sure.
24     Q.  -- of your definition for the
25  term.

85

1          J. Fox
2          Is it your understanding that
3  communications that don't have attorneys in
4  them are not protected by privilege?
5          MS. DOUD:  Objection.
6      A.  I'm not sure.
7      Q.  Okay.  So that's not something
8  Ms. Doud just told you?
9          MS. DOUD:  Objection.
10         You should not be asking what
11         I have advised him.
12         MR. ONAYEMI:  Excuse me.  You
13         can instruct him not to answer.  But
14         please don't instruct me what
15         questions to ask.
16         So are you instructing him not
17         to answer then?
18         MS. DOUD:  Do not respond to
19         questions where the response is
20         things that I told you during a
21         privileged communication.
22         THE WITNESS:  Okay.
23         MR. ONAYEMI:  Great.  Okay.
24         Well, I'll say for the record that
25         if your interpretation of privilege

86

J. Fox

1    is that you shouldn't be talking
2    about conversations that had no
3    attorneys present during the
4    conversation, we're going to be in a
5    place to challenge that privilege.
6    We've discussed it with your counsel
7    before, with Ms. Doud before, and if
8    that's what she instructed you
9    during the break, then I think
10   that'll be a larger topic of
11   discussion going forward in this
12   case.
13        MS. DOUD:  And I'm just going
14   to object to that, whatever you
15   would call it that you just
16   provided, that was not a question
17   and some sort of strange statement
18   that you made to the witness.
19        MR. ONAYEMI:  Okay.  Thank
20   you.
21   BY MR. ONAYEMI:
22        Q.   So let's go back to this document.
23   The first four entries on this list seem to be
24   related to some sort of upcoming EO.

87

J. Fox

2        Does that appear to be correct?
3        A.   That appears to be correct.
4        Q.   Okay.  Do you know what EO that
5    was in relation to?
6        A.   No.
7        Q.   Did you end up getting detailed to
8    those four agencies?
9        A.   Yes, I believe so.  I'm not
10   certain about Minority Business Development
11   Agency, but yes for the top three.
12        Q.   What about the bottom four, the
13   Community Development Financial Institutions
14   Fund, the Federal Mediation and Conciliation
15   Service, the Woodrow Wilson International
16   Center for Scholars, and the United States
17   Interagency Council on Homelessness.
18        Were you detailed to those four?
19        A.   Woodrow Wilson, yes.  The other
20   three, I'm not sure.  I don't remember.
21        Q.   You don't remember whether you
22   were detailed to those agencies or not?
23        A.   Yes, at one point our team was not
24   all detailed into the same agency.  And there
25   are 150 or so.  So I don't remember.

88

J. Fox

2        Q.   Do you know roughly how many
3    agencies you were detailed to?
4        A.   Precisely, no.  20 to 40 is
5    probably the band.
6        Q.   And what was your goal in being
7    detailed to these agencies?
8        MS. DOUD:  Objection.
9        A.   Help the agency lead find
10   efficiencies, savings via contracts.
11       Q.   Terminating grants?
12       A.   Terminating grants, insuring that
13   they were aligned with the executive orders.
14       Q.   Okay.  And that took place at
15   somewhere between 20 and 40 agencies.  Is that
16   right?
17       A.   For me, yes.
18       Q.   For you, yeah.  Thanks.  Okay.
19   Let's go to --
20       MR. ONAYEMI:  Jacob, let's go
21   to Tab 3.  Actually, sorry.  Before
22   we move on, can you scroll up all
23   the way to the top.
24       Q.   And I just want to read this into
25   the record.  On March 14, 2025, Nate Cavanaugh

89

J. Fox

2    sends to Ryan Leppert, cc'ing you and Ethan,
3    an e-mail.  He says:
4        "Hi Ryan, can you send detail
5    agreement for the three of us for
6    IMLS?  Keith Sonderling is the new
7    director and will countersign on
8    their behalf."
9        Did I read that correctly?
10       A.   Yes.
11       Q.   Were you detailed to IMLS?
12       A.   Yes.
13       Q.   What do you understand Ryan
14   Leppert's role to be in the government at this
15   time?
16       A.   White House liaison for GSA.
17       Q.   Do you have an understanding of
18   how Ryan was being directed at this time?
19       A.   No.
20       Q.   Okay.  This was someone that you
21   had met quite recently at this point.  Is that
22   fair to say?
23       A.   Yes.
24       Q.   Do you know who he reported to?
25       A.   No.

90

1      J. Fox
2      Q.   But it appears that he had some
3   power to help you and other members of your
4   team get detailed to different agencies.  Is
5   that fair?
6      MS. DOUD:  Objection.
7      A.   Yes.
8      Q.   Was that yes?
9      A.   Repeat the question again for me.
10     MR. ONAYEMI:  Can you read
11  back the question, please.
12     (Record read by the certified
13  stenographer as follows:
14     "QUESTION:  It appears that he
15     had some power to help you and other
16     members of your team get detailed to
17     different agencies.  Is that fair?")
18     A.   He countersigned all of the detail
19  agreements.
20     Q.   So that's a yes?
21     A.   That's fair.
22     MR. ONAYEMI:  Okay.  Let's get
23  Tab Number 3 up, Jacob.  Thank you.
24     Okay.  So Tab Number 3 is the
25  text for Executive Order 14238 of

91

1      J. Fox
2   March 14, 2025, called Continuing
3   the Reduction of the Federal
4   Bureaucracy.  Under Section 2, it
5   names several agencies.
6      (Fox Exhibit 3, Executive
7   Order 14238, Continuing the
8   Reduction of the Federal
9   Bureaucracy, dated March 14, 2025,
10  marked for identification, as of
11  this date.)
12  BY MR. ONAYEMI:
13     Q.   Is this the EO to your
14  understanding that Nate was referencing in
15  that e-mail?
16     CERTIFIED STENOGRAPHER:  Is
17  this Exhibit 3 now?
18     MR. ONAYEMI:  This is
19  Exhibit 3.  Yes.
20     A.   To my understanding based on what
21  you've showed me, yes.
22     Q.   It's fair to say that based on
23  that e-mail and the substance of that e-mail,
24  that this could have been the EO that he was
25  referring to?

92

1      J. Fox
2      A.   It could have been.
3      Q.   And we see some agencies listed.
4      MR. ONAYEMI:  Can you maybe
5   zoom in a little bit Jacob, just so
6   the text is a little bigger.  That's
7   good.  Thank you.
8      Q.   So we see here many of the same
9   agencies that were listed in that e-mail.  Is
10  that fair to say?
11     A.   That is fair to say.
12     Q.   Were you detailed to any of these
13  agencies?
14     A.   Woodrow Wilson, yes, IMLS, yes.
15  The other five, I'm not sure.
16     Q.   Why are you not sure?
17     MS. DOUD:  Objection.
18     A.   There were 150 agencies.  At some
19  point, we all split up and not all of us were
20  onboarded on to all of the same agencies.
21     Q.   Okay.  So you were -- so you don't
22  remember all of the agencies that you yourself
23  were detailed to.
24     Is that fair to say?
25     A.   The ones that I worked with, I

93

1      J. Fox
2   would remember.  Hence why Woodrow Wilson,
3   IMLS, yes.  But again, at some point we
4   stopped having all of us onboard.  And so I
5   may have been onboarded to Community
6   Development Financial Institutions Fund, but I
7   didn't spend time with the team --
8      Q.   Got it.
9      A.   -- at that agency, so ...
10     Q.   I see.  So there is a distinction
11  here between where you were, kind of, actually
12  detailed versus where you actually did work.
13     A.   Spending time and doing work.
14     Q.   Got it, okay.  So when you say you
15  don't know, what you're saying is that you
16  don't know if you were officially detailed
17  there?
18     A.   Yes, but I --
19     Q.   But you know that you did not do
20  work there?
21     A.   Yes.
22     Q.   Okay.  Got it.  That's helpful.
23  Okay.
24     So did you understand that this
25  EO -- did you understand this EO to be a

94

J. Fox

1  direction for your team in particular?
2  A.   These are independent agencies
3  that do not fall under a bureau-level agency,
4  so yes.
5      Q.   Did you use this EO to understand
6  your mission to your smaller group at DOGE?
7      A.   It certainly gave direct guidance
8  that these agencies were meant to be reduced,
9  and our team was the only one focused on
10  independent agencies.
11      Q.   Did you talk to anyone about that
12  within your DOGE team?
13      A.   About what?
14      Q.   About this EO as a directive for
15  the work you were doing with that team?
16      A.   Doing with which team?
17      Q.   With your small agencies team?
18      A.   With the small agencies team.
19  Yes.
20      Q.   Who did you talk to on your team
21  about this EO?
22      A.   Everyone on the team at the time,
23  Nate, Ethan, Justin Aimonetti.
24      Q.   And who is Justin Aimonetti?

95

J. Fox

1      A.   DOGE legal.
2      Q.   Was he advising the small agencies
3  team?
4      A.   He was joining us for meetings
5  and, yeah, giving the legal backdrop for every
6  agency.
7      Q.   And who were in these meetings
8  with Justin Aimonetti?
9      A.   The leadership teams of the
10  agencies.
11      Q.   Who were those?
12      A.   NEH, IMLS, NEA, any agency that we
13  went to.
14      Q.   So under Section 2, which is
15  titled "Reducing the Scope of the Federal
16  Bureaucracy."
17      It says:
18      "(a) Except as provided in
19      subsection (b) of this section, the
20      nonstatutory components and
21      functions of the following
22      governmental entities shall be
23      eliminated to the maximum extent
24      consistent with applicable law, and

96

J. Fox

1  such entities shall reduce the
2  performance of their statutory
3  functions and associated personnel
4  to the minimum presence and function
5  required by law."
6      Q.   Did I read that correctly?
7      A.   Yes.
8      Q.   Did you understand your goal at
9  the agencies that you were detailed to?  To
10  comply with that directive in the executive
11  order?
12      MS. DOUD:  Objection.
13      A.   For these agencies, yes.
14      Q.   And so this is what you would have
15  used to understand your work at the Woodrow
16  Wilson Center?
17      A.   Yes.
18      Q.   Do you know what the Woodrow
19  Wilson Center does?
20      A.   Issue scholarship grants.
21      Q.   Anything else?
22      A.   That's my understanding, a
23  grant-making organization.
24      (Stenographer clarification.)

97

J. Fox

1      Q.   Did you do anything to understand
2  more than that before you were detailed there
3  to eliminate it its statutory minimum?
4      A.   Yes, we met with the board.
5      Q.   Okay.  And you said IMLS you were
6  also detailed to and worked with.  Is that
7  right?
8      A.   Yes.
9      Q.   Okay.  Do you understand the
10  function of IMLS?
11      A.   Yes.
12      Q.   What's that?
13      A.   A grant-making organization
14  specifically for museum and library services.
15      Q.   And did you -- you worked there as
16  well.  Right?
17      A.   I was detailed there.
18      Q.   And did you succeed in
19  implementing this EO there?
20      A.   I'm not sure.
21      Q.   You don't remember?
22      A.   I'm not sure if it's precisely
23  what's written in this EO.
24      Q.   What did you do there?

98

J. Fox

1
2     A.   Found optimization through
3     grant-making terminations and work-force
4     terminations, and overall worked with the
5     agency leads to comply with this EO.
6         Q.   You also worked with the
7     inter-American foundation during your time at
8     the government.  Was that right?
9         A.   Yes.
10        Q.   Do you have an understanding of
11    the mission of the Inter-American Foundation?
12        A.   Yes.
13        Q.   You also were working with the US
14    Institute of Peace.  Is that right?
15        A.   Yes.
16        Q.   Do you have an understanding of
17    their mission?
18        A.   Yes.
19        Q.   How would you describe that?
20        A.   A peace-keeping organization that
21    primarily does international affairs
22    involvement.
23        Q.   Who did you work with on that
24    project?
25        A.   Nate Cavanaugh, Ken Jackson,

99

J. Fox

1
2     Justin Aimonetti.  I think that was it.
3         Q.   And the Millennium Challenge
4     Corporation.  You also worked there.  Right?
5         A.   Yes.
6         Q.   What was your mission to your
7     understanding of your work with the Millennium
8     Challenge Corporation?
9         A.   Be installed as the DOGE leads,
10    find efficiencies, eliminate wasteful spend.
11        Q.   And who did you work with on that?
12        A.   Nate Cavanaugh, Justin Aimonetti,
13    Jack Stein.  I think that's all.
14        Q.   Did you report to anyone during
15    your work with the MCC, US Institute of Peace,
16    and Inter-American Foundation?  I guess let me
17    leave it there.  Did you report to anyone?
18        A.   Yes, the agency leads.
19        Q.   And then you went to the National
20    Labor Relations Board.  Is that right?
21        A.   Yes.
22        Q.   Do you have an understanding of
23    what they do?
24        A.   Yes.
25        Q.   What do they do?

100

J. Fox

1
2     A.   Manage disputes between employers
3     and employees.
4         Q.   Okay.  Did you know that before
5     you were detailed there?
6         A.   At a high level.  We had many
7     meetings with their team.
8         Q.   Okay.  Who from the DOGE team did
9     you work with on that project?
10        A.   Nate Cavanaugh, Justin Aimonetti,
11    and I believe that's it.
12        Q.   Okay.  And you were detailed and
13    worked with the National Endowment for the
14    Humanities as well.  Right?
15        A.   Yes.
16        Q.   Do you have an understanding of
17    the mission of the NEH?
18        A.   A grant-making organization for
19    humanities.
20        Q.   Anything more than that?
21        A.   Yeah, I mean, that's the highest
22    level, like, way to describe it.
23        Q.   I guess, what kind of grants?  You
24    said --
25        A.   Humanities grants.

101

J. Fox

1
2     Q.   When were you detailed to the NEH?
3         A.   Sometime around mid March.
4         Q.   Okay.  And just taking a quick
5     step back, during your detail and during your
6     work with these agencies that we've listed,
7     how were you communicating with the small
8     teams that you've listed?
9             MS. DOUD:  Objection.
10        A.   Which small teams?
11        Q.   So for the Millennium Challenge
12    Corporation, you named some people that you
13    worked with on that project.
14        A.   Mm-hmm.
15        Q.   You can rename them if you --
16        A.   Sure.  We were in person every
17    day.
18        Q.   And did you speak on Signal as
19    well with these -- with this team?
20        A.   About specifically those agencies?
21        Q.   Yeah.
22        A.   Signal was used to coordinate
23    where we were.  The real work about each of
24    these agencies was done over e-mail or our GSA
25    phones.

102

1          J. Fox
2      Q.   So how do you understand your
3   mission during your detail to the NEH?
4      A.   Work with Mike to find
5   optimization efforts through grants,
6   contracts, and personnel.
7      Q.   Great.  And how did you come to
8   understand that as being the mission?
9      A.   That was the mission for all of
10  our agencies we onboarded to, was find savings
11  through contracts, grants, personnel.
12     Q.   And that directive was coming
13  Steve and Josh?
14     A.   The executive order wrote a pretty
15  clear mandate that every agency needed a DOGE
16  lead, and we were focused on all of the small
17  agencies, so that direction was clear.
18     Q.   So who would you, if you ever came
19  upon a question that you needed to elevate to
20  a superior, who would that superior be?
21     A.   A question about what?
22     Q.   About your work with relation to
23  these agencies?
24     A.   Well, we always deferred to the
25  head of the agencies.

103

1          J. Fox
2      Q.   I'm sorry.  Let me repeat my
3   question or ask my question differently.
4          If you had a question that related
5   to what the mandate of DOGE was during your
6   detail to these agencies, who would you ask?
7      A.   I'm not sure I understand who I'm
8   asking about what we're doing at these
9   agencies.  It was to find savings.  So through
10  contracts, grants, and personnel, we detailed
11  to small agencies, the 150 or so, worked with
12  the agency lead to execute on that executive
13  order.
14     Q.   So I guess when I ask who you
15  would go to with your questions, I'm trying to
16  get a sense for who -- if there was anyone at
17  the DOGE team that was helping you to
18  understand what your role was as a part of
19  DOGE as you were being detailed to these
20  agencies?
21         MS. DOUD:  Objection.
22     A.   Me personally?  No.  I generally
23  followed Nate.
24     Q.   Okay.  So --
25     A.   And the mandate was clear.  I

104

1          J. Fox
2   mean, it was install as DOGE leads on
3   independent agencies to find savings.
4      Q.   But if any question came up about
5   the proper way to find savings, where to look
6   for savings, what kind of projects would be
7   continued versus cut, were you just using your
8   own discretion based on your understanding of
9   the EOs to do that?
10     A.   We worked with the agency leads.
11     Q.   So how did you end up on the team
12  that got detailed to NEH in particular?
13     A.   I ended up on Nate's team per Josh
14  Gruenbaum and Anthony telling me that I'm on
15  Nate's team, which is the small agencies team
16  which is focused on the independent agencies.
17     Q.   Right.
18     A.   So all independent agencies need a
19  DOGE lead, so I worked with Nate and team to
20  get onboarded on to those agencies, and work
21  with the leads to find savings.
22     Q.   Right, but I guess why NEH and not
23  some other small agency.  Do you have an
24  understanding of that?
25     A.   We had a list of 150.  We probably

105

1          J. Fox
2   onboarded to 120.  That list was ordered by
3   congressional appropriations.  The common
4   sense approach is to go to the ones that have
5   the highest congressional appropriations that
6   are independent.  And so we onboarded to all
7   of them.
8      Q.   Right, but why were you -- so you
9   worked with the NEH.  But, you know, perhaps
10  not Marshall Wood, for instance.
11         Why were you detailed to the NEH
12  and why did you work with the NEH and not
13  Marshall Wood?
14     A.   Well, at the time it was just
15  myself, Nate, and Ethan.
16     Q.   In the small agencies?
17     A.   In the small agencies.
18     Q.   So Marshall Wood would have come
19  later?
20     A.   He wasn't there, Jack Stein wasn't
21  there, Jonathan Mendelson wasn't there.  So it
22  was just the three of us in this team.
23     Q.   So thank you for clarifying.  The
24  entire team, the entire small agencies team at
25  the time of that detail to NEH went to NEH?

106

J. Fox

1
2    A.   Yes.
3    Q.   Is that fair to say?
4         MS. DOUD:  Objection.
5    A.   I think.  Because I don't know if
6    Ethan -- Ethan didn't work with us.  It was
7    really Nate and myself.
8    Q.   Okay.  So did you use any
9    particular -- strike that.
10        So you noted that one of your
11   goals in getting detailed to these agencies
12   was to look for savings, terminate grants, et
13   cetera, et cetera.  Right?
14        MS. DOUD:  Objection.
15   A.   Could you rephrase.
16   Q.   One of the goals of getting
17   detailed to these agencies was finding
18   savings.  Right?
19   A.   Work with agency leads.
20   Q.   Right.
21   A.   To find optimization through
22   personnel, grants, contracts.
23   Q.   And part of that was through the
24   termination of grants.  Right?
25   A.   Part of that, yeah.

107

J. Fox

1
2    Q.   Okay.  Did you use any particular
3    methodology in assessing NEH grants for
4    termination?
5    A.   There was an executive order that
6    said to eliminate spend on DEI and other
7    wasteful government spending, and that was the
8    lens.
9    Q.   Okay.  So DEI would have been one,
10   kind of, guidepost for the grant's
11   determinant?
12   A.   Yeah.
13   Q.   How do you interpret DEI?
14   A.   There was -- the EO explicitly
15   laid out the details.  I don't remember it off
16   the top of my head.
17   Q.   That's okay.  I'm asking for your
18   understanding of it.
19   A.   Yeah, my understanding was exactly
20   what was written in the EO.
21   Q.   So can you --
22   A.   I don't remember what was in the
23   EO.
24   Q.   So right now do you have an
25   understanding of what DEI is?

108

J. Fox

1
2    A.   Yeah.
3    Q.   So what's your understanding as
4    you sit here today in this deposition?
5    A.   Well, it was exactly what was
6    written in the EO.  And so any time that we
7    would look at a grant through the lens of
8    complying with an executive order, we would
9    just refer back to the EO and assess if this
10   grant had relation to it.
11   Q.   Okay.  But I guess I'm stepping
12   back from --
13   A.   Yeah.
14   Q.   -- your methodology strictly in
15   terminating the grants.  Do you have an
16   understanding as you sit here today of what
17   DEI means?
18   A.   Yeah.
19   Q.   So what's your understanding of
20   what it means?
21   A.   Well, it is exactly what was
22   written in the EO.
23   Q.   Okay, so --
24   A.   And I don't have the EO in front
25   of me, but that was -- we would always

109

J. Fox

1
2    reference back to the EO and make sure that
3    this grant was in compliance with the EO
4    language.
5    Q.   Right.  I understand that.  Okay.
6    But I'm not asking necessarily about what was
7    in the EO.  I am asking very specifically
8    about your present understanding of what -- of
9    DEI.
10        Do you have a present
11   understanding of DEI?
12   A.   Yeah.
13   Q.   Okay.  Can you explain what that
14   present understanding is?
15   A.   Well, it's just easier for me to
16   be referencing back to the EO.
17   Q.   Are you refusing to answer the
18   question?
19   A.   I'm not refusing to answer the
20   question.
21   Q.   Okay.
22   A.   I just feel that referencing back
23   to the verbatim executive order was the best
24   way for us to capture all the DEI language.
25   And so I think giving a high-level overview of

Justin Fox - January 28, 2026

110

J. Fox

1
2  what I could relay as DEI is not going to do
3  justice what was written in the EO.
4      Q.   And that's okay.  We can look at
5  the EO as well.
6      A.   Great.
7      Q.   But I'm asking you -- I mean, this
8  is a deposition, I'm asking you questions,
9  you're under oath.
10     A.   Yeah.
11     Q.   You're required to answer them.
12         So what is your understanding of
13  what DEI means?
14     A.   Well, I think I would say again,
15  that I would go back to the EO to make sure
16  I'm capturing enough.  I don't feel
17  comfortable saying a high-level overview
18  because it's such a big bucket and there's
19  just a lot of pieces of the puzzle.
20     Q.   What's a part of the bucket?
21     A.   Gender fluidity.  Sort of,
22  promoting, like, promoting subsets of LGBTQ
23  plus that might alienate another part of the
24  community.  Again, it was just easier for us
25  to reference back into the EO.  And I don't

111

J. Fox

1
2  want to give you a broad overview because it's
3  like, end of the day, it is capturing, it is
4  all-encompassing in the EO.  It's how we did
5  our methodology.
6      Q.   Right.  Do you always refer to EOs
7  to gain an understanding of words used in your
8  typical daily vernacular?
9          MS. DOUD:  Objection.
10     A.   What do you mean?
11     Q.   You say that you have an
12  understanding of what DEI means, and when I
13  ask you, you say you need to reference the EO.
14         Do you need to reference EOs to
15  define every word you use in your everyday
16  life?
17         MS. DOUD:  Objection.
18     A.   No.
19     Q.   Okay.  So what's stopping you from
20  defining DEI to your understanding as you sit
21  here today on January 28, 2026?
22     A.   It wouldn't be capturing enough of
23  how big the topic is.  DEI is a very broad
24  structure.  Giving my limited recall of what's
25  included is just not --

112

J. Fox

1
2      Q.   Okay.  I understand.
3          MR. ONAYEMI:  Can we go to --
4  actually.
5      Q.   So who did you work with
6  internally at NEH?  Were there people at NEH,
7  kind of, embedded in NEH that you worked with
8  during your detail there?
9          MS. DOUD:  Objection.
10     A.   When you say "embedded in NEH,"
11  you mean just employees of NEH?
12     Q.   Yeah, that's what I mean.
13     A.   Mike McDonald, Adam Wolfson,
14  Pranita -- I don't remember her last name --
15  Brett Bobley.  That's -- there are others, but
16  the employees of NEH, yes.
17     Q.   Okay.  And how did you communicate
18  with those employees?
19     A.   E-mail.
20     Q.   Anything else?
21     A.   My GSA phone with Mike.
22     Q.   Anything else?
23     A.   No.
24         MR. ONAYEMI:  Jacob, can we
25  pull up Tab 4.  And this will be

113

J. Fox

1
2  Exhibit 4.
3          (Fox Exhibit 4, Executive
4          Order 14151, Ending Radical and
5          Wasteful Government DEI Programs and
6          Preferencing, dated January 20,
7          2025, marked for identification, as
8          of this date.)
9      Q.   All right.  So this is Exhibit 4.
10  It's Executive Order 14151 of January 20, '25.
11  The title is "Ending Radical and Wasteful
12  Government DEI Programs and Preferencing."
13         Did I read that title correctly,
14  Justin?
15     A.   Yes.
16     Q.   Okay.  Is this the DEI executive
17  order that you're referencing?
18     A.   That I'm referencing when?
19     Q.   When you said you referred to the
20  EO to define your understanding of DEI?
21         THE WITNESS:  Could you scroll
22  down.  Yeah.
23     A.   Let me just read it, if you don't
24  mind.
25     Q.   Sure.  Please.

