# EXHIBIT 2

# In the Matter Of:

## *The Authors Guild vs*

*National Endowment for the Humanities*

## *JUSTIN FOX*

*January 28, 2026*



1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


THE AUTHORS GUILD, et al.,        )
                                  )
              Plaintiffs,         )
                                  )
      vs.                         )   Civil Action No.
                                  )   25-cv-3923
NATIONAL ENDOWMENT FOR THE        )
HUMANITIES, et al.,               )
                                  )
              Defendants.         )
_____     )




CONFIDENTIAL VIDEO-RECORDED DEPOSITION OF

JUSTIN FOX

New York, New York

Wednesday, January 28, 2026




Reported Stenographically By:
PATRICIA A. BIDONDE
Registered Professional Reporter
Realtime Certified Reporter
JOB#:  2026-1011068

2

January 28, 2026
9:59 a.m.

Confidential Videoconference Video-Recorded Deposition of JUSTIN FOX, held at the offices of Schindler, Cohen & Hochman, 100 Wall Street, New York, New York, before Patricia A. Bidonde, Stenographer, Registered Professional Reporter, Realtime Certified Reporter, Certified eDepoze Court Reporter, Notary Public of the States of New York, New Jersey, and Connecticut.

Confidential                        Justin Fox - January 28, 2026

3

A P P E A R A N C E S


FAIRMARK PARTNERS, LLP

Attorneys for Plaintiff The Authors Guild

        400 7th Street, NW

        Suite 304

        Washington, D.C. 20004

BY:    YINKA ONAYEMI, ESQ.

        yinka@fairmarklaw.com


Via Videoconference:


BY:    AMANDA VAUGHN, ESQ.

        amanda@fairmarklaw.com

BY:    SARAH MARTIN, ESQ.

        sarah@fairmarklaw.com

BY:    JAMIE CROOKS, ESQ.

        jamie@fairmarklaw.com

4

A P P E A R A N C E S  (CONTINUED)

JACOBSON LAWYERS GROUP PLLC

Attorneys for Plaintiff ACLS

Via Videoconference:

        5100 Wisconsin Ave. NW, Suite 301

        Washington, D.C. 20016

BY:    KYLA SNOW, ESQ.

        kyla@JacobsonLawyersGroup.com

BY:    JOHN ROBINSON, ESQ.

        john@JacobsonLawyersGroup.com

BY:    LYNN EISENBERG, ESQ.

        lynn@JacobsonLawyersGroup.com


U.S. ATTORNEY'S OFFICE FOR THE SOUTHERN

DISTRICT OF NEW YORK

Attorneys for Defendants

        86 Chambers Street, 3rd Floor

        New York, New York 10007

BY:    RACHAEL DOUD, ESQ.

        rachael.doud@usdoj.gov


ALSO PRESENT:
CHRISTIAN BIDONDE, Legal Video Specialist
Via Videoconference:
JACOB FIGUEROA, Lexitas Document Tech
                - - -

107

J. Fox - Confidential

Q.    Okay.  Did you use any particular methodology in assessing NEH grants for termination?

A.    There was an executive order that said to eliminate spend on DEI and other wasteful government spending, and that was the lens.

Q.    Okay.  So DEI would have been one, kind of, guidepost for the grant's determinant?

A.    Yeah.

Q.    How do you interpret DEI?

A.    There was -- the EO explicitly laid out the details.  I don't remember it off the top of my head.

Q.    That's okay.  I'm asking for your understanding of it.

A.    Yeah, my understanding was exactly what was written in the EO.

Q.    So can you --

A.    I don't remember what was in the EO.

Q.    So right now do you have an understanding of what DEI is?

108

J. Fox - Confidential

A.    Yeah.

Q.    So what's your understanding as you sit here today in this deposition?

A.    Well, it was exactly what was written in the EO.  And so any time that we would look at a grant through the lens of complying with an executive order, we would just refer back to the EO and assess if this grant had relation to it.

Q.    Okay.  But I guess I'm stepping back from --

A.    Yeah.

Q.    -- your methodology strictly in terminating the grants.  Do you have an understanding as you sit here today of what DEI means?

A.    Yeah.

Q.    So what's your understanding of what it means?

A.    Well, it is exactly what was written in the EO.

Q.    Okay, so --

A.    And I don't have the EO in front of me, but that was -- we would always

109

J. Fox - Confidential

reference back to the EO and make sure that this grant was in compliance with the EO language.

Q.    Right.  I understand that.  Okay. But I'm not asking necessarily about what was in the EO.  I am asking very specifically about your present understanding of what -- of DEI.

Do you have a present understanding of DEI?

A.    Yeah.

Q.    Okay.  Can you explain what that present understanding is?

A.    Well, it's just easier for me to be referencing back to the EO.

Q.    Are you refusing to answer the question?

A.    I'm not refusing to answer the question.

Q.    Okay.

A.    I just feel that referencing back to the verbatim executive order was the best way for us to capture all the DEI language. And so I think giving a high-level overview of

126

J. Fox - Confidential

MR. ONAYEMI:  Sorry.  This is US-000050393.

Okay.  Could you scroll up so we could see the introduction.

Scroll up, up, up.  Yeah, just right there.  That's good.

Q.    So it looks like on March 13, 2025, Adam Wolfson writes to what appears to be you and Nate Cavanaugh.  Is that right?

A.    Is that right?  Does -- I see it's just Adam Wolfson wrote.

Q.    And then it says "Hi Nate, Hi Justin."

A.    Okay.  Am I included on the cc?

Q.    I think above.  We can scroll up if you'd like.

MR. ONAYEMI:  Jacob, can you scroll up, please.

A.    From, date, okay.

Q.    So you understand that to be you and Nate Cavanaugh.  Is that right?

A.    Yes.

Q.    That he's addressing?

He goes on to say:

127

J. Fox - Confidential

"Great meeting you yesterday and catching up today. As discussed, I've copied below the link for the award spreadsheet created by Brett that the program directors used for their historical review of NEH's grants since January 2021."

Did I read that correctly?

A.   Yes.

Q.   And this is generally tracking -- when he says "program directors used for their historical review," that's tracking the process you were just, kind of, describing -- right? -- that NEH had its own --

A.   Yes.

Q.   -- review?  Yes?

A.   Yes.

Q.   Okay.  He says "great meeting you yesterday."

And this was on March 13.  Would this have been a day after you first met him for the first time?

