# EXHIBIT 4



UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


AMERICAN COUNCIL OF

LEARNED SOCIETIES, et al.,

      Plaintiffs,       CASE NO. 1:25-cv-03657

v.                    CONSOLIDATED WITH

MICHAEL MCDONALD,     NO. 1:25-cv-03923

in his official capacity

as Acting Chairman of the

National Endowment of the

Humanities, et al.,

      Defendants.

_____

                     VIDEOTAPED DEPOSITION OF

                         ADAM WOLFSON

                             TAKEN ON

            THURSDAY, JANUARY 29, 2026

                         9:45 A.M.

        NATIONAL ENDOWMENT FOR THE HUMANITIES

           400 SEVENTH STREET SOUTHWEST

             WASHINGTON, D.C. 20506

THE PIONEER COURTHOUSE

# NAEGELI
## DEPOSITION & TRIAL

**(800) 528 - 3335**

**NAEGELIUSA.COM**

*Nationwide*

**COURT REPORTING**

**LEGAL VIDEOGRAPHY**

**REMOTE DEPOSITIONS**

**TRIAL PRESENTATION**

**LEGAL TRANSCRIPTION**

**COPYING AND SCANNING**

**LANGUAGE INTERPRETERS**



*Powerful* LITIGATION SUPPORT

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

ADAM WOLFSON
93096

January 29, 2026                    2
Outside Counsel Only

APPEARANCES


Appearing on behalf of the Plaintiffs:

JOHN ROBINSON, ESQUIRE

NINA CAHILL, ESQUIRE

KYLA M. SNOW, ESQUIRE

DANIEL F. JACOBSON, ESQUIRE

LYNN D. EISENBERG, ESQUIRE

Jacobson Lawyers Group, PLLC

5100 Wisconsin Avenue Northwest, Suite 301

Washington, D.C. 20016

(301) 823-1148

john@jacobsonlawyersgroup.com

nina@jacobsonlawyersgroup.com

kyla@jacobsonlawyersgroup.com

daniel@jacobsonlawyersgroup.com

lynn@jacobsonlawyersgroup.com

ADAM WOLFSON                    January 29, 2026                         3
93096                                              Outside Counsel Only

APPEARANCES (CONTINUED)


Appearing on behalf of the Authors Guild Plaintiffs:

JAMIE CROOKS, ESQUIRE

AMANDA VAUGHN, ESQUIRE

YINKA ONAYEMI, ESQUIRE (via Zoom)

SARAH MARTIN, ESQUIRE (via Zoom)

Fairmark Partners, LLP

400 7th Street NW, Suite 304

Washington, D.C. 20004

(202) 417-7111

jamie@fairmarklaw.com

amanda@fairmarklaw.com

yinka@fairmarklaw.com

sarah@fairmarklaw.com

APPEARANCES (CONTINUED)


Appearing on behalf of the Defendants:

JONAKI SINGH, ESQUIRE

MARY ELLEN BRENNAN, ESQUIRE

RACHAEL DOUD, ESQUIRE

U.S. Attorney's Office -

Southern District of New York

1 Saint Andrews Plaza

New York, New York 10007

(212) 637-2200

jonaki.singh@usdoj.gov

maryellen.brennan@usdoj.gov

rachael.doud@usdoj.gov


Also Present:

Annie Cleaver, Head of Research, Fairmark Partners

Kimberly Hylan, Attorney-Advisor, NEH

Elizabeth "Lisette" Voyatzis, Deputy General

Counsel, NEH

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  The time is 10:58 a.m., and we are on the record.

BY MR. CROOKS:

Q.  Okay.  Welcome back, Mr. Wolfson.  And you're aware -- you're aware that you're still under oath?

A.  Yes.

Q.  Okay.  What is your understanding of the term DEI?

A.  It stands for diversity, equity, and inclusion.

Q.  Okay.  And what does it mean?

A.  I -- I can't give you a precise definition.  I think it means different things to different people. But we know it -- DEI policies and so on -- so on and so forth.  It's -- yeah.

Q.  What does it mean to you?

A.  I think the diversity, equity, and inclusion -- I -- right?  I think it's an effort to -- as the words say, to emphasize diversity, equity -- and usually that's used in terms of underserved groups -- and being inclusive.

