# EXHIBIT A

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE AUTHORS GUILD, WILLIAM GOLDSTEIN, ELIZABETH KADETSKY, VALERIE ORLANDO, KATALIN BALOG, BENJAMIN HOLTZMAN, LEE JASPERSE, and NICOLE JENKINS, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>NATIONAL ENDOWMENT FOR THE HUMANITIES, et al.,<br><br>      Defendants. | Case No. 1:25-cv-03923<br><br>Consolidated with No. 1:25-cv-03657 |

**DECLARATION OF JAMIE CROOKS**

I, JAMIE CROOKS, declare as follows:

1.      I am an attorney duly licensed to practice law before this Court in this matter. I am a member of the Bar of the District of Columbia, and I have been admitted to this Court *pro hac vice*. I make this declaration on my own personal knowledge, and if called as a witness to testify, I could and would testify competently to the following facts.

2.      I am the Managing Partner of Fairmark Partners, LLP ("Fairmark" or "Class Counsel"), which served as counsel for the plaintiffs and the class in the above-captioned action. I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction, which seeks an order requiring NEH to reserve 15% of grant disbursements to class members pending this Court's adjudication of Plaintiffs' anticipated motion for common-fund fees. That anticipated fee motion will be supported by another, more detailed declaration about the history of this litigation

and the work performed by Class Counsel, and that anticipated motion may seek less than 15% of grant disbursements to class members as fees. This declaration is intended to provide only those facts necessary for adjudicating the present request for preliminary relief.

3.      The Court's summary judgment order enjoins the Mass Termination and preserves for the benefit of the class the grant funds previously obligated to class members. I view this as complete relief for the class, and I am not aware of any additional relief that would have been available in this case under governing law. I am proud of my team for obtaining this result and extremely happy for the scholars and writers in the class whose grants will now be restored. I also know that my colleagues at Fairmark share these sentiments.

4.      Shortly after the Mass Termination, the Authors Guild approached me (after a former co-clerk of mine recommend me) about retaining Fairmark for a challenge against the Mass Termination. Fairmark undertook an intensive investigation that included reviewing the public records, interviewing affected grantees, reviewing grant documents and termination notices, conducting extensive legal research, and consulting with the named plaintiffs and putative class members about their injuries and available legal theories. Fairmark and the Authors Guild also jointly organized and hosted widely attended webinars for affected grantees, at which I and other Fairmark attorneys answered grantees' questions about process, rights, legal theories, federal court jurisdiction, available and likely relief, and standing.

5.      Fairmark was ultimately retained by the Authors Guild and seven individual scholars: Elizabeth Kadetsky, Nicole Jenkins, Bill Goldstein, Benjamin Holtzman, Lee Jasperse, Valerie Orlando, and Katalin Balog. Fairmark agreed to represent the individuals on contingency, and our agreements entitled Fairmark to seek up to 25% of any recovery obtained.

6.      The Authors Guild agreed to make one non-contingent payment of $150,000, with all other compensation contingent on the outcome of the case. The Authors Guild also agreed to a 25% contingency fee. Due to the complexity of the legal issues, and the fact that as we drafted the complaint we also began drafting our preliminary injunction motion, the one-time payment covered Fairmark's billed time only through May 20, 2025—just eight days after we filed the complaint. In the year-plus since then, we have pursued this case on an entirely contingent basis, with no guarantee of any further recovery. Fairmark's engagement agreement with the Authors Guild also obligates Fairmark to repay the Authors Guild that initial $150,000 if the firm applied for and received attorneys fee in the event of a successful resolution of this case.

7.      In undertaking this case, I knew it would be complex, that it would be opposed by a well-resourced and experienced opponent, and that it would require significant resources. I also knew this case would proceed on an accelerated schedule, given the preliminary injunction proceedings we planned to initiate shortly after filing the complaint and overall urgency of the matter to our clients and the class members. I also understood that if Fairmark sued the federal government over DOGE's activities, we faced a risk of retribution from the Trump Administration; our initial case assessment took place in April and May of 2025, after the Trump Administration had issued multiple Executive Orders targeting law firms that had challenged the President's and the Administration's priorities.

8.      Fairmark nevertheless decided to take on this considerable risk. Over the course of the case, Fairmark expended more than a thousand of hours of attorney time without any guarantee of being fully compensated for that time. Moreover, committing to the case meant turning down other potentially lucrative opportunities given that our firm (which has only six full-time litigation

attorneys) had to expend significant resources, in both attorney time and money, to litigate this case properly.

9.      On May 12, 2025, Plaintiffs filed a complaint on behalf of the Authors Guild and seven additional Named Plaintiffs, asserting claims under the APA, the First Amendment, and the *ultra vires* doctrine. Plaintiffs moved for a preliminary injunction shortly thereafter. The Government moved to dismiss, arguing among other things that this action belonged in the Court of Federal Claims—a jurisdictional argument it would press repeatedly throughout the litigation, and that has been successful in other grants-related cases in which the plaintiffs framed their requests for relief differently from ours. The parties also provided supplemental briefing, at the Court's request, about impact of the Supreme Court's June 27, 2025 decision in *Trump v. CASA*. Plaintiffs prevailed on the bulk of the issues, and on August 6, 2025, the Court entered a preliminary injunction staying the Mass Termination and enjoining the Government from re-obligating the terminated grant funds pending final resolution of the action. Specifically, the Court "direct[ed] that [the terminated grant] funds not be re-obligated *pendente lite* – essentially, … that these funds be 'escrowed' until we can hold a trial." ECF 116 at 80-81.

