# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>

THE AUTHORS GUILD, WILLIAM
GOLDSTEIN, ELIZABETH KADETSKY,
VALERIE ORLANDO, KATALIN BALOG,
BENJAMIN HOLTZMAN, LEE JASPERSE,
and NICOLE JENKINS, on behalf of themselves
and all others similarly situated,

Plaintiffs,

v.

NATIONAL ENDOWMENT FOR THE
HUMANITIES, et al.,

Defendants.

</td><td>

Case No. 1:25-cv-03923

Consolidated with No. 1:25-cv-03657

</td></tr>
</table>

**DECLARATION OF MARY RASENBERGER**
**CEO OF PLAINTIFF AUTHORS GUILD**

I, Mary Rasenberger, declare as follows:

1.      I am the Chief Executive Officer of the Authors Guild, the nation's oldest and largest professional organization for published writers. Our members include leading historians, biographers, academicians, journalists, and other writers of nonfiction and fiction whose works have appeared in the most influential and well-respected publications in every field. The Guild's mission is to protect the rights of all American authors under the United States Constitution. I submit this declaration on behalf of the Authors Guild and its almost 18,000 members in support of Plaintiffs' motion for preliminary injunction seeking the holding back of no more than 15% of grant moneys disbursed by the Government as a result of the Court's invalidation of the Mass Termination.

2.      In the first week of April 2025, the Department of Government Efficiency ("DOGE") terminated over 1,400 active NEH grants in one fell swoop, including grants held by many of Authors Guild's members. These were scholars and writers who had structured their lives around these awards, in reliance on commitments made by the NEH. The terminations came without warning, without explanation, and without any meaningful avenue for appeal. We received many inquiries from our members, some of whom are grantees, who were confused and troubled by this sudden disruption to their livelihoods. In response to these concerns and our belief that the Mass Termination was unlawful, Authors Guild determined that litigation against the Government was likely necessary to protect our members' financial and reputational interests.

3.      Soon after the Mass Termination, I sought the advice of attorneys that then represented Authors Guild in another, unrelated matter, and they put me in contact with Jamie Crooks, managing partner of Fairmark Partners, LLP ("Fairmark"), who our attorneys described to us as a highly capable attorney leading an elite boutique of talented litigators that might be willing to take on our case. After a few initial conversations with Fairmark about the nature of the case and the situation our members whose NEH grants were canceled were facing, we engaged Fairmark.

4.      From the first conversation in mid-April 2025, we were confident that Fairmark could ably litigate this important matter on our and the writers' behalf. Fairmark moved with urgency and purpose from the outset. Within a few weeks of the Mass Termination, Fairmark had investigated the legal basis for our claims, consulted directly with many of our affected grantees and other Authors Guild contacts, and filed suit on our behalf. Less than a month later, Fairmark moved for a preliminary injunction to protect our members' and other NEH grantees' financial interests in grants that NEH had previously duly awarded. Both before and after that motion for a

preliminary injunction was granted, Fairmark worked with us regularly to keep our members informed about their rights, obligations, and best options.

5.      From the inception of this litigation, we have been highly satisfied with Fairmark's representation of our members' interests and the interests of other scholars affected by the Mass Termination. Fairmark's attorneys kept us and our members informed at every stage—not only holding regular calls with Authors Guild leadership but also holding webinars with Authors Guild members (and other NEH grantees) to explain the legal ramifications of the Mass Termination, answering grantees' questions (both in these webinars and individually over email) about their rights and best options going forward, and advising us and grantees about the likelihood of legal relief from a court to reinstate the grants that had been terminated.  I and my staff at Authors Guild spoke by telephone regularly, sometimes multiple times a week, with Fairmark and were in consistent email contact throughout the litigation.

6.      When major developments in the litigation arose, Fairmark explained them clearly and always was available to answer questions Authors Guild or our members had. After the case was filed, Fairmark led multiple webinars that Authors Guild organized for its members and other affected grantees, and Fairmark's attorneys took the time to explain the legal theories and risks to grantees, answer grantees' questions, and make grantees feel heard and supported during an uncertain time and under unprecedented circumstances. Throughout, we and our members were made to feel like partners in the litigation, and Fairmark assuaged many of our members and other Class Members concerns about what the Mass Termination meant for their livelihood.

7.      Because a significant number of Authors Guild's members were affected by the Mass Termination, Authors Guild agreed to front $150,000 to Fairmark to undertake the representation, billed at Fairmark's usual and customary rates.  At the time Authors Guild made

that commitment, both my and Mr. Crooks' express understanding—reflected in our engagement agreement—was that this initial payment would cover but a fraction of the attorney time and expenses that would be necessary to successfully litigate this matter. Authors Guild's engagement letter with Fairmark obligates Fairmark to repay Authors Guild this $150,000 should the Court award Fairmark attorneys fees.

8.      Authors Guild's engagement agreement with Fairmark also provides that Authors Guild would support Fairmark's application to the Court for a fee of 25% of any successful recovery. This was a figure we understood to be consistent with awards regularly approved in complex contingency litigation of this nature. I agreed, on Authors Guild's behalf, to such a contingency fee both because I believed that amount to be fair compensation to Fairmark in the event of a complete recovery, and because I understood that to be in the standard range of percentage fee awards that plaintiffs firms like Fairmark are regularly awarded in like situations.

9.      Fairmark has informed Authors Guild that it is now seeking a fee award of no more than 15% of the recovery across the now-certified class, which is meaningfully below what our agreement contemplates. Authors Guild believes that figure to be fair and fully warranted, not only given the time and money Fairmark has expended on this litigation but also in light of the result Fairmark's efforts have achieved: a declaration from the Court that the Mass Termination was unlawful, and an order reinstating the NEH grants issued to Authors Guild's members and other affected scholars—*i.e.*, all of the relief that Authors Guild and its members desired when they retained Fairmark to represent them in this matter.

10.      In my and Authors Guild's view, Fairmark took on a case on a largely contingent basis that few firms would be willing to bring in this political climate; litigated it with skill and dedication over the course of a year; and swiftly achieved an outcome that we believe will greatly

benefit our members, the broader humanities community, and members of the public who benefit from the humanities scholarship that the now-reinstated NEH grants will support.

11.     When Authors Guild first approached Fairmark to bring this case, they informed us of the risks and contingencies of bringing a case against the federal government, and indicated that the likelihood of a complete win for our members and other affected grantees was not high, given the risks of litigating against the government, the complicated jurisdictional issues involved in the case, and the nature of the plaintiffs' legal claims.  We were thus extremely pleased with the result Fairmark achieved when the Court issued its Summary Judgment Order granting all of the relief that our Complaint sought.

12.     We therefore support Fairmark's request for a preliminary injunction reserving its right to seek, at the appropriate time, at most 15% of the monetary value of the judgment Fairmark's work on this case created.

13.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 29, 2026, in New York, New York.


Mary Rasenberger
Chief Executive Officer
The Authors Guild