114

```
1              J. Fox
2       A.   (Document review.)
3       Yes.
4       Q.   So fair to say you've seen this
5  executive order before?
6       A.   Yes.
7       Q.   And you referenced it in
8  terminating grants -- excuse me -- in deciding
9  which grants to mark for termination?
10      MS. DOUD: Objection.
11      A.   Mike McDonald and our team.
12      Q.   Right.
13      A.   This was a guiding principle for
14  terminating grants but not the only principle.
15      Q.   Okay. Great.
16      MR. ONAYEMI: Can you scroll
17  up again, Jacob.
18      Q.   So it says "radical," "wasteful,"
19  "DEI." Do you have an understanding of what
20  radical means as used here?
21      A.   No.
22      Q.   What about "DEI programs and
23  preferencing." Do you have an understanding
24  of what that means?
25      A.   Diversity, equity, inclusion
```

115

```
1              J. Fox
2  programs, so be that special task force within
3  agencies or even extending into grants, and
4  then preferencing being a bias toward spend on
5  DEI programs relative to others.
6       Q.   Okay. So now maybe we can more
7  comfortably talk about what DEI means.
8  Earlier you said something about LGBTQ plus.
9       Were there other things that you
10  interpreted as being DEI other than LGBTQ
11  plus?
12      MS. DOUD: Objection.
13      A.   Do you have some examples?
14      Q.   I was going to ask you the same
15  thing. Do you have examples of what you would
16  consider to be DEI other than LGBTQ plus?
17      A.   So, for instance, there was a
18  $400,000 grant for gay and trans travel guides
19  in SF. That's DEI.
20      Do you need others?
21      Q.   I don't think now. That's okay.
22      MR. ONAYEMI: Can we pull up
23  Tab Number 5, Jacob. Currently
24  displayed is Executive Order 14168.
25  This is Exhibit Number 5.
```

116

```
1              J. Fox
2       (Fox Exhibit 5, Executive
3  Order 14168, Defending Women From
4  Gender Ideology Extremism and
5  Restoring Biological Truth to the
6  Federal Government, marked for
7  identification, as of this date.)
8       Q.   And it reads:
9       "Defending Women From Gender
10  Ideology Extremism and Restoring
11  Biological Truth to the Federal
12  Government."
13      Have you seen this executive order
14  before?
15      A.   No.
16      Q.   You've never seen this?
17      THE WITNESS: Could you scroll
18  down. You can pause.
19      A.   (Document review.)
20      How long does this go?
21      Q.   It's 9 pages long.
22      A.   When was this dated? Wait, I'm
23  talking to you. I don't know why I'm yelling.
24      MS. DOUD: If you need to be
25  able to read the full exhibit,
```

117

```
1              J. Fox
2  you're entitled to do that.
3       MR. ONAYEMI: I mean, before
4  we get to that.
5       Q.   Is this a document, based on what
6  you've seen so far, that you recognize?
7       A.   Maybe.
8       MS. DOUD: He's entitled to
9  see the full exhibit. This is why
10  you normally have printouts.
11      MR. ONAYEMI: Okay, I'm asking
12  him a question, and he just answered
13  it.
14      Q.   Thank you for answering. You said
15  maybe you've seen the exhibit before?
16      A.   I'd have to read it to remember.
17      Q.   Okay. That's fine.
18      It mentions "biological reality of
19  sex." It says "defending women," "protecting
20  women."
21      Are these concepts that would have
22  come up during your analysis of marking grants
23  for termination at some of the agencies that
24  you were detailed to?
25      MS. DOUD: Objection.
```

118

```
1        J. Fox
2    A.   (Document review.)
3        THE WITNESS: Could you scroll
4    down.
5    Q.   I have a standing question.
6        MS. DOUD: He's entitled to be
7    able to read an exhibit. You cannot
8    prevent him from being able to see
9    the full exhibit. That is
10   completely inappropriate.
11       MR. ONAYEMI: Counsel, I can
12   hear you. I'm asking him a question
13   that actually isn't about the
14   entirety of the exhibit.
15       MS. DOUD: In a deposition,
16   you are entitled to read an exhibit,
17   and for some reason, you are not
18   allowing him to see the full
19   exhibit.
20       MR. ONAYEMI: Ma'am, he's
21   reading it right now.
22       MS. DOUD: He can't see the
23   full thing because you have elected
24   to not provide any copies of any of
25   the exhibits. So if he is asking to
```

119

```
1        J. Fox
2    scroll down to read the exhibit, you
3    need to allow him to do that.
4        MR. ONAYEMI: He of course can
5    scroll down if --
6        THE WITNESS: It would be
7    helpful to get the full context.
8        MS. DOUD: He can't because he
9    doesn't control the computer.
10       MR. ONAYEMI: Okay.
11       MS. DOUD: He just asked to
12   scroll down and you tried to prevent
13   him from being able to do that.
14       MR. ONAYEMI: How did I do
15   that?
16       MS. DOUD: By -- because you
17   said he has to answer the question
18   before doing that. So allow him to
19   read the exhibit if that's what he
20   wants. This is pretty basic.
21       MR. ONAYEMI: You can say it's
22   basic, I asked him a question.
23       MS. DOUD: Well, it's basic to
24   be able -- for a witness to be able
25   to look at a full exhibit during a
```

120

```
1        J. Fox
2    deposition.
3        MR. ONAYEMI: But --
4        MS. DOUD: I have never
5    encountered a situation where an
6    attorney taking a deposition will
7    not allow the witness to read an
8    entire exhibit.
9        MR. ONAYEMI: For the record,
10   just because this is still on the
11   record, he's absolutely -- I have
12   not prevented him in any way from
13   reading the document.
14       MS. DOUD: Please allow him to
15   do so then.
16       MR. ONAYEMI: And I ask that
17   you keep your speaking objections
18   briefer than that.
19       MS. DOUD: This is not an
20   objection to a question, this is an
21   objection to the way you're
22   conducting this deposition. He has
23   repeatedly asked to scroll down --
24       MR. ONAYEMI: Counsel, I hear
25   you. Thank you, I appreciate it.
```

121

```
1        J. Fox
2        MS. DOUD: I'm entitled to say
3    what I want. Don't cut me off.
4        MR. ONAYEMI: Thank you.
5    BY MR. ONAYEMI:
6    Q.   I'll ask again, is this generally
7    a document that you recognize, Mr. Fox?
8    A.   Maybe.
9    Q.   That's fine. Are concepts like
10   defending women, gender ideology extremism,
11   biological truth, did those come up in the
12   context of selecting of grants for
13   terminations? Yes or no?
14   A.   (Document review.)
15       THE WITNESS: Could you scroll
16   down. You can keep going.
17       MR. ONAYEMI: I'll note for
18   the record that the witness has been
19   reading a nine-page document for
20   almost five minutes now.
21       MS. DOUD: I'll note for the
22   record that it's challenging to read
23   the documents because no copies of
24   any of the exhibits have been
25   provided.
```

122

J. Fox
1
2     A.   (Document review.)
3          Some of the definitions in here,
4     yes, would have come up by way of DEI.
5     Q.   Which ones?
6     A.   I can't see them all.
7     Q.   But what's the basis for you
8     saying that?  Which ones have you seen that
9     make you say what you just said?
10    A.   (Document review.)
11         The "gender ideology" piece and
12    "sex as an immutable biological classification
13    as either male or female."
14         THE WITNESS:  Could you scroll
15    down.
16    A.   There's a lot of definitions in
17    here.
18    Q.   I'm not asking you to read every
19    single definition, though.  I'm asking --
20    A.   But you asked if I would use this
21    in interpreting grants.  And I can't see the
22    full --
23    Q.   This document, yes.  Would you use
24    some of the concepts that have been written
25    into this document as a basis for analyzing

123

J. Fox
1
2     grants to mark for termination.  I'm not
3     asking for -- exhaustively.  I'm asking if
4     some of these concepts you used.
5     A.   Some of these concepts would have
6     come up in discussions about grants, yeah.
7          MR. ONAYEMI:  We can move on
8     to Tab 6-A, Jacob.  And this will be
9     Exhibit 6.
10         (Fox Exhibit 6, E-mails
11    including Justin Fox dated March 13,
12    2025, beginning Bates Number
13    US-000050393, marked for
14    identification, as of this date.)
15    Q.   Who did you speak with about those
16    concepts?
17    A.   Mike, Adam, Nate.
18    Q.   Ethan Shaotran?
19    A.   No.
20    Q.   How did you discuss those concepts
21    with Nate, Mike, and Adam?
22    A.   On a grant-by-grant basis.
23    Q.   And was this in person, via text,
24    Signal?
25    A.   In person for Adam and Mike, we

124

J. Fox
1
2     did comprehensive reviews.  They also did
3     their own individual independent work between
4     the two of them.
5     Q.   Got it.  Did anyone specifically
6     instruct you to apply the concepts that were
7     laid forth in EO 14151 and EO 14168 to your
8     grant termination process?
9     A.   Which EOs are you referring to?
10    Q.   The two that we just looked at.
11    A.   What were the titles?
12    Q.   The titles were Ending Radical and
13    Wasteful Government DEI Programs and
14    Preferencing was EO 14151.  And EO 14168 was
15    Defending Women From Gender Ideology Extremism
16    and Restoring Biological Truth to the Federal
17    Government.
18         And I'll repeat the question --
19    A.   When were they -- when was the
20    second one released?  I think I didn't get an
21    answer there.  The nine-page one.
22    Q.   Right, I can -- January 20 it
23    looks like.
24    A.   '25?
25    Q.   2025.

125

J. Fox
1
2     A.   And then repeat the question,
3     sorry.
4          MR. ONAYEMI:  Could you please
5     read back the question for the
6     witness?
7          (Record read by the certified
8     stenographer as follows:
9          "QUESTION:  Did anyone
10    specifically instruct you to apply
11    the concepts that were laid forth in
12    EO 14151 and EO 14168 to your grant
13    termination process?")
14    A.   Mike was the one directing his
15    team to identify DEI grants, and we came in to
16    help him with that.  The whole purpose of us
17    being onboarded was to assist in finding
18    savings, and Mike's team had already been at
19    this for close to a month.
20    Q.   Okay, great.  So we're looking at
21    Exhibit 6 now, this is Tab 6-A.
22         MR. ONAYEMI:  Can you scroll
23    to the bottom of this, Jacob.
24         MS. DOUD:  What document is
25    this?

126

1           J. Fox
2           MR. ONAYEMI: Sorry. This is
3     US-000050393.
4           Okay. Could you scroll up so
5     we could see the introduction.
6     Scroll up, up, up. Yeah, just right
7     there. That's good.
8           Q. So it looks like on March 13,
9     2025, Adam Wolfson writes to what appears to
10    be you and Nate Cavanaugh. Is that right?
11          A. Is that right? Does -- I see it's
12    just Adam Wolfson wrote.
13          Q. And then it says "Hi Nate, Hi
14    Justin."
15          A. Okay. Am I included on the cc?
16          Q. I think above. We can scroll up
17    if you'd like.
18          MR. ONAYEMI: Jacob, can you
19    scroll up, please.
20          A. From, date, okay.
21          Q. So you understand that to be you
22    and Nate Cavanaugh. Is that right?
23          A. Yes.
24          Q. That he's addressing?
25          He goes on to say:

127

1           J. Fox
2           "Great meeting you yesterday
3     and catching up today. As
4     discussed, I've copied below the
5     link for the award spreadsheet
6     created by Brett that the program
7     directors used for their historical
8     review of NEH's grants since
9     January 2021."
10          Did I read that correctly?
11          A. Yes.
12          Q. And this is generally tracking --
13    when he says "program directors used for their
14    historical review," that's tracking the
15    process you were just, kind of, describing --
16    right? -- that NEH had its own --
17          A. Yes.
18          Q. -- review? Yes?
19          A. Yes.
20          Q. Okay. He says "great meeting you
21    yesterday."
22          And this was on March 13. Would
23    this have been a day after you first met him
24    for the first time?
25          A. I would think so.

128

1           J. Fox
2           Q. Okay. Do you remember that
3     meeting that you had with him on March 12?
4           A. The specific contents, no, but we
5     did have a meeting at the office.
6           Q. Okay. And this was at the NEH
7     office?
8           A. Yes.
9           Q. And who was present at that
10    meeting?
11          A. Mike and Adam, I believe those
12    were the only two. They hadn't returned to
13    office as a team.
14          Q. Got it. And Mr. Cavanaugh?
15          A. And Nate.
16          Q. Okay. Was that also the first
17    time that you had met Mr. McDonald?
18          A. That's right.
19          Q. How did you set up the meeting on
20    that day?
21          A. I don't remember.
22          Q. Would it have been through Signal,
23    do you think?
24          A. No, not with Mike and Adam.
25          Q. Maybe through e-mail?

129

1           J. Fox
2           A. Yeah.
3           Q. Is that most likely?
4           A. Maybe through e-mail is the most
5     likely.
6           Q. And there was no one else besides
7     you four in that meeting. Is that fair to
8     say?
9           A. I think so. Although, like I
10    said, the specific contents -- I know at one
11    point we had met with Pranita and Brett,
12    although there might have been some follow up
13    meetings.
14          Q. Do you know who actually set up
15    this meeting? Like, who called it into
16    effect?
17          A. I don't remember.
18          Q. Do you remember who led the
19    meeting?
20          A. Myself, Nate, and Mike. It wasn't
21    really a lead situation. It was a where can
22    we help? What have you been doing?
23          Q. Right. I noticed you didn't say
24    Adam.
25          A. Adam was certainly there. But

130

J. Fox

1    J. Fox
2    Mike was head of the agency.
3        Q.   Okay.
4        A.   So we deferred to him.
5        Q.   And do you remember the content of
6    the discussion?
7        A.   Talk to us about what you've been
8    doing since January 20. How has that been
9    going? Tell us more about NEH and your
10   alignment with the EOs, hence our discussion
11   about the grant review.
12       Q.   And do you understand the Brett as
13   referenced in this e-mail to be Brett Bobley?
14       A.   Yes.
15       Q.   It says it's -- well, strike that.
16           Do you remember the disposition of
17   Mr. McDonald and Mr. Wolfson during this
18   meeting?
19       A.   No.
20       Q.   No? Was it a typical meeting
21   between professionals, you would say?
22       A.   Yes.
23       Q.   Did anyone voice any frustration
24   or surprise at members of the DOGE team
25   interacting with them to work on their agency

131

J. Fox

1    J. Fox
2    projects?
3        A.   I don't remember.
4        Q.   Okay.
5        A.   Yeah.
6        Q.   Why did you pause for so long?
7        A.   I was trying to think. I actually
8    could not remember, like I said, the specific
9    contents of this meeting. I know based on
10   Adam's e-mail that you just showed me that we
11   obviously talked about the spreadsheet that
12   the team had been doing. But the demeanor of
13   the team is -- there was a lot of meetings
14   following this.
15       Q.   Okay. Was there ever a point
16   where maybe employees of any age expressed
17   surprise, discontent that -- DOGE's
18   involvement with NEH's process?
19       A.   No, no. Not at all.
20       Q.   Not that you saw?
21       A.   Yeah, not that I saw. Right.
22       MR. ONAYEMI: Can you scroll
23   down, please, Jacob.
24       Q.   It goes on to say:
25       "There's also a tab for

132

J. Fox

1    J. Fox
2    agency-wide grants (which applies
3    mainly to ARP awards and Chair's
4    awards). A few of the directors
5    still need to review awards made
6    through their office for this tab
7    and enter their comments.
8        "Mike and I will appreciate
9    having your thoughts and
10   suggestions. We've set aside a
11   block of time Monday morning to
12   finalize the list for OMB."
13       MR. ONAYEMI: And I think --
14   could you scroll down quickly,
15   Jacob, and then -- just all the way
16   to the bottom. Great. And then all
17   the way up.
18       THE WITNESS: Could you go to
19   the body of that e-mail that Adam
20   sent again, just so we can see the
21   full e-mail. Perfect.
22       MR. ONAYEMI: Oh, wait.
23       THE WITNESS: Could you hold
24   it there.
25       MR. ONAYEMI: Could you go

133

J. Fox

1    J. Fox
2    down again, Jacob. Thanks. I
3    actually realized that we skipped a
4    paragraph.
5        Q.   The second paragraph after the
6    first one that I read, is the record, at the
7    very beginning of talking about this e-mail
8    was, quote:
9        "It's broken down by program
10   office, each one having its own tab.
11   The directors reviewed the grants
12   made through their office and
13   entered comments for the three
14   relevant categories (i.e., DEI/DEIA;
15   gender ideology; and environmental
16   justice) and rated them based on
17   level of involvement with any of the
18   categories (high, medium, low,
19   N/A)."
20       Did I read that correctly?
21       A.   Yes.
22       Q.   Was it your understanding that --
23   did this track your understanding of the
24   review process upon joining the NEH -- upon
25   being detailed to NEH?

134

J. Fox

1  J. Fox
2  MS. DOUD: Objection.
3  A. Yeah, this aligns with ...
4  Q. Sure. So DEI, gender ideology,
5  and environmental justice --
6  A. That's what the team was looking
7  at, initially.
8  Q. Is that also something that you
9  looked at during your review process of
10 grants?
11 A. Yes.
12 Q. Okay.
13 A. One of the pieces we looked at.
14 Q. Okay. It also says "high, medium,
15 and low" there. Do you have an understanding
16 of what that means?
17 A. The interpretation of the
18 directors and the level of, at their
19 discretion, involvement of DEI, DEIA, gender
20 ideology and environmental justice.
21 Q. Okay.
22 (Stenographer clarification.)
23 MR. ONAYEMI: And then we'll
24 scroll up a bit, Jacob. Thanks.
25 Q. And then Nate Cavanaugh responds

135

J. Fox

1  J. Fox
2  and he says:
3  "Thanks Adam, Justin is going
4  to run point on preparing the grant
5  report for your meeting on Monday.
6  We'll be in touch if any questions
7  arise before then."
8  Did I read that correctly?
9  A. Yes.
10 MR. ONAYEMI: Probably one
11 more exhibit before we can break for
12 a little bit. Can you pull up
13 Exhibit 6-B -- excuse me, Tab 6-B.
14 This will be Exhibit 7.
15 (Fox Exhibit 7, E-mail from
16 Justin Fox, Bates Number
17 US-000045042, marked for
18 identification, as of this date.)
19 MR. ONAYEMI: Okay. This is
20 an e-mail from -- excuse me. This
21 is a document US-000045042, Exhibit
22 Number 7.
23 Q. This appears to be an e-mail from
24 you, Justin Fox, to Mike McDonald and Adam
25 Wolfson cc'ing Nate Cavanaugh.

136

J. Fox

1  J. Fox
2  Does that appear to be right?
3  A. Yes.
4  Q. The -- do you recognize this
5  e-mail?
6  A. Yes.
7  Q. The first -- would this have been
8  an e-mail that you sent in the ordinary course
9  of your work as a detailee to NEH?
10 A. This was work that Mike and Adam
11 asked me to do.
12 Q. You didn't answer my question.
13 Was this a document that --
14 A. Yeah. That's, that's what they
15 wanted me to do, so yeah.
16 Q. So you answered is yes, that this
17 was --
18 A. Yeah, this is pretty ordinary
19 course.
20 Q. It appears authentic?
21 A. Yes.
22 Q. Let me read the first -- well,
23 actually let's read the first paragraph:
24 "Michael, Adam, hope you both
25 had a good weekend. See attached

137

J. Fox

1  J. Fox
2  for our review of NEH grants, census
3  and contracts. It will be easier to
4  connect over the phone when
5  convenient and discuss what we've
6  pulled together. Let me know when
7  works for you tomorrow. Below
8  summarizes the attachments along
9  with the key areas for your input."
10 So I guess, let me start with
11 who's being referred to here, when you say
12 "our review view of NEH grants."
13 Are you referring to you and
14 Mr. Cavanaugh?
15 A. Yes.
16 Q. Okay. And you say "it's easier to
17 connect over phone" in the second sentence.
18 Would that have been through your
19 GSA phone?
20 A. Yes.
21 Q. And to his government phone?
22 A. Yes.
23 Q. Is it possible that that would
24 have been a communication on your personal
25 devices?

138

J. Fox

1          J. Fox
2     A.   No.
3     Q.   And then it says:
4          "Discuss what we've pulled
5     together."
6          Again, are you referring to you
7     and Mr. Cavanaugh?
8     A.   Yes.
9     Q.   Okay.  But at this point, you were
10    aware that NEH was doing its own parallel
11    review.  Right?
12         MS. DOUD:  Objection.
13    A.   Could you rephrase.
14    Q.   Was it your understanding that the
15    NEH employees were reviewing documents --
16    reviewing grants for termination based on the
17    EOs that we looked at before, DEI, gender
18    ideology, environmental justice?
19    A.   And so you're saying after or
20    alongside me reviewing these grants, or
21    before?
22    Q.   I guess let me start, just, kind
23    of, like, without any chronology.
24    A.   Sure.
25    Q.   Were you aware that the NEH was

139

J. Fox

1     reviewing grants to mark for termination by
2     the employees of the NEH?
3          MS. DOUD:  Objection to form.
4     A.   Yes.
5     Q.   Okay.  What's your understanding
6     of why you and Mr. Cavanaugh would then review
7     grants in addition to what was being done by
8     NEH?
9     A.   Well, for one, there was speed in
10    which this was getting done, and the EO
11    mandated a 60-day timeline.  We needed to help
12    them move that process along.  And this is all
13    at the request of Michael.
14         So we came in, we spent the whole
15    weekend reviewing grants for him.  And that
16    was what he wanted us to do.
17    Q.   Okay.  The next paragraph says:
18         "Grants.  We reviewed all
19    active grants for DEI involvement
20    and marked them accordingly.  Page 1
21    is a summarized view of the grant
22    details on page 2-89.  Grants are
23    shown on page 2-89 in descending
24    order of dollar amount by division.

140

J. Fox

1          J. Fox
2     Page 2 through 89 shows details for
3     active grants which were flagged as
4     having DEI involvement only.  It
5     does not show details for active
6     grants without DEI involvement or
7     grants which are expired/ended.
8     Please review the active grants
9     flagged for DEI involvement and mark
10    your decision in the column titled
11    'MM/AW' in the Excel."
12         Did I read that correctly?
13    A.   Yes.
14    Q.   When you use the word "DEI" in
15    this e-mail, are you referring to what we saw
16    in EO 14151?
17    A.   I'm referring to the same
18    parameters that the team was reviewing the
19    grants for, and --
20    Q.   Okay, what -- sorry.
21    A.   Just -- that was encompassing of
22    DEI, DEIA, environmental justice, and however
23    else they were reviewing the grants.
24    Q.   Okay.  What did you understand
25    their protocol to be?

141

J. Fox

1          J. Fox
2     A.   I didn't.  It was what Mike had
3     told them to do.
4     Q.   And how did you interpret those
5     same -- so DEI for instance, how did you gain
6     an understanding for what DEI meant in the
7     context of assessing NEH grants?
8     A.   Well, I think these grants shown
9     here are only the ones that the team flagged.
10    So to answer your question, I didn't need to
11    interpret anything.  This was just a
12    consolidated view of all the grants that the
13    team had done reviews of.
14    Q.   And you say "see attached our
15    review of NEH grants"?
16    A.   Yeah, I think --
17    Q.   Is it your testimony that you
18    actually didn't do a review of NEH grants?
19    A.   Oh, we did.
20    Q.   Okay.
21    A.   But this grant doc was a
22    consolidated view of the work that his team
23    had done.  You'll see it says:
24         "Shows details for active
25    grants which were flagged as having

142

J. Fox

1
2    involvement for DEI, it does not
3    show details for active grants
4    without DEI involvement or grants
5    which have expired/ended."
6        So this is take the work that the
7    team has done and put it into something that
8    Mike and Adam can review ahead of a meeting
9    that they had, which was for pending grants or
10   existing awards. They had it with their, I
11   think, board of directors.
12       Q.  Okay. Thank you.
13       MR. ONAYEMI:  We can take that
14   down, Jacob. Appreciate it.
15       Q.  So you were reviewing, you and
16   Nate were reviewing grants. Is that fair to
17   say?
18       A.  Yes.
19       Q.  And part of that review invoked an
20   application of your understanding of DEI,
21   gender ideology, and environmental justice.
22       Is that fair to say?
23       MS. DOUD:  Objection.
24       A.  For the ones that were flagged as
25   not having involvement, part of the lens that

143

J. Fox

1
2    we looked at it was from what you just
3    described.
4        Q.  What methodology did you use to
5    flag a grant along those lines?
6        A.  Again, the team had already done
7    high, medium, low involvement with DEI. And
8    then, so we're just focused on the raw output
9    of what is the description of that grant, and
10   apply it from the view of is this related to
11   DEI or the all-encompassing definition that
12   DEI captures, DEIA, environmental justice,
13   however Mike had described, plus is this a
14   wasteful grant.
15       Q.  Okay.
16       A.  And this was the description, the
17   full-length description that the team at NEH
18   had shared with us.
19       Q.  Got it. So there ever a point
20   in time where you yourself were looking at a
21   grant description and determining whether or
22   not it should be labeled as DEI?
23       A.  We gave our thoughts, certainly.
24   The ultimate decision came down to Mike and
25   Adam, but yes, we were looking at it from that

144

J. Fox

1
2    context.
3        Q.  Just to clarify. So you yourself
4    were looking at grants and assessing whether
5    or not there was DEI involvement with those
6    grants.
7        Is that fair to say?
8        A.  As one piece of the puzzle, yes.
9        Q.  Right.
10       A.  And there was other, yeah, aspects
11   can play into that, but --
12       Q.  Right.
13       A.  -- and we ultimately deferred to
14   Adam and Mike, but we relayed our
15   perspectives.
16       Q.  You said that a number of times
17   and I've understood, yeah. But --
18       A.  Great.
19       Q.  -- I'm asking you about how you
20   were, actually, assessing the grants as you
21   privately looked at them. Which I can ask.
22       Did you ever sit down, not with
23   Mike and not with Adam and not with Nate, and
24   review grants for DEI involvement on your own?
25       MS. DOUD:  Objection.