A.   I would think so.

128

J. Fox - Confidential

Q.    Okay.  Do you remember that meeting that you had with him on March 12?

A.    The specific contents, no, but we did have a meeting at the office.

Q.    Okay.  And this was at the NEH office?

A.    Yes.

Q.    And who was present at that meeting?

A.    Mike and Adam, I believe those were the only two.  They hadn't returned to office as a team.

Q.    Got it.  And Mr. Cavanaugh?

A.    And Nate.

Q.    Okay.  Was that also the first time that you had met Mr. McDonald?

A.    That's right.

Q.    How did you set up the meeting on that day?

A.    I don't remember.

Q.    Would it have been through Signal, do you think?

A.    No, not with Mike and Adam.

Q.    Maybe through e-mail?

142

J. Fox - Confidential

involvement for DEI, it does not show details for active grants without DEI involvement or grants which have expired/ended."

So this is take the work that the team has done and put it into something that Mike and Adam can review ahead of a meeting that they had, which was for pending grants or existing awards.  They had it with their, I think, board of directors.

Q.    Okay.  Thank you.

MR. ONAYEMI:  We can take that down, Jacob.  Appreciate it.

Q.    So you were reviewing, you and Nate were reviewing grants.  Is that fair to say?

A.    Yes.

Q.    And part of that review invoked an application of your understanding of DEI, gender ideology, and environmental justice.

Is that fair to say?

MS. DOUD:  Objection.

A.    For the ones that were flagged as not having involvement, part of the lens that

143

J. Fox - Confidential

we looked at it was from what you just described.

Q.    What methodology did you use to flag a grant along those lines?

A.    Again, the team had already done high, medium, low involvement with DEI.  And then, so we're just focused on the raw output of what is the description of that grant, and apply it from the view of is this related to DEI or the all-encompassing definition that DEI captures, DEIA, environmental justice, however Mike had described, plus is this a wasteful grant.

Q.    Okay.

A.    And this was the description, the full-length description that the team at NEH had shared with us.

Q.    Got it.  So was there ever a point in time where you yourself were looking at a grant description and determining whether or not it should be labeled as DEI?

A.    We gave our thoughts, certainly. The ultimate decision came down to Mike and Adam, but yes, we were looking at it from that

J. Fox - Confidential

context.

Q.   Just to clarify.  So you yourself were looking at grants and assessing whether or not there was DEI involvement with those grants.

Is that fair to say?

A.   As one piece of the puzzle, yes.

Q.   Right.

A.   And there was other, yeah, aspects can play into that, but --

Q.   Right.

A.   -- and we ultimately deferred to Adam and Mike, but we relayed our perspectives.

Q.   You said that a number of times and I've understood, yeah.  But --

A.   Great.

Q.   -- I'm asking you about how you were, actually, assessing the grants as you privately looked at them.  Which I can ask.

Did you ever sit down, not with Mike and not with Adam and not with Nate, and review grants for DEI involvement on your own?

MS. DOUD:  Objection.

145

J. Fox - Confidential

A.    Yes, as one piece of the puzzle.

Q.    And the same for gender ideology. Is that fair to say?

A.    That'd be fair.

Q.    And economic justice.  Right?

A.    That'd be fair.

Q.    Or -- excuse me -- environmental justice, is that fair?

What methodology did you apply when you were sitting and reviewing grants alone to determine whether something should be flagged yes or no for DEI?

A.    Reading the description under the context of the all-encompassing definition that we've gone over about DEI, does this relate, this description, the full-length description relate to DEI, yes or no.

And, again, this is only on the grants that were not flagged as having DEI involvement, because the NEH team had already done weeks of work on the existing grants that were outstanding and flagged them as having DEI involvement or not.

So then our work was solely

157

J. Fox - Confidential

A.    Not entirely.

Q.    Okay.  Why do you say "not entirely"?

A.    Do you have a specific grant in mind?

Q.    We'll come to that.  But I want to get your understanding of what you're doing day-to-day in canceling -- in reviewing these grants.

A.    And you were asking what again? Specifically about LGBTQ relationship to DEI?

Q.    Yeah.  Is it fair to say that in applying this synthesized understanding of the EOs, LGBTQ grants jumped out as being contrary to the nature of the EOs?

MS. DOUD:  Objection.

A.    Contrary to the nature meaning conflicting with?

Q.    Conflicting with, yes.

A.    Potentially.

Q.    Okay.

A.    Ultimately not my call.

Q.    What else did you think was DEI, anything besides LGBTQ?

158

J. Fox - Confidential

A.    Gender ideology, race, cultural or underrepresented cultures.

Q.    Just to be clear, marking something for DEI was a precursor to cancellation?

MS. DOUD:  Objection.

A.    It informs Mike and Adam to make a decision.

Q.    Okay.  But you understood your marking of a grant as DEI to be a precursor, to -- on the road to potential cancellation.

Is that fair to say?

A.    Being in conflict with an EO, potentially.

Q.    And one of those EOs was about DEI?

A.    Reducing spend on DEI grants.

Q.    Right.  Okay.  And so you said race, underrepresented groups, why would you suggest that grants about those issues be terminated?

A.    I didn't suggest they be terminated.  I only tagged their relationship to DEI, diversity, equity, and inclusion.

159

J. Fox - Confidential

Q.    With the understanding that you marking that would serve as a precursor, a signal to cancel those grants.  Right?

MS. DOUD:  Objection.

A.    Signals a review, those grants.

Q.    On the road to termination. Right?

MS. DOUD:  Objection.

A.    If that's what they wanted to do, yes.

Q.    I'm a little confused.  Your goal with DOGE was to save money be -- right? -- reduce the deficit, and apply these EOs on the road to those goals.  Right?

MS. DOUD:  Objection.

A.    To assist the agency heads with being in compliance with the EOs.  Part of the EOs were to find savings through reduction and spend.

Q.    Right.  Okay.  And so part of -- we discussed this, you know, hours ago, part of your work was to help to identify grants for termination.  Right?

I'm not saying you terminated

160

J. Fox - Confidential

them.  I just want to be clear that we're,
kind of, collating these things.  I'm not
saying them all at once.