Q.  Okay.  About when did you first hear or become aware of the term DEI?

A.   I think the term has been kicking around for a while.  It first really came on my horizon under the administration of Shelly Lowe, where it was a major -- a major emphasis of her -- of her chairship.

Q.   Okay.  And how did she emphasize it?

A.   There were several pillars or priorities for the agency, and DEI or -- or other descriptions of it were one of them.

Q.   As a priority for the -- for the awarding of grants?

A.   Yes.  Well, the -- the -- right.  The -- the main priorities for the agency under -- under the Biden administration -- they were sort of, I think -- they described them in various ways, but three of the important pillars were, if I recall, strengthening democracy, addressing our changing climate, and the third one -- I don't remember the exact language they used.  I think -- I think it was advancing equity for racially underserved groups.

Those were the three -- the three pillars that -- that were central at that time.

Q.   Okay.  Did you ever discuss DEI or DEI-related topics with Chair Lowe?

A.   I'm -- I'm sure it -- it came up.  I can't

ADAM WOLFSON                    January 29, 2026                    71
93096                                          Outside Counsel Only

remember specifically.  I didn't report directly to her, so -- I -- I report to the senior deputy.

Q.   Okay.  And so when Chair Lowe was implementing this program, how did it affect how NEH made decisions about which grants to award?

A.   Under her leadership, we developed a -- and I took a big part in this.  We developed a -- a special initiative called American Tapestry.  And that was -- and you'll -- you'll -- I'm sure it, you know, was on the website and so on and so forth.

At the time it, was in our -- our NOFOs about -- and one of the important parts of that initiative was the idea of diversity, equity, and inclusion, in so many words.

Q.   And what's a NOFO?

A.   Oh, I'm sorry.  Those are -- those are Notices of Funding Opportunities, or we used to call them guidelines, but that's the way we advertise our programs.

Q.   I see.  With -- solicit applications?

A.   Exactly.

Q.   Okay.  And so you worked with Chair Lowe to adjust or modify the -- the NOFOs in part based on DEI criteria?

A.   Yeah.  We -- we came up with language that

ADAM WOLFSON                        January 29, 2026                        83
93096                                                      Outside Counsel Only

Q.   So you never discussed the fact that many of the grants that were first being considered for cancellation and then canceled related to Jewish studies and combating anti-Semitism?

A.   No.

Q.   You did not discuss that with anybody?

A.   I did not.

MS. SINGH:  Objection.

BY MR. CROOKS:

Q.   Okay.  Looking at the text you sent on April 13th at 8:17 a.m., you say, "Thanks for sending.  Well, it is the case that DOGE cut grants having nothing to do with DEI.  As they said, it was a government-wide effort to claw back money, but note the tendentious accusation that the administration is acting like all authoritarian or even totalitarian governments to destroy the humanities."

Did I read that correctly?

A.   Mm-hmm.

MS. BRENNAN:  Can I just say for the record that the question itself contains confidential information and might call for confidential information.  So we'll -- we'll write to the reporter after the deposition about what

lines --

MR. CROOKS:  Yep.

MS. BRENNAN:  -- pursuant to the protective order.

MR. CROOKS:  Understood.

BY MR. CROOKS:

Q.   Did I read that correctly?

A.   Yes, you did.

Q.   Okay.  When you wrote that, "It is the case that DOGE cuts -- DOGE cut grants having nothing to do with DEI," that was your true belief at the time you wrote this, right?

A.   Yes.

Q.   Okay.  Is that your belief sitting here today?

A.   Yes.

Q.   Okay.  And what do you mean by that?

A.   What I mean is that they -- is that there were -- the -- the grants that were terminated -- some were terminated because they were related to these categories that the executive orders had made clear were not among their priorities -- diversity, equity, inclusion, so on.  But at the same time, they made clear that they were also just interested in things like budget reduction, and -- and that --

that's what I mean there.

Q.   Okay.   When you say "they," you mean DOGE?

A.   I mean the administration.

Q.   Okay.

A.   Yeah.   DOGE is a part of the administration.

Q.   And who conveyed to you that position, that it was part of a government-wide effort to claw back money?

A.   Well, it was in -- it was in the executive order about -- right -- when -- when DOGE first -- as I recall, there was an executive order about DOGE in February and what -- what they were all about. And -- and then, you know, the -- the two representatives from DOGE who came to the agency made clear at various points that it wasn't just grants related to DEI, but just grants that didn't fit the priorities of the new administration.