10.     In undertaking this representation, I also was well aware that Fairmark's involvement in the case exposed the firm to significant risk from the Trump Administration. I was and remain aware that President Trump's Administration has targeted many law firms perceived to be opponents to its agenda, and I am aware of reporting that many law firms have declined to represent clients in cases against the federal government as a result. *See, e.g.*, Mike Spector, et al., *How Trump's crackdown on law firms is undermining legal defenses for the vulnerable*, Reuters (July 31, 2025); Madiba K. Dennie, *Trump's Attacks On Law Firms Are Hurting Regular People, Too*, Balls and Strikes (Aug. 14, 2025); Molly Redden, *Trump's War on Big Law Means It's Harder*

*to Challenge the Administration*, ProPublica (Aug. 6, 2025). I knew that engaging in this representation could make Fairmark a target for the Trump Administration and would risk potentially crippling federal action against our firm. As a small and relatively new firm with limited resources, I do not know whether we could have survived in the face of a prolonged attack from the White House. Despite these risks, we pressed forward with the case, never wavering from our commitment to fight for class members, restore their grants, and ensure that the general public would not be deprived of their important work.

11. Throughout the litigation, the Government resisted nearly all discovery. Fairmark attorneys engaged in many meet and confers with the Government on myriad discovery issues and multiple hearings with the Court about discovery related issues. We were also able to resolve some such issues out of court. For example, we convinced the government to withdraw an improper privilege designation over Michael McDonald's "it's your decision" email, which proved to be one of the key pieces of evidence for Plaintiffs' *ultra vires* claim. Fairmark also filed multiple successful motions to compel, ensuring a full discovery record and that the true facts behind the Mass Termination came to light.

12. Since the Court's order granting summary judgment, my team and I have conferred with the Government multiple times about its plan to comply with the Court's order and the process for restoring class members' grants. Based on those conversations, my understanding is that NEH is designing a process through which grantees whose grants were cancelled by the Mass Termination will have those grants restored and be potentially offered accommodations if changed circumstances necessitate a different or longer schedule than originally anticipated. My understanding is that this process will commence soon and that grant payments will start being made in the near future.

13.     To date, the Government has not advised whether it intends to appeal from this Court's summary judgment order, despite our asking the Government directly about that potentiality.

14.     My team and I have reviewed the record in this case to quantify the unpaid grant funds associated with class members' terminated grants. In making these calculations, we consulted with counsel in the consolidated case, No. 25-cv-03657, to ensure that we had accurate information about grants awarded to members of the plaintiff organizations in their case ("ACLS group"), who were not within the class definition in our case. *See* ECF 291 at 131. We also excluded grants covered by the preliminary injunction in the *Thakur* litigation (some of which are also within the ACLS group) from our calculations, though those grantees are properly within the class the Court certified in this case. As to the latter calculation, we currently use our best estimate and are working on finalizing the number.

15.     The total unpaid amounts associated with the terminated grants was $169,353,723. *See* US-000061492. We then subtracted the funds associated with grants that are not within the class definition: $3,980,573.25 for grants issued during the first Trump Administration; $51,718,601.60 for grants issued to members of the ACLS plaintiff organizations; and an estimated $1,365,950.00 for the grants covered by the preliminary injunction issued in *Thakur* but not within the ACLS group. This leads to an estimate of unpaid grant funds associated with class members' terminated grants, after these exclusions—*i.e.*, a likely monetary benefit obtained by Fairmark's representation of the class in this litigation—of $112,288,598.15.

16.     In advance of this motion, my team and I contacted the named plaintiffs to ask their position on our anticipated motion for a common-fund award. Mary Rasenberger, the CEO of the Authors Guild, is submitting herewith a declaration attesting to the Authors Guild's support for the

holdback request, and intends to submit a declaration alongside Fairmark's eventual fee request as well. The other named plaintiffs have likewise indicated to me and my team that they support Fairmark's anticipated fee request—which will be for a substantially lower percentage of the award than our retention agreements with them called for, and substantially lower than is typical in like common-fund cases—and also intend to file declarations in support of our anticipated fee motion.

17.    Fairmark endeavored to work efficiently and with adequate but non-redundant staffing. I believe that our success in achieving the excellent result in this case without an excessive number of hours is, at least in part, a reflection of our efforts to staff the case efficiently.

18.    On Tuesday, May 26, 2026, we asked the Government for its position on the requested relief. At the Government's request, we met with Government counsel on the topic on Wednesday, May 27, 2026, and sent legal authorities to them by email later that day. As of the time of filing, the Government has not provided its position on this motion.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on May 29, 2026, at New York, New York.

By:    */s/ Jamie Crooks*
Jamie Crooks
Managing Partner
FAIRMARK PARTNERS, LLP