145

J. Fox

1
2        A.  Yes, as one piece of the puzzle.
3        Q.  And the same for gender ideology.
4    Is that fair to say?
5        A.  That'd be fair.
6        Q.  And economic justice. Right?
7        A.  That'd be fair.
8        Q.  Or -- excuse me -- environmental
9    justice, is that fair?
10       What methodology did you apply
11   when you were sitting and reviewing grants
12   alone to determine whether something should be
13   flagged yes or no for DEI?
14       A.  Reading the description under the
15   context of the all-encompassing definition
16   that we've gone over about DEI, does this
17   relate, this description, the full-length
18   description relate to DEI, yes or no.
19       And, again, this is only on the
20   grants that were not flagged as having DEI
21   involvement, because the NEH team had already
22   done weeks of work on the existing grants that
23   were outstanding and flagged them as having
24   DEI involvement or not.
25       So then our work was solely

146

J. Fox

1    focused on those that the team did not at
2    first pass believe related to DEI, those were
3    the grants that we really spent time
4    deliberating on and receiving input from Mike
5    and Adam.
6        Q.   Okay.  I think you said earlier
7    something about the fact that there were so
8    many grants, and so part of your job was to
9    come in with an aide and aide, kind of, help with
10   the general, like, load of work that needed to
11   be done.
12       Do you remember saying something
13   to that effect?
14       MS. DOUD:  Objection.
15       A.   Helping Mike and Adam was the sole
16   reason they were there.  When we got there,
17   all of the grant reviews were in separate tabs
18   and disorganized.  And so what we did was help
19   them organize the work that their team did.
20       Q.   Okay.  And then you also have said
21   that you applied your own -- you reviewed
22   grants yourself as well.  Right?
23       A.   Yes.
24       Q.   Okay.  So it wasn't just
25

147

J. Fox

1    organizing work that was already done.  You
2    were adding to the process of grant review.
3        Is that fair to say?
4        MS. DOUD:  Objection.
5        A.   We were helping Mike and Adam
6    think through each of the grants that their
7    team had not deemed related to DEI.  That was
8    the sole purpose.
9        Q.   Okay.  Got it.  But you weren't
10   just organizing work that was already done.
11   You were adding your own impressions to grants
12   to mark for DEI or not DEI?
13       A.   Our impressions, yes.
14       Q.   Okay.  Great.
15       MR. ONAYEMI:  Let's go to the
16   next.
17       MS. DOUD:  Yinka, it's after 1
18   and we've been going for quite a
19   while.  Can we break for lunch soon.
20       MR. ONAYEMI:  Yeah, we can --
21   yeah, sure.  We can break here.  Go
22   off the record.
23
24
25       (Continued on the next page.)

148

J. Fox

1        THE VIDEOGRAPHER:  The time is
2    1:06 p.m.  This concludes Media 3.
3    Off the record.
4        (Lunch recess taken from 1:06
5    p.m. to 2:00 p.m.)
6        ---
7    AFTERNOON SESSION
8        ---
9        (Time noted:  2:00 p.m.)
10       ---
11       THE VIDEOGRAPHER:  The time
12   now is 2:00 p.m.  This begins Media
13   4.  On the record.
14
15   JUSTIN FOX,  resumed and testified
16       further as follows:
17   CONTINUED EXAMINATION
18   BY MR ONAYEMI:
19       Q.   Hi Justin.  So before the break,
20   we were talking about DEI.  Do you remember
21   that?
22       A.   Yes.
23       Q.   Was screening grants, projects, et
24   cetera, a directive for DEI, a directive that
25

149

J. Fox

1    came from DOGE?
2        A.   No, from the executive order.
3        Q.   Okay.  And did you apply that
4    same -- did you apply those executive orders
5    to several agencies during your time with the
6    government?
7        A.   Yes.
8        Q.   Which other agencies did you apply
9    them to?
10       A.   Every agency that we went to.
11       Q.   And that's the EO about DEI and
12   the EO about gender ideology?
13       A.   And the EO about initiating a DOGE
14   lead and finding optimization savings.
15       Q.   But those two were included in
16   the --
17       A.   Included in the scope of what we
18   were focused on.
19       Q.   Got it.  Who told you to apply
20   those executive orders to your work at
21   grants -- excuse me -- at agencies?
22       A.   The executive orders themselves
23   require that every agency adhere to them, and
24   we were there to help the agency leads
25

150

J. Fox
1
2    implement EOs. That was just the protocol for
3    the small agencies team.
4        Q. Okay. Who told you that part of
5    your role would be implementing -- helping to
6    implement those EOs at the various agencies.
7        A. Nate.
8        Q. Anyone else?
9        A. The leadership team, Josh, Stephen
10   Ehikian, Anthony Armstrong.
11       Q. Did those people know that you
12   were detailed to NEH?
13       A. Yes.
14       Q. Did you tell them that -- again,
15   strike that.
16          How would they have known that you
17   were detailed to NEH?
18       A. We were focused on all of the
19   small agencies. We probably had -- yeah, the
20   100 agencies that we were detailed into, yeah.
21       Q. So as you went through -- strike
22   that.
23          You testified earlier about the
24   fact that you reviewed grants yourself to mark
25   for termination. Is that right?

151

J. Fox
1
2        MS. DOUD: Objection.
3        A. That's not right.
4        Q. So explain why that's not --
5        A. We mark our interpretation of
6    grants and whether or not we think it
7    adheres -- and that's "we" as in Nate and I --
8    and we present that back to the agency leads,
9    who ultimately make the final decision.
10       Q. But what were you marking?
11       A. Compliance with the EOs being --
12   relating to DEI or wasteful spending in the
13   context that we were just talking about, the
14   team had focused on all of the DEI, and we
15   were consolidating the lists of DEI grants
16   that were flagged and reporting that back to
17   Adam and Mike. We weren't terminating grants
18   on the spot.
19       Q. Right. I didn't mean to suggest
20   that if that's what you understood.
21          What I was asking was -- let me
22   break it into its several parts.
23          You were reviewing grants. Is
24   that fair to say?
25       A. Yes.

152

J. Fox
1
2        Q. And you were reviewing grants for
3    DEI, gender ideology, wasteful spending, et
4    cetera. Right?
5        A. Yes.
6        Q. But including those three
7    specifically -- right? -- plus others, but
8    those three explicitly you were using to
9    assess or analyze the grants.
10          Is that fair to say?
11       A. Yes.
12       Q. And was it your understanding
13   while you were doing that, that the grants
14   that you marked "yes" for under those concepts
15   would be teed up for later termination?
16          MS. DOUD: Objection.
17       A. Subject to Adam and Mike's input.
18   We read through all of them and explained what
19   we felt, hence the column for Mike McDonald,
20   Adam Wolfson to tag as "keep."
21       Q. Right. I guess -- we'll get --
22       A. Procedurally.
23       Q. We'll get there. That's not
24   exactly the question I'm asking.
25          Was it your impression at the time

153

J. Fox
1
2    of marking those grants that that was
3    somewhere in the pipeline towards termination
4    of those grants?
5          Did you assess them with the sense
6    that these are grants that if I say yes, DEI,
7    it would be moving that grant closer to
8    eventual termination?
9          MS. DOUD: Objection to form.
10       A. Yes.
11       Q. So as you were going through the
12   grants -- and, again, you noted that you did
13   private review of grants for DEI and wasteful
14   spending. Right?
15       A. Yes.
16          MS. DOUD: Objection.
17       Q. As you were doing that, what
18   informed your understanding of whether a grant
19   had DEI?
20       A. We applied the same definitions
21   that were listed in the EOs that we read
22   through, and overlaid that into the context of
23   what was the mission of this grant, what are
24   the outcomes, why was this awarded. We
25   applied that to every grant.

Justin Fox - January 28, 2026

154

J. Fox

1
2      Q.   When you say "we," who are you
3   talking about?
4      A.   Nate, me, and, what I would
5   assume, the rest of the NEH team who was
6   making a competitiveness review to align with
7   the executive orders.
8      Q.   So if you were looking at a
9   specific grant, your starting point for
10  analyzing that grant is does this comply or
11  not comply with this set of EOs.
12      Is that fair to say?
13      A.   Does this present -- the way that
14  we framed it was:  Does this potentially
15  conflict with the EOs.
16      Q.   Okay.
17      A.   If it did, Mike and Adam, this is
18  what we think, why it conflicts, what do you
19  think.  So yeah, so it is.
20      Q.   Okay.  And as you were assessing
21  whether or not it conflicts, can you explain,
22  kind of, your mental impression -- strike
23  that.
24      Maybe I can ask:  Like, where were
25  you doing this work, first of all, physically?

155

J. Fox

1
2      A.   GSA, the GSA building.
3      Q.   At your desk at the GSA building?
4      A.   Yes.
5      Q.   Okay.  And so maybe, and I know
6   this sounds boring, but maybe walk me through
7   what an afternoon of reviewing grants would
8   look like for you at GSA?
9      MS. DOUD:  Objection.
10      A.   The list that I had consolidated
11  from Mike's team has details from eGMS and
12  Brett Bobley and team on each grant, read all
13  the details about this grant, and overlay the
14  EO's mission on what we're trying to find on
15  top of this grant.
16      Q.   Would you -- you think it's fair
17  to say that after looking at hundreds of
18  these, you had synthesized some sort of, kind
19  of, easier way to assess whether a grant
20  conflicted with an EO that didn't require you
21  to go to the EO every time and read the whole
22  thing?
23      A.   There's definitely patterns that
24  you can recognize, grants that are two
25  different people -- or two different grantees

156

J. Fox

1
2   that are accomplishing the same mission.  You
3   read every one, and yes, after the 6th or
4   700th one, you do start to develop pattern
5   recognition of how each grant is infringing or
6   not on the EOs.
7      Q.   Did you read every one?
8      A.   Yes.
9      Q.   What were some patterns that you
10  noticed?
11      A.   Promoting an LGBTQ study,
12  stipending research on gender fluidity.
13      Q.   Why is, in your view, is LGBTQ
14  DEI?
15      A.   This is based on the EO discussing
16  underrepresented minority groups of which
17  LGBTQ is often associated with.
18      Q.   So I guess in synthesizing --
19  strike that.
20      Part of your synthesis of the EOs
21  was that LGBTQ stuck out as obviously contrary
22  to the spirit of those EOs.
23      Is that, kind of, what you're
24  saying?
25      MS. DOUD:  Objection.

157

J. Fox

1
2      A.   Not entirely.
3      Q.   Okay.  Why do you say "not
4   entirely"?
5      A.   Do you have a specific grant in
6   mind?
7      Q.   We'll come to that.  But I want to
8   get your understanding of what you're doing
9   day-to-day in canceling -- in reviewing these
10  grants.
11      A.   And you were asking what again?
12  Specifically about LGBTQ relationship to DEI?
13      Q.   Yeah.  Is it fair to say that in
14  applying this synthesized understanding of the
15  EOs, LGBTQ grants jumped out as being contrary
16  to the nature of the EOs?
17      MS. DOUD:  Objection.
18      A.   Contrary to the nature meaning
19  conflicting with?
20      Q.   Conflicting with, yes.
21      A.   Potentially.
22      Q.   Okay.
23      A.   Ultimately not my call.
24      Q.   What else did you think was DEI,
25  anything besides LGBTQ?

158

1        J. Fox
2    A.   Gender ideology, race, cultural or
3  underrepresented cultures.
4    Q.   Just to be clear, marking
5  something for DEI was a precursor to
6  cancellation?
7        MS. DOUD:  Objection.
8    A.   It informs Mike and Adam to make a
9  decision.
10   Q.   Okay.  But you understood your
11  marking of a grant as DEI to be a precursor,
12  to -- on the road to potential cancellation.
13       Is that fair to say?
14   A.   Being in conflict with an EO,
15  potentially.
16   Q.   And one of those EOs was about
17  DEI?
18   A.   Reducing spend on DEI grants.
19   Q.   Right.  Okay.  And so you said
20  race, underrepresented groups, why would you
21  suggest that grants about those issues be
22  terminated?
23   A.   I didn't suggest they be
24  terminated.  I only tagged their relationship
25  to DEI, diversity, equity, and inclusion.

159

1        J. Fox
2    Q.   With the understanding that you
3  marking that would serve as a precursor, a
4  signal to cancel those grants.  Right?
5        MS. DOUD:  Objection.
6    A.   Signals a review, those grants.
7    Q.   On the road to termination.
8  Right?
9        MS. DOUD:  Objection.
10   A.   If that's what they wanted to do,
11  yes.
12   Q.   I'm a little confused.  Your goal
13  with DOGE was to save money be -- right? --
14  reduce the deficit, and apply these EOs on the
15  road to those goals.  Right?
16       MS. DOUD:  Objection.
17   A.   To assist the agency heads with
18  being in compliance with the EOs.  Part of the
19  EOs were to find savings through reduction and
20  spend.
21   Q.   Right.  Okay.  And so part of --
22  we discussed this, you know, hours ago, part
23  of your work was to help to identify grants
24  for termination.  Right?
25       I'm not saying you terminated

160

1        J. Fox
2  them.  I just want to be clear that we're,
3  kind of, collating these things.  I'm not
4  saying them all at once.
5        Part of your job was to identify
6  grants for potential termination.  Is that
7  fair to say?
8    A.   For the review of Mike and Adam to
9  comply with the EO.  In view that this grant
10  was not in compliance with the EO, ultimately,
11  it's their decision to cancel it.  And we were
12  helping them review these grants in the
13  context of adherence to the EO.
14   Q.   In the context of the grants
15  potentially being terminated?
16   A.   Relating to DEI.
17   A.   Relating to DEI.
18   A.   That's what we give to them, is
19  the grants that are not in compliance with the
20  EO's mandate.  Ultimately, their decision to
21  terminate.
22   Q.   And so you said not in compliance
23  with the EO's mandate, earlier you noted that
24  things that jumped out to you were LGBTQ plus
25  issues, oppressed minorities, race, et cetera.

161

1        J. Fox
2        Is that fair to say?
3    A.   Those stood out to me as relating
4  to DEI.
5    Q.   Okay.  So would you -- just
6  applying one.  Let's take LGBTQ, is it -- was
7  it whether the author was identified as LGBTQ?
8  Was it whether the grant purpose was --
9  mission was about LGBTQ?  What were you
10  assessing?
11       MS. DOUD:  Objection.
12   A.   There's a grant description, and
13  we were assessing if that had related to DEI.
14   Q.   LGBTQ being one form of DEI that
15  you've explicitly stated in the deposition.
16  Right?
17   A.   A form of it.
18   Q.   Race being another one?
19   A.   Wasteful spending being another
20  one.
21   Q.   Sure, yeah, but race is another
22  one too.
23       MS. DOUD:  Objection.
24   A.   However the EO had stated it was
25  how we interpreted it.

162

J. Fox

1
2    Q.   Okay.  But you've already noted
3    that you were synthesizing and not referring
4    to the EO every time you looked at a new
5    grant.
6         Is that fair to say?
7    A.   That's fair to say.
8         MR. ONAYEMI:  Let's go to
9    Tab 7.  I think this will be
10   Exhibit 8.
11        (Fox Exhibit 8, Attachment to
12   Exhibit 7, Bates Number
13   US-000045132, marked for
14   identification, as of this date.)
15   Q.   It's, kind of, small.  Can you see
16   the text from where you're sitting?
17        THE WITNESS:  Could you scroll
18   up.
19        (Discussion off the record.)
20        MS. DOUD:  What document is
21   this?
22        MR. ONAYEMI:  This is
23   US-000045132.
24   Q.   So I will represent that this is
25   the attachment that was referenced in

163

J. Fox

1
2    Exhibit 7, in that e-mail from you to
3    Mr. McDonald and Mr. Wolfson, that we reviewed
4    before the break.
5    A.   Which one was that?  Which e-mail?
6    Q.   The one that said -- that had the
7    "Grants" section bullet, and it said:
8         "We reviewed all active grants
9         for DEI involvement and marked them
10        accordingly."
11        Do you remember that?
12   A.   Yes.
13   Q.   So this is the document that was
14   attached to that e-mail.
15        MR. ONAYEMI:  And if you
16   scroll down a little bit, Jacob.
17        I'm sorry.  I'm doing the same
18   thing.  Can you scroll down, Jacob.
19   Thanks.  Keep going.
20   Q.   Yeah, so starting on page 3 of
21   this document, and going down through page 66,
22   there are just, you know, hundreds and
23   hundreds of grants.
24        Does this look like -- does this
25   appear to be the document that you would have

164

J. Fox

1
2    been referencing in that e-mail to
3    Mr. McDonald?
4    A.   This came --
5         MS. DOUD:  Objection.
6         THE WITNESS:  Sorry.
7    A.   This came across in the
8    attachment.  Right?
9    Q.   Right.
10   A.   Yes.
11   Q.   But it looks like the type of
12   thing that you were talking about in that
13   e-mail?  There's a --
14        MR. ONAYEMI:  Sorry, can you
15   scroll up again, Jacob.  Keep it --
16   yeah, right there is good.
17   Q.   There's a column all the way to
18   the left that says "yes/no DEI" question mark.
19   Then there's -- the next column is "division,"
20   the next one is "number," the next one is
21   "award number."  And then if you keep going,
22   there's a "DEI rationale," there's the "MM/AW"
23   that I think we read earlier in one of the
24   e-mails.
25        Does this look like it comports

165

J. Fox

1
2    with your understanding of the document that
3    was being referenced?
4    A.   For that e-mail, yes.
5    Q.   Do you recognize this document?
6    A.   It is one of a few that looked
7    very similar to this.
8    Q.   Did you contribute to this
9    document?
10   A.   Yes.
11   Q.   What did you do to contribute to
12   this document?
13   A.   At this point, I don't remember
14   because there was a lot of back and forth
15   between the team doing their review, Adam and
16   Mike doing their view, and Nate and myself
17   doing review.
18        I don't remember which stage this
19   was in, frankly, because documents like this
20   were passed throughout our interactions.
21   Q.   Okay.  But let's say -- let's just
22   take, kind of, the life of the document.
23        How did you contribute to it over
24   that life span?
25   A.   Mike and Adam gave what their team

166

1          J. Fox
2   had done, reviewing every outstanding grant,
3   tagging for DEI or not.
4          The first thing we did was
5   re-review the ones that had already been
6   reviewed by the team and assessed our
7   understanding of compliance or not with the
8   EOs, and sent that back to Adam and Mike
9   because that's what they asked us to do.
10          Over the lifecycle of this and,
11   again, I don't know which stage we're looking
12   at here, we passed it back and forth and
13   identified the ones that were most aligned
14   with the direction that NEH was choosing to
15   go, and in most compliance with the EOs.
16      Q.   You said in the direction that the
17   NEH was willing to go?
18      A.   Was headed.
19      Q.   Was headed.
20      A.   Yes.
21      Q.   Okay. What was your understanding
22   of that direction?
23      A.   Pro-America, meritocracy,
24   mission-critical grants, Garden for American
25   Heroes, elimination of wasteful spending, DEI,

167

1          J. Fox
2   and adherence to the EOs.
3      Q.   How did you come to that
4   understanding?
5      A.   Our meetings.
6      Q.   With who?
7      A.   Mike and Adam.
8      Q.   And what exactly did they say
9   about those focuses of DEI -- or excuse me --
10   of NEH?
11      A.   That they knew they needed to be
12   in compliance with EOs and reduce the amount
13   of DEI grants that they had, and separate
14   funds to go towards Garden for American Heroes
15   and America250 initiatives.
16          (Stenographer clarification.)
17          THE WITNESS: Statues and
18   garden, yeah.
19      Q.   There's a column called "DEI
20   rationale." Do you know who would have
21   contributed to the entries in that column?
22      A.   Me and Nate.
23      Q.   Okay. And I think I understood
24   you to be saying earlier that you would read
25   the grant description and then make a judgment

168

1          J. Fox
2   based on your understanding of the EOs to fill
3   in this column.
4          Is that a fair recounting?
5      A.   Directionally, it is.
6      Q.   Anything you want to clarify about
7   it?
8      A.   Yeah.
9      Q.   Sure.
10      A.   Part of it is framing, assisting
11   Adam and Mike with their review -- right? --
12   so part of what we did was pulling in a large
13   amount of data from different sources and
14   putting it into something that is digestible
15   for the team, because Adam and Mike are going
16   to review every grant, but we need to convey
17   our thoughts about DEI rationale.
18      Q.   So how did you -- like, any of
19   these rationales, how would you have actually
20   gotten from the description to that DEI
21   rationale in the column of that same name?
22      A.   Using the grant description.
23      Q.   And applying a synthesized
24   understanding of what the EOs called for?
25      A.   Interpreting the grant description

169

1          J. Fox
2   into the executive order context.
3      Q.   Okay. So, again, you mentioned
4   that certain concepts you saw as being
5   contrary or conflicting with the EOs, and you
6   named LGBTQ, race, oppressed minorities.
7          Do you remember that testimony?
8      A.   Yes.
9          MS. DOUD: Objection.
10      Q.   So, like, is it your view -- or
11   while you were doing this, was -- would you
12   say it was correct to, kind of, state that a
13   project that discussed an underrepresented
14   culture, for instance, was something that the
15   executive orders required to be terminated?
16          MS. DOUD: Objection.
17      A.   Required to be terminated? No.
18      Q.   Is the issue with the word
19   "required"? I guess, why did you repeat that
20   particular clause?
21      A.   The EOs are meant to instruct how
22   to frame the problem, and eliminating wasteful
23   spending and DEI grants was the mandate.
24      Q.   So there's 60-something pages
25   here, thousands of grants. Did you write all

170

J. Fox

of those rationales.

A. Reviewed -- reviewing the grant
description, you can extract and highlight key
text. Right? As we said, there are patterns
to what is related to DEI. It's not Garden
for American Heroes. It's typically involving
underrepresented cultures and communities,
race, LGBTQ, then that informs what's written
in DEI rationale.

Q. Okay. So you didn't write those
descriptions?

A. We edited and wrote on top of.
But they pull out the keywords and phrases
from grant description.

Q. What pulls out the keywords and
phrases?

A. There's extractors that you can
layer on top of Excel to grab the keywords,
and then you can pull in how it frames in the
context of the EO.

Q. When you say -- so what extractor
do you use to pull out keywords from the
Excel?

A. Well, Excel has a lot of native

171

J. Fox

functions to pull out keywords. You can
overlay that on top of grant descriptions.

Q. Respectfully, I'm not asking about
Excel's capabilities. I'm asking what you
actually did on this spreadsheet to pull out
key terms?

MS. DOUD: Objection.

A. We used closed-source aggregators
that drew the context from the grant
description into DEI verbiage that related to
this grant. And then over top of what was
extracted, we write in additional thoughts and
clarification.

Q. What's a "closed-source
aggregator" -- strike that.

What closed-source aggregator did
you use to assess these grant descriptions?

A. Within Excel, you're able to put
in a closed-loop LLM that extract the keywords
and phrases.

Q. What LLM did you use?

A. OpenAI.

Q. That's ChatGPT?

A. That's the umbrella. It wasn't

172

J. Fox

ChatGPT, but it's one of the LLMs in ...

Q. So you used an LLM to screen the
grant descriptions for certain terms?

A. Yes.

Q. Okay. How did you come up with
that list of terms?

A. The executive order has
explanations of what is involving DEI. And
you keyword search into the grant description
to extract the keywords and phrases that match
the phrases that are listed in the EO.

Q. Okay. Why did you use OpenAI to
assess these grants rather than read them one
by one?

A. We reviewed each grant, each
grant, and for the sake of efficiency, pulled
out the key phrases and layered on top our
view of how this overlays with the EOs.

Q. So give me an example of a key
word that you would have --

A. LGBTQ.

Q. Okay. And so if a grant had
LGBTQ, you would -- well, I guess the model
would identify that, and then you would mark

173

J. Fox

it yes for DEI?

A. No. We extract the phrase and the
four to five words that come before or after
that keyword, and adjust what's written to
address why this may be related, in our view,
to something conflicting with an EO.

Q. Did Mr. McDonald know that you
were using an LLM to assess the grant
descriptions?

A. I'm not sure.

Q. What about Nate Cavanaugh?

A. I don't know.

Q. Did anyone instruct you to do
that?

A. No.

Q. So you used an LLM on your own
initiative to screen thousands of grants for
what the LLM perceived was DEI?

MS. DOUD: Objection.

A. No.

Q. Why no?

A. We had to read the grant
description and make our own assessment of
whether this was related to DEI or not.

174

J. Fox

1
2   The DEI rationale column is only
3   meant to contextualize it by extracting the
4   key phrases that came up in our keyword
5   search, so that Mike and Adam, instead of
6   having to go in each one and call us and say,
7   Grant 1, why did you believe this was DEI.
8       And that we were able to put in
9   our rationale for each of these grants after
10  having looked at the grant description.
11      Q.  So you reviewed every grant
12  yourself?
13      A.  Yes.
14      Q.  And you also used an LLM?
15      A.  To pull out --
16      MS. DOUD:  Objection.
17      A.  To pull out the keywords and
18  phrases so that Mike and Adam can see what we
19  see without needing to have them call us and
20  explain each grant.  We put it into a
21  digestible document and explain in the DEI
22  column why we feel, based on the grant
23  description, this could be related to DEI.
24      Q.  You keep saying "we" but you just
25  testified that Nate didn't know you were using

175

J. Fox

1
2   an LLM, that Mike McDonald didn't know, Adam
3   Wolfson didn't know.
4       Who is "we"?
5       MS. DOUD:  Objection.
6       A.  Is the question whether or not
7   they knew that I was writing a DEI rationale
8   for each one?
9       Q.  Well, when you said "we," and then
10  fill in whatever you did with the LLM.  Is
11  there a "we"?  Who are you working with in
12  this particular LLM project?
13      A.  Yeah.  Whether Nate knew I was
14  using an LLM or not, I'm not sure.  That's
15  what I said.  We were collectively pulling in
16  DEI rationale to explain why the grant
17  description we felt was relating to DEI.
18      Q.  If you had already been reviewing
19  every grant one by one, such that you gained
20  an understanding of it, why then run all those
21  grants again through a large language model
22  like OpenAI?
23      MS. DOUD:  Objection.
24      A.  I'm not sure.
25      Q.  You don't know?  But no one told

176

J. Fox

1
2   you to.
3       A.  No.
4       Q.  Was this in an effort to increase
5   efficiencies in the project?
6       A.  To make sure that Mike and Adam
7   knew what context we were reviewing this
8   grant.
9       Q.  Right.
10      A.  Individual grants.
11      Q.  But you knew the context because
12  you had reviewed the grants?
13      A.  Yeah.
14      Q.  So why do you need an LLM to tell
15  Mike or Adam that?
16      A.  We needed Mike and Adam to
17  understand where we were coming from, because
18  it is their decision.  And instead of calling
19  them for each grant and explaining each grant,
20  we pulled out a DEI rationale to explain our
21  point of view so that Mike and Adam could see
22  our point of view.  They have the grant
23  description themselves, it's ultimately their
24  judgment call but we were helping them review.
25  So the DEI rationale puts it into context for

177

J. Fox

1
2   them.
3       Q.  Absolutely.  I understand why you
4   might want to communicate a DEI rationale to
5   Mike and Adam.  I don't understand why or how
6   the involvement of OpenAI would be required to
7   do that.
8       MS. DOUD:  Objection.
9       A.  Is that a question?
10      Q.  Why did you use OpenAI for that
11  purpose?
12      A.  Excel functions are loaded
13  inherently by whatever you can do in Excel
14  with formulas.  So in order to grab the
15  phrases that we were searching for and to put
16  it into something that we can adjust, to best
17  contextualize it for Adam and Mike, I elected
18  for using that.
19      But I read every grant
20  description, I could've just filled it out on
21  my own.  So my answer is I don't know why.
22      Q.  Okay.  But I guess the model was
23  pulling out whether or not a grant description
24  involved DEI.  Is that fair to say -- strike
25  that.