Part of your job was to identify
grants for potential termination.  Is that
fair to say?

A.    For the review of Mike and Adam to
comply with the EO.  In view that this grant
was not in compliance with the EO, ultimately,
it's their decision to cancel it.  And we were
helping them review these grants in the
context of adherence to the EO.

Q.    In the context of the grants
potentially being terminated?

A.    Relating to DEI.

Q.    Relating to DEI.

A.    That's what we give to them, is
the grants that are not in compliance with the
EO's mandate.  Ultimately, their decision to
terminate.

Q.    And so you said not in compliance
with the EO's mandate, earlier you noted that
things that jumped out to you were LGBTQ plus
issues, oppressed minorities, race, et cetera.

161

J. Fox - Confidential

Is that fair to say?

A.    Those stood out to me as relating to DEI.

Q.    Okay.  So would you -- just applying one.  Let's take LGBTQ, is it -- was it whether the author was identified as LGBTQ? Was it whether the grant purpose was -- mission was about LGBTQ?  What were you assessing?

MS. DOUD:  Objection.

A.    There's a grant description, and we were assessing if that had related to DEI.

Q.    LGBTQ being one form of DEI that you've explicitly stated in the deposition. Right?

A.    A form of it.

Q.    Race being another one?

A.    Wasteful spending being another one.

Q.    Sure, yeah, but race is another one too.  Right?

MS. DOUD:  Objection.

A.    However the EO had stated it was how we interpreted it.

178

J. Fox - Confidential

How do you know that your understanding of DEI was consistent with the model's understanding of DEI?

MS. DOUD:  Objection.

A.    Because we read every grant description and adjusted DEI rationale based on our perspectives.

Q.    So the final rationales that you would have sent to Mike and Adam would be different than the rationales that were spit out by OpenAI's model?

A.    Some of them.

Q.    But not all of them?

A.    Hard to say.  We made edits on every single one.

MR. ONAYEMI:  Jacob, can we go down to -- it's Row 880 in that number column.  It's going to be far down.  You might just want to drag the cursor.  Yeah.  There you go. You're close.  There you go.  All right.  It's right there.

So what we're looking at is Row 880 of Exhibit 8, US-000045132.

183

                    J. Fox - Confidential

diversity.

Q.    What's wrong with promoting a
language center?

MS. DOUD:  Objection.

A.    It's wasteful, noncritical spend.

Q.    But you have a DEI rationale
there.

MS. DOUD:  Objection.

A.    It is DEI.  I just explained why
it was DEI.  Because you're promoting a subset
Alaskan Native Language Center in the archives
to promote diverse perspectives.

Q.    A subset of what.  You said you're
promoting a subset.  What does that mean?

A.    A minority group.

Q.    Okay.  So a project that promotes
a minority group would be conflicting with
your interpretation of the EOs?

MS. DOUD:  Objection.

Q.    Is that fair to say?

A.    It's subjective.

Q.    Subjective based on what?

A.    It's all based on the
interpretation of each grant and the details

184

J. Fox - Confidential

of it.

Q.   You --

A.   So --

Q.   Oh, sorry.

A.   You can't overgeneralize a statement like that.

Q.   Your interpretation of the grants?

A.   It depends on the grant.

Q.   Based on your interpretation of those grants.  Is that fair to say?

MS. DOUD:  Objection.

A.   Through the lens of applying the EO's language.

Q.   Right.  But you ultimately decided how you would apply the EO's language to these grants descriptions.  Right?

A.   Ultimately, I made the effort to overlay the way that the EO was written with the grant's descriptions, and whether they conflicted or not is ultimately the decision for Adam and Mike.

Q.   How did you deal with edge cases? Let me take a step back.

Were there ever descriptions that

185

J. Fox - Confidential

you said this might be DEI, it might not.  I don't really know.

Or was it always clear?

A.    It's not always clear with DEI, but the context of wasteful spending is a fairly clear way to delineate the grants.

(Stenographer clarification.)

Q.    Would you say that spending on DEI is innately wasteful?

A.    It depends.

Q.    When you were assessing this Alaskan language project for DEI, it was on the basis that it promoted a minority group. Is that fair?

MS. DOUD:  Objection.

A.    A minority culture, minority group.

Q.    I suppose, so I guess what's a majority culture?

A.    I'm not sure.

Q.    Well, did you ever screen anything for majority cultures?

A.    In what context?

Q.    Well, I guess what's a minority?

191

J. Fox - Confidential

Q.    Okay.  So tell me why what I just said isn't DEI, but what you just said is DEI?

MS. DOUD:  Objection.

A.    It's a Jewish -- specifically focused on Jewish cultures and amplifying the marginalized voices of the females in that culture.  It's inherently related to DEI for those reasons.

Q.    Because it's about Jewish culture?

A.    Plus marginalized female voices during the holocaust gender-based violence.

Q.    Is this, when we focus on a minority, is it your understanding that, you know, the Jewish people fall into the category of a minority?

A.    Certainly a culture that could be described as minorities.

Q.    So how did you go about determining what was a minority and what wasn't a minority for the purpose of identifying DEI in grants?

A.    Inherently focused on any ethnicity, culture, gender, no matter the, sort of, race or gender or religion or --

192

J. Fox - Confidential

yeah.

Q.    Okay.  And you said that your understanding of the purpose of marking these grants for DEI was eventual possible termination of the grant?

MS. DOUD:  Objection.

A.    For Mike and Adam.

Q.    To make a judgment about termination?

A.    To see how we felt this did or did not comply with DEI involvement from the perspective of the EOs.

Q.    With the ultimate goal of assessing which grants needed to be terminated.  Right?

A.    Helping Adam and Mike review comprehensively the grant's adherence to existing EOs that is --

Q.    And if they did not comply with the EOs, those grants presumably would be terminated.  Right?

MS. DOUD:  Objection.

A.    Up to Mike and Adam.

Q.    Was it your understanding that the

193

J. Fox - Confidential

goal of this review was to understand which grants would be kept versus which grants would be terminated?

A.   Certainly to understand where they landed in the scope of do they adhere to the EO or do they not.

Q.   And if they didn't adhere to the EO, those are grants that would be more likely to be terminated.

Is that fair to say?

A.   That's what the EOs wanted, was to find savings in the bucket.  So they identified, ultimately Adam and Mike made that call.