Q.   Okay.   Was it ever the case that -- and I'm sorry.   Those two individuals were Mr. Fox and Mr. Cavanaugh?

A.   Yeah.   Nate and Justin as -- as we knew them.

Q.   Okay.   And am I right that when NEH started its review under the executive order and

when you first interacted with Mr. Fox and Mr. Cavanaugh, it was about DEI and not wasteful spending; is that right?

A.   Yes.  I think that's a fair statement.  It was sort of two stages.

Q.   Okay.  And they came in and asked -- well, how did they convey that they were interested in cutting grants related to DEI?

A.   How did they convey that?  We -- we were -- so that process had, in a way, already begun because there was the executive order at the end of January asking for a historical review of all projects in these various categories dating to the -- January 2021, right?  And so -- so we already had that -- under Chair Lowe, we were already working on that list.

How did they convey it?  I -- I don't remember exactly what they -- what they said or didn't say. Yeah.

Q.   So before the --

A.   But -- I'm sorry.

Q.   No, no.  Before the two individuals from DOGE came over to the agency, you said that NEH was already in the process of doing a review to ensure compliance with the executive order, correct?

A.   Correct.  Yes.

Q.   Okay.  And this is the executive order about DEI?

A.   Yes.  It was -- it was an executive -- yes.

Q.   Okay.  And so did Chair Lowe instruct the staff to conduct that review?

A.   Yes.  It was -- it was under -- under Chair Lowe and the Chief of Staff --

Q.   Okay.

A.   -- who kind of oversaw all operations at the agency.

Q.   Okay.  And do you know whether someone instructed Chair Lowe to give that instruction?

A.   I -- I don't know.

Q.   Okay.

A.   Yeah.

Q.   And what was the instruction that Chair Lowe and her Chief of Staff gave to folks working on this project?

A.   We -- the -- the -- there were -- there were meetings with the directors and the Chief of Staff, and they were asked to -- as the executive order made clear, to do a historical review of all grants starting in -- at the start of the Biden

administration, January of 2021 -- for whether or not they were implicated in respect to these various areas.  There were kind of a flurry.  There -- there was more than just one executive order, as I recall.

Under the -- you know, under Chair Lowe and the Chief of Staff, we -- a -- a spreadsheet was created.  Brett Bobley, who was the Chief Information Officer, actually created the -- the spreadsheet, and the directors were asked to -- to do that review using the spreadsheet.  And then, not long after, at the suggestion of -- of Brett Bobley and, I believe, Richard Brundage, who's the head of the Office of Grant Management, the idea of -- of doing a -- a tiered process was added -- of low, medium, high, not applicable.

Q.  Okay.  A -- a tiered process for low, medium, high, not applicable, as it relates to DEI?

A.  Yes, or -- or the other categories that they count.

Q.  Okay.  And so, other than Mr. Bobley and Mr. Brundage, who at NEH was involved in that review process?

A.  So the -- the review was done by the -- we -- we asked the -- the directors to do the review, the directors of each of the seven grant-making

the termination notice." Did I read that correctly?

A.    Yes.

Q.    And that must mean it was prepared by someone else, right?

MS. SINGH:  Objection.

BY MR. CROOKS:

Q.    How could they have prepared it if they haven't seen it, right?

A.    Yeah.  It sounds ---

MS. SINGH:  Objection.

THE DEPONENT:  Fair enough.  Sounds that way.

BY MR. CROOKS:

Q.    Okay.  So who prepared the termination notice?

A.    Again, it would be better to ask Michael. It's -- it's my understanding that it was drafted by the DOGE folks or others.  Michael reviewed it.  I don't know if he made revisions or changes or not, approved it, and then it was sent out under his -- by him.

Q.    Okay.  And I think, for the termination notice, the attachment to be -- is that right, the termination notice?

A.    I'm sorry.  Are you asking me?

Q.   Yes.  Do you see the attachment?

A.   Yes, this right here?

Q.   Okay.  Is that the termination notice?

A.   Yes, I believe this is the termination notice.

Q.   Okay.  And had you seen that before you received this email?

A.   I -- I don't think so.  But I'm -- I'm not sure.

Q.   Okay. And you don't know who prepared this, who drafted this?

A.   I -- I don't know who drafted it.

MR. CROOKS:  Okay.  Okay.  I think we can take a break, if that makes sense.