178

J. Fox

1
2     How do you know that your
3     understanding of DEI was consistent with the
4     model's understanding of DEI?
5         MS. DOUD:  Objection.
6     A.  Because we read every grant
7     description and adjusted DEI rationale based
8     on our perspectives.
9     Q.  So the final rationales that you
10    would have sent to Mike and Adam would be
11    different than the rationales that were spit
12    out by OpenAI's model?
13    A.  Some of them.
14    Q.  But not all of them?
15    A.  Hard to say.  We made edits on
16    every single one.
17        MR. ONAYEMI:  Jacob, can we go
18    down to -- it's Row 880 in that
19    number column.  It's going to be far
20    down.  You might just want to drag
21    the cursor.  Yeah.  There you go.
22    You're close.  There you go.  All
23    right.  It's right there.
24        So what we're looking at is
25    Row 880 of Exhibit 8, US-000045132.

179

J. Fox

1
2     If you can scroll down a tiny bit or
3     maybe scroll up, actually, just so
4     we can see that far left Column 880.
5     BY MR. ONAYEMI:
6     Q.  Do you remember the far left
7     Column being "DEI?  Yes/No"?  We can go back
8     up if you want, but --
9     A.  Well, this is just what you're
10    saying, that the far-left column is yes or no,
11    DEI?
12    Q.  Yeah.  Right.
13    A.  Yes.
14    Q.  So you can see in Row 880, it says
15    "yes"?
16    A.  Yes.
17    Q.  Okay.  And that means that this
18    project, in your view, did have DEI such that
19    it conflicted with the EOs that you were
20    applying?
21        MS. DOUD:  Objection.
22    A.  Can I read it?
23    Q.  Sure.  Sure.  Yeah.
24        MR. ONAYEMI:  Can you zoom in
25    a bit so we can see the text larger,

180

J. Fox

1
2     Jacob.  That's fine.  880.
3     I can read it into the record.
4     Q.  For Row 880, it says, under the
5     "DEI rationale" column:
6         "The Troth Yeddha' project
7     aims to increase access to diverse
8     humanities collections which aligns
9     with DEI goals of promoting
10    inclusion and diverse perspectives."
11        Did I read that correctly?
12    A.  Yes.
13        THE WITNESS:  Could you scroll
14    to the right for the product
15    description.  Sorry I'm yelling
16    again.
17    Q.  So this is -- in the next column
18    over, that's the grant description, it says:
19        "The Troth Yeddha' humanities
20    infrastructure project will allow
21    interdisciplinary, humanities
22    programs and centers, currently
23    scattered across campus, to be
24    housed under one roof to better
25    serve students, staff, faculty,

181

J. Fox

1
2     campus and visitors.  In particular,
3     the Alaska Native Language Center
4     and its Archives will be showcased,
5     to increase student and public
6     access to diverse humanities
7     collections."
8         Did I read that correctly?
9     A.  Yes.
10        MR. ONAYEMI:  And then we can
11    go back to the DEI rationale column,
12    Jacob.
13    Q.  Again, it says:
14        "The Troth Yeddha' project
15    aims to increase access to diverse
16    humanities collections which aligns
17    with DEI goals of promoting
18    inclusion and diverse perspectives."
19        Did you write that?
20    A.  Yes.
21    Q.  Did OpenAI write that?
22    A.  Portions of it, maybe.
23    Q.  So tell me why this project is
24    DEI.
25        MS. DOUD:  Objection.

182

J. Fox

1
2    A.   It's promoting inclusion and
3    diverse perspectives.
4    Q.   What about diverse perspectives is
5    DEI?
6    A.   It's not merit based.
7    Q.   Diverse perspectives is not merit
8    based?
9    A.   There's just no reason for it to
10   be -- this is involving DEI.  It is
11   involving -- it is promoting through federal
12   funding diversity, equity, and inclusion
13   principles.
14   Q.   And those principles are, I see
15   right here, promoting inclusion and diverse
16   perspectives.  Right?
17        THE WITNESS:  Scroll to the
18   right.
19   A.   For the Native Alaskan Language:
20        "Native Alaskan Language and
21   its archives will be showcased, to
22   increase student and public" --
23   yeah.
24        It is just promoting this language
25   center in the archives for the sake of

183

J. Fox

1
2    diversity.
3    Q.   What's wrong with promoting a
4    language center?
5        MS. DOUD:  Objection.
6    A.   It's wasteful, noncritical spend.
7    Q.   But you have a DEI rationale
8    there.
9        MS. DOUD:  Objection.
10   A.   It is DEI.  I just explained why
11   it was DEI.  Because you're promoting a subset
12   Alaskan Native Language Center in the archives
13   to promote diverse perspectives.
14   Q.   A subset of what.  You said you're
15   promoting a subset.  What does that mean?
16   A.   A minority group.
17   Q.   Okay.  So a project that promotes
18   a minority group would be conflicting with
19   your interpretation of the EOs?
20        MS. DOUD:  Objection.
21   Q.   Is that fair to say?
22   A.   It's subjective.
23   Q.   Subjective based on what?
24   A.   It's all based on the
25   interpretation of each grant and the details

184

J. Fox

1
2    of it.
3    Q.   You --
4    A.   So --
5    Q.   Oh, sorry.
6    A.   You can't overgeneralize a
7    statement like that.
8    Q.   Your interpretation of the grants?
9    A.   It depends on the grant.
10   Q.   Based on your interpretation of
11   those grants.  Is that fair to say?
12        MS. DOUD:  Objection.
13   A.   Through the lens of applying the
14   EO's language.
15   Q.   Right.  But you ultimately decided
16   how you would apply the EO's language to these
17   grants descriptions.  Right?
18   A.   Ultimately, I made the effort to
19   overlay the way that the EO was written with
20   the grant's descriptions, and whether they
21   conflicted or not is ultimately the decision
22   for Adam and Mike.
23   Q.   How did you deal with edge cases?
24   Let me take a step back.
25        Were there ever descriptions that

185

J. Fox

1
2    you said this might be DEI, it might not.  I
3    don't really know.
4        Or was it always clear?
5    A.   It's not always clear with DEI,
6    but the context of wasteful spending is a
7    fairly clear way to delineate the grants.
8        (Stenographer clarification.)
9    Q.   Would you say that spending on DEI
10   is innately wasteful?
11   A.   It depends.
12   Q.   When you were assessing this
13   Alaskan language project for DEI, it was on
14   the basis that it promoted a minority group.
15   Is that fair?
16        MS. DOUD:  Objection.
17   A.   A minority culture, minority
18   group.
19   Q.   I suppose, so I guess what's a
20   majority culture?
21   A.   I'm not sure.
22   Q.   Well, did you ever screen anything
23   for majority cultures?
24   A.   In what context?
25   Q.   Well, I guess what's a minority?

186

1          J. Fox
2          MS. DOUD: Objection.
3      Q.  In this context.
4      A.  What context? This grant?
5      Q.  Of you analyzing all of these
6   grants for DEI or conflicts with the EOs?
7      A.  It fully depends on the grants.
8      Q.  When you say "it fully depends on
9   the grant," is what you're saying that you
10  would have to read the grant to determine,
11  based on the system that you were applying,
12  whether or not that grant was promoting DEI?
13     A.  Yes.
14         MR. ONAYEMI: Okay.
15         So less go now, Jacob, to
16  Row 252.
17     Q.  Okay. So we're in Row 252 of the
18  same document. Can you read what's in the
19  first column that was "yes or no DEI" into the
20  record?
21     A.  (Reading): "Yes."
22     Q.  It says "yes" in that column.
23  Right?
24     A.  Yes.
25     Q.  Okay. And under "DEI rationale,"

187

1          J. Fox
2   in the column of the same name, it says:
3          "The documentary addresses
4       gender-based violence and overlooked
5       histories, contributing to DEI by
6       amplifying marginalized voices."
7          Did I read that correctly?
8      A.  Yes.
9      Q.  Is gender-based violence DEI?
10     A.  Could I see the full grant
11  description?
12     Q.  Well, sure. But, I guess, that's
13  a question that has nothing to do with what's
14  in the next column just like is gender
15  based --
16         MS. DOUD: Once again, you
17     need to allow him to read the
18     document.
19         MR. ONAYEMI: Well, I'm asking
20     him to answer the question.
21         MS. DOUD: No, he gets to read
22     the entire exhibit. This is how
23     depositions work. So if he says he
24     needs to see part of it, you need to
25     let him see part of it.

188

1          J. Fox
2          MR. ONAYEMI: Okay, Counsel,
3      just for the record, let me just say
4      this pretty clearly, so I'm sure
5      you've been in cases where there are
6      a hundred or a thousand page
7      contracts that need to be submitted
8      in full. I am sure that you're not
9      implying that every witness needs to
10     read every page of a contract --
11         MS. DOUD: I'm saying if he
12     asks to read something, you have to
13     let him read it. And you're trying
14     to prevent him from doing that, I
15     don't know why. But he asked to
16     read it, let him read it.
17         MR. ONAYEMI: Right. Go ahead
18     and read it, please.
19         THE WITNESS: Which one was
20     it, Jacob? Sorry.
21  BY MR. ONAYEMI:
22     Q.  252. Right there. I can read it
23  into the record. The grant description of
24  column or Row 252, says:
25         "Production of 'My Underground

189

1          J. Fox
2   Mother,' a feature-length
3       documentary that explores the untold
4       story of Jewish women's slave labor
5       during the holocaust through a
6       daughter's search for her late
7       mother's past, a collective camp
8       diary in which she wrote, and
9       interviews with dozens of woman
10      survivors who reveal the
11      gender-based violence they suffered
12      and hid from their own families."
13         Did I read that correctly?
14     A.  Yes.
15     Q.  And then, in that row or column,
16  you say "yes," DEI. Did you write the
17  rationale in that column?
18         THE WITNESS: Can you scroll
19     over, Jacob.
20     Q.  Again, the rationale says:
21         "The documentary addresses
22      gender-based violence and overlooked
23      histories contributing to DEI by
24      amplifying marginalized voices."
25     A.  Yes.

190

J. Fox

1
2    Q.    Why is a documentary about
3    holocaust survivors, DEI?
4            MS. DOUD:  Objection.
5    A.    It's a gender-based story to
6    that's inherently discriminatory to focus on
7    this specific group.
8    Q.    It's inherently discriminatory to
9    focus on what specific group?
10   A.    Gender based.  So females during
11   the holocaust.
12   Q.    And you believe that's inherently
13   discriminatory?
14   A.    I'm just saying that's what it's
15   focused on.  This is related to DEI.
16   Q.    Right.  But you just used the term
17   "inherently discriminatory."  What did you
18   mean by that?
19   A.    It's focusing on DEI principles,
20   gender being one of them.
21   Q.    So a documentary that's about
22   women would be DEI?
23           MS. DOUD:  Objection.
24   Q.    Is that fair to say?
25   A.    No.

191

J. Fox

1
2    Q.    Okay.  So tell me why what I just
3    said isn't DEI, but what you just said is DEI?
4            MS. DOUD:  Objection.
5    A.    It's a Jewish -- specifically
6    focused on Jewish cultures and amplifying the
7    marginalized voices of the females in that
8    culture.  It's inherently related to DEI for
9    those reasons.
10   Q.    Because it's about Jewish culture?
11   A.    Plus marginalized female voices
12   during the holocaust gender-based violence.
13   Q.    Is this, when we focus on a
14   minority, is it your understanding that, you
15   know, the Jewish people fall into the category
16   of a minority?
17   A.    Certainly a culture that could be
18   described as minorities.
19   Q.    So how did you go about
20   determining what was a minority and what
21   wasn't a minority for the purpose of
22   identifying DEI in grants?
23   A.    Inherently focused on any
24   ethnicity, culture, gender, no matter the,
25   sort of, race or gender or religion or --

192

J. Fox

1
2    yeah.
3    Q.    Okay.  And you said that your
4    understanding of the purpose of marking these
5    grants for DEI was eventual possible
6    termination of the grant?
7            MS. DOUD:  Objection.
8    A.    For Mike and Adam.
9    Q.    To make a judgment about
10   termination?
11   A.    To see how we felt this did or did
12   not comply with DEI involvement from the
13   perspective of the EOs.
14   Q.    With the ultimate goal of
15   assessing which grants needed to be
16   terminated.  Right?
17   A.    Helping Adam and Mike review
18   comprehensively the grant's adherence to
19   existing EOs that is --
20   Q.    And if they did not comply with
21   the EOs, those grants presumably would be
22   terminated.  Right?
23           MS. DOUD:  Objection.
24   A.    Up to Mike and Adam.
25   Q.    Was it your understanding that the

193

J. Fox

1
2    goal of this review was to understand which
3    grants would be kept versus which grants would
4    be terminated?
5    A.    Certainly to understand where they
6    landed in the scope of do they adhere to the
7    EO or do they not.
8    Q.    And if they didn't adhere to the
9    EO, those are grants that would be more likely
10   to be terminated.
11   Is that fair to say?
12   A.    That's what the EOs wanted, was to
13   find savings in the bucket.  So they
14   identified, ultimately Adam and Mike made that
15   call.
16   Q.    I'm not asking who made the call.
17   I'm asking for your understanding of what
18   would happen to grants that were marked with
19   DEI.
20   Was it your understanding that
21   these grants were being isolated as grants to
22   terminate?
23   A.    To be compliant with the EO, yes.
24   Q.    Yes, to terminate in order to be
25   compliant with the EO.

194

J. Fox

1      Is that what you're saying?

2    A.  Yeah, I mean, we just needed Mike

3 and Adam to see which grants and why related

4 to DEI, and as you've said, ultimately the

5 call was their judgment to make.  But the

6 intention is to find savings, redirect funds

7 to America-first priorities, Garden for

8 Heroes, DEI is one of the buckets we screened

9 for, as well as wasteful spending.

10    Q.  I just want to be clear, you know

11 we're going to be talking to several others at

12 NEH as part of this lawsuit?

13    A.  Mm-hmm.

14    Q.  And other people that are members

15 of the DOGE teams that you've been discussing?

16    MS. DOUD:  Objection.

17    Q.  Are you aware of that?

18    A.  Well, I guess to answer your

19 previous question, I don't know who else

20 you're interviewing from NEH and I don't know

21 anybody else outside of Nate.

22    Q.  Do you know that we're going to

23 talk to Mr. McDonald?

24    MS. DOUD:  Objection.

---

195

J. Fox

1    A.  I don't know.

2    Q.  You don't know.  We will be

3 talking about Mr. McDonald, we will be talking

4 to Mr. Wolfson.  We've already spoke with

5 Nate, as you know.

6    Do you think all of them would

7 agree with your framing here that -- strike

8 that.

9    Would they think that part of this

10 review was being done to tee grants up for

11 termination?

12    MS. DOUD:  Objection.

13    A.  Who do you mean "they"?

14    Q.  Mr. Wolfson, Mr. Cavanaugh,

15 Mr. McDonald?

16    A.  I don't know.

17    Q.  Did you discuss terminating grants

18 that were related to DEI?

19    A.  Yes.

20    Q.  Did you discuss terminating grants

21 because they related to DEI?

22    A.  To align with the EO, yeah.

23    Q.  And so when you mark, for

24 instance, this grant about the holocaust as

---

196

J. Fox

1 DEI, was it your understanding that that would

2 make it more likely that that grant would be

3 terminated?

4    I'll remind you you're under oath,

5 I mean, and we're going to talk to others.

6    MS. DOUD:  Objection.

7    A.  Yes.

8    Q.  Okay.  And so based on your

9 judgment here, you believe a grant about women

10 during the holocaust that were subject to

11 gender-based violence, a documentary about

12 that should be short listed for termination at

13 the NEH?

14    MS. DOUD:  Objection.

15    A.  Which one?

16    Q.  Grant 252, the one that we've been

17 talking about.

18    A.  We were --

19    Q.  -- it's just a yes-or-no question.

20    A.  -- presenting it to Mike and

21 Adam --

22    Q.  That doesn't answer my question.

23    A.  -- under the context of does this

24 comply or does it not.  And this is the

---

197

J. Fox

1 rationale that we give for whether we believe

2 it complied or not or related to DEI in any

3 capacity.

4    Q.  But the first column is yes or no?

5    A.  Yup.

6    Q.  So you're saying yes, it has DEI,

7 or no, it doesn't have DEI.  And that's the

8 very first column of the spreadsheet.  Is that

9 right?

10    A.  Yes.

11    Q.  And you put "yes," in the first

12 column with respect to this grant about the

13 holocaust.

14    Is it your understanding that

15 grants marked "yes" for DEI, Mr. McDonald and

16 Mr. Wolfson would have viewed as more likely

17 to terminate based on DEI grounds and EO

18 grounds?

19    A.  We were helping them.  So it's

20 fair to assume that they would think that.

21    MR. ONAYEMI:  All right.

22    Let's go to -- well, actually, I

23 think we can take a -- go off the

24 record.

198

J. Fox

1
2      MS. DOUD:  Sure.
3      MR. ONAYEMI:  Take a
4  five-minute break, is that cool?
5      MS. DOUD:  Okay.
6      THE VIDEOGRAPHER:  The time
7  now is 3:04 p.m.  This concludes
8  Media 4.  Off the record.
9      (Recess taken from 3:04 p.m.
10  to 3:13 p.m.)
11      THE VIDEOGRAPHER:  The time
12  now is 3:13 p.m.  This begins Media
13  5.  On the record.
14  BY MR. ONAYEMI:
15      Q.  Hello again.  Part of your
16  analysis of whether a grant was related to DEI
17  was whether or not it referenced racial
18  minorities.
19      Is that fair to say?
20      A.  Part of it.
21      Q.  How did you ascertain what a
22  racial minority was?
23      A.  Whether it was focused on any
24  specific race in any capacity.
25      Q.  Right.  So --

199

J. Fox

1
2      A.  Racial minority is probably where
3  we're missing.
4      Q.  Okay.
5      A.  Having to do with race and
6  diversity of race, minority or not, is related
7  to diversity, equity, and inclusion.
8      Q.  Okay.  But doesn't everyone to
9  some degree have a race?
10      A.  Yes.
11      Q.  So you were canceling grants based
12  on whether they had to do with -- strike that.
13      I guess, how did you make the
14  distinction between whether a grant should be
15  terminated based on the fact that it involves
16  a minority or not?
17      A.  It would be based on the grant
18  description for each grant.
19      Q.  Okay.  But this, kind of, system
20  that you were using to analyze that, walk me
21  through it.
22      MS. DOUD:  Objection.
23      A.  Read through the grant, identify
24  keywords that may relate to DEI, and give
25  context as to why this may relate to DEI so

200

J. Fox

1
2  that Adam and Mike can review our perspective.
3      Q.  Right.  So if a grant said, for
4  instance, a history of Michael Jordan versus a
5  history of Black, former NBA player Michael
6  Jordan, would that make a difference in the
7  way that you analyzed the grant?
8      MS. DOUD:  Objection.
9      A.  It would depend on the grant and
10  the full context of the description.
11      Q.  Sure.  Would the word "Black" by
12  itself have, in the system you're applying in
13  your DEI review, have led you to mark that
14  grant as being DEI?
15      MS. DOUD:  Objection.
16      A.  It would depend on the grant.
17      Q.  So sitting here today, you can't
18  answer that example, for instance?
19      MS. DOUD:  Objection.
20      A.  Well, it would need to be a grant
21  that we were reviewing in the full context.
22      Q.  Yeah.  We'll look at more grants.
23      MR. ONAYEMI:  Let's go to
24  Tab 8.  This will be Exhibit 9.
25  Excuse me.  I think I got that

201

J. Fox

1
2  wrong.  Tab 9 which will be
3  Exhibit 9.  I guess then it should
4  be Tab 8.  Sorry about that.  And
5  this will be, I believe, an Excel
6  sheet, not a PDF.
7      Q.  While he pulls that up, I have a
8  couple more questions for you.
9      When you say it depends on the
10  grant, is what you're saying that it depends
11  on how you interpreted the grant during your
12  review?
13      A.  For what?  There's a full question
14  there.
15      Q.  Sorry.
16      A.  Well, yeah, could you restate the
17  question, please.
18      Q.  I'll give you the full context.
19      I believe you testified earlier
20  that it would depend on what the grant says
21  when I asked whether you would say it was DEI
22  or not.
23      Do you remember that?
24      A.  Yes.
25      Q.  Okay.  Did it also depend on how

Justin Fox - January 28, 2026

202

J. Fox
1
2  you personally interpreted that grant?
3       A.   For the rationale, Nate and our
4  view of its relation to DEI, yes.
5       MR. ONAYEMI:  Sorry, Jacob,
6  are you able to find that Tab 8?
7  Yup, that's the one.
8       (Fox Exhibit 9, Spreadsheet
9       with grant descriptions beginning
10      Bates Number US-000062485, marked
11      for identification, as of this
12      date.)
13      MR. ONAYEMI:  Thank you.  So
14 this is US-000062485.
15      Q.   I'll represent to you that you're
16 the custodian of this document, meaning that
17 it was produced to us from your possession, I
18 presume at your GSA computer.
19      Does this document look familiar
20 to you, and I'm happy to scroll or ask Jacob
21 to manipulate it any way that you need to see
22 it.
23      A.   Yes, this looks familiar.
24      Q.   Can you describe what this is?
25      A.   This is a way to assist

203

J. Fox
1
2  contextualizing, summarizing really, relation
3  to DEI, and it was used to inform the
4  rationale piece of the broader grant view.
5       Q.   Okay.  Let's go a little bit
6  broader than that, so, just to fully paint the
7  picture.
8       What's on this spreadsheet?
9       A.   It pulls out the key phrases and
10 words and context from the description as its
11 relation to DEI.
12      Q.   The grant description?
13      A.   The grant description.
14      Q.   Okay.  And did you create this
15 document?
16      A.   Yes.
17      Q.   Okay.  Did anyone help you to
18 create this document?
19      A.   No.
20      MR. ONAYEMI:  Can we go to
21 Table 5, that's the first tab there
22 on the left side, Jacob.  Now, if
23 you just go left with your mouse,
24 there's several little tabs,
25 "Table 5, Invoked Function, Sheet1."

204

J. Fox
1
2       Yup, there we go.
3       Q.   Okay.  Does this look familiar?
4       A.   Yes.
5       Q.   Did you create this sheet?
6       A.   Yes.
7       Q.   Can you briefly tell me the
8  context for creating this document.
9       A.   To look at the grant descriptions,
10 the full grant descriptions and bring out the
11 context of which a DEI grant may relate, or a
12 grant may relate to DEI.  And it was used to
13 inform DEI rationale.
14      Q.   And Cell B1 says "GPT response."
15      Do you see that?
16      A.   Yes.
17      Q.   So when you say "pull out," you
18 mean run the grant description through ChatGPT
19 to pull out a DEI rationale?
20      A.   To highlight why this grant may
21 relate to DEI, which we used to give context
22 to Adam and Mike on why this grant may be
23 related to DEI.
24      Q.   How did you ensure that GPT would
25 know what did or did not relate to DEI?

205

J. Fox
1
2       MS. DOUD:  Objection.
3       A.   Well, we read the responses and
4  adjusted based on the EOs.
5       Q.   Okay.  So it says -- sorry, just
6  to look at one brief example, Cell 2A or A2,
7  it starts by saying:
8       "From the perspective of
9       someone looking to identify DEI
10      grants, does this involve DEI?
11      Respond factually in less than 120
12      characters.  Begin with 'Yes.' or
13      'No.' followed by a brief
14      explanation.  Do not use 'this
15      initiative' or 'this description' in
16      your response."
17      Did I read that correctly?
18      A.   Yes.
19      Q.   And that's the command for
20 ChatGPT.  Is that right?
21      A.   Yes.
22      Q.   And then after that, you would put
23 the grant description into ChatGPT for ChatGPT
24 to analyze.  Is that right?
25      A.   Again, to inform the rationale for

Justin Fox - January 28, 2026

206

J. Fox
1
2  why this may relate to DEI, and that was then
3  used on top of what we understood from the
4  grant description ourselves, to be sent to
5  Adam and Mike in a consolidated format.
6      Q.  How -- what's your understanding
7  of how the model understood the word "DEI"?
8      A.  I don't know.
9      Q.  Did you do anything to teach the
10  model what DEI meant as you used it in this
11  command?
12      A.  We didn't need to because we were
13  adjusting and making the call ultimately based
14  on the full description whether this was DEI
15  or not.
16      Q.  Okay.
17      A.  This was only a tool to assist in
18  contextualizing.  It was not the
19  decision-making factor.
20      Q.  Did you use this tool for every
21  grant that you reviewed?
22      A.  Not the ones that the NEH team had
23  already deemed relating to DEI.
24      Q.  But the thousands that you
25  reviewed personally, you used this process?