Q.   I'm not asking who made the call. I'm asking for your understanding of what would happen to grants that were marked with DEI.

Was it your understanding that these grants were being isolated as grants to terminate?

A.   To be compliant with the EO, yes.

Q.   Yes, to terminate in order to be compliant with the EO.

194

J. Fox - Confidential

Is that what you're saying?

A.   Yeah, I mean, we just needed Mike and Adam to see which grants and why related to DEI, and as you've said, ultimately the call was their judgment to make.  But the intention is to find savings, redirect funds to America-first priorities, Garden for Heroes, DEI is one of the buckets we screened for, as well as wasteful spending.

Q.   I just want to be clear, you know we're going to be talking to several others at NEH as part of this lawsuit?

A.   Mm-hmm.

Q.   And other people that are members of the DOGE teams that you've been discussing?

MS. DOUD:  Objection.

Q.   Are you aware of that?

A.   Well, I guess to answer your previous question, I don't know who else you're interviewing from NEH and I don't know anybody else outside of Nate.

Q.   Do you know that we're going to talk to Mr. McDonald?

MS. DOUD:  Objection.

195

J. Fox - Confidential

A.   I don't know.

Q.   You don't know.  We will be talking about Mr. McDonald, we will be talking to Mr. Wolfson.  We've already spoke with Nate, as you know.

Do you think all of them would agree with your framing here that -- strike that.

Would they think that part of this review was being done to tee grants up for termination?

MS. DOUD:  Objection.

A.   Who do you mean "they"?

Q.   Mr. Wolfson, Mr. Cavanaugh, Mr. McDonald?

A.   I don't know.

Q.   Did you discuss terminating grants that were related to DEI?

A.   Yes.

Q.   Did you discuss terminating grants because they related to DEI?

A.   To align with the EO, yeah.

Q.   And so when you mark, for instance, this grant about the holocaust as

201

J. Fox - Confidential

wrong.  Tab 9 which will be

Exhibit 9.  I guess then it should

be Tab 8.  Sorry about that.  And

this will be, I believe, an Excel

sheet, not a PDF.

Q.    While he pulls that up, I have a
couple more questions for you.

When you say it depends on the
grant, is what you're saying that it depends
on how you interpreted the grant during your
review?

A.    For what?  There's a full question
there.

Q.    Sorry.

A.    Well, yeah, could you restate the
question, please.

Q.    I'll give you the full context.

I believe you testified earlier
that it would depend on what the grant says
when I asked whether you would say it was DEI
or not.

Do you remember that?

A.    Yes.

Q.    Okay.  Did it also depend on how

202

J. Fox - Confidential

you personally interpreted that grant?

A.    For the rationale, Nate and our view of its relation to DEI, yes.

MR. ONAYEMI:  Sorry, Jacob, are you able to find that Tab 8?

Yup, that's the one.

(Fox Exhibit 9, Spreadsheet with grant descriptions beginning Bates Number US-000062485, marked for identification, as of this date.)

MR. ONAYEMI:  Thank you.  So this is US-000062485.

Q.    I'll represent to you that you're the custodian of this document, meaning that it was produced to us from your possession, I presume at your GSA computer.

Does this document look familiar to you, and I'm happy to scroll or ask Jacob to manipulate it any way that you need to see it.

A.    Yes, this looks familiar.

Q.    Can you describe what this is?

A.    This is a way to assist

203

J. Fox - Confidential

contextualizing, summarizing really, relation to DEI, and it was used to inform the rationale piece of the broader grant view.

Q.    Okay.  Let's go a little bit broader than that, so, just to fully paint the picture.

What's on this spreadsheet?

A.    It pulls out the key phrases and words and context from the description as its relation to DEI.

Q.    The grant description?

A.    The grant description.

Q.    Okay.  And did you create this document?

A.    Yes.

Q.    Okay.  Did anyone help you to create this document?

A.    No.

MR. ONAYEMI:  Can we go to Table 5, that's the first tab there on the left side, Jacob.  Now, if you just go left with your mouse, there's several little tabs, "Table 5, Invoked Function, Sheet1."

204

J. Fox - Confidential

Yup, there we go.

Q.    Okay.  Does this look familiar?

A.    Yes.

Q.    Did you create this sheet?

A.    Yes.

Q.    Can you briefly tell me the context for creating this document.

A.    To look at the grant descriptions, the full grant descriptions and bring out the context of which a DEI grant may relate, or a grant may relate to DEI.  And it was used to inform DEI rationale.

Q.    And Cell B1 says "GPT response."

Do you see that?

A.    Yes.

Q.    So when you say "pull out," you mean run the grant description through ChatGPT to pull out a DEI rationale?

A.    To highlight why this grant may relate to DEI, which we used to give context to Adam and Mike on why this grant may be related to DEI.

Q.    How did you ensure that GPT would know what did or did not relate to DEI?

205

J. Fox - Confidential

MS. DOUD:  Objection.

A.    Well, we read the responses and adjusted based on the EOs.

Q.    Okay.  So it says -- sorry, just to look at one brief example, Cell 2A or A2, it starts by saying:

"From the perspective of someone looking to identify DEI grants, does this involve DEI? Respond factually in less than 120 characters.  Begin with 'Yes.' or 'No.' followed by a brief explanation.  Do not use 'this initiative' or 'this description' in your response."

Did I read that correctly?

A.    Yes.

Q.    And that's the command for ChatGPT.  Is that right?

A.    Yes.

Q.    And then after that, you would put the grant description into ChatGPT for ChatGPT to analyze.  Is that right?

A.    Again, to inform the rationale for

206

J. Fox - Confidential

why this may relate to DEI, and that was then
used on top of what we understood from the
grant description ourselves, to be sent to
Adam and Mike in a consolidated format.

Q.    How -- what's your understanding
of how the model understood the word "DEI"?

A.    I don't know.

Q.    Did you do anything to teach the
model what DEI meant as you used it in this
command?

A.    We didn't need to because we were
adjusting and making the call ultimately based
on the full description whether this was DEI
or not.