THE DEPONENT:  Sure.  When -- when are we --

MR. CROOKS:  Go off the record.

THE DEPONENT:  When are we starting again?

THE VIDEOGRAPHER:  Okay.  Please stand by. The time is 2:57 p.m., and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  Time is 3:16 and -- p.m., and we are on the record.

MR. CROOKS:  Mr. Wolfson, I only have a few more documents to go through with you.  Let's

mark this one as Exhibit 13 -- 14 -- Exhibit 14.

Bates is US-000050461.

(WHEREUPON, Exhibit 14 was marked for identification.)

THE REPORTER:  Exhibit 14 marked.

BY MR. CROOKS:

Q.   All right.  Mr. Wolfson, this is an email chain, it looks like, with you, Mr. McDonald, Mr. Fox, and Mr. Cavanaugh.  The latest date in it is April 2nd, 2025.  Do you see that?

A.   Mm-hmm.

Q.   And you see how the top email is Mr. McDonald responding to Justin at DOGE, "I approve the language in the termination letters."

A.   Mm-hmm.

Q.   Okay.  Do you remember this email chain?

A.   I -- I don't remember the particular chain, but -- but, yes, it's all authentic, yes.

Q.   And -- okay.  You have no reason to doubt the authenticity?

A.   No, I have no reason to doubt it.

Q.   Okay.  And am I right that, on this first page, Bates ending in 50461, it looks like emails between Mr. McDonald and Justin Fox about both the language in the termination letters and the language

THE DEPONENT: "Either way, as you've made clear, it's your decision on whether to discontinue funding." I -- I think he's -- I think -- I think he's probably referring -- you know, I think he's probably referring to this swath of grants that we've been discussing that were the NAs, the -- the not-applicable ones -- that it was clear DOGE thought should be canceled because of the broader parameters I've talked about, including deficit reduction and whatnot.

And he's -- and he's saying that -- that -- you know, he's saying that -- that's -- he's -- he's clearly asking for their opinion.

BY MR. CROOKS:

Q. He's asking for their opinion? That's your testimony under oath?

MS. SINGH: Objection.

BY MR. CROOKS:

Q. Your testimony under oath is that this paragraph is asking for their opinion?

MS. SINGH: Objection.

THE DEPONENT: Again -- again, I -- I can't -- I can't speak to what Michael is -- is saying here.

BY MR. CROOKS:

Q.   I'm asking your understanding of that paragraph.

A.   "It's your decision."

Q.   Is asking for their opinion?

MS. SINGH:  Objection.

THE DEPONENT:  My understanding -- and -- and you see that in some of the emails that -- that we've reviewed and in these other documents -- you can see the -- the DOGE folks saying do we have permission, do we have your approval.  So -- so he was the final decision-maker.  That's my understanding.

I think -- I think you're correct.  This -- this is -- this -- this particular sentence is -- is hard to reconcile with, again, my -- my understanding of what was going on.

BY MR. CROOKS:

Q.   And you never once talked with Mr. McDonald about the ways in which DOGE has made clear it's their decision?

MS. SINGH:  Objection.

THE DEPONENT:  No.

BY MR. CROOKS:

Q.   Okay.  That swath of grants you -- as you put it -- are grants that NEH staff marked as not

**DEI and that the DOGE-generated DEI list had explanations that make clear there is no DEI component, right?**

MS. SINGH:  Objection.

THE DEPONENT:  Yeah.  I'm -- I'm sorry. Was there a question there?

BY MR. CROOKS:

**Q.   I mean, but that's the swath you're talking about?**

A.   Yeah, I'm talking about the swath of grants that the -- the NAs, where there was no DEI component, but that DOGE wanted to cancel as budget reduction and whatnot.  I think it was my view and Michael's view -- not to speak for him -- that, I think, as he says here, they're not going to do any harm.

**Q.   And they should be allowed to continue, he says here, right?**

A.   Yes.

**Q.   Okay.  Did they continue?**

A.   I think they were canceled.

**Q.   Okay.**

A.   Right?

MR. CROOKS:  Okay.  With that, I think I'll pass the witness to Mr. Robinson.  Do you want