207

J. Fox
1
2      A.  To, again, to help with the
3  contextualizing of it, to Mike and Adam, to
4  pull out the key phrases of which this may
5  relate to DEI, to assist in that step of the
6  process which is consolidating the points.
7          And we could have gone in and
8  written our own summaries, and that's why this
9  is only a tool, and it didn't end up with the
10  final decisions, yes or no.
11      Q.  Did you do anything to ensure that
12  ChatGPT's conception of DEI as applied here,
13  wouldn't discriminate on the basis of race?
14          MS. DOUD:  Objection.
15      A.  No.
16      Q.  Did you do anything to ensure that
17  ChatGPT's conception of DEI in this task that
18  you gave to ChatGPT would -- strike that.
19          Did you do anything to ensure that
20  ChatGPT's perception of DEI as applied here
21  wouldn't discriminate on the basis of sex?
22          MS. DOUD:  Objection.
23      A.  It didn't matter because, again,
24  this was not the ultimate decision-making
25  factor.

208

J. Fox
1
2      Q.  But that doesn't answer my
3  question.
4          Did you do anything to ensure that
5  ChatGPT's description -- perception of DEI as
6  applied here wouldn't discriminate on the
7  basis of sex?
8          MS. DOUD:  Objection.
9      A.  I didn't need to.  This was not
10  the decision-making factor.
11      Q.  Right.  But I'm not asking you
12  whether you needed to or not, I'm asking you
13  whether you did or not?
14          MS. DOUD:  Objection.
15      A.  This is a rephrasing of the
16  previous question.  What is it that you're
17  referring to now, like, specifically?
18      Q.  Did you do anything to ensure that
19  ChatGPT's perception of DEI as applied here
20  wouldn't discriminate on the basis of sex?
21          MS. DOUD:  Objection.
22      Q.  It's a yes-or-no question.
23      A.  This is just to identify phrases
24  that may relate to DEI to assist in our
25  population of giving context to Adam and Mike

209

J. Fox
1
2  as they're reviewing.  And this was not the
3  ultimate decision-making factor.
4      Q.  Did you do anything to ensure that
5  ChatGPT's perception of DEI as applied here
6  wouldn't discriminate on the basis of sex?
7  I'd like an answer to my question, eventually.
8  I'll keep asking it.
9          MS. DOUD:  Objection.
10      A.  It didn't matter.
11      Q.  Did you do anything to ensure that
12  ChatGPT's perception of DEI as applied here
13  wouldn't discriminate on the basis of sex?
14          MS. DOUD:  Objection, asked
15  and answered several times.
16      A.  It didn't matter.  We didn't need
17  to.
18      Q.  Is that yes or no?
19          MS. DOUD:  Objection.
20      A.  Is what yes or no?
21      Q.  Did you do anything to ensure that
22  ChatGPT's perception of DEI as applied here
23  wouldn't discriminate on the basis of sex?
24          MS. DOUD:  Objection.
25      A.  The task was to pull out anything

210

J. Fox

1       related to DEI. There was no reason to check
2
3       for discrimination.
4           Q.  So you didn't do it?
5               MS. DOUD: Objection.
6           A.  We did not need to.
7           Q.  Did you do it or not?
8               MS. DOUD: Objection.
9           A.  This was a medium step in between
10      getting the consolidated list to Adam and Mike
11      for review.
12          Q.  I'm sorry, Justin. We can keep
13      doing this. I'm asking you for -- I'm
14      entitled to an answer to my question as posed.
15      I'm not asking you about Michael McDonald or
16      Adam Wolfson. I'm not asking you about how
17      many other iterative steps it took to the
18      terminations.
19              I'm asking this question: Did you
20      do anything to ensure that ChatGPT's
21      perception of DEI as applied here wouldn't
22      discriminate on the basis of sex?
23              MS. DOUD: Objection.
24          A.  There was no need to do that
25      because this was only an intermediary step.

211

J. Fox

1           Q.  So because there was no need, did
2       you not do it?
3               MS. DOUD: Objection.
4           Q.  I'll inform you that, you know,
5       it's possible that the finder of fact will
6       watch this and read this transcript.
7           A.  Uh-huh.
8           Q.  I would suggest being
9       straightforward. Of course, that's your
10      choice.
11              MS. DOUD: That isn't
12      appropriate. First of all, just
13      because you say the answer is yes or
14      no, does not mean that every answer
15      is yes or no. He has given you an
16      answer many, many times. Frankly, I
17      don't think your question even makes
18      sense. You can't keep asking the
19      witness the same question time after
20      time. This is becoming harassing.
21              MR. ONAYEMI: Okay. I would
22      just put into the record that
23      counsel's statement there is
24      partially coaching the witness. So,

212

J. Fox

1       again, I'd ask that you keep your
2       objections to form or foundation.
3               MS. DOUD: It's not coaching
4       the witness.
5               MR. ONAYEMI: Thank you.
6               MS. DOUD: You are proceeding
7       in an inappropriate manner.
8               MR. ONAYEMI: I appreciate it,
9       counsel. You're clearly coaching
10      the witness and if we need to go to
11      the Court about this, we will.
12              MS. DOUD: Okay. Feel free to
13      call the Court. I have not done
14      anything remotely inappropriate and
15      you are doing something
16      inappropriate.
17              MR. ONAYEMI: In your
18      estimation. Thank you.
19      BY MR. ONAYEMI:
20          Q.  Hi Justin. Did you do anything to
21      ensure that ChatGPT, as you were using to
22      assess grants for DEI, would not discriminate
23      on the basis of sex or religion?
24              MS. DOUD: Objection.

213

J. Fox

1           A.  We did not need to.
2           Q.  So you're refusing to answer the
3       question?
4               MS. DOUD: Objection.
5           Q.  It's a yes-or-no question.
6               MS. DOUD: Objection.
7           A.  I'm telling you we did not need to
8       do this because we're just identifying whether
9       it involves DEI.
10          Q.  Right. And again, I'm not asking
11      you what you needed to do or what you didn't
12      need to do, I'm asking whether or not
13      factually you did something. And you're
14      refusing to give me an answer.
15          A.  What was the question?
16          Q.  Factually speaking, did you do
17      anything yourself to ensure that the model
18      here would not discriminate on the basis of
19      sex?
20              MS. DOUD: Objection.
21          A.  We did not need to.
22              MR. ONAYEMI: Okay. Thank
23      you, Justin. So I'll mark for the
24      record that the witness is refusing

214

J. Fox
1
2    to answer this question.  And we can
3    move on, I guess.
4         MS. DOUD:  And I'll note that
5    he has answered the question.
6         Q.   Did you do anything to ensure that
7    ChatGPT's perception of DEI as applied
8    wouldn't discriminate on the basis of
9    religion?
10        MS. DOUD:  Objection.
11        A.   We did not need to do that.
12        Q.   Did you teach this model anything
13   about the meaning of DEI or how it should be
14   applied?
15        A.   The prompt is from the perspective
16   of someone looking to identify DEI grants.  So
17   just extract the key phrases that may relate
18   to DEI.  And again, this just informed how we
19   were synthesizing a perspective to share with
20   Mike and Adam, not the ultimate decisions from
21   Mike and Adam.
22        Q.   Did you use ChatGPT during any
23   other work while at the government?
24        A.   Sometimes.
25        Q.   For similar projects?

215

J. Fox
1
2        A.   For some, not all.
3        Q.   If someone were to say that you
4    didn't use ChatGPT or LLMs in your analysis of
5    grants while at NEH, would that be false?
6         MS. DOUD:  Objection.
7         A.   To analyze the grants we were
8    using just the descriptions in its entirety.
9    That's what informed the -- like, giving it
10   back to Adam and Mike, and this is just an
11   intermediary step to synthesize the key
12   phrases that might relate to DEI.  Ultimate
13   decisions, no.
14        Q.   No, but -- I'm sorry.  If someone
15   were to say that you didn't use ChatGPT in
16   your work related to NEH, would that be false?
17        MS. DOUD:  Objection.
18        A.   Could you just rephrase, because I
19   think double negative threw me off there.
20        Q.   If someone made the representation
21   that you did not use ChatGPT in relation to
22   your work at NEH, would that be false?
23        MS. DOUD:  Objection.
24        A.   It would depend on the context.
25        Q.   You did use ChatGPT in relation to

216

J. Fox
1
2    your work at NEH.  Right?
3         A.   Here, for the intermediary step,
4    yes.
5         Q.   And if someone implied that you
6    didn't do this, that would be false.  Right?
7         MS. DOUD:  Objection.
8         A.   Didn't do this for what?
9         Q.   Didn't use ChatGPT in the way that
10   you did on this screen?
11        MS. DOUD:  Objection.
12        A.   In any capacity?
13        Q.   Yes.
14        A.   It was used to assist Mike and
15   Adam's understanding of where we were coming
16   from as grants related to DEI.
17        Q.   That doesn't even come close to
18   answering my question.
19        If someone said that you didn't
20   use ChatGPT in relation to your work with NEH,
21   would that be a falsity or a truth?
22        MS. DOUD:  Objection.
23        A.   It would depend on the context.
24        Q.   What contexts would it be true?
25        A.   Whether it's making decisions on

217

J. Fox
1
2    granting terminations or not, or intermediary
3    steps.
4         Q.   Any at all.
5         MS. DOUD:  Objection to form.
6         A.   Any at all, full question?
7         Q.   If someone said that you didn't
8    use ChatGPT in relation to your work at NEH in
9    any capacity, would that be false?
10        A.   Yes.
11        MR. ONAYEMI:  Okay.  Hey,
12   Jacob, could you go to Sheet 2.  I
13   think it's the fourth tab.
14        Q.   Do you recognize this tab, Justin?
15        A.   As separate and distinct from the
16   other tabs, no.
17        Q.   So this tab has, I think, two
18   columns.  And, you know, we can -- I can read
19   an example of what's in Column 1.  There's a
20   command for each one of these entries on the
21   page that says:
22        "Does the following relate at
23   all to DEI?  Respond factually in
24   less than 120 characters.  Begin
25   with 'Yes.' or 'No.' followed by a

218

J. Fox

1    brief explanation.  Do not use 'this
2
3    initiative' or 'this description' in
4    your response."
5         Did I read that correctly?
6    A.   Yes.
7    Q.   Okay.  And then Cell A3.
8         MR. ONAYEMI:  If you could
9    zoom up a bit, Jacob.  Or scroll up,
10   sorry.  So if we could look at A3.
11   Could you zoom in too, it's kind of
12   small for me to see.  So Cell 3
13   says -- Jacob, could you actually go
14   to the line between 2 to 3 and pull
15   it down so you can see the full
16   text.  There's like, yeah, if you
17   could go over -- there's a line --
18   yeah, so I want to make that -- I
19   want to make that one bigger.
20   Actually I think that's the right
21   size.  No, that's the right size.
22   Okay.
23   BY MR. ONAYEMI:
24   Q.   So this here says, this is cell
25   A3, again.  It says:

219

J. Fox

1
2         "Does the following relate at
3    all to DEI?  Respond factually in
4    less than 120 characters.  Begin
5    with 'Yes.' or 'No.' followed by a
6    brief explanation.  Do not use 'this
7    initiative' or 'this description' in
8    your response.  The documentary
9    tells the story of the Colfax
10   Massacre, the single greatest
11   incidence of anti-Black violence
12   during Reconstruction, and its
13   historical and legacy for Black
14   civil rights in Louisiana, the
15   South, and in the nation as a
16   whole."
17        Did I read that correctly?
18   A.   Yes.
19   Q.   And then in Column B right next to
20   that, it says:
21        "Yes, the documentary explores
22   a historical event that
23   significantly impacted Black civil
24   rights, making it relevant to the
25   topic of DEI."

220

J. Fox

1
2    Did I read that correctly?
3    A.   Yes.
4    Q.   Is it fair to say that that's --
5    what I just read is the ChatGPT output of the
6    prompt in the first column?
7    A.   Yes.
8    Q.   Okay.  Do you agree with ChatGPT's
9    assessment here that the document is DEI if it
10   explores historical events that significantly
11   impacted Black civil rights?
12   A.   Yes.
13   Q.   Why would that be DEI?
14   A.   It's focused on a singular race.
15   It is not for the -- it is not for the benefit
16   of humankind.  It is focused on a specific
17   group of -- or a specific race, here being
18   Black.
19   Q.   Why would learning about
20   anti-Black violence not be to the benefit of
21   humankind?
22        MS. DOUD:  Objection.
23   A.   That's not what I'm saying.
24   Q.   Okay.  Then what are you saying?
25   A.   I'm saying it relates to

221

J. Fox

1
2    diversity, equity, and inclusion.
3    Q.   You said it's not to the benefit
4    of humankind.  Right?
5    A.   Is that what I said?
6    Q.   Yeah, could you read back the
7    witness' response about benefits to humankind.
8        (Record read by the certified
9    stenographer as follows:
10        "QUESTION:  Why would that be
11   DEI?
12        "ANSWER:  It's focusing on a
13   singular race.  It is not for the --
14   it is not for the benefit of
15   humankind.  It is focused on a
16   specific group or a specific race,
17   here being Black.")
18   Q.   So what do you mean by "not for
19   the benefit of humankind?
20   A.   That's a very subjective -- the
21   way that I phrased it there wasn't exactly
22   what I meant.  It is focused on a specific
23   subset of race, and therefore, it relates to
24   DEI.  I'm not suggesting that this is not for
25   the betterment of humankind.  That was a

222

1        J. Fox
2    misphrasing.
3        Q.   Okay.  So is it your understanding
4    that the actual massacre was an event of
5    anti-Black violence?
6        MS. DOUD:  Objection.
7        A.   What do you mean?
8        Q.   Like, I guess I'm trying to
9    distinguish between the facts of the massacre
10   itself, the historical event versus how it's
11   written here.  There was, at least in the
12   description here, a massacre that seems to
13   have been in some ways anti-Black or against
14   Black people.
15       Is that your understanding of it
16   by reading this?
17       THE WITNESS:  Could you zoom
18   in.
19       A.   (Document review.)
20       Okay.  What was the question?
21       Q.   Is it your understanding that the
22   historical event itself, the Colfax massacre,
23   was an event that featured anti-Black
24   violence?
25       A.   What do you mean by "featured"?

223

1        J. Fox
2        Q.   That there was anti-Black violence
3    exercised during the Colfax massacre?
4        A.   Yes.
5        Q.   Okay.  And so you're not disputing
6    whether this was a real event, are you?
7        A.   No.
8        Q.   So if anti-Black violence was a
9    real feature of a real historical event, what
10   about this project is DEI?
11       A.   Because it focuses on exclusively
12   anti-Black violence, which is a race.
13       Q.   So because the massacrists at the
14   Colfax massacre decided to kill only Black
15   people, there should be no -- this project
16   should be marked for DEI and put on a
17   potential list for termination?
18       MS. DOUD:  Objection.
19       A.   The same as it would be an
20   anti-white violence during reconstruction, as
21   it's a race that you're isolating, and it
22   relates to diversity, equity, and inclusion.
23       Q.   So in the exercise of your role
24   with DOGE in looking at these grants, any
25   historical event that would have been

224

1        J. Fox
2    featuring one particular race would be marked
3    for DEI in your view.
4        Is that fair to say?
5        A.   It would depend on the grant.
6        Q.   But that was one factor that you
7    analyzed, whether the event itself had to do
8    with a specific race or gender?
9        A.   To identify if it related or could
10   have related at all to DEI in the EOs.
11       MR. ONAYEMI:  Jacob, can you
12   pull up Tab 10.
13       DOCUMENT TECH:  Exhibit 10?
14       MR. ONAYEMI:  Sorry.  Tab 10.
15       DOCUMENT TECH:  Yes, is this
16   Exhibit 10?
17       MR. ONAYEMI:  Yes, I think so.
18       (Fox Exhibit 10, Active Grants
19       Flagged as N/A for DEI, spreadsheet,
20       Bates Number NEH_AR_000024, marked
21       for identification, as of this
22       date.)
23       Q.   So this is document NEH_AR_000024.
24   Do you recognize this document?
25       A.   Was there an e-mail associated

225

1        J. Fox
2    with this being sent?
3        Q.   There was.  Yeah, actually, if we
4    could just, because of the logistics here, set
5    up here, I'll skip over this.  We haven't
6    really gotten to it yet.  We'll come back to
7    it though.
8        MR. ONAYEMI:  So this is
9       Exhibit 10.  I'll now go to Tab 11,
10      Jacob.  This will be Exhibit 11.
11      This is going to be an e-mail,
12      but not the e-mail that you just
13      asked for, just FYI.  It's a
14      different e-mail.  I just don't want
15      to confuse anyone.
16      (Fox Exhibit 11, E-mail to and
17      from Justin Fox, subject "Crazy
18      grants" dated April 3, 2025, Bates
19      Number US-000016153, marked for
20      identification, as of this date.)
21      MR. ONAYEMI:  Okay.  This is
22      Exhibit 11, Bates Number
23      US-000016153.  Very short.
24      It's from "justin.fox@gsa.gov"
25      to "jfox@neh.gov," subject "Crazy

226

```
1            J. Fox
2     Grants."
3     BY MR. ONAYEMI:
4         Q.   Did I read that correctly?
5         A.   Yes.
6         Q.   So this is an e-mail from your GSA
7     e-mail to your NEH e-mail.  Is that fair to
8     say?
9         A.   Yes.
10        Q.   And you had e-mails at both?
11        A.   Yes.
12        Q.   Do you remember why you sent this
13    e-mail to yourself?
14        A.   April 3?  No, I don't.
15        Q.   Did you typically send e-mails
16    between your NEH and your GSA accounts?
17        A.   Not often, from what I remember.
18        Q.   In what circumstance might you
19    have done that?
20        A.   Work done on my GSA that needed to
21    go and be continued to work on from my NEH
22    laptop.
23        Q.   Okay.  Do you think that might
24    have been what was happening here?
25        A.   Maybe.
```

227

```
1            J. Fox
2         Q.   Any other reasons you could think
3     of?
4         A.   For this single e-mail, I don't
5     know.
6             MR. ONAYEMI:  Okay.  We can
7         move on to -- well, before we do
8         that.
9         Q.   It says "Crazy grants."  Do you
10    see that?
11        A.   Yes.
12        Q.   Did you write that?
13        A.   Yes.
14        Q.   Do you know what that means?
15        A.   I don't remember.
16        Q.   You don't remember what "Crazy
17    grants" means?
18        A.   I don't remember what it meant in
19    the context of this attachment.
20        Q.   Well, we can open the attachment.
21            MR. ONAYEMI:  This is Tab 12,
22        Jacob, Exhibit 12.  It's going to be
23        Bates Number US-000016154.
24            (Fox Exhibit 12, Grants.gov
25        spreadsheet listing NEH grants
```

228

```
1            J. Fox
2     attached to Exhibit 11, Bates Number
3     US-000016154, marked for
4     identification, as of this date.)
5         Q.   So this is the document that you
6     sent to yourself on April 3, 2025, in an
7     e-mail, subject "Crazy grants."
8             Does this look familiar to you?
9         A.   Yes.
10        Q.   Is this a document that you
11    created?
12        A.   That I edited from grants.gov,
13    yes.
14        Q.   So but -- sorry, several parts
15    there.
16            Did you get this document from
17    grants.gov directly, and then, kind of, work
18    within it?
19        A.   Yes.
20        Q.   Okay.  So no single person sent
21    you this document.  Is that fair to say?
22        A.   This?  No.
23        Q.   Okay.  So –
24        A.   From what I -- from what I
25    remember.  This, no.
```

229

```
1            J. Fox
2         Q.   Can you describe what it is?
3         A.   From what I remember, all
4     outstanding grants for NEH with the obligated
5     in dollars outlaid, and the remaining amount,
6     along with on the right, all of the
7     descriptions about the recipient and the
8     description of the project.  I don't remember
9     what else is on the right.  If you wouldn't
10    mind scrolling over.
11            MR. ONAYEMI:  Jacob, you can
12        scroll to the right quickly for the
13        witness.
14            THE WITNESS:  Thank you.
15        Q.   Does that comport with your
16    understanding of --
17        A.   Yeah.
18            MR. ONAYEMI:  We can scroll
19        back to the left now, Jacob.
20        Q.   Did someone tell you to put this
21    document together?
22        A.   Not that I remember.
23        Q.   So you did this on your own
24    volition?
25        A.   Ahead of meeting with Mike and
```

230

J. Fox

1 Adam in our first meeting, we were identifying
2 areas to discuss with them about compliance
3 with the EO, and to make sure we had
4 discussion points to talk with Adam and Mike
5 about, did our own, sort of, condensed review
6 of what was publicly available on NEH's
7 grants.
8     Q.    When you say "our," who are you
9 referring to?
10    A.    Nate and myself.
11    Q.    Okay.  Was it your idea to do this
12 or Nate's idea to do this?
13    A.    This is just what we did for
14 meetings that we had coming up, was do a
15 review of the publicly available grants, and
16 assess their adherence to the existing EOs.
17    Q.    Okay.  So there are several grants
18 in the -- in this document with shortened
19 descriptions under Column E that say things
20 like:
21         "Understanding historical
22         LGBTQ spaces through gay travel
23         guides," for instance.
24         That's Cell E12.

231

J. Fox

1         Do you see that?
2    A.    Yes.
3    Q.    I think you actually referenced
4 this -- this project at the very, very
5 beginning of the deposition.
6         Do you remember that?
7    A.    Yes.
8    Q.    Okay.  And you said that, you
9 know, that was obviously DEI or something
10 earlier?
11    A.    Yes.
12    Q.    Here, you're calling it among the
13 craziest grants.  Is that a fair, kind of,
14 summary of -- by looking at this document?
15    A.    A summary of?
16         MS. DOUD:  Objection.
17    Q.    Like, is that -- is that what the
18 placement of that grant in this section means,
19 that you considered it to be one of the
20 craziest grants?
21    A.    From the lens of adherence to the
22 EOs, "crazy" is one way of saying it, "most
23 incriminating" is another way.  The most
24 blatantly misaligned with the latest EOs, to

232

J. Fox

1 our understanding.  And this is a very
2 preliminary exercise, again, to address the
3 initial meeting with Mike and Adam.
4    Q.    But you sent it to yourself on
5 April 2?
6    A.    Yeah.
7    Q.    And your initial meeting with Mike
8 and Adam Wolfson, I think, was much earlier on
9 March 12?
10    A.    Yeah, this document should be
11 saved exactly around the time that we'd met
12 with Adam and Mike.  I don't remember why I'd
13 send it from my GSA to my NEH at that time,
14 but I know that this document was formed
15 immediately or right before we had that first
16 interaction with Mike and Adam.
17    Q.    So why do you label these the
18 craziest grants?
19    A.    They're the most obviously
20 infringing on the EOs to identify and
21 eliminate wasteful spend or DEI-related
22 projects.
23    Q.    You say "most obviously."  Most
24 obviously based on your point of view.  Is

233

J. Fox

1 that fair to say?
2    A.    Our interpretation of the EOs.
3    Q.    You and Nate's interpretation of
4 the EOs.  Is that --
5    A.    Yes.
6    Q.    Okay.  And that's how you assessed
7 what grants were crazy and what grants weren't
8 crazy.  Is that fair?
9    A.    That's how we assessed whether or
10 not a grant would be most infringing or not on
11 the EOs.
12    Q.    Your subjective interpretation?
13    A.    Yes.
14    Q.    Okay.  So let's look at some of
15 these.  In Row 12, Cell C -- excuse me,
16 Cell E, we already read it.  It says:
17         "Understanding historical
18         LGBTQ spaces through gay travel
19         guides."
20         In Row 11, Cell E, it says:
21         "Improving access to LGBTQ
22         plus cultural heritage."
23         In Row 11, Cell D, it says:
24         "Developing a Spanish-language

Justin Fox - January 28, 2026

234

1          J. Fox
2     homosaurus."
3          MR. ONAYEMI:  If we scroll
4     down a bit, Jacob.
5          Q.   We'll see in Row 32 -- in Row 32,
6     it says:
7               "Digital stories of
8          transgender adults in the Pacific
9          Northwest."
10              In Row 16, if we scroll up a
11    bit, it says:
12              "Examining the relationship
13         between the Internet and the LGBTQ
14         communities."
15              Did I generally read all those
16    correctly?
17         A.   Yes.
18         Q.   So why, for instance, is, to your
19    view, improving access to LGBTQ plus cultural
20    heritage DEI?
21         A.   Which one was that?
22         Q.   Row 11.
23         A.   Could I see the full description.
24         MR. ONAYEMI:  Yeah.  Could you
25    scroll up a little, Jacob.