Q.    Okay.

A.    This was only a tool to assist in
contextualizing.  It was not the
decision-making factor.

Q.    Did you use this tool for every
grant that you reviewed?

A.    Not the ones that the NEH team had
already deemed relating to DEI.

Q.    But the thousands that you
reviewed personally, you used this process?

207

J. Fox - Confidential

A.    To, again, to help with the contextualizing of it, to Mike and Adam, to pull out the key phrases of which this may relate to DEI, to assist in that step of the process which is consolidating the points.

And we could have gone in and written our own summaries, and that's why this is only a tool, and it didn't end up with the final decisions, yes or no.

Q.    Did you do anything to ensure that ChatGPT's conception of DEI as applied here, wouldn't discriminate on the basis of race?

MS. DOUD:  Objection.

A.    No.

Q.    Did you do anything to ensure that ChatGPT's conception of DEI in this task that you gave to ChatGPT would -- strike that.

Did you do anything to ensure that ChatGPT's perception of DEI as applied here wouldn't discriminate on the basis of sex?

MS. DOUD:  Objection.

A.    It didn't matter because, again, this was not the ultimate decision-making factor.

208

J. Fox - Confidential

Q.    But that doesn't answer my question.

Did you do anything to ensure that ChatGPT's description -- perception of DEI as applied here wouldn't discriminate on the basis of sex?

MS. DOUD:  Objection.

A.    I didn't need to.  This was not the decision-making factor.

Q.    Right.  But I'm not asking you whether you needed to or not, I'm asking you whether you did or not?

MS. DOUD:  Objection.

A.    This is a rephrasing of the previous question.  What is it that you're referring to now, like, specifically?

Q.    Did you do anything to ensure that ChatGPT's perception of DEI as applied here wouldn't discriminate on the basis of sex?

MS. DOUD:  Objection.

Q.    It's a yes-or-no question.

A.    This is just to identify phrases that may relate to DEI to assist in our population of giving context to Adam and Mike

209

J. Fox - Confidential

as they're reviewing.  And this was not the ultimate decision-making factor.

Q.    Did you do anything to ensure that ChatGPT's perception of DEI as applied here wouldn't discriminate on the basis of sex? I'd like an answer to my question, eventually. I'll keep asking it.

MS. DOUD:  Objection.

A.    It didn't matter.

Q.    Did you do anything to ensure that ChatGPT's perception of DEI as applied here wouldn't discriminate on the basis of sex?

MS. DOUD:  Objection, asked and answered several times.

A.    It didn't matter.  We didn't need to.

Q.    Is that yes or no?

MS. DOUD:  Objection.

A.    Is what yes or no?

Q.    Did you do anything to ensure that ChatGPT's perception of DEI as applied here wouldn't discriminate on the basis of sex?

MS. DOUD:  Objection.

A.    The task was to pull out anything

210

J. Fox - Confidential

related to DEI.  There was no reason to check for discrimination.

Q.    So you didn't do it?

MS. DOUD:  Objection.

A.    We did not need to.

Q.    Did you do it or not?

MS. DOUD:  Objection.

A.    This was a medium step in between getting the consolidated list to Adam and Mike for review.

Q.    I'm sorry, Justin.  We can keep doing this.  I'm asking you for -- I'm entitled to an answer to my question as posed. I'm not asking you about Michael McDonald or Adam Wolfson.  I'm not asking you about how many other iterative steps it took to the terminations.

I'm asking this question:  Did you do anything to ensure that ChatGPT's perception of DEI as applied here wouldn't discriminate on the basis of sex?

MS. DOUD:  Objection.

A.    There was no need to do that because this was only an intermediary step.

213

J. Fox - Confidential

A.    We did not need to.

Q.    So you're refusing to answer the question?

MS. DOUD:  Objection.

Q.    It's a yes-or-no question.

MS. DOUD:  Objection.

A.    I'm telling you we did not need to do this because we're just identifying whether it involves DEI.

Q.    Right.  And again, I'm not asking you what you needed to do or what you didn't need to do, I'm asking whether or not factually you did something.  And you're refusing to give me an answer.

A.    What was the question?

Q.    Factually speaking, did you do anything yourself to ensure that the model here would not discriminate on the basis of sex?

MS. DOUD:  Objection.

A.    We did not need to.

MR. ONAYEMI:  Okay.  Thank you, Justin.  So I'll mark for the record that the witness is refusing

Confidential                        Justin Fox - January 28, 2026

214

J. Fox - Confidential

to answer this question.  And we can

move on, I guess.

MS. DOUD:  And I'll note that

he has answered the question.

Q.    Did you do anything to ensure that

ChatGPT's perception of DEI as applied

wouldn't discriminate on the basis of

religion?

MS. DOUD:  Objection.

A.    We did not need to do that.

Q.    Did you teach this model anything

about the meaning of DEI or how it should be

applied?

A.    The prompt is from the perspective

of someone looking to identify DEI grants.  So

just extract the key phrases that may relate

to DEI.  And again, this just informed how we

were synthesizing a perspective to share with

Mike and Adam, not the ultimate decisions from

Mike and Adam.

Q.    Did you use ChatGPT during any

other work while at the government?

A.    Sometimes.

Q.    For similar projects?

215

J. Fox - Confidential

A.    For some, not all.

Q.    If someone were to say that you didn't use ChatGPT or LLMs in your analysis of grants while at NEH, would that be false?

MS. DOUD:  Objection.

A.    To analyze the grants we were using just the descriptions in its entirety. That's what informed the -- like, giving it back to Adam and Mike, and this is just an intermediary step to synthesize the key phrases that might relate to DEI.  Ultimate decisions, no.

Q.    No, but -- I'm sorry.  If someone were to say that you didn't use ChatGPT in your work related to NEH, would that be false?

MS. DOUD:  Objection.

A.    Could you just rephrase, because I think double negative threw me off there.

Q.    If someone made the representation that you did not use ChatGPT in relation to your work at NEH, would that be false?

MS. DOUD:  Objection.

A.    It would depend on the context.

Q.    You did use ChatGPT in relation to

227

J. Fox - Confidential

Q.    Any other reasons you could think of?

A.    For this single e-mail, I don't know.

MR. ONAYEMI:  Okay.  We can move on to -- well, before we do that.

Q.    It says "Crazy grants."  Do you see that?

A.    Yes.

Q.    Did you write that?

A.    Yes.

Q.    Do you know what that means?

A.    I don't remember.

Q.    You don't remember what "Crazy grants" means?

A.    I don't remember what it meant in the context of this attachment.

Q.    Well, we can open the attachment.

MR. ONAYEMI:  This is Tab 12, Jacob, Exhibit 12.  It's going to be Bates Number US-000016154.