235

1          J. Fox
2     A.   Column F?
3     Q.   Yeah.
4     A.   I believe it's truncated here.
5          MR. ONAYEMI:  If you could
6     click on that Cell 11, F11.
7     A.   I still can't read all of it.
8          THE WITNESS:  If you press the
9     down button on the -- in the bar or
10    make the row bigger.
11         MR. ONAYEMI:  If you drag
12    down, if you go to 11, right below
13    11 where the 11 turns into 12, and
14    click on that line and drag it
15    downwards, it should expand.  Yeah,
16    just like that.  There you go.
17         THE WITNESS:  Great.
18         MR. ONAYEMI:  Keep going until
19    all the text is visible, Jacob,
20    thank you.
21         THE WITNESS:  If you could
22    zoom in as well.
23    A.   This is the homosaurus one?
24    BY MR. ONAYEMI:
25         Q.   Yeah, I think so, I guess you can

236

1          J. Fox
2     do the same assessment here.
3          A.   (Document review.)
4               So this is funding to create a
5     Spanish version of LGBTQ plus vocabulary.
6          Q.   Okay.  And it looks like in the
7     next column over -- strike that.
8               And that's what makes it DEI.  Is
9     that what you're saying?
10         A.   It's spend to create vocabulary
11    for just LGBTQ words for the benefit of the
12    LGBTQ community, or Q plus community in
13    Spanish.
14         Q.   Okay.  And was it your
15    understanding that grants like this should not
16    continue based on the DEI principle?
17         A.   That they were related to DEI,
18    yes.
19         Q.   And then in the next column it
20    says "LGBTQ, queer."  Do you see that?
21         A.   Yes.
22         Q.   And then above that, it says
23    "Indigenous" in G10.  Below that, it says
24    "LGBTQ, gay" in Cell G11.  These look like
25    keywords.  Is that right?

237

1          J. Fox
2          MS. DOUD:  Objection.
3          A.   Yes.
4          Q.   Did you use keywords to identify
5     certain concepts and grant descriptions in
6     this document?
7          A.   For this document, again, the
8     preliminary work that we were doing before
9     meeting Adam and Mike was to find grants that
10    were not aligned with the EOs.
11         MR. ONAYEMI:  Okay.  So can we
12    go to the third tab there, Jacob.
13    It says "Detection List" in the same
14    spreadsheet at the bottom.
15         Q.   You can take a second to review
16    that.
17         THE WITNESS:  Can you zoom in,
18    Jacob.
19         Q.   Do you have an understanding of
20    what this list is?
21         A.   A list of words or phrases that
22    may relate to diversity, equity, and
23    inclusion.
24         Q.   So you said that you and Nate
25    were -- prepared this in preparation for

238

J. Fox

1
2    meeting with Mr. McDonald and Mr. Wolfson for
3    the first time?
4        A.   Yes.
5        Q.   So how would you have determined
6    that this would be at all useful to
7    Mr. McDonald and Mr. Wolfson before you even
8    met with them?
9        MS. DOUD:  Objection.
10       A.   The EOs made it clear that funding
11   to DEI programs needed to be terminated in the
12   timeframe, I think it was 60 days from the
13   time it dropped.  And we were there to assist
14   them in any way we could.  And part of what we
15   thought would be helpful was to think through
16   the existing base of grants, which of these
17   may infringe with the direction of EOs.
18       Q.   And you had done that thinking in
19   the lead up to your first meeting with
20   Mr. Wolfson and Mr. Cavanaugh -- excuse me --
21   Mr. Wolfson or Mr. McDonald.  Is that right?
22       A.   Yes.
23       Q.   Was this in the context of helping
24   Mr. McDonald and Mr. Wolfson identify grants
25   to terminate?

239

J. Fox

1
2        A.   Not at this point.  This was --
3        Q.   So what -- I'm sorry.
4        A.   -- to assess whether they were
5    even aware of some of the grants that they had
6    outstanding, and whether they may conflict
7    with EOs priorities.
8        Q.   Okay.  But this is all under the
9    context of possibly terminating grants.
10       Is that fair to say?
11       A.   Identifying grants that may relate
12   or conflict with EOs.
13       Q.   Okay.  Was there any world in
14   which you were -- you saw your goal as being
15   identifying grants that had to do with DEI in
16   order to ensure that you preserve all of those
17   grants through the end of their terms?
18       MS. DOUD:  Objection.
19       A.   Could you restate.
20       Q.   Were you flagging these grants in
21   order to save them?
22       A.   We were flagging them because they
23   may conflict with the EOs.
24       Q.   And what would happen to grants
25   that conflict with the EOs?

240

J. Fox

1
2        A.   The heads of agencies would need
3    to assess if they were in line with the
4    executive orders.
5        Q.   How did you come up with this
6    list?
7        A.   I don't remember.
8        Q.   It's got LGBTQ on it, homosexual,
9    tribal, immigrants, immigrant.  So it was your
10   assessment that immigrant would have been
11   contrary to the EOs?
12       A.   It depends on the grant.
13       Q.   But you put it on this list
14   because, at some point, you thought that a
15   word like immigrant might conflict with the
16   EOS?
17       A.   It may but it all depends on the
18   grant.
19       Q.   But is that why you put this word
20   on the list, though?
21       A.   It could indicate DEI.  It's not
22   hamburger; it's something that may relate to
23   cultural appropriation and DEI-related grants.
24       Q.   Okay.  You also put the word
25   "refugees," that's C25.  Is there something

241

J. Fox

1
2    about refugees that invokes DEI principles?
3        A.   Maybe.  It depends on the grant.
4        Q.   But you were using this list to
5    flag grants for potential DEI.  Is that fair
6    to say?
7        A.   Or wasteful spend.
8        Q.   So would you say that spending on
9    LGBTQ was wasteful?
10       A.   That would depend entirely on the
11   grant and the specifics of that grant.
12       Q.   Well, you say "or wasteful spend,"
13   but what about these words would imply
14   wasteful spend?
15       A.   Well, they may not be a
16   life-or-death award.  For something like food
17   stamps, it's clear, you need spend to go to
18   those, they're critical spend, expenditures of
19   the government.  Again, all depends on the
20   grant itself.
21       Q.   Okay.  And you put on here
22   "homosexual."  I don't see heterosexual
23   though.  You can confirm or deny.
24       THE WITNESS:  Could you scroll
25   down.

242

J. Fox
1
2     A.   (Document review.)
3          Very well could have put
4     heterosexual, but it is not on this list.
5     Q.   It's not on this list?
6     A.   I don't know why I didn't put
7     heterosexual, but it is not on this list.
8     Q.   Okay.  Do you see "white" on this
9     list?
10    A.   I see "privilege."
11    Q.   Do you see "white" on this list?
12         THE WITNESS:  Could you scroll
13    back up.
14    A.   (Document review.)
15         No.
16    Q.   What about Caucasian?  Is that on
17    the list?
18    A.   (Document review.)
19         No.
20    Q.   So you can see that there is gay,
21    LGBTQ plus, homosexual on this list.  Right?
22    A.   Yes.
23    Q.   But there is no heterosexual on
24    this list.  Right?
25    A.   Very well could have put

243

J. Fox
1
2     heterosexual, although this list does not
3     capture everything that is DEI.  Again, this
4     was a preliminary search.
5     Q.   And we can see that it says,
6     "Black, indigenous, people of color" on this
7     list.  Right?
8     A.   Yes.
9     Q.   It doesn't say "white" or
10    "Caucasian" on this list, does it?
11    A.   It very well could have.  Again,
12    this is an early -- before we had our
13    meetings, and it all depends on the grant
14    itself.
15    Q.   Did you ever correct that by
16    putting "white" or "Caucasian" on any list
17    that you used to screen for DEI?
18    A.   I didn't need to because we read
19    the grants themselves.
20    Q.   So you were using ChatGPT to
21    screen grants using keywords, and that
22    screening didn't have white, heterosexual,
23    Caucasian on it.  Is that fair?
24         MS. DOUD:  Objection.
25    A.   This list was not used in the

244

J. Fox
1
2     context of deciding which grants to keep or
3     not.  This list was preemptive and not the
4     source of truth.
5          So this is from a publicly
6     available site called grants.gov.  Grants.gov
7     is where you can download any grant, but it's
8     not up to date and it doesn't give you the
9     best information in terms of description.
10         So what we did after we met and
11    talked with Mike and Adam is can we get
12    details from eGMS and have the full list that
13    you guys have, which is the latest up-to-date,
14    so that we can properly assess alongside you.
15    Q.   Okay.  Got it.
16    A.   So this is -- this got thrown out,
17    frankly, after the first meeting when Adam had
18    sent me the file that you showed me, which is
19    here's our active grants.
20    Q.   Okay.  So this list was not
21    used --
22    A.   No.
23    Q.   -- in determining which grants to
24    keep or not?
25    A.   No.

245

J. Fox
1
2     Q.   Okay.  But a future list that you
3     created was used in that way?
4     A.   In what way?
5     Q.   In determining which grants to
6     keep or not.
7     A.   In determining which grants
8     related or may have related to DEI or not?
9     Yes.
10    Q.   For the purposes of keeping or not
11    keeping those grants at the agency?
12    A.   For the purposes of identifying if
13    this may conflict with DEI.
14    Q.   Okay.  Number 49 says "melting
15    pot."  Why would that be DEI?
16    A.   I guess it's melting pot, I
17    assume, of cultures, is the way that the
18    context could be used.  So it's promoting an
19    inclusion atmosphere or something that's DEI
20    related.
21         Again, did not use this as a
22    source of truth.  This was the initial
23    publicly available research for a jumping-off
24    point to talk with Mike and Adam.
25    Q.   Right.  But you did put this

246

J. Fox

1   together.  Right?
2
3       A.   Yes, I don't remember where.
4       Q.   And this does reflect your
5   understanding of what the EOs would have
6   conflicted with.  Right?
7       A.   Not necessarily.  This was the
8   initial take of which grants may be
9   conflicting, but not necessarily prescriptive
10  as to here's the only 55 terms that we would
11  use to assess whether or not a grant is
12  related to DEI or wasteful for that matter.
13      Q.   Sure.
14      A.   Preliminary list, this got thrown
15  out.
16      Q.   Sure, yeah.  But would you agree,
17  at least, that this list captures at least a
18  moment of your perception of what the EOs were
19  calling for in analyzing grants?
20      A.   This list helped us identify which
21  grants we needed to read, but not make the
22  ultimate yay-or-nay decision on whether we
23  keep this grant or not.
24      Q.   But this is subjective.  Right?
25      A.   What is?

247

J. Fox

1
2       Q.   The terms that you picked.  Why
3   you picked one term versus another term.  This
4   was a subjective call by you and
5   Mr. Cavanaugh.  Right?
6       A.   Yes.
7       Q.   Okay.  And the DEI rationales that
8   we saw in previous spreadsheets, those were
9   also subjective calls about how DEI in the EOs
10  would apply to certain grant descriptions.
11  Right?
12      A.   Yes.
13      MR. ONAYEMI:  Let's go off the
14  record for a few minutes.  Counsel?
15      MS. DOUD:  Yeah.
16      THE VIDEOGRAPHER:  The time
17  now is 4:21 p.m.  This concludes
18  Media 5.  Off the record.
19      (Recess taken from 4:21 p.m.
20  to 4:32 p.m.)
21      THE VIDEOGRAPHER:  The time
22  now is 4:32 p.m.  This begins Media
23  6.  On the record.
24  BY MR. ONAYEMI:
25      Q.   Hi there.

248

J. Fox

1
2       MR. ONAYEMI:  I think we were,
3   Jacob, I think we were looking at
4   Exhibit 12.  This is US-000016154.
5   Great.  Thanks.
6       And if you could go back to
7   the first tab on this document
8   called "NEH grants (JF)."  Maybe if
9   you zoom out a bit so that we could
10  see more of the document, and
11  scroll to the right -- excuse me --
12  scroll to the left, please.  Thank
13  you.
14  BY MR. ONAYEMI:
15      Q.   So Justin, again, these are what
16  you're testifying that you and Nate put
17  together in the lead-up to your initial
18  meeting with Mr. Wolfson and Mr. McDonald?
19      A.   Yes.
20      Q.   Did you actually show Mr. Wolfson
21  and Mr. McDonald this list?
22      A.   No.
23      Q.   Why not?
24      A.   We didn't get to it, frankly.  We
25  said that we could show them.  They said

249

J. Fox

1
2   great, we've actually been doing the same
3   thing.  We should send you the work that we've
4   been doing as a team.
5       Q.   So you never gave this to
6   Mr. Wolfson or Mr. McDonald?
7       A.   Not that I remember.
8       MR. ONAYEMI:  Let's go to
9   Tab 13, Jacob.  This will be
10  Exhibit 13, Bates US-000063326.
11      (Fox Exhibit 13, Cellebrite
12  text message report, Bates Number
13  US-000063326, marked for
14  identification, as of this date.)
15      Q.   So this is a recording of text
16  messages in a Cellebrite report.  It's just an
17  image of texts on a phone.  This appears to be
18  a conversation between --
19      MR. ONAYEMI:  Well, can we
20  zoom in, Jacob, just so we can see.
21  There we go.  That should be, that's
22  perfect.
23      Q.   So there are two phone numbers on
24  the top left, "12024806696."
25      Was that a phone number to your

250

1          J. Fox
2   understanding that was affiliated with Michael
3   McDonald?
4          A.   Yes.
5          Q.   And then, there's a number of
6   "+17712109025."  Do you understand that to be
7   your government phone number?
8          A.   I think so.
9          Q.   So in the first text of the right
10  side, there's a bubble, and --
11         MR. ONAYEMI:  And if you could
12         zoom in a bit more, Jacob, to that
13         gray bubble.
14         Q.   So it looks like the -9025 number
15  sends a text to the -6696 number, Mike
16  McDonald.
17         Does that seem to be what's going
18  on?
19         A.   Yes.
20         Q.   So this is a text from you to
21  Mr. McDonald.  Is that fair?
22         A.   I believe so.
23         Q.   It says, quote -- pardon me.  This
24  is sent on, under "delivered," it says
25  "5/20/2025."

251

1          J. Fox
2          Do you see that?
3          A.   Yes.
4          Q.   Were you still with the government
5   at this point?
6          A.   Yes.
7          Q.   Was it this after your work had
8   been finished with the NEH, to your
9   understanding?
10         A.   Substantively, I think so.
11         Q.   So you text Mr. McDonald and you
12  say:
13         "Ringing to give you a
14         heads-up that the DOGE team is
15         planning to make an X post on NEH
16         highlighting a few of the crazy DEI
17         grants from Biden-era administration
18         and reiterating that NEH grants
19         going forward will be merit-based
20         and awarded to nonDEI, pro-America
21         causes."
22         Did I read that correctly?
23         A.   Yes.
24         Q.   So it appears that you have a
25  pretty specific reference point in what you

252

1          J. Fox
2   call the "DOGE team."
3          Who is the DOGE team that you're
4   referring to there?
5          A.   The leadership team, Stephen
6   Ehikian, Josh Gruenbaum, Anthony Armstrong.
7          Q.   Anthony Armstrong, Josh Gruenbaum,
8   and who else?
9          A.   Stephen Ehikian.
10         Q.   Stephen Ehikian.  Okay.  And
11  collectively, this leadership team was
12  planning to make an X post?  Is that --
13         A.   Yeah.
14         Q.   Do you know who ran the X for
15  DOGE?
16         A.   I know it moved around.  I don't
17  know who was physically in charge while I was
18  there.
19         Q.   Got it.  How did you become
20  aware -- before we -- strike that.
21         How did you know that, I guess I
22  should say?
23         A.   Nate.
24         Q.   Nate told you that the owner of
25  the X DOGE page moved around?

253

1          J. Fox
2          A.   Well, we just didn't know or I
3   didn't know who was running it.  But I know
4   that Josh and Stephen had their own X accounts
5   as well through GSA.
6          Q.   How did you find out that this was
7   going to happen?
8          A.   That the X post was going to
9   happen?
10         Q.   Yeah.
11         A.   I think Nate told me.
12         Q.   Do you have an understanding of
13  why the DOGE account on X would post about NEH
14  grants?
15         A.   Just exemplatory work that's been
16  done on aligning with the administration's
17  priorities.
18         Q.   Did you often text Mr. McDonald
19  like this?
20         A.   In the month prior to that,
21  infrequently.  But while we were engaging, you
22  know, can you get me from the lobby, and no
23  substantive work via text, but coordinating
24  meeting times, fairly common.
25         Q.   Via text from your government --

254

J. Fox

1   on your government cell phone?
2   A.  Yes.
3   Q.  Did you search for those documents
4   in the preparation -- or in the context of
5   this litigation?
6   A.  I didn't have my phone.
7   Q.  Got it.  But you were texting
8   Mr. McDonald on this phone number while you
9   were working with NEH?
10  A.  Yes.
11  Q.  Okay.
12  MR. ONAYEMI:  I'm just going
13  to put in the record that we request
14  all of the text messages that --
15  MS. DOUD:  This is where that
16  came from.
17  MR. ONAYEMI:  I know.
18  MS. DOUD:  So it came from
19  imaging his phone and producing it
20  to you.
21  MR. ONAYEMI:  Right.  I --
22  MS. DOUD:  So we produced the
23  ones that are --
24  MR. ONAYEMI:  I do know that.
25

255

J. Fox

1   MS. DOUD:  -- responsive.  So
2   I don't know what you're requesting
3   is different from what we've already
4   done.
5   MR. ONAYEMI:  Okay.  Just
6   putting on the record that we make
7   that request of all -- of the text
8   messages that he's referring to that
9   he shared with Mr. McDonald.
10  MS. DOUD:  Well, we produced
11  the ones that were -- we said we
12  would produce, you know, pursuant to
13  response of this criteria.  And --
14  so that is what we've done.
15  MR. ONAYEMI:  Okay.  Surely
16  text messages about meetings that
17  you were having with the head of NEH
18  would be responsive to your
19  communications with the head of NEH.
20  We'll move on.
21  MS. DOUD:  That's not really
22  an issue for him to answer at his
23  deposition, so I'm not sure what
24  you're --
25

256

J. Fox

1   MR. ONAYEMI:  I'm putting it
2   on the record for you --
3   MS. DOUD:  Okay.
4   MR. ONAYEMI:  -- and the
5   judge.
6   MS. DOUD:  We are not
7   responding to whatever this new
8   request is as phrased on the record.
9   MR. ONAYEMI:  Okay.
10  MS. DOUD:  I think that we've
11  been pretty clear about what we did.
12  MR. ONAYEMI:  Okay.  Great.
13  Thank you.
14  BY MR. ONAYEMI:
15  Q.  You note the DOGE team is planning
16  to post about "crazy DEI grants."
17  Did I read that correctly?
18  A.  Yes.
19  Q.  Did you have an understanding of
20  what "crazy" meant in this context?
21  A.  Grants that were most infringent
22  on the EOs.
23  Q.  The EOs about DEI, gender
24  ideology?
25

257

J. Fox

1   A.  And waste.
2   Q.  And waste.  It also says
3   "pro-America causes."
4   Do you see that?
5   A.  Mm-hmm.
6   Q.  Do you understand what that means?
7   A.  America 250 grants, Garden for
8   American Heroes.  Yeah.
9   Q.  So is it your understanding that
10  grants that involve DEI as they relate to the
11  EOs are also not pro-America?
12  A.  I --
13  MS. DOUD:  Objection.
14  THE WITNESS:  Sorry.
15  A.  It depends on the grant.
16  Q.  It says "nonDEI, pro-America,"
17  though.  Right?
18  A.  Yeah.
19  Q.  So I guess my question is:  Could
20  a grant be DEI and pro-America?
21  A.  That depends on the grant.
22  Q.  Okay.  How do you know that
23  Anthony, Josh, and Stephen were involved with
24  this X post?
25

258

J. Fox

2    A.   They were the leaders that we were
3    communicating with.
4    Q.   You also say that grants going
5    forward will be merit-based.  Can you explain
6    what you mean by that?
7    A.   This is reiterating some of the
8    verbiage that Mike felt the agency should be
9    headed.  What Mike interprets as merit-based
10   is entirely up to him.  But this is just, kind
11   of, the way that he wanted the agency to be
12   heading towards.
13   Q.   Did he ever explain to you what he
14   understood merit-based to mean?
15   A.   We never got into definitionally
16   what is merit-based.  In, you know, implied
17   conversation, it's just not discriminating
18   based on cultural, race, identity, gender.
19   Q.   Not discriminating based on --
20   A.   Purely based on merit.
21   Q.   Okay.  Did you make an assessment
22   of the scholarly quality of the grants that
23   you were reviewing for potential termination?
24   A.   We were only looking at it from
25   the view of the EOs, whether it was related to

259

J. Fox

2    DEI in any way or wasteful, noncritical, et
3    cetera.
4    Q.   So if you came across -- strike
5    that.
6        Did you ever come across a grant
7    during your time at NEH that you flagged as
8    DEI and then you did an additional assessment
9    as to whether it was also pro-America?
10   A.   Yes.  There were a few grants
11   that, for example, may have been promoting a
12   specific race within an American veterans
13   initiative, and while, yes, you are awarding a
14   grant based on race, that is also a veterans
15   benefit, which, in our view, in discussions,
16   is pro-America, and so would be adjusted from
17   DEI-related to align with Mike's view of NEH.
18   Q.   In your view, were the grants that
19   were eventually terminated on DEI grounds not
20   merit-based?
21   A.   It depends on which grant.  Do you
22   have examples?
23   Q.   I guess, just in general, I, kind
24   of, wanted to understand how you are
25   systemitizing, let's say, you know, merit DEI.

260

J. Fox

2    It sounds like these are two concepts that are
3    on your mind as you were looking at grants.
4    Is that fair to say?
5    A.   Frankly, merit-based is how Mike
6    was conceptualizing the go-forward review of
7    applicants.  And as you know, I was looking on
8    the historical view of grants that had gone
9    out, and whether or not they were related to
10   DEI or wasteful spend.
11       And so my understanding is that
12   Mike was going to implement new methods of
13   just assessing purely on merit of an
14   awardee --
15   Q.   That --
16   A.   -- forward-looking.
17   Q.   Right.  Okay.  So there's, like,
18   a, kind of, a chronological element to this
19   that I'm not sure I fully appreciated before.
20       You were backwards-looking at
21   existing grants that had been awarded in your
22   implementation of this DEI review.
23       Is that fair to say?
24   A.   Some of them were going up for
25   review with the board.  And part of the

261

J. Fox

2    request from Mike and Adam was to assist in
3    reviewing the 800 or -- I don't remember the
4    exact number -- of awards that were up for
5    review for approval or denial.
6        And so, in that sense they hadn't
7    been awarded yet, but it was an ongoing active
8    review.
9        MR. ONAYEMI:  So let's scroll
10   down a little bit, Jacob, and to the
11   left so we can see that text, yeah.
12   Actually, I don't think this
13   one has any text on it, does it?
14   Yeah, so let's scroll down to the
15   next bubble.  There we go.
16   Q.   Mr. McDonald responds -- sorry.
17   Mr. McDonald responds to you later on.  Does
18   that look right, a text from Mr. McDonald?
19   A.   Yes.
20   Q.   Okay.  This is on -- pardon me.
21   This is also on 5/20/2025.  It appears that he
22   responds to your last message that we looked
23   at with "just saw it:"  And then he drops an X
24   link there.
25       Did I read that correctly?

262

J. Fox

1        J. Fox
2    A. Yes.
3    Q. And this looks like he's
4    acknowledging that he thinks he's identified
5    the X post that you were referring to in your
6    text to him earlier.
7        Is that a fair reading of this?
8    A. Yes.
9        MR. ONAYEMI: Let's go to
10   Tab 14, Jacob. This is Exhibit 14.
11       (Fox Exhibit 14, Department of
12       Government Efficiency X post, marked
13       for identification, as of this
14       date.)
15   Q. All right. So this is an X post
16   that is just the link that Mr. McDonald put in
17   his last text message to you in Exhibit 13.
18       Does this look like what he was
19   probably referring to?
20   A. Yes.
21   Q. What he sent to you? Okay. Have
22   you seen this before?
23   A. Yes.
24   Q. And is this the X post that you
25   were actually referring to in your text

263

J. Fox

1        J. Fox
2    message to him?
3    A. Yes.
4    Q. Okay. So let's look at some of
5    these grants. Let's look at the full text.
6    This is the Department of Government
7    Efficiency X page.
8        Would you agree with that?
9    A. Yes.
10   Q. And it says:
11       "During the previous
12       administration, the National
13       Endowment for the Humanities awarded
14       the following grants to spend
15       taxpayer dollars, all of which have
16       been canceled. ($163 million in
17       overall savings). NEH grants will
18       be merit-based and awarded to nonDEI
19       pro-America causes."
20       Did I read that correctly?
21   A. Yes.
22   Q. This language looks very similar
23   to the text that you sent to Mr. McDonald,
24   doesn't it?
25   A. Yes.

264

J. Fox

1        J. Fox
2    Q. Had you seen this draft X post
3    before you wrote to Mr. McDonald?
4    A. Yes.
5    Q. How did you see that?
6    A. Draft form. It was something that
7    Nate and I pulled together. So savings is
8    something that Josh Gruenbaum has. We had to
9    report all of our grant and contract savings
10   in to him.
11       The verbiage "NEH grants will be
12   merit-based and awarded to nonDEI and
13   pro-America causes" is from NEH's -- I forget
14   what it -- like, the publicity statement that
15   Mike had launched, and so this was aligned
16   with his thinking.
17       And then the six grants were a
18   consolidated version of some of the grants
19   that were most infringent on DEI and wasteful
20   spending EOs -- or targeting DEI within
21   spending EOs.
22   Q. So tell me if I'm misunderstanding
23   this, you actually helped to draft what
24   eventually became this X post?
25   A. Yes.

265

J. Fox

1        J. Fox
2    Q. And what did you do with that
3    draft?
4    A. I don't remember exactly, but we
5    did make sure that it was accurate and that
6    NEH -- the direction of NEH and the go-forward
7    methodology for examining grants what --
8    aligned with what Mike had issued in the press
9    release.
10   Q. Who did you collaborate with on
11   this?
12   A. Nate.
13   Q. Who else?
14   A. I don't remember who Nate sent it
15   to, but this was a -- this is a form of the
16   draft that we put together, Nate and I.
17   Q. Okay. And let's look at the date.
18   It says May 20, 2025. Is that right?
19   A. Yes.
20   Q. This is the same day, actually,
21   that you texted McDonald in the last exhibit.
22   Does that sound right?
23   A. Yes.
24   Q. Let's look at some of these
25   grants. So the first line says:

266

J. Fox

1
2      "$350,000 for interactive gay
3      travel guides to better understand
4      historical LGBTQ plus spaces."
5          The second one says:
6      "$350,000 to create a Spanish
7      version of Homosaurus.org."
8      A.   The third one says:
9      "$247,000 to digitize stories
10     of transgender adults in the Pacific
11     Northwest."
12         The fourth one says:
13     "$75,000 to examine the
14     relationship between the Internet
15     live-streaming and LGBTQ plus
16     communities."
17         Did I read those correctly?
18     A.   Yes.
19     Q.   Do you remember seeing these
20     grants earlier in this deposition?
21     A.   Yes.
22     Q.   Where did you see those grants?
23     A.   The preliminary list that we had
24     used.
25     Q.   Okay.