(Fox Exhibit 12, Grants.gov spreadsheet listing NEH grants

228

J. Fox - Confidential

attached to Exhibit 11, Bates Number

US-000016154, marked for

identification, as of this date.)

Q.    So this is the document that you sent to yourself on April 3, 2025, in an e-mail, subject "Crazy grants."

Does this look familiar to you?

A.    Yes.

Q.    Is this a document that you created?

A.    That I edited from grants.gov, yes.

Q.    So but -- sorry, several parts there.

Did you get this document from grants.gov directly, and then, kind of, work within it?

A.    Yes.

Q.    Okay.  So no single person sent you this document.  Is that fair to say?

A.    This?  No.

Q.    Okay.  So --

A.    From what I -- from what I remember.  This, no.

229

J. Fox - Confidential

Q.    Can you describe what it is?

A.    From what I remember, all outstanding grants for NEH with the obligated in dollars outlaid, and the remaining amount, along with on the right, all of the descriptions about the recipient and the description of the project.  I don't remember what else is on the right.  If you wouldn't mind scrolling over.

MR. ONAYEMI:  Jacob, you can scroll to the right quickly for the witness.

THE WITNESS:  Thank you.

Q.    Does that comport with your understanding of --

A.    Yeah.

MR. ONAYEMI:  We can scroll back to the left now, Jacob.

Q.    Did someone tell you to put this document together?

A.    Not that I remember.

Q.    So you did this on your own volition?

A.    Ahead of meeting with Mike and

230

J. Fox - Confidential

Adam in our first meeting, we were identifying areas to discuss with them about compliance with the EO, and to make sure we had discussion points to talk with Adam and Mike about, did our own, sort of, condensed review of what was publicly available on NEH's grants.

Q.    When you say "our," who are you referring to?

A.    Nate and myself.

Q.    Okay.  Was it your idea to do this or Nate's idea to do this?

A.    This is just what we did for meetings that we had coming up, was do a review of the publicly available grants, and assess their adherence to the existing EOs.

Q.    Okay.  So there are several grants in the -- in this document with shortened descriptions under Column E that say things like:

"Understanding historical
     LGBTQ spaces through gay travel
     guides," for instance.

That's Cell E12.

231

J. Fox - Confidential

Do you see that?

A.    Yes.

Q.    I think you actually referenced this -- this project at the very, very beginning of the deposition.

Do you remember that?

A.    Yes.

Q.    Okay.  And you said that, you know, that was obviously DEI or something earlier?

A.    Yes.

Q.    Here, you're calling it among the craziest grants.  Is that a fair, kind of, summary of -- by looking at this document?

A.    A summary of?

MS. DOUD:  Objection.

Q.    Like, is that -- is that what the placement of that grant in this section means, that you considered it to be one of the craziest grants?

A.    From the lens of adherence to the EOs, "crazy" is one way of saying it, "most incriminating" is another way.  The most blatantly misaligned with the latest EOs, to

232

J. Fox - Confidential

our understanding.  And this is a very preliminary exercise, again, to address the initial meeting with Mike and Adam.

Q.    But you sent it to yourself on April 2?

A.    Yeah.

Q.    And your initial meeting with Mike and Adam Wolfson, I think, was much earlier on March 12?

A.    Yeah, this document should be saved exactly around the time that we'd met with Adam and Mike.  I don't remember why I'd send it from my GSA to my NEH at that time, but I know that this document was formed immediately or right before we had that first interaction with Mike and Adam.

Q.    So why do you label these the craziest grants?

A.    They're the most obviously infringing on the EOs to identify and eliminate wasteful spend or DEI-related projects.

Q.    You say "most obviously."  Most obviously based on your point of view.  Is

233

                  J. Fox - Confidential

that fair to say?

        A.    Our interpretation of the EOs.

        Q.    You and Nate's interpretation of

the EOs.  Is that --

        A.    Yes.

        Q.    Okay.  And that's how you assessed

what grants were crazy and what grants weren't

crazy.  Is that fair?

        A.    That's how we assessed whether or

not a grant would be most infringing or not on

the EOs.

        Q.    Your subjective interpretation?

        A.    Yes.

        Q.    Okay.  So let's look at some of

these.  In Row 12, Cell C -- excuse me,

Cell E, we already read it.  It says:

              "Understanding historical

        LGBTQ spaces through gay travel

        guides."

              In Row 11, Cell E, it says:

              "Improving access to LGBTQ

        plus cultural heritage."

              In Row 11, Cell D, it says:

              "Developing a Spanish-language

238

J. Fox - Confidential

meeting with Mr. McDonald and Mr. Wolfson for the first time?

A.    Yes.

Q.    So how would you have determined that this would be at all useful to Mr. McDonald and Mr. Wolfson before you even met with them?

MS. DOUD:  Objection.

A.    The EOs made it clear that funding to DEI programs needed to be terminated in the timeframe, I think it was 60 days from the time it dropped.  And we were there to assist them in any way we could.  And part of what we thought would be helpful was to think through the existing base of grants, which of these may infringe with the direction of EOs.

Q.    And you had done that thinking in the lead up to your first meeting with Mr. Wolfson and Mr. Cavanaugh -- excuse me -- Mr. Wolfson or Mr. McDonald.  Is that right?

A.    Yes.

Q.    Was this in the context of helping Mr. McDonald and Mr. Wolfson identify grants to terminate?

239

J. Fox - Confidential

A.    Not at this point.  This was --

Q.    So what -- I'm sorry.

A.    -- to assess whether they were even aware of some of the grants that they had outstanding, and whether they may conflict with EOs priorities.

Q.    Okay.  But this is all under the context of possibly terminating grants.

Is that fair to say?

A.    Identifying grants that may relate or conflict with EOs.

Q.    Okay.  Was there any world in which you were -- you saw your goal as being identifying grants that had to do with DEI in order to ensure that you preserve all of those grants through the end of their terms?

MS. DOUD:  Objection.