267

J. Fox

1
2      A.   To prep for the initial meeting
3      with Mike and Adam.
4      Q.   The initial meeting that was on
5      March 12, 2025?
6      A.   Yes.
7      Q.   Okay.  And this is a post
8      highlighting those same grants in
9      May 20, 2025.  Is that right?
10     A.   Yes.
11     Q.   Okay.  And you had identified
12     these grants by running a list of terms that
13     we saw through ChatGPT.  Is that right?
14         MS. DOUD:  Objection.
15     A.   No.
16     Q.   You had identified these grants by
17     screening grant descriptions for the list of
18     terms that we discussed a little bit earlier.
19     Right?
20     A.   Step 1 in a review is to hone in
21     on where you may find grants that are not
22     aligned with EOs.  And so Step 1 was using
23     that list, which was just a VLOOKUP on
24     publicly available data.
25         Then you read the actual grant and

268

J. Fox

1
2      determine what is this about, when does it
3      reference the term that we matched it with.
4          And then make the ultimate
5      judgment call, Okay, from the lines of these
6      EOs, is this DEI related or wasteful.
7      Q.   So you reviewed thousands of
8      grants between your start at NEH and when you
9      stopped working with NEH.  Right?
10     A.   Yes.
11     Q.   Is it a little odd that so many
12     of -- or at least five or six of the grants
13     that you flagged for your initial meeting with
14     Mr. McDonald and Mr. Wolfson ended up two
15     months later on an X post on DOGE's official
16     account?
17         MS. DOUD:  Objection.
18     A.   Is it a little odd, meaning?
19     Q.   How do you explain that at some --
20     that grants that were in your preliminary
21     list, specifically these grants in your
22     preliminary list ended up being on the DOGE
23     official page, which ended up getting over
24     half a million views?
25         MS. DOUD:  Objection.

269

J. Fox

1
2      A.   Because we reviewed each of the
3      grants, and these, we believed, were most
4      infringent with the executive orders.  And to
5      the point about what is the X post meant to
6      do, it's just to show some of the progress in
7      aligning agencies like NEH with administration
8      priorities.
9      Q.   And these grants were identified
10     by you in the run-up to the meeting on
11     March 12 with Mr. McDonald and Mr. Wolfson by
12     running terms through the grant description
13     such as homosexual, gay, Black, people of
14     color, tribal.  Right?
15         MS. DOUD:  Objection.
16     A.   These along with 80 others.
17     Q.   80 other what?
18     A.   Just hits on that term search.  So
19     then you read the description and assess how
20     misaligned is this with administration
21     priorities.
22     Q.   But again, these grants that we
23     see here were on that preliminary list through
24     which you ran a set of words to identify these
25     grants that included words like Black,

270

J. Fox

1  homosexual. Right?
2  A.  To get to a big list of grants and
3  all of their project descriptions, which we
4  then had to read through each one and pull out
5  shortened language of these grants.
6  You highlighted the four of the 80
7  or 100, I don't even remember how many hits it
8  was. But we had to read the full description
9  in order for us to make any assessment of how
10  misaligned it was with the EOs.
11  Q.  Right. But these are grants that
12  had words in the description that hit on the
13  key terms from that list that we were
14  discussing. Right?
15  A.  Yes, but they did not -- that
16  wasn't the sole reason that they would have
17  ended up on this post.
18  Q.  Right.
19  A.  You understand that? Because I'm
20  reading the full description to -- in the
21  context of the EOs that had come out, is this
22  wasteful, is it related to DEI.
23  Q.  Right, absolutely. And I'm not
24  implying that you did or didn't do that. I

271

J. Fox

1  was just asking the simple yes-or-no question.
2  A.  Right. Which I've answered.
3  Sorry. I don't want to ...
4  Q.  Right. Okay. So you said you
5  never showed that initial preliminary list to
6  Mr. Wolfson and Mr. McDonald. Right?
7  A.  That's right. But these do appear
8  in the broader list of grants that we
9  reviewed.
10  Q.  So it was your view going into
11  your work with NEH, before you even stepped
12  foot in there, that these specific grants
13  probably violated or conflicted with the EOs,
14  DEI, gender ideology, and wasteful spending.
15  MS. DOUD: Objection.
16  Q.  Is that right?
17  A.  Maybe. But we needed to confirm
18  with Mike and Adam and read the full
19  description, which, again, publicly available
20  information is different from what eGMS has,
21  so we used the source of truth in the final
22  determination of whether this conflicted or
23  not.
24  Q.  Well, why is $247,000 to digitize

272

J. Fox

1  stories of transgender adults in the Pacific
2  Northwest a crazy grant?
3  MS. DOUD: Objection.
4  A.  In what way do you mean crazy?
5  Q.  In the way that you described it
6  in your text to Mr. McDonald?
7  A.  In the way that it is misaligned
8  with administration priorities of focusing on
9  nonDEI initiatives.
10  Q.  And who made that judgment?
11  A.  When?
12  Q.  Who made the judgment that it was
13  misaligned with the administration's
14  priorities?
15  A.  When?
16  Q.  When you put it on your
17  preliminary list for Mr. McDonald and
18  Mr. Wolfson?
19  A.  Prior to the meeting, you mean?
20  Q.  Yes.
21  A.  We just looked at what could be
22  infringing on the EOs. And Nate and I
23  reviewed each of these to see which of these
24  could conflict. And all of these, if I

273

J. Fox

1  remember correctly, ended up on the eventual
2  termination list.
3  Q.  Right. Several grants on that
4  preliminary list ended up on the cancellation
5  list.
6  Is that fair to say?
7  A.  Separate and apart from the
8  initial work, yes.
9  Q.  Okay. And that was a list that
10  you put together before you had a single
11  meeting with Mr. McDonald. Right?
12  A.  Yes.
13  (Stenographer clarification.)
14  Q.  So in essence, just to recap, you
15  put together a list of what you considered to
16  be the craziest grants prior to meeting with
17  Mr. McDonald and Mr. Wolfson. Right?
18  A.  In the context of is this aligned
19  with administration priorities or not, yes.
20  Q.  And then fast forward two months,
21  a lot of those grants at the top of that
22  preliminary list end up on a post that DOGE is
23  putting into the Twitter-X universe about
24  grants that have actually been canceled.

274

J. Fox

1      Is that what's happening here?
2      MS. DOUD:  Objection.
3      A.  Could you repeat.
4      Q.  Two months later, a lot of those
5  grants that were at the top of your
6  preliminary list of craziest grants ends up in
7  a DOGE post about canceled grants.
8      Is that fair to say?
9      A.  What do you mean by "the top"?
10  Like, that it was within the list of 180 that
11  had tagged for these keywords, yes.  If that's
12  what you consider the top.
13      Q.  Okay.  Well, there's a portion of
14  the spreadsheet that said "craziest grants"
15  specifically, and I think it only had
16  something like 25 grants.  Did you --
17      A.  Could we pull it up?
18      Q.  Absolutely, yeah.
19      MR. ONAYEMI:  Jacob, if we
20  could go back to -- this will be
21  Tab 12, Exhibit 12.
22      Q.  So if we look at, again, this is
23  Tab 12, Exhibit 12.  If we look at Row 3, it
24  says "craziest grants."

275

J. Fox

1      A.  Mm-hmm.
2      MR. ONAYEMI:  And if you could
3  scroll down very slowly, Jacob.  You
4  can stop there.
5      Q.  At Row 25, another section starts
6  that's called "other bad grants."
7      Several of the grants that we
8  looked at, and that were on that X post, are
9  in the top 25 labeled under "craziest grants."
10      Is that fair to say?
11      A.  Yeah, four of the 25.
12      Q.  Four.  Do you have an
13  understanding for why, out of the thousands
14  and thousands of grants that were canceled,
15  four from this top 25 that you had been
16  compiling, before ever stepping foot into NEH,
17  ended up on the cancellation list that was
18  publicized on DOGE?
19      MS. DOUD:  Objection.
20      Q.  X.
21      A.  Because if you read the
22  descriptions and confirm from the work with
23  Adam and Mike, these are misaligned with the
24  EOs for identifying wasteful spend and

276

J. Fox

1  identifying programs that are related to DEI.
2      MR. ONAYEMI:  Can you scroll
3  down to the bottom of this list,
4  Jacob, just to the last entry.  That
5  would be better to drag it, yeah.
6      Q.  So there are around 1,500 entries
7  here?
8      A.  Is that the bottom?
9      Q.  Yeah, I think so.
10      A.  Yeah, many of these may not be
11  active.
12      MR. ONAYEMI:  You can stop
13  going down, Jacob.  You can just go
14  back to the top.  Thank you.
15      Q.  Did you run this list of words
16  through every grant description that you could
17  find on the -- I forgot where you got this
18  from.
19      Where did you get this from?
20      A.  Grants.gov.
21      Q.  Did you run that detection list
22  through every grant that was available on
23  grants.gov?
24      A.  From NEH?

277

J. Fox

1      Q.  From NEH, yes.
2      A.  Yes.
3      Q.  So the five or six that ended up
4  on the DOGE X page would have been identified
5  through the detection list, which is Tab 3 of
6  Exhibit 12?
7      A.  No, there was a review we did with
8  Mike and Adam to review every grant, and these
9  were the most infringent on -- the four out of
10  six in the list were the most infringent of
11  the EOs.
12      Q.  So Mike and Adam agreed with you
13  that the craziest grants that you identified
14  before joining NEH were indeed the craziest
15  grants that the NEH had herein?
16      MS. DOUD:  Objection.
17      MR. ONAYEMI:  I'll note that
18  counsel is laughing, I guess, during
19  her objection.
20      MS. DOUD:  I wasn't -- I was
21  coughing.  I'm sorry.  Okay?  I
22  like --
23      A.  Could you repeat the question.
24      MS. DOUD:  I'm not laughing.

278

J. Fox

1    I was -- had a cough coming on right
2    while I was saying an objection.
3        MR. ONAYEMI: Okay. I just
4    want to keep this professional,
5    Counsel.
6        MS. DOUD: I literally cannot
7    help if I occasionally cough. I'm
8    sorry about that. That was
9    completely involuntary and I am
10   sorry. I will try to keep coughing
11   to a minimum, which I have been
12   trying to do. But I am recovering
13   from something and I can't help it
14   if it occasionally happens. So I'm
15   sorry to offend you by coughing.
16       MR. ONAYEMI: Thanks, Counsel.
17       Let's go to -- let's pull up
18   Tab 15, Jacob.
19   BY MR. ONAYEMI:
20       Q.   But I'll ask a few questions
21   before we get there. Were you part of the
22   process of actually sending out termination
23   notices to grantees at NEH?
24       A.   Yes.

279

J. Fox

2        Q.   Describe what that process was.
3    And I mean the, kind of, logistical process in
4    terms of how the grants actually left NEH and
5    got to the grantees.
6        A.   Sorry. The communication, the
7    documents, preparation, where do you want to
8    focus?
9        Q.   Sure. I guess I'm just asking
10   broadly. I guess before we start talking
11   into, like, what communications were happening
12   between you and Michael and Nate and Adam, and
13   the, kind of, hierarchy, and who's deciding to
14   do what. Just the mechanics of sending out
15   terminations.
16       Were you involved in that process?
17       A.   Yes.
18       Q.   Okay. What role did you play in
19   that process?
20       A.   Sending out the terminations.
21       Q.   Can you describe what that
22   entailed?
23       A.   Yes. For each grant, you need to
24   have an official letter explaining why there
25   was a termination. That letter is bespoke to

280

J. Fox

2    the grantee, the name of the organization, and
3    an explanation for why Mike and team have
4    elected to terminate. And that goes out from
5    an e-mail, an NEH e-mail to the inbox of the
6    grantees.
7        Q.   Okay. And who is actually sending
8    that e-mail out?
9        A.   Me.
10       Q.   Through your GSA e-mail account?
11       A.   Through my NEH e-mail.
12       Q.   Okay. Was it the jfox@neh.gov
13   that we saw earlier?
14       A.   No, it was a notifications inbox
15   that was set up so that -- not Brett, but the
16   person that was in charge of grants at NEH, so
17   that he could have access to it and
18   communicate directly with the grantees,
19   following their responses. So this is a
20   separate inbox, not from my jfox.
21       MR. ONAYEMI: Let go to
22   Tab 15, Jacob. This is Exhibit 15.
23       (Fox Exhibit 15, E-mails
24   including Justin Fox dated April 1,
25   2025, beginning Bates Number

281

J. Fox

2    US-000050461, marked for
3    identification, as of this date.)
4        MR. ONAYEMI: This is Bates
5    US-000050461. It's an e-mail from
6    Mr. Fox to Mr. McDonald and
7    Mr. Wolfson cc'ing Mr. Cavanaugh,
8    sent on April 1, 2025.
9        MS. DOUD: What document is
10   this?
11       MR. ONAYEMI: This is
12   US-000050461.
13   BY MR. ONAYEMI:
14       Q.   Do you recognize this document?
15       A.   Could I see the full context here.
16       (Document review.)
17       Q.   Do you recognize this,
18   Mr. Cavanaugh? Excuse me -- Mr. Fox?
19       A.   I'm just reading, refreshing a
20   memory on this e-mail.
21       Q.   Sure.
22       A.   It, sort of, takes off on an
23   e-mail chain.
24       (Document review.)
25       THE WITNESS: Could you scroll

282

J. Fox

1    up, Jacob. Okay. You can keep
2    going up.
3    Q. Let me know when you're ready
4    to --
5         THE WITNESS: Okay. One more.
6    A. (Document review.)
7         Yup. Okay. I remember.
8    Q. Great. Is this the doc- -- does
9    this appear to be authentic to you?
10   A. Yes, upon review.
11   Q. And is this an exchange you would
12   have had in your ordinary course doing work
13   with the NEH as a detail aide from GSA?
14   A. Yes.
15   Q. So in this e-mail again from
16   Mr. Fox, or from you, Justin, to Mr. McDonald,
17   Mr. Wolfson, cc'ing Mr. Cavanaugh, the subject
18   is "RE: NEH grants termination."
19        Did I read that correctly?
20   A. Yes.
21   Q. And the body of this e-mail from
22   you to Mr. McDonald says:
23        "Mike, please see attached
24        grant termination letter which we

283

J. Fox

2    have to use for Organizations and
3    State and Jurisdictional Humanities
4    Counsels. We will address these
5    first and individuals/scholarship
6    grants once the
7    orgs are finished as those are more
8    personalized.
9        "Additionally, see below
10   typical language sent to each of the
11   grantees receiving a notification.
12   If it's your
13   preference, we can set up an e-mail
14   like Grant_Notification@neh.gov and
15   add language to the beginning of the
16   e-mail saying 'At the direction of
17   the Acting Chairman for NEH,'
18   instead of sending from your e-mail
19   or signing off with your name in the
20   signature. Your details are already
21   in the attachment. Let us know on
22   below and attached tomorrow."
23        Did I read that correctly?
24   A. Yes.
25   Q. And below that, you're

284

J. Fox

2    referencing, I think, the body of an e-mail
3    that would be sent to a grantee with the
4    attached actual termination letter for that
5    grant. Is that right?
6    A. Yes.
7    Q. So do you have an understanding of
8    why you were engaged in the actual process of
9    sending out the grant terminations?
10   A. Because Mike did not feel
11   confident in the timeline of getting notices
12   out. He said it was going to take hours of
13   the team that they didn't have, and he wanted
14   us to do it for him.
15   Q. What's this proposition that
16   you're making when you say:
17        "If it's your preference, we
18        can send up an e-mail like
19        grant_notification@neh.gov."
20   A. What's my read of that sentence?
21   Q. What are you -- can you give me
22   context as to what you're actually proposing
23   here?
24   A. Yeah, ultimately, procedurally
25   it's going to be up to Mike how he'd like to

285

J. Fox

2    send out some of these notifications. He's --
3    he was NEH counsel. He's going to have an
4    opinion on how this is conducted, and this is
5    just opening up optionally for him.
6    Q. But what are you proposing?
7    A. To set up an e-mail that's
8    grant_notifications@neh, or if he would like
9    to send it from his e-mail.
10   Q. Right. Did you end up setting up
11   an e-mail address like
12   grant_notification@neh.gov?
13   A. If I remember correctly, I spoke
14   with Mike on the phone following this e-mail,
15   unless there's an e-mail that he responded to,
16   and his preference was to set up an e-mail.
17   Q. So if I ask Mr. McDonald at his
18   deposition why you drafted this language, he's
19   going to tell us it's because he told you to
20   go draft the language?
21        MS. DOUD: Objection.
22   A. I don't know what he's going to
23   say, but I know that he wanted us to execute
24   the terminations, and so we're doing anything
25   we can to help him.

286

J. Fox

1
2    Q.   So he told you specifically to
3    draft termination draft language for the
4    terminations that you were going to be sending
5    out?
6         MS. DOUD:  Objection.
7    A.   No, but we were just helping him
8    throughout this process.  So this is a
9    courtesy, not a mandatory thing that we did.
10   Q.   Below that, it says "Dear," open
11   parens, this is in the letter, in the body of
12   an e-mail that would go out to the grantees.
13   In your draft, you write:
14        "Dear (organization name), we
15        regret to inform you that your NEH
16        grant has been terminated.  Please
17        see the attached grant termination
18        notice."
19        Did I read that correctly?
20   A.   Yes.
21   Q.   And was the goal here to insert
22   the organizations that had been subject to
23   grant terminations?
24   A.   The goal here is to get Mike's
25   input on what would be sent alongside grant

287

J. Fox

1
2    terminations.
3    Q.   But the organization name inside
4    of the brackets there, that would be filled
5    with organizations that were subject to grant
6    terminations.  Right?
7    A.   That is right.
8    Q.   And you drafted this without
9    Mr. McDonald directing you to draft this.  Is
10   that right?
11   A.   If I remember correctly, yes, I
12   did this for his benefit.
13   Q.   Did you also draft the letter that
14   was attached to this e-mail?
15   A.   Along --
16        MS. DOUD:  Objection.
17   A.   Alongside Mike.
18   Q.   Okay.  What do you mean "alongside
19   Mike"?
20   A.   In the standard, normal course of
21   draft that gets iterated, his input,
22   ultimately, his sign off.
23   Q.   When did you sit down with Mike
24   and draft this language together?
25        MS. DOUD:  Objection.

288

J. Fox

1
2    A.   I don't know when precisely, but
3    back and forth we had e-mails iterating on the
4    language, redlining on the language.
5    Q.   Okay.  But you did the first draft
6    of the letter.  Is that fair to say?
7    A.   With input from Justin Aimonetti,
8    I drafted the first take, and Mike, again,
9    ultimately had to sign off.
10   Q.   With input from who?
11   A.   Justin Aimonetti.
12   Q.   But you and Justin drafted the
13   first draft of this letter.  Is that fair?
14   A.   I drafted the first with Justin
15   Aimonetti's input.
16   Q.   So you were aware that the
17   terminations here would be for active NEH --
18   grants that were active at the time of the
19   sending of the terminations.
20        Is that fair to say?
21   A.   Could you repeat that question.
22   Q.   This termination letter would have
23   terminated active grants.  Correct?
24   A.   I'm not sure I get what you mean
25   by "active grants."

289

J. Fox

1
2    Q.   I guess it's a little bit, sort
3    of, circular.  We could actually just strike
4    that question.
5         In the DOGE X post that we
6    reviewed earlier, the number that -- there's a
7    figure of $163 million that it references with
8    respect to terminated grants at the NEH.
9         Do you remember that?
10   A.   Yes.
11   Q.   And having played a role in
12   identifying grants that had to do with DEI, do
13   you feel any remorse about the scale of the
14   grants that were ultimately terminated on
15   those grounds?
16        MS. DOUD:  Objection.
17   A.   No, in the context of the $2
18   trillion deficit like we spoke about, why I
19   joined, it was to reduce wasteful spending and
20   noncritical spend.
21   Q.   Would you --
22   A.   I'm sorry for those impacted, but
23   there's a bigger problem, and that's --
24   ultimately the more important piece is
25   reducing the government spend.

290

1        J. Fox
2        Q.  Did you ever find it problematic
3   that you were alongside Nate short-listing for
4   termination projects that had hits on words
5   like Black, homosexual, LGBTQ plus?
6        MS. DOUD:  Objection.
7        A.  What do you mean "problematic"?
8        Q.  What did you think about it?  Let
9   me put it that way.
10       A.  We were identifying wasteful spend
11  in the government based on administration
12  direction.  That was the whole reason we were
13  there, was to find savings.
14       Q.  But we saw in your list of terms,
15  you actually didn't use words like white,
16  Caucasian, heterosexual.
17       Do you remember talking about
18  that?
19       A.  Yes.
20       Q.  And you didn't use those words to
21  identify grants that that would be conflicting
22  with the EOs.  Right?
23       A.  Very well could have.
24       Q.  Did you?
25       A.  I didn't.  But going back, it

291

1        J. Fox
2   would have made sense because as we'd
3   mentioned, there's -- DEI is a pretty
4   encompassing bucket.
5        Q.  What do you find wasteful about
6   grants relating to Black, homosexual, or LGBTQ
7   subjects?
8        MS. DOUD:  Objection.
9        A.  It is noncritical spend, meaning
10  nobody's life is at stake.
11       Q.  But you didn't screen for white,
12  Caucasian, or heterosexual.  Right?
13       A.  We could have.
14       Q.  But you didn't?
15       A.  We didn't.
16       Q.  And that was based on your choice
17  and Mr. Cavanaugh in selecting those words
18  that you used to screen grants.  Right?
19       MS. DOUD:  Objection.
20       A.  The list itself was only a tool to
21  find grants that we needed to read the full
22  context for.
23       Q.  That was a judgment call based on
24  your perception and Nate's perception on what
25  would be DEI.  Right?

292

1        J. Fox
2        MS. DOUD:  Objection.
3        A.  Ultimately what was canceled is at
4   the discretion of the agency heads, and those
5   grants that we'd identified ultimately were
6   canceled because of further in-depth review of
7   the context and the descriptions.
8        MR. ONAYEMI:  Can we scroll
9   down, Jacob, to the bottom e-mail,
10  keep going.  Okay.  Well, we can go
11  to Tab 16, Jacob.
12       Okay.  This is Exhibit 16,
13  US-000050717.  This is another
14  e-mail thread, the top e-mail is
15  from Justin Fox to Michael McDonald
16  and Nate Cavanaugh sent on March 31,
17  2025.
18       (Fox Exhibit 16, E-mails
19  including Justin Fox dated March 31,
20  2025, beginning Bates Number
21  US-000050717, marked for
22  identification, as of this date.)
23  BY MR. ONAYEMI:
24       Q.  Would you like to see the full
25  e-mail?

293

1        J. Fox
2        THE WITNESS:  Yeah, if you
3   wouldn't mind going to the, just the
4   beginning of this chain.  Okay.  You
5   can go up.
6        Q.  Before we -- are you still
7   reading?
8        A.  I am.  Sorry.
9        Q.  Sorry about that.
10       A.  (Document review.)
11       MR. ONAYEMI:  You can probably
12  zoom in a little bit too, Jacob, the
13  text is kind of small.  Thank you so
14  much.
15       A.  I think I'm on this -- I might be
16  on this e-mail.
17       THE WITNESS:  Yeah, you can go
18  up to the first page.  Sorry.
19       A.  (Document review.)
20       Okay.  I think I get the context.
21       Q.  Okay.  Before we really analyze
22  this e-mail, sorry, I have a few follow-ups
23  about our last conversation.
24       I think I unders- -- you said that
25  you felt no remorse for the termination of

Justin Fox - January 28, 2026

294

J. Fox

1  these NEH grants. Is that right?
2
3        MS. DOUD: Objection.
4        A. I think if we're talking
5  procedurally, I feel sorry for those impacted.
6  The bigger picture element, it was a necessary
7  step in the right direction of saving --
8        Q. Of --
9        A. -- of saving money because of the
10 federal deficit, growth in government spending
11 leads to a debt spiral, leads to
12 hyperinflation, leads to every American
13 feeling 10 to 12 percent inflation. It's
14 knock-on effects of something that you can
15 address today through noncritical spending
16 cuts or you can all feel tomorrow.
17       Q. Did the federal deficit go down as
18 a result of -- strike that.
19       Did the federal deficit actually
20 decrease from 2024 to 2025?
21       A. Discretionary spending was down
22 183 million in FY26 proposed budget from OMB.
23 Granted, there was 600 -- 4 or 600 million
24 growth in Department of Defense budget. So it
25 could have been more, but I think we were

295

J. Fox

1
2  trending towards at least 183 in discretionary
3  spending going down in FY26.
4        Q. But did the deficit itself go down
5  in its totality?
6        A. I'm not sure.
7        Q. Would you be surprised to hear
8  that it did not?
9        A. No.
10       MS. DOUD: Objection.
11       Q. Does that change how you assess
12 whether there's any remorse about canceling
13 hundreds of millions of dollars of grants for
14 scholars in the humanities?
15       MS. DOUD: Objection.
16       A. Again, I have to believe that the
17 dollars that were saved went to
18 mission-critical, nonwasteful spending. And
19 so, again, in the broad macro, an unfortunate
20 circumstance for individual, but this is an
21 effort for the administration.
22       Q. You said it went to nonwasteful
23 spending, suggesting that the canceled grants
24 were wasteful spending.
25       Is that fair to say?