A.    Could you restate.

Q.    Were you flagging these grants in order to save them?

A.    We were flagging them because they may conflict with the EOs.

Q.    And what would happen to grants that conflict with the EOs?

240

J. Fox - Confidential

A.    The heads of agencies would need to assess if they were in line with the executive orders.

Q.    How did you come up with this list?

A.    I don't remember.

Q.    It's got LGBTQ on it, homosexual, tribal, immigrants, immigrant.  So it was your assessment that immigrant would have been contrary to the EOs?

A.    It depends on the grant.

Q.    But you put it on this list because, at some point, you thought that a word like immigrant might conflict with the EOS?

A.    It may but it all depends on the grant.

Q.    But is that why you put this word on the list, though?

A.    It could indicate DEI.  It's not hamburger; it's something that may relate to cultural appropriation and DEI-related grants.

Q.    Okay.  You also put the word "refugees," that's C25.  Is there something

241

J. Fox - Confidential

about refugees that invokes DEI principles?

        A.    Maybe.  It depends on the grant.

        Q.    But you were using this list to flag grants for potential DEI.  Is that fair to say?

        A.    Or wasteful spend.

        Q.    So would you say that spending on LGBTQ was wasteful?

        A.    That would depend entirely on the grant and the specifics of that grant.

        Q.    Well, you say "or wasteful spend," but what about these words would imply wasteful spend?

        A.    Well, they may not be a life-or-death award.  For something like food stamps, it's clear, you need spend to go to those, they're critical spend, expenditures of the government.  Again, all depends on the grant itself.

        Q.    Okay.  And you put on here "homosexual."  I don't see heterosexual though.  You can confirm or deny.

                THE WITNESS:  Could you scroll down.

242

J. Fox - Confidential

A.    (Document review.)

Very well could have put heterosexual, but it is not on this list.

Q.    It's not on this list?

A.    I don't know why I didn't put heterosexual, but it is not on this list.

Q.    Okay.  Do you see "white" on this list?

A.    I see "privilege."

Q.    Do you see "white" on this list?

THE WITNESS:  Could you scroll back up.

A.    (Document review.)

No.

Q.    What about Caucasian?  Is that on the list?

A.    (Document review.)

No.

Q.    So you can see that there is gay, LGBTQ plus, homosexual on this list.  Right?

A.    Yes.

Q.    But there is no heterosexual on this list.  Right?

A.    Very well could have put

J. Fox - Confidential

heterosexual, although this list does not capture everything that is DEI.  Again, this was a preliminary search.

Q.    And we can see that it says, "Black, indigenous, people of color" on this list.  Right?

A.    Yes.

Q.    It doesn't say "white" or "Caucasian" on this list, does it?

A.    It very well could have.  Again, this is an early -- before we had our meetings, and it all depends on the grant itself.

Q.    Did you ever correct that by putting "white" or "Caucasian" on any list that you used to screen for DEI?

A.    I didn't need to because we read the grants themselves.

Q.    So you were using ChatGPT to screen grants using keywords, and that screening didn't have white, heterosexual, Caucasian on it.  Is that fair?

MS. DOUD:  Objection.

A.    This list was not used in the

244

J. Fox - Confidential

context of deciding which grants to keep or not.  This list was preemptive and not the source of truth.

So this is from a publicly available site called grants.gov.  Grants.gov is where you can download any grant, but it's not up to date and it doesn't give you the best information in terms of description.

So what we did after we met and talked with Mike and Adam is can we get details from eGMS and have the full list that you guys have, which is the latest up-to-date, so that we can properly assess alongside you.

Q.    Okay.  Got it.

A.    So this is -- this got thrown out, frankly, after the first meeting when Adam had sent me the file that you showed me, which is here's our active grants.

Q.    Okay.  So this list was not used --

A.    No.

Q.    -- in determining which grants to keep or not?

A.    No.

245

J. Fox - Confidential

Q.   Okay.  But a future list that you created was used in that way?

A.   In what way?

Q.   In determining which grants to keep or not.

A.   In determining which grants related or may have related to DEI or not?  Yes.

Q.   For the purposes of keeping or not keeping those grants at the agency?

A.   For the purposes of identifying if this may conflict with DEI.

Q.   Okay.  Number 49 says "melting pot."  Why would that be DEI?

A.   I guess it's melting pot, I assume, of cultures, is the way that the context could be used.  So it's promoting an inclusion atmosphere or something that's DEI related.

Again, did not use this as a source of truth.  This was the initial publicly available research for a jumping-off point to talk with Mike and Adam.

Q.   Right.  But you did put this

283

J. Fox - Confidential

have to use for Organizations and State and Jurisdictional Humanities Counsels.  We will address these first and individuals/scholarship grants once the orgs are finished as those are more personalized.

"Additionally, see below typical language sent to each of the grantees receiving a notification.  If it's your preference, we can set up an e-mail like Grant_Notification@neh.gov and add language to the beginning of the e-mail saying 'At the direction of the Acting Chairman for NEH,' instead of sending from your e-mail or signing off with your name in the signature.  Your details are already in the attachment.  Let us know on below and attached tomorrow."

Did I read that correctly?

A.    Yes.

Q.    And below that, you're

284

J. Fox - Confidential

referencing, I think, the body of an e-mail

that would be sent to a grantee with the

attached actual termination letter for that

grant.  Is that right?

        A.    Yes.

        Q.    So do you have an understanding of

why you were engaged in the actual process of

sending out the grant terminations?

        A.    Because Mike did not feel

confident in the timeline of getting notices

out.  He said it was going to take hours of

the team that they didn't have, and he wanted

us to do it for him.

        Q.    What's this proposition that

you're making when you say:

                "If it's your preference, we

        can send up an e-mail like

        grant_notification@neh.gov."

        A.    What's my read of that sentence?

        Q.    What are you -- can you give me

context as to what you're actually proposing

here?

        A.    Yeah, ultimately, procedurally

it's going to be up to Mike how he'd like to

285

J. Fox - Confidential

send out some of these notifications.  He's --
he was NEH counsel.  He's going to have an
opinion on how this is conducted, and this is
just opening up optionally for him.

Q.    But what are you proposing?

A.    To set up an e-mail that's
grant_notifications@neh, or if he would like
to send it from his e-mail.

Q.    Right.  Did you end up setting up
an e-mail address like
grant_notification@neh.gov?

A.    If I remember correctly, I spoke
with Mike on the phone following this e-mail,
unless there's an e-mail that he responded to,
and his preference was to set up an e-mail.