296

J. Fox

1
2        A. Ultimately it was the decision of
3  Mike and Adam to address if it was wasteful
4  for not wasteful. In my opinion, what's
5  certainly not wasteful is food stamps,
6  healthcare, Medicare-Medicaid funding.
7        Q. Right. So hundreds of millions of
8  dollars of grants were terminated for the NEH,
9  the deficit didn't change much, and you were
10 paid $150,000 to do that job of reducing the
11 deficit.
12       Do you feel like the 150,000 paid
13 to you was wasteful spending?
14       MS. DOUD: Objection.
15       A. What are you, like, definitionally
16 saying wasteful spending is here?
17       Q. Nondiscretionary -- excuse me --
18 discretionary spending or however you defined
19 wasteful spending when you said it.
20       A. The broad principle is to reduce
21 the amount of dollars flowing out of the
22 government into the market.
23       And so any chance you have to
24 reduce dollars flowing out into noncritical
25 life supporting grants or programs, I would

297

J. Fox

1
2  view as wasteful. And so any software or even
3  consultants that you pull in that assist you
4  in redirecting funds to the most critical
5  resources is not waste in the way that I would
6  view wasteful spending.
7        Q. Okay. So your job was not
8  wasteful spending, but humanities projects
9  that we've seen that were canceled as a result
10 of your input were wasteful spending?
11       MS. DOUD: Objection.
12       A. Not necessarily.
13       Q. What do you mean?
14       A. I mean, it just depends on how
15 you're going to bucket or consider wasteful
16 spending or not.
17       Q. I'm asking you to apply your
18 own --
19       A. Yeah.
20       Q. -- definition of wasteful
21 spending. So for instance --
22       A. The net benefit of paying 150 in
23 salary to redirect, for example, 163 million
24 of humanities grants into something like food
25 stamps or healthcare, that means you've saved

298

J. Fox
1      183 million, and you've lost 150,000, you
2      know, 9/12th of that, 110,000 relative to
3      $163 million that then was redirected to
4      critical funding or saved. So the net benefit
5      would be not wasteful.
6          Q. We saw a grant about women who had
7      violence committed against them during the
8      holocaust.
9          Do you remember that grant?
10         A. Yes.
11         Q. You ended up determining that that
12     grant had DEI elements to it. Do you remember
13     that?
14         MS. DOUD: Objection.
15         A. Yes.
16         Q. Would you say that that grant was
17     wasteful spending?
18         A. Ultimately not my decision.
19         Q. But do you think that that grant
20     was wasteful spending?
21         A. Yes.
22         Q. Okay. But the 150,000 that DOGE
23     paid you to mark that grant as DEI was not
24     wasteful spending?

299

J. Fox
1          MS. DOUD: Objection.
2          A. It's the net of the spend that you
3      put in --
4          Q. Got it.
5          A. -- that determines if it's
6      wasteful or not. And so a grant that goes out
7      to an individual that's creating a documentary
8      on something relating to DEI, is not -- those
9      dollars could be getting put to something like
10     food stamps or Medicaid for grandma in a rural
11     county. So that's not wasteful spend.
12         Q. So because you were paid 150,000
13     to help to save hundreds of millions of
14     dollars, that 150,000 is not wasteful.
15         Is that your position?
16         MS. DOUD: Objection.
17         A. Yes.
18         Q. Thank you.
19         MR. ONAYEMI: We can go to --
20     oh, we already have it up, Tab 16,
21     Exhibit 16. I'm almost wrapping up
22     here guys, so we'll be out of here
23     soon.
24         Q. You've already reviewed this. Do

300

J. Fox
1      you recognize this document?
2          A. The e-mail?
3          Q. Yes.
4          A. Okay, yeah.
5          Q. Okay, great.
6          MR. ONAYEMI: If we scroll
7      down to the first-in-time message,
8      so the bottom of the document, and
9      again this is US-000050717.
10         Q. It says "Mike" -- excuse me, this
11     is an e-mail from Justin Fox to Michael
12     McDonald and Adam Wolfson cc'ing Nate
13     Cavanaugh. The subject is "To review: Active
14     grants." Justin, here you write:
15         "Mike/Adam, thanks for the
16     productive time today. See attached
17     active grants for your review of DEI
18     or wasteful spend (approximately 440
19     grants.) Flagging these are the
20     ones NEH staff marked N/A for DEI.
21     It may be easier to review these in
22     the Excel format so you can mark yes
23     or no in the active Excel."
24         Did I read that correctly?

301

J. Fox
1          A. Yes.
2          Q. What does "N/A for DEI" mean as
3      you wrote it here?
4          A. The NEH staff had been reviewing
5      grants for the last few months, and N/A
6      indicated a grant that they deemed to not have
7      relation to DEI, not applicable for DEI.
8          Q. Not applicable. N/A means not
9      applicable for DEI?
10         A. They marked as N/A in the review,
11     the comprehensive and review that they had of
12     all the outstanding grants. And N/A, in their
13     opinion, was not applicable for DEI.
14         Q. Does that mean no DEI?
15         MS. DOUD: Objection.
16         A. In their view. It does not apply
17     to DEI in the construct of the EO.
18         Q. And then you did an additional
19     review of the grants that they had marked
20     that -- not apply or not applicable for DEI.
21     Is that fair to say?
22         A. According to Mike's and Adam's
23     direction, yes.
24         Q. Okay. Do you have an

302

J. Fox
1
2 understanding of why you would need to
3 re-review grants that had already been marked
4 not applicable for DEI?
5      A.  Mike and Adam asked us to.
6      Q.  Why couldn't Mike and Adam do this
7 themselves?
8      A.  They --
9         MS. DOUD:  Objection.
10     A.  They did.
11     Q.  And then they needed a third set
12 of eyes after they did their review?
13     A.  They did in tandem with our
14 review.
15     Q.  So there was already a review done
16 by NEH employees, and they marked not
17 applicable for DEI, no DEI -- right? -- and
18 then later on, you did a review of these
19 already reviewed grants to assess for DEI
20 again.
21        Is that right?
22        MS. DOUD:  Objection to form.
23     A.  Yes.
24     Q.  Was there any reason that you
25 thought that NEH employees wouldn't be capable

303

J. Fox
1
2 of making a sound call on whether a grant had
3 DEI or not in their initial review?
4         MS. DOUD:  Objection.
5      A.  Well, Mike and Adam had asked us
6 to, so they believed so.
7         MR. ONAYEMI:  Okay.  Let's go
8 up to the next e-mail.  Let's go up
9 to the next one, actually.
10     Q.  So later, you e-mail Mike McDonald
11 on March 31, 2025:
12        "Mike, could you pass along
13        your cell number.  Sorry, don't have
14        it saved and need to catch up with
15        you on something time sensitive."
16        Did I read that correctly?
17     A.  Yes.
18     Q.  Okay.  Do you know what you were
19 referring to here?
20     A.  Probably what I was referring to
21 in the e-mail right above it.
22        THE WITNESS:  Could you scroll
23        up.
24     A.  (Document review.)
25     Q.  So then a few minutes later, you

304

J. Fox
1
2 write on the same day:
3        "Mike, please call me as soon
4        as you can."
5        Did I read that correctly?
6      A.  Mm-hmm.
7      Q.  And then, a few minutes later
8 again, you write:
9        "Mike, call me when you get
10       the chance.  We need a game plan for
11       effectuating RIFS, final grant
12       terminations and contract
13       cancellations by tomorrow a.m.  We
14       will carry these plans out before
15       the end of the week.  We're getting
16       pressure from the top on this and
17       we'd prefer that you remain on our
18       side but let us know if you're no
19       longer interested."
20        Did I read that correctly?
21     A.  Yes.
22     Q.  You keep referring to "we."  Who
23 is "we"?
24     A.  Nate and me.
25     Q.  Anyone else?

305

J. Fox
1
2      A.  Mike, we need to game plan for
3 effectuating RIFS, grant terminations, et
4 cetera.
5      Q.  Anyone else besides you, Nate, and
6 Mike?
7      A.  In what context?
8      Q.  Well, you're saying "we," we will
9 carry these plans out, we need a game plan,
10 we're getting pressure, our side.  Who's "we"?
11     A.  Our side is Nate and myself.
12     Q.  Okay.  So you're saying that you'd
13 prefer that Mr. McDonald stay on the side of
14 you and Nate here?
15        MS. DOUD:  Objection.
16     A.  Which inherently implies on the
17 side of the White House.
18     Q.  And when you say "we're getting
19 pressure from the top," what are you referring
20 to there?
21     A.  Broadly, this is pressure from OMB
22 to free up money for spend on Garden for
23 Heroes and America-first initiatives.  This is
24 also adherence to the EOs, which at this point
25 will have been over 60 days outstanding,

306

J. Fox
1
2    particularly as it relates to the DEI and
3    wasteful spending and DOGE lead EOs.
4         (Stenographer clarification.)
5         Q.   But let's get specific here
6    because you ping him to have him call you
7    three times in an hour.  Right?
8         A.   Yeah.
9         Q.   Then you say "we're getting
10   pressure from the top."
11        Is "the top" generally the
12   amorphous OMB and other agencies that's
13   causing you to call him and text him
14   frantically within the span of an hour?
15        MS. DOUD:  Objection.
16        A.   We were in person here.  Every
17   DOGE member could come and go from GSA at any
18   point.  Discussions are happening all the time
19   between them and the White House and focusing
20   on the priorities, the pressure is a general
21   pressure here.  And Mike was clearly in line
22   or wanted to be in line with the
23   administration.  And so that's what this is
24   referring to, is pressure to be in line with
25   the administration given these EOs released so

307

J. Fox
1
2    long ago.
3         Q.   Who determined that "we need a
4    game plan by tomorrow AM"?
5         A.   This is "we" referring to Nate and
6    I.
7         Q.   Who determined that tomorrow a.m.
8    would be the appropriate day to have this game
9    plan?
10        A.   In our view.
11        Q.   You and Nate?
12        A.   Yeah.
13        Q.   (Reading):
14        "We will carry these plans out
15   before the end of the week."
16        Again, "we" is you and Nate?
17        A.   "We" in this context, given we
18   cannot do things unilaterally, is the NEH
19   team, Mike and Adam.
20        Q.   Okay.  So when you say "pressure
21   from the top," that's not referring to
22   Gruenbaum?
23        A.   I don't remember where the
24   information was getting disseminated from.
25   But like I said, we were always in person in

308

J. Fox
1
2    GSA, and it was clear from conversations
3    internally, no one person in particular, but
4    that the White House was focused on making
5    sure that agencies were addressing the EOs
6    that were getting dropped.
7         Q.   Agencies like the NEH?
8         A.   And the Department of Labor, HHS.
9         Q.   Right.  So you said you don't know
10   exactly where the information was coming from,
11   but there was some information disseminating
12   about the urgency there?
13        A.   I think so.
14        Q.   And that's what you were
15   channeling in this e-mail to Mike McDonald?
16        A.   Yes.
17        Q.   Did anyone specifically tell you
18   that NEH needed to have the cancellations game
19   plan ready by tomorrow a.m. other than
20   Mr. Cavanaugh?
21        A.   Well, we were already late on
22   adhering to the EOs on DEI initiatives and
23   addressing wasteful spend.
24        Q.   So Mr. Cavanaugh would agree with
25   you that there was no specific person that was

309

J. Fox
1
2    applying quote unquote "pressure from the
3    top"?
4         MS. DOUD:  Objection.
5         A.   That I'm aware of.  Although this
6    was nine months ago, ten months ago, so ...
7         Q.   Is there anyone that it could have
8    been referencing?
9         MS. DOUD:  Objection.
10        A.   I'm not sure.  I don't remember.
11   It was ten months ago.
12        Q.   Right.  For some people ten months
13   isn't a very long time.
14        MS. DOUD:  Objection.
15        A.   For my ten months, it feels like a
16   lifetime.
17        Q.   How did you know that the White
18   House was at play in this urgency that you're
19   describing?
20        MS. DOUD:  Objection.
21        A.   I knew that there were close
22   relationships between white house and the
23   liaisons that we were working with.  And we
24   spoke on a daily basis with some of the
25   leaders at GSA, Josh Gruenbaum, Stephen

Justin Fox - January 28, 2026

310

J. Fox

1    Ehikian.
2    Q. Steve who?
3    A. Stephen Ehikian.
4    Q. Who were the -- who had these
5    close relationships that you're referencing?
6    A. The leadership team.
7    Q. So this is Gruenbaum, Ehikian,
8    Armstrong, anyone else?
9    A. From what I remember, yeah.
10   Q. Anyone else besides those three?
11   A. Well, there was probably 30
12   individuals that were older and in their late
13   stage of their career. Steve Davis is one
14   that came up as someone that was involved but
15   not someone that we were looking to for
16   specific game plans on agencies, although he
17   was informed.
18   Q. Who are you looking to for
19   specific game plans on agencies?
20   A. Ourselves, Nate and myself. Nate
21   particularly, given he had been around longer.
22   Like I said, it was a working dynamic, the
23   EOs.
24   Q. How did you know that Ehikian,
25

311

J. Fox

1    Gruenbaum, Armstrong, Davis had relationships
2    with the White House?
3    A. I just assumed as much based on
4    context they were sharing in our group
5    meetings.
6    Q. Were they making representations
7    during the group meetings that made it seem
8    like they were in communication with the White
9    House?
10   A. I suppose.
11   Q. Like what?
12   A. They were close with Elon, and
13   Elon was de facto over the relationship with
14   Trump. And so priorities coming from whoever
15   is closest with Elon, I assumed had the
16   closest relationships in the White House.
17   Q. Okay. What did you understand the
18   role of Gruenbaum, Armstrong, Ehikian, and
19   Davis to be generally speaking?
20   A. Senior guys with close
21   relationships to Elon and deeply entrenched as
22   leaders of the agencies that they're onboarded
23   to.
24   Q. Senior guys within the DOGE team?
25

312

J. Fox

1    A. And in their agency roles. So
2    Anthony was deputy chair of OM -- or OPM, and
3    Stephen Ehikian was the head of GSA, Gruenbaum
4    was the head of federal acquisition service.
5    So titles.
6    MR. ONAYEMI: Let me pause
7    there and go off the record, if
8    that's okay with you.
9    THE VIDEOGRAPHER: The time is
10   6:02 p.m. This concludes Media 6.
11   Off the record.
12   (Recess taken from 6:02 p.m.
13   to 6:11 p.m.)
14   THE VIDEOGRAPHER: The time
15   now is 6:11 p.m. This begins Media
16   7. On the record.
17   BY MR. ONAYEMI:
18   Q. Really quick before I wrap up, you
19   just -- we were just talking about your
20   colleagues, Armstrong and Ehikian, Davis, and
21   Gruenbaum.
22   Do you remember that?
23   A. Yes.
24   Q. Was it your understanding that
25

313

J. Fox

1    they were taking direction from Elon and
2    others affiliated with the White House?
3    A. My understanding is that they had
4    the relationships and spoke very closely with
5    constituents all involved in the
6    administration. So whether they were taking
7    direction, I knew they had close
8    relationships, I couldn't tell you
9    specifically.
10   Q. Okay.
11   MR. ONAYEMI: That's all I've
12   got. I'll pass the witness to my
13   colleague, Kyla, who is on Zoom, I
14   believe.
15   MS. DOUD: Before we do that,
16   I'm just going to put on the record
17   that pursuant to the federal rules,
18   in order to take a deposition
19   remotely, you're supposed to get the
20   agreement from the others involved,
21   which did not happen here. But in
22   the interest of efficiency,
23   defendants are willing to move
24   forward if the witness also is.

314

```
1           J. Fox
2           THE WITNESS: Yes.
3      EXAMINATION BY
4      MS. SNOW:
5           Q.  Okay.  Thank you for that.  I'm
6      going to ask just a few questions.  I know
7      we're getting toward the end of the day and
8      I'll keep this pretty short.  So I'm Kyla Snow
9      for the ACLS plaintiffs.
10          And I just wanted to return to
11     testimony -- your testimony earlier about the
12     termination process.  And if I remember
13     correctly, you said that Michael McDonald told
14     you on a phone call that he wanted you to
15     execute the termination notices.
16          Is that correct?
17          (Stenographer clarification.)
18          A.  On a phone call or in person, I
19     don't remember, but he wanted us to execute
20     after we solidified the list.
21          Q.  Okay.
22          A.  Procedurally, he wanted us to go
23     and notify these grantees.
24          Q.  Okay.  And when would you have to
25     do that?  Do you remember generally?
```

315

```
1           J. Fox
2           A.  At some point, before I cued up
3      that e-mail.  Sometime in mid-March I would
4      guess, the e-mail being the template for
5      here's what we could say, give us your input.
6      So as you know, that e-mail was sent before
7      the terminations went out.  So at some point
8      before then, either in person or by phone, he
9      wanted us to procedurally handle
10     communications.
11          Q.  Okay.
12          MS. SNOW:  I'm going to
13     introduce just one exhibit.  This
14     is -- it looks like we're on
15     Exhibit 16.  This is in the record
16     as AR_13, and I just put it in the
17     chat.
18          MR. ONAYEMI:  I think the
19     court reporter noted that this will
20     be Exhibit 17.
21          MS. SNOW:  Sorry.  Yes, sorry.
22     This is Exhibit 17.  Sorry about
23     that.
24          MS. DOUD:  I'm sorry, AR what?
25          MS. SNOW:  13.
```

316

```
1           J. Fox
2           (Fox Exhibit 17, E-mails
3      including Justin Fox dated March 28,
4      2025, beginning Bates Number AR_13,
5      marked for identification, as of
6      this date.)
7           Q.  And can you see this on your
8      screen?
9           A.  Yes.
10          Q.  This initial e-mail -- this is an
11     e-mail from you to Michael McDonald and Adam
12     Wolfson with Nate Cavanaugh copied on March 28
13     at 11:57 a.m.
14          You saw this earlier, do you
15     recall seeing this e-mail earlier?
16          A.  I recall seeing what?  I missed
17     that, sorry.
18          Q.  Do you recall seeing this initial
19     e-mail earlier?
20          A.  Yes.
21          Q.  Okay.  You're attaching that
22     spreadsheet that said DEI or wasteful spending
23     grants.  I want to look at this e-mail
24     response from Michael Cavanaugh.  It's dated
25     March 13 at 4:28 p.m.  And I'll just give you
```

317

```
1           J. Fox
2      a chance to read it.  Please let me know when
3      you're ready.
4           A.  (Document review.)
5           Okay.
6           Q.  So he says:
7           "To recap, you have the first
8      spreadsheet from Brett."
9           And these are spreadsheets that he
10     and -- that Mike McDonald and Adam Wolfson
11     reviewed and sent to OMB listing all the
12     applications implicated by the EOs minus the
13     N/As.  So he --
14          (Discussion off the record.)
15          MS. SNOW:  I'll see what I can
16     do.  Is this any better?
17          CERTIFIED STENOGRAPHER:  Yes,
18     thank you.
19          Q.  So in this e-mail, McDonald says:
20          "You have the first
21     spreadsheet from Brett (that Adam
22     and I reviewed and sent to OMB)."
23          And he says:
24          "We were getting ready to
25     cancel them today but understanding
```

318

J. Fox

1    that you will do so."
2         He then says:
3         "Attached is the second list
4    (the N/As) that you prepared and
5    that we reviewed today. As you
6    instructed, we have only excluded
7    the ones that seem not to conflict
8    with the administration's priorities
9    - such as the papers of George
10   Washington."
11        And again, he says:
12        "We understand that you will
13   cancel this list of projects as
14   well."
15        Why would he say to you "we were
16   getting ready to cancel them today but
17   understand that you will do so"? This seems
18   to contradict him asking you to execute the
19   terminations?
20        MS. DOUD: Objection.
21        A.  When Mike says "we were getting
22   ready to cancel them today," as we discussed,
23   Mike and I discussed, this process would have
24   taken weeks for the team to do. So he wanted

319

J. Fox

1    us to do it. That's why he said "understand
2    that you will do so."
3         Q.  Why would he say that he was
4    getting ready to cancel them today then?
5         MS. DOUD: Objection.
6         Q.  What is your understanding as to
7    why he would say "we were getting ready to
8    cancel them today"?
9         A.  He was getting ready procedurally
10   to begin the process of canceling. But
11   because of our conversation, he understands
12   that we will do it.
13        Q.  It doesn't sound like he's getting
14   ready procedurally to cancel them. He says
15   "we were getting ready to cancel them today"?
16        MS. DOUD: Objection.
17        Q.  It sounds like he's ready to
18   cancel them.
19        MS. DOUD: Objection.
20        A.  Is that a question?
21        Q.  I mean, is that what it says, "we
22   were getting ready to cancel them today"?
23        A.  That is what it says.
24        Q.  Okay. Sorry, one moment. So if

320

J. Fox

1    Michael McDonald were to testify that he was
2    planning to cancel the grants on Monday,
3    March 31, would that be false?
4         MS. DOUD: Objection.
5         A.  Could you clarify this
6    hypothetical when Michael was going to cancel
7    them and would that be on the same day?
8         Q.  This e-mail is dated Monday,
9    March 31. And Michael McDonald says:
10        "We were getting ready to
11   cancel them" -- these grants --
12   "today but understand that you will
13   do so."
14        So this seems to indicate he was
15   getting ready to cancel them on Monday,
16   March 31, the same day that he sent this
17   e-mail to you.
18        MS. DOUD: Objection.
19        Q.  If he testified in his deposition
20   that he was getting ready to cancel them on
21   Monday, March 31, would that be false?
22        MS. DOUD: Objection.
23        A.  I don't know. I know that Mike
24   and I have had discussions, and Nate and Adam,

321

J. Fox

1    that the procedures for canceling these grants
2    in their existing process was going to take
3    hours and weeks of their time.
4         So when he says "we are getting
5    ready to cancel them today," there's a big
6    procedural element for them. And that was
7    what we've talked about, that they're -- this
8    is a multiweek process for them to cancel and
9    terminate grants.
10        Q.  When did the actual cancellation
11   notifications go out?
12        A.  If I remember correctly, the first
13   of April.
14        Q.  So that was the next day. Right?
15        A.  Yes.
16        Q.  Okay. I want to stop sharing the
17   screen. Taking that down.
18        So who set up the e-mail account
19   that was used to send the termination notices?
20        A.  Who? Is that the question?
21        Q.  Yes.
22        A.  I did.
23        Q.  And who had access to that account
24   when it was first set up? Was it only you?

322

J. Fox

1    A.   And the sys admin administrator
2
3    could have access to all the data associated.
4    Q.   Is this sys admin administrator at
5    GSA?
6    A.   I believe it was Brett Bobley who
7    was the CIO.
8    Q.   And when the notices were sent on
9    April 1 from that account, did you send those
10   notices?
11   A.   Did I send the termination
12   notices?
13   Q.   Yes.
14   A.   Yes.
15   Q.   Okay. Where were you when you
16   sent the termination notices? Were you at
17   GSA? In your office or somewhere else?
18   A.   At GSA.
19   Q.   Okay. Was anyone else with you?
20   A.   Maybe Nate, we sat next to each
21   other at GSA often late at night. I don't
22   know -- I don't remember if he was there or
23   not.
24   Q.   Okay. But you had sent on the
25   e-mail notices that went out on April 1st?

323

J. Fox

1
2    A.   After getting the full guarantee
3    and approval from Mike, yes.
4    Q.   Okay. I just want to be clear on
5    the understanding of DEI as it relates to the
6    grants, in your review of the grants.
7         Is it your position that if an
8    award studied one particular race or gender,
9    that that would be DEI?
10   A.   I missed one word there. Could
11   you repeat.
12   Q.   Is it your position that if an
13   award studied one particular race or gender,
14   that would relate to DEI?
15   A.   If you are one particular race or
16   gender, would that relate to DEI? That's the
17   question?
18   Q.   If the award relates to one
19   particular -- if the award relates to the
20   study of one particular race or gender, would
21   that be DEI?
22        MS. DOUD: Objection.
23   A.   That depends on the grant, the
24   full grant description and the context of what
25   the award is delivering.

324

J. Fox

1
2    Q.   Okay. But if the award, the
3    purpose of the award were to study the
4    particular aspects of Black culture, is that
5    DEI?
6         MS. DOUD: Objection.
7    A.   It depends on the full breadth of
8    the award, the full description that gives
9    context to its relation to DEI or not.
10   Q.   Sorry. One moment. Okay. If the
11   full description of an award were to study --
12   sorry. If the full description of the award
13   were quote, to study 21-century Black culture,
14   unquote, is that DEI?
15   A.   Again, there's a lot of context
16   that comes with the full, the full grant
17   descriptions. So if you have a particular
18   grant in mind, we can review that and we can
19   talk about whether we believe it relates or
20   not. But without that, it's -- you can't
21   determine fully, if it's fully related.
22        MS. SNOW: Okay. Those are
23   all my questions.
24        MS. DOUD: And I just have a
25   few questions.

325

J. Fox

1
2    EXAMINATION BY
3    MS. DOUD:
4    Q.   You were asked some questions by
5    plaintiffs' counsel earlier about
6    communications via Signal.
7         Do you remember that?
8    A.   Yes.
9    Q.   Did you have any substantive
10   discussions about grant terminations at NEH
11   via Signal?
12   A.   No.
13        MR. ONAYEMI: Objection to the
14   form.
15   Q.   Did you have any substantive
16   discussions about grant terminations at NEH
17   with Josh Gruenbaum?
18   A.   No.
19   Q.   Did you have any substantive
20   discussions about grant terminations at NEH
21   with Anthony Armstrong?
22   A.   No.
23   Q.   Did you have any substantive
24   discussions about grant terminations at NEH
25   with Mike Sullivan?