Q.    So if I ask Mr. McDonald at his
deposition why you drafted this language, he's
going to tell us it's because he told you to
go draft the language?

MS. DOUD:  Objection.

A.    I don't know what he's going to
say, but I know that he wanted us to execute
the terminations, and so we're doing anything
we can to help him.

286

J. Fox - Confidential

Q.    So he told you specifically to draft termination draft language for the terminations that you were going to be sending out?

MS. DOUD:  Objection.

A.    No, but we were just helping him throughout this process.  So this is a courtesy, not a mandatory thing that we did.

Q.    Below that, it says "Dear," open parens, this is in the letter, in the body of an e-mail that would go out to the grantees. In your draft, you write:

"Dear (organization name), we regret to inform you that your NEH grant has been terminated.  Please see the attached grant termination notice."

Did I read that correctly?

A.    Yes.

Q.    And was the goal here to insert the organizations that had been subject to grant terminations?

A.    The goal here is to get Mike's input on what would be sent alongside grant

J. Fox - Confidential

trending towards at least 183 in discretionary spending going down in FY26.

Q.   But did the deficit itself go down in its totality?

A.   I'm not sure.

Q.   Would you be surprised to hear that it did not?

A.   No.

MS. DOUD:  Objection.

Q.   Does that change how you assess whether there's any remorse about canceling hundreds of millions of dollars of grants for scholars in the humanities?

MS. DOUD:  Objection.

A.   Again, I have to believe that the dollars that were saved went to mission-critical, nonwasteful spending.  And so, again, in the broad macro, an unfortunate circumstance for individual, but this is an effort for the administration.

Q.   You said it went to nonwasteful spending, suggesting that the canceled grants were wasteful spending.

Is that fair to say?

296

J. Fox - Confidential

A.    Ultimately it was the decision of Mike and Adam to address if it was wasteful for not wasteful.  In my opinion, what's certainly not wasteful is food stamps, healthcare, Medicare-Medicaid funding.

Q.    Right.  So hundreds of millions of dollars of grants were terminated for the NEH, the deficit didn't change much, and you were paid $150,000 to do that job of reducing the deficit.

Do you feel like the 150,000 paid to you was wasteful spending?

MS. DOUD:  Objection.

A.    What are you, like, definitionally saying wasteful spending is here?

Q.    Nondiscretionary -- excuse me -- discretionary spending or however you defined wasteful spending when you said it.

A.    The broad principle is to reduce the amount of dollars flowing out of the government into the market.

And so any chance you have to reduce dollars flowing out into noncritical life supporting grants or programs, I would

297

J. Fox - Confidential

view as wasteful.  And so any software or even consultants that you pull in that assist you in redirecting funds to the most critical resources is not waste in the way that I would view wasteful spending.

Q.   Okay.  So your job was not wasteful spending, but humanities projects that we've seen that were canceled as a result of your input were wasteful spending?

MS. DOUD:  Objection.

A.   Not necessarily.

Q.   What do you mean?

A.   I mean, it just depends on how you're going to bucket or consider wasteful spending or not.

Q.   I'm asking you to apply your own --

A.   Yeah.

Q.   -- definition of wasteful spending.  So for instance --

A.   The net benefit of paying 150 in salary to redirect, for example, 163 million of humanities grants into something like food stamps or healthcare, that means you've saved

321

J. Fox - Confidential

that the procedures for canceling these grants in their existing process was going to take hours and weeks of their time.

So when he says "we are getting ready to cancel them today," there's a big procedural element for them.  And that was what we've talked about, that they're -- this is a multiweek process for them to cancel and terminate grants.

Q.    When did the actual cancellation notifications go out?

A.    If I remember correctly, the first of April.

Q.    So that was the next day.  Right?

A.    Yes.

Q.    Okay.  I want to stop sharing the screen.  Taking that down.

So who set up the e-mail account that was used to send the termination notices?

A.    Who?  Is that the question?

Q.    Yes.

A.    I did.

Q.    And who had access to that account when it was first set up?  Was it only you?

322

J. Fox - Confidential

A.    And the sys admin administrator could have access to all the data associated.

Q.    Is this sys admin administrator at GSA?

A.    I believe it was Brett Bobley who was the CIO.

Q.    And when the notices were sent on April 1 from that account, did you send those notices?

A.    Did I send the termination notices?

Q.    Yes.

A.    Yes.

Q.    Okay.  Where were you when you sent the termination notices?  Were you at GSA?  In your office or somewhere else?

A.    At GSA.

Q.    Okay.  Was anyone else with you?

A.    Maybe Nate, we sat next to each other at GSA often late at night.  I don't know -- I don't remember if he was there or not.

Q.    Okay.  But you had sent on the e-mail notices that went out on April 1st?

323

J. Fox - Confidential

A.    After getting the full guarantee and approval from Mike, yes.

Q.    Okay.  I just want to be clear on the understanding of DEI as it relates to the grants, in your review of the grants.

Is it your position that if an award studied one particular race or gender, that that would be DEI?

A.    I missed one word there.  Could you repeat.

Q.    Is it your position that if an award studied one particular race or gender, that would relate to DEI?

A.    If you are one particular race or gender, would that relate to DEI?  That's the question?

Q.    If the award relates to one particular -- if the award relates to the study of one particular race or gender, would that be DEI?

MS. DOUD:  Objection.

A.    That depends on the grant, the full grant description and the context of what the award is delivering.

324

J. Fox - Confidential

Q.    Okay.  But if the award, the purpose of the award were to study the particular aspects of Black culture, is that DEI?

MS. DOUD:  Objection.

A.    It depends on the full breadth of the award, the full description that gives context to its relation to DEI or not.

Q.    Sorry.  One moment.  Okay.  If the full description of an award were to study -- sorry.  If the full description of the award were quote, to study 21-century Black culture, unquote, is that DEI?

A.    Again, there's a lot of context that comes with the full, the full grant descriptions.  So if you have a particular grant in mind, we can review that and we can talk about whether we believe it relates or not.  But without that, it's -- you can't determine fully, if it's fully related.

MS. SNOW:  Okay.  Those are all my questions.

MS. DOUD:  And I just have a few questions.