UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

THE AUTHORS GUILD, WILLIAM GOLDSTEIN, ELIZABETH KADETSKY, VALERIE ORLANDO, KATALIN BALOG, BENJAMIN HOLTZMAN, LEE JASPERSE, AND NICOLE JENKINS, on behalf of themselves and all others similarly situated,

                                             25-cv-3923 (CM)

            Plaintiffs,

    -against-

NATIONAL ENDOWMENT FOR THE HUMANITIES, *et al.*,

Defendants.

———————————————————————— x

**OPINION AND ORDER GRANTING IN PART THE AUTHORS GUILD PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION TO PRESERVE FUNDS FOR A POTENTIAL COMMON-FUND FEE AWARD**

McMahon, J.:

On May 7, 2026, this Court held unlawful the Government's mass termination of grants awarded by the National Endowment for the Humanities ("NEH"), certified a class of affected grantees under Federal Rule of Civil Procedure 23(b)(2), and entered a permanent injunction requiring the grants' reinstatement. *Am. Council of Learned Societies v. Nat'l Endowment for the Humanities*, 2026 WL 1256545 (S.D.N.Y. May 7, 2026). The Government has appealed, but I was recently advised that NEH has begun processing reinstatements and resuming payment of the affected awards.

The Authors Guild Plaintiffs anticipate seeking attorneys' fees under the common-fund doctrine. They now move for a preliminary injunction requiring NEH to reserve fifteen percent of

future disbursements to class members pending adjudication of that application.  Dkt. No. 170.

Plaintiffs contend that, once the funds are distributed among hundreds of grantees, any later fee

award may become practically uncollectible.  The Government responds that the Court has not

created a common fund and argue that expending money appropriated for humanities projects on

attorneys' fees would not be consistent with statutory authorization.

I have told the parties that I will not consider making a fee award until the case is over –

which is to say, until all appeals have been exhausted.  The question presented now is only whether,

because apparently the grants are now being funded, a portion of the undistributed funds should

be preserved pending the later fee award motion.  The Court is not being asked to decide whether

counsel will ultimately be entitled to a fee to be paid out of the monies collected for the grantees,

or in what amount.

For the reasons that follow, the motion is GRANTED IN PART.

## I.    BACKGROUND

The Court assumes familiarity with the facts and procedural history set forth in its prior

opinions.  In July 2025, the Court preliminarily stayed the Mass Termination and prohibited the

Government from re-obligating the funds associated with the terminated awards – directing, in

substance, "that these funds be 'escrowed' until we can hold a trial."  *Am. Council of Learned

Societies v. McDonald*, 792 F. Supp. 3d 448, 500 (S.D.N.Y. 2025).

Following discovery, the Court granted summary judgment to Plaintiffs on May 7, 2026,

certified a class and two subclasses under Rule 23(b)(2), and appointed Fairmark Partners, LLP as

Class Counsel.  *Am. Council of Learned Societies v. Nat'l Endowment for the Humanities*, 2026

WL 1256545 (S.D.N.Y. May 7, 2026).  The certified class consists of "All National Endowment

for the Humanities grant recipients whose grants were awarded on or after January 20, 2021 and

terminated as part of the Mass Termination," excluding the ACLS Plaintiffs and their members. *Id.* The Court permanently enjoined the Government from giving effect to the Mass Termination; it did not direct that the grantees be paid any money. The Government appealed on July 6, 2026; that appeal is pending. Dkt. No. 174.

I am advised that NEH has recently established a process through which affected recipients can seek reinstatement of their terminated grants. Recipients must indicate whether they wish to resume their awards and whether changes in project scope, personnel, or budget are necessary. According to the NEH, an award "is not officially reinstated until NEH issues a NOA–Amendment," and processing can take several months. Nat'l Endowment for the Humanities, *Reinstatement Assurance Form Instructions* 6, 10–11 (June 17, 2026), available at https://www.neh.gov/sites/default/files/2026-06/Reinstatement%20Assurances%20Form%20Instructions_FINAL.pdf [https://perma.cc/6QS3-NHFY]. The Government has not provided the Court with an accounting of the awards reinstated to date, the funds already disbursed, or the balances that remain unpaid.

Class Counsel anticipates moving for an award of attorneys' fees to be paid out of the reinstated awards pursuant to the common-fund doctrine. Counsel also plans to seek an award of fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d), which, if granted, would be used to offset a portion of any award that came out of the restored grant monies. Counsel represents that the eventual application may seek less than of the restored grant funds, but will seek no more. Dkt. No. 170-2, Crooks Decl., ¶ 2.

On May 29, 2026, the Authors Guild Plaintiffs filed a motion asking the Court to preserve fifteen percent of the reinstated award money pending adjudication of the fee application. Dkt. No. 170. The Government opposes the motion, Dkt. No. 171. The ACLS Plaintiffs take no

position on the common-fund theory, but ask that any interim relief the Court is inclined to award neither come out of their grants nor delay the reinstatement of their funds. Dkt. No. 172. They therefore oppose the motion to the extent it would require NEH to withhold any portion of funds otherwise payable to the ACLS Plaintiffs or their members.

The Court has separately established a schedule under which Class Counsel are to move for fees after the appeal is decided. In connection with that process, affected class members will receive notice and an opportunity to object. Dkt. No. 177. The affected class members have not had any notice or opportunity to opine on the present request. However, no fee application is presently pending, and the only issue presented by this motion is whether funds should be preserved pending later adjudication of a fee request.

## II.    DISCUSSION

### A.  The Pendency of the Appeal Does Not Deprive the Court of Jurisdiction

A notice of appeal ordinarily "confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). But an application for attorneys' fees requires "an inquiry separate from the decision on the merits" and is therefore collateral to the merits judgment. *White v. N.H. Dep't of Emp. Sec.*, 455 U.S. 445, 451–52 (1982). The Second Circuit has accordingly held that a district court retains jurisdiction to adjudicate a fee application while an appeal from the merits judgment is pending. *Tancredi v. Metro. Life Ins. Co.*, 378 F.3d 220, 225 (2d Cir. 2004) ("[N]otwithstanding a pending appeal, a district court retains residual jurisdiction over collateral matters, including claims for attorneys' fees.").

In *Savoie v. Merchants Bank*, 84 F.3d 52, 54 (2d Cir. 1996), trust-account customers filed a putative class action after the bank invested their funds in a portfolio that suffered substantial

losses.  The bank later announced that it would reimburse its customers approximately $9 million, thereby mooting the underlying claims.  *Savoie*, 84 F.3d at 54, 58.  The plaintiffs sought to reserve $500,000 from that distribution for a possible common-fund fee award.  *Id.* at 54.  After a magistrate judge recommended granting that relief, but before the district court acted, the bank distributed the entire $9 million; the district court then ordered the bank to place $500,000 in escrow.  *Id.* at 54–55.  The Second Circuit held that the district court retained jurisdiction because "the injunction seeks limited and collateral relief."  *Id.* at 58.  The injunction "merely ordered the Bank to set aside a portion of money in an interest-bearing account for a short time, pending a determination of whether attorney's fees should be awarded."  *Id.* at 58.

The relief sought here neither revisits the merits of the May 7 judgment nor adjudicates any issue that is presently before the Court of Appeals.  It would merely prevent, on a temporary basis, the complete distribution of the asserted common fund so that the Court can later adjudicate a collateral fee application.  The Government's recently-filed appeal thus does not deprive this Court of jurisdiction to entertain the present motion.

### B.  The Authors Guild Plaintiffs Satisfy the Requirements for Preliminary Injunctive Relief

1.  Governing Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Ordinarily, a movant must demonstrate "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction," as well as "that the balance of equities tips in his or her favor."  *A.H. ex rel. Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (citation modified).  Because the Government is a party, the balance of equities and public-interest inquiries merge.  *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020).

A heightened standard applies when an injunction would modify, rather than preserve, the status quo.  In that circumstance, the movant must "make a 'strong showing' of irreparable harm" and "demonstrate a 'clear or substantial likelihood of success on the merits.'"  *A.H.*, 985 F.3d at 176 (quoting *Yang v. Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020)).  Whether an injunction is mandatory or prohibitory turns on its practical effect on "the last actual, peaceable uncontested status which preceded the pending controversy."  *Id.* at 176–77 (citation omitted).

The requested relief is principally preservative.  As to funds not yet distributed, it would prohibit NEH from dissipating the entire asserted common fund until the Court can decide whether to make a fee award against that fund.  The Second Circuit's decision in *Savoie* distinguishes an injunction entered before distribution – which merely sets aside part of the fund – from an injunction entered afterward, which could require the defendant affirmatively to restore the status quo.  84 F.3d at 58–59.  Nonetheless, because the injunction directs NEH affirmatively to identify and reserve funds during the postjudgment reinstatement process, the Court will assume, without deciding, that the heightened standard applies.

Plaintiffs satisfy that standard.

2. <u>Plaintiffs Have Demonstrated a Substantial Likelihood of Entitlement to Some Fee Award on a Common-Fund Theory</u>

### a.    The Judgment Produced a Traceable Monetary Benefit for an Identifiable Class

"A litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  The common fund doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense."  *Id.*  A court with jurisdiction over the fund may

therefore assess fees against it, "thus spreading fees proportionately among those benefited by the suit." *Id.*

The judgment in this case did not direct grant the United States to pay anyone any money; it simply declared that the Mass Termination was unlawful and directed the Government not to reobligate the funds that had been wrongfully taken from the grantees.  The Government insists that the court did not thereby create a common fund, so movants fail to show a likelihood on the merits on that issue.

But the common-fund doctrine is not limited to litigation that produces a damages judgment or that brings money into the court's custody.  As the Supreme Court has explained, "Although the earliest cases recognizing a right to reimbursement involved litigation that had produced or preserved a 'common fund' for the benefit of a group, nothing in these cases indicates that the suit must actually bring money into the court as a prerequisite to the court's power to order reimbursement of expenses."  *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 392–93 (1970) (citations omitted).  The doctrine also applies when successful litigation confers "a substantial benefit on the members of an ascertainable class" and the costs can be spread proportionately among those beneficiaries.  *Id.* at 393–94.  The doctrine applies, not just to suits where monetary relief is awarded, but also to litigation that "corrects or prevents an abuse which would be prejudicial to the rights and interests" of others.  *Hall v. Cole*, 412 U.S. 1, 5 n.7 (1973) (quoting *Mills*, 396 U.S. at 396).

This litigation conferred considerably more than an abstract benefit.  Before the Court entered judgment, the class members' grants had been terminated and the funds associated with those awards were subject to reallocation – which means the class members would have gotten nothing, even though they had contracts for funding from NEH.  The judgment declared the Mass

Termination unlawful, required NEH to rescind the termination notices and treat them as without legal effect, and prohibited NEH from reallocating the associated funds on the unlawful grounds adjudicated by the Court. Although it did not order the immediate payment of grant funds or adjudicate any particular grantee's contractual entitlement to money, the judgment struck an unlawful Government action that was plainly prejudicial to the rights and interests of the affected grantees.

The Government's reliance on the fact that the Court awarded injunctive relief rather than damages elevates form over substance. The American Law Institute's *Principles of the Law of Aggregate Litigation* provides that fees should be based on "the actual value of the judgment or settlement to the class" and that, in most common-fund cases, the percentage should reflect "both the monetary and the nonmonetary value of the judgment or settlement." *Principles of the Law of Aggregate Litigation*, § 3.13(a)–(b) (Am. L. Inst. 2010). The Court's order enjoining of the Government's unlawful termination of the grants and effectively impounding the illegally terminated monies is obviously monetizable, even though the relief granted was entirely equitable. The class is defined, any monetary benefit is traceable to grant funds that are restored ultimately goes to the individual class members, and litigation costs can be allocated in proportion to the amount each member actually receives. The value of the equitable judgment can be measured by the grant funds, if any, that class members actually receive through NEH's administration of the reinstated awards. The relevant benefit is, therefore, the value ultimately realized by members of the Authors Guild class if and when their grants are restored. The precise value actually conferred remains to be determined, but the form of the Court's equitable judgment does not render the benefit ultimately realized through the reinstatement process nonmonetizable.

### b.    No Statute Expressly Prohibits a Common-Fund Award

The Government next contends that Plaintiffs are unlikely to succeed on the merits because using the restored grant funds to pay for lawyers would violate federal appropriations law, grant regulations, and the terms of the individual awards.  Plaintiffs counter that none of those authorities expressly prohibits a court from awarding attorneys' fees out of a common fund.  *See* Dkt. No. 171 at 10–14; Dkt. No. 173 at 7–8.  Plaintiffs are correct.

Under the usual American Rule, "each side in a litigation bears its own legal fees." *Puerto Rico v. Heckler*, 745 F.2d 709, 711 (D.C. Cir. 1984) (Ginsburg, J.).  But the Equal Access to Justice Act ("EAJA") provides:

> Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys . . . to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action.  The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law.

28 U.S.C. § 2412(b).  Section 2412(b) thus makes the United States subject to the same established common-law grounds for awarding attorneys' fees that apply in litigation involving private parties. For purposes of subsection (b), "the common law" refers to the established judicial exceptions to the American Rule.  Congress identified the relevant doctrines expressly.  The House Report issued in connection with the passage of the EAJA explains that, under § 2412(b), "cases involving the United States would be subject to the 'bad faith,' 'common fund' and 'common benefit' exceptions to the American rule against fee-shifting."  H.R. Rep. No. 96-1418, at 17 (1980), reprinted in 1980 U.S.C.C.A.N. 4984, 4996.

One of the established common-law exceptions recognized by the House Report is the common-fund doctrine.  The Supreme Court has described that doctrine as "a well recognized exception to the general principle that requires every litigant to bear his own attorney's fees."

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). Similarly, *Puerto Rico* describes it as a "principal exception" to the American Rule, which "permits court-awarded fees when a litigation eventuates in a recovery not only for the complainant, but for a group of similarly situated others." 745 F.2d at 711; *see also Gelis v. BMW of N. Am., LLC*, 178 F.4th 810, 820 (3d Cir. 2026) (stating that the common fund doctrine reflects a "traditional practice in courts of equity").

The doctrine requires the persons who receive a litigation-generated benefit to bear proportionately the cost of obtaining it. Thus, "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing*, 444 U.S. at 478. The doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," and permits the court to spread the fees "proportionately among those benefited by the suit." *Id.* at 478.

Section 2412(b) places the United States in the same position as a private party that possesses or administers such a fund. If a private defendant held money that had been awarded to a class, the common-fund doctrine would permit the court to deduct a reasonable fee before distributing the balance to the beneficiaries. Section 2412(b) permits the same equitable allocation when the United States holds funds that are subject to a judgment for the benefit of a class. The economic burden remains with the beneficiaries, because the fee is deducted proportionately from the amounts otherwise payable to them. As *Boeing* explained, counsel are paid "from the amount for which [the defendant] has already been held liable"; "There is no 'surcharge' on the defeated litigant." *Id.* at 481. Instead, "every member of the class" shares the attorneys' fees "to the same extent that he can share the recovery." *Id.*

Accordingly, to the extent this litigation produced a common fund for the grantees, § 2412(b) authorizes the Court to apply that established common-law doctrine in this action. The United States would be required to reserve and administer the fee because it presently administers the restored grant payments, but the fee would be borne proportionately by the beneficiaries through a reduction in the amounts otherwise payable to them. That is different from a direct fee-shifting award under § 2412(d), under which the Government itself pays reasonable fees to a prevailing party, ordinarily subject to that subsection's hourly-rate limitation. *See* 28 U.S.C. § 2412(d)(1)(A), (2)(A).

It is also different from the situation presented in *Grace v. Burger*, 763 F.2d 457 (D.C. Cir. 1985). There, the plaintiffs successfully challenged a statute restricting expressive activity on the sidewalks surrounding the Supreme Court and then sought attorneys' fees from the United States under the common-benefit doctrine. *Id.* at 458–60. The D.C. Circuit rejected the request because any award "would ultimately be born[e] by all taxpayers, rather than just those benefiting from the injunctive order." *Id.* at 459–60 (quoting *Trujillo v. Heckler*, 587 F. Supp. 928, 930 (D. Colo. 1984)). Such an award "would not compel the beneficiaries to compensate the winning litigant who acted as their representative, but would assess costs against the unrelated losing party." *Id.* at 460 (quoting *Trujillo*, 587 F. Supp. at 931).

That concern is absent here. Plaintiffs seek to reserve a proportionate share of the restored grant payments otherwise payable to the identifiable class members who benefited from the judgment. They do not seek payment from general federal revenues or from taxpayers who received no particular benefit from this litigation. *Grace* therefore reinforces, rather than undermines, the distinction on which the common-fund doctrine rests. The fee must be borne by those who share in the litigation-generated benefit, not by the losing party or the public at large.

*Puerto Rico* is the most directly on-point – and, to date, the most definitive – appellate decision addressing the application of § 2412(b) to a common-fund fee taken from federal grant monies.  Neither the parties nor the Court has identified no decision questioning its result in the federal-grant context.

In *Puerto Rico*, the Commonwealth won a judgment requiring the Department of Health and Human Services to make federal health-planning grants available to Puerto Rico and five other jurisdictions. 745 F.2d at 710–11.  Under the decree, Puerto Rico became entitled to approximately $600,000, and each of the five other jurisdictions became entitled to $100,000. *Id.* at 711.  Puerto Rico proposed that each jurisdiction contribute the same percentage of its grant toward counsel's compensation.  Specifically, "Under this arrangement each jurisdiction would contribute to the cost of the litigation 2.5 percent of the funds it received." *Id.* at 713.  Puerto Rico therefore contributed $15,000 from its $600,000 grant, and each of the five other jurisdictions contributed $2,500 from its $100,000 grant. *Id.*  The district court approved the proportional 2.5% allocation after giving the five other jurisdictions notice and receiving no objection.  The D.C. Circuit affirmed, concluding that the percentage was reasonable. *Id.* at 713–14.

The Government in *Puerto Rico* argued that no part of the grant monies could be used to pay counsel because litigation expenses were not among the uses enumerated in the governing grant statute. *Id.* at 712.  The D.C. Circuit rejected that argument.  It held, first, that the Government bore the burden to show that a common-fund award was expressly prohibited by statute.  "To succeed in its opposition to any 'common fund' court-awarded counsel fee for Puerto Rico, therefore, the government must show an express statutory prohibition." *Id.* at 711–12.  It then rejected the statutory-use argument that the Government asserts here:

> This argument is not reasonable.  The litigation is what enabled Puerto Rico and
> other similarly situated jurisdictions to get the grant funds in the first place so that

the money could be put to the enumerated uses. The authorized uses, in other words, sprang from, and would not have been possible without, Puerto Rico's investment in litigation. Under the circumstances, it defies common sense to read the statute as branding Puerto Rico's key, use-unlocking, expenses as "impermissible."

*Id.* at 712. The court "reject[ed] the government's indiscriminate argument that, in the context of grants, if something is not expressly authorized, then inevitably it is expressly prohibited." *Id.* It further concluded that compensating counsel whose efforts made the grant funds available was "*in full harmony* with both statutes and with the public interests that prompted Congress to pass them." *Id.* (emphasis added). The House Report is the proof of the pudding.

The Government does not squarely address § 2412(b)'s command that common-law liability must be "expressly prohibited by statute." It instead argues that NEH "lacks the statutory authority to 'reprogram' or use the obligated funds for a different purpose (such as attorneys' fees incurred in litigation) without congressional approval." Dkt. No. 171 at 11. This argument mischaracterizes the requested relief. Plaintiffs do not ask NEH to reprogram appropriated money from one agency purpose to another. They ask the Court to allocate proportionately the cost of obtaining a litigation-generated benefit among the persons who receive that benefit – the very allocation authorized by the common-fund doctrine and incorporated by § 2412(b).

The Government specifically relies on the Purpose Statute, which provides that "Appropriations shall be applied only to the objects for which the appropriations were made *except as otherwise provided by law*." 31 U.S.C. § 1301(a) (emphasis added). As construed in *Puerto Rico*, § 2412(b) supplies the relevant authority "provided by law." It expressly permits the Court to apply established common-law fee doctrines in litigation involving the United States unless another statute expressly prohibits the award. And because the fee would be allocated from the beneficiaries' recovery rather than spent by NEH on an unrelated governmental program, the reserve would not constitute an administrative "reprogramming" of funds.

- 13 -

Section 2412(d) of the EAJA does not compel a different conclusion.  It provides Plaintiffs with a potential alternative way to obtain attorneys fees – directly from the United States, rather than out of a common fund.  Any such award is subject to that subsection's requirements and rate limitation.   But Congress enacted § 2412(b) and § 2412(d) as distinct provisions with distinct remedies.  Reading § 2412(d)'s limitations as the exclusive way that fees can be awarded pursuant to the EAJA would effectively read § 2412(b) out of the statute.  Of course, this Court might ultimately conclude, as a matter of equity, that an award under § 2412(d) is sufficient and that no common-fund award should be made.[1]  But the availability of that alternative remedy does not erase the authority Congress separately conferred in § 2412(b).

Nor has the Government identified any more specific statute that expressly forecloses the common-fund remedy.  The fiscal-year 2024 appropriation, for example, made $192 million available "for support of activities in the humanities, pursuant to section 7(c) of the Act and *for administering the functions of the Act*," and $15 million available for the Act's matching-grants program.  *Consolidated Appropriations Act,* 2024, Pub. L. No. 118-42, 138 Stat. 25, 281–82 (emphasis added).  Section 956(c), in turn, authorizes grants to promote "progress and scholarship in the humanities," strengthen the nation's "research and teaching potential" in the humanities, support "training and workshops in the humanities," and fund programs and research of "substantial scholarly and cultural significance."  20 U.S.C. § 956(c).  Together, those provisions identify the purposes for which Congress made NEH funds available.  Neither expressly prohibits a court's equitable allocation of litigation costs among the beneficiaries whose access to those funds was restored through this suit.

---

[1] The ACLS Plaintiffs may well take that position, since they have asked that no portion of the grants payable to them or their members be withheld for a common-fund award.

The Government also relies on Subpart E of 2 C.F.R. part 200, which is entitled "Cost Principles," and on the terms of the awards. Section 200.400(a) makes each recipient responsible for the "efficient and effective administration of the Federal award through the application of sound management practices," while § 200.403(a) provides that a cost is allowable only if it is "necessary and reasonable for the performance of the Federal award." These provisions govern whether a recipient can charge a particular expense to its federal award. The award terms likewise require recipients to use the promised funds to perform the work that NEH approved. From these premises, the Government argues that a reserve would effectively require grantees to complete the same projects with only a fraction of their awards. *See* Dkt. No. 171 at 12–13.

I find it ironic that the Government is suddenly interested in protecting the grantee's right to finish their projects. By terminating the grants altogether – for illegal reasons – the Government made it impossible for the grantees to finish – and in many cases to start – work that, after an exhaustive application process, had been deemed worthy of Government support. Those terminations were reversed only as a result of these successful lawsuits, which restored the grantees' ability to carry out the projects the Government once derided as unworthy of funding.

In any event, the Government's argument conflates the allowability of a project expense with the Court's authority to allocate a common fund. The cited regulations govern only the former. They determine which costs a grantee is allowed to charge to a federal award in carrying out an approved project. They do not address whether a court can allocate part of a litigation-generated benefit to the cost of obtaining that benefit.

The Government's reliance on federal regulations is also misplaced. Section 2412(b) permits common-law fee awards unless Congress has displaced that authority through an express prohibition "by statute." Congress's use of the word "statute" "meant to reserve express

prohibitions to itself, *not to remit the matter to executive regulation.*"  *Puerto Rico*, 745 F.2d at 712 (emphasis added).  Congress thus reserved to itself – not to an agency acting through regulations – the decision whether to foreclose a common-fund award.  The Government's cited regulations do not constitute an act of Congress.

The regulations and award terms nonetheless remain relevant to the equities and to the amount of any reserve, particularly because withholding funds may affect grantees' ability to complete their projects.  But they do not resolve the threshold question of the Court's authority or offer the express statutory prohibition of a common fund award that § 2412(b) requires.

### 3.  Plaintiffs Have Made a Strong Showing of Irreparable Harm

The threatened harm is the loss of any practical means of enforcing a common-fund award after the asserted fund has been distributed to the class.  In *Savoie*, the Second Circuit held that such a loss constitutes irreparable harm.  It explained that, if fees were later awarded but no portion of the common fund had been preserved, counsel "would have had to attempt to seek recovery from each of the hundreds of trust customers who received part of the [applicable] payment." *Savoie*, 84 F.3d at 58.  The court held that "such a recourse is so impractical as to be infeasible, and constitutes irreparable harm."  *Id.*  It therefore instructed that, "where a defendant intends to distribute the entirety of what is arguably a common fund, plaintiffs should seek a preliminary injunction to set aside a portion of the common fund" pending a determination whether fees are warranted.  *Id.*

The Second Circuit reiterated that principle in *Kickham Hanley P.C. v. Kodak Retirement Income Plan*, 558 F.3d 204 (2d Cir. 2009).  There, counsel sought to reserve part of payments otherwise distributable to approximately 530 pension-plan participants.  *Id.* at 207–09.  The court again recognized that forcing counsel to collect separately from hundreds of recipients "is so

impractical as to be infeasible, and constitutes irreparable harm." *Id.* at 209 (quoting *Savoie*, 84 F.3d at 58). Indeed, the defendants did "not appear to challenge the district court's reliance on *Savoie* to find that Kickham demonstrated irreparable injury." *Id.* Although the court ultimately vacated the injunction because ERISA's anti-alienation provision expressly prohibited counsel from reaching the pension benefits, it did so on the merits of the proposed common-fund claim, not because widespread distribution failed to threaten irreparable injury. *Id.* at 209–10. No comparable statutory prohibition applies here. *See supra* Section II(B)(2)(b).

The same practical problem exists here. The Government represents that NEH has rescinded the termination notices and is working with grantees to restart their projects and resume funding. *See* Dkt. No. 171 at 2. But the Court has directed Class Counsel to file its fee application only *after* the appeal is complete, so that the Court can address any fee award once, on a complete record. Dkt. No. 177. Unless some portion of future disbursements is preserved in the interim, NEH may distribute the full amount of the asserted common fund long before the Court adjudicates that application. Once those funds have been paid to hundreds of recipients and used to resume their projects, Class Counsel's only means of collecting a common-fund award would be to pursue the individual grantees. Under *Savoie*, such a circumstance is precisely the sort of impractical and infeasible recourse constituting irreparable harm.

The Government responds that Class Counsel has an adequate alternative because it can seek EAJA fees directly from the United States under 28 U.S.C. § 2412(d). *See* Dkt. No. 171 at 18–19. That is, of course, correct. Section 2412(d) supplies a conventional means of compensating a prevailing party without reducing the grants, and the Court may ultimately conclude that an award under that provision is all that equity requires. But the existence of a potential § 2412(d) award does not preserve the distinct remedy that is presently threatened. An

award under § 2412(d) is subject to a statutory rate limitation and is calculated under fee-shifting principles; a common-fund award is paid by the beneficiaries and may be calculated as a percentage of the benefit. As the Second Circuit has observed, "a common-fund fee may . . . exceed what would be a 'reasonable fee' in the fee-shifting context." *Fresno County Employees' Retirement Ass'n v. Isaacson*, 925 F.3d 63, 70 (2d Cir. 2019).

Whether the Court should ultimately prefer the statutory remedy is a question for the eventual fee proceeding and bears heavily on the equities. It does not change the practical fact that complete distribution of the grants would eliminate any meaningful ability to impose a proportional common-fund award later.

Congress has not made fee awards under a common fund and Section 2412(d) of the EAJA mutually exclusive. In *Gorgonzola v. McGettigan*, 2017 WL 1449789, at *14 (W.D. Pa. Apr. 21, 2017), the court concluded that "a limited common fund holdback from any retrospective payment(s) is appropriate" even though "The EAJA may also remain as an available avenue for Plaintiffs' counsel to seek compensation at a future date." Class Counsel represents that it intends to seek fees under § 2412(d) and will ask that any such award that might be made reduce whatever it recovers from the common fund. *See* Dkt. No. 170-1 at 20–21. But the possibility of such an offset does not cure the threatened loss of the distinct common-fund remedy.

Because NEH's distribution of the funds would render any eventual common-fund award practically uncollectible, Plaintiffs have made the required strong showing of irreparable harm.

4. The Balance of Equities and the Public Interest Favor Limited Interim Relief

The balance of equities favors preserving the Court's ability to adjudicate Class Counsel's anticipated fee application. Without interim relief, NEH might distribute the asserted common fund before that application becomes due, leaving counsel without any practical means of

- 18 -

collecting a fee from the beneficiaries of the litigation.  A temporary reserve, by contrast, does not award counsel any money or constitute a determination that counsel is entitled to a fee, either at all or in any particular amount.  It merely preserves a portion of funds that have not yet been distributed while those questions are adjudicated.

The Government identifies two competing burdens.  It contends that NEH would face administrative difficulties in identifying and withholding a portion of payments made under individual awards.  *See* Dkt. No. 171 at 20–21.  I do not see the difficulty.  Apparently the agency had no difficulty is carrying out the court's injunction that it not to reobligate the terminated grant monies; it should be equally possible to identify the reinstated awards that are being paid to class members and simply to hold back a small portion of each payment.  Requiring NEH temporarily to reserve a specified portion of those payments adds an extra administrative task, but the Government offers no evidence that doing so would materially disrupt the agency's operations.  *See Essex Crane Rental Corp. v. Vic Kirsch Const. Co.*, 486 F. Supp. 529, 535 (S.D.N.Y. 1980) (discounting allegations of hardship "unsupported by particulars by way of proof or affidavit" (citation omitted)).

Of course, the agency would have to distinguish between members of the Authors Guild class and members of the plaintiff group in American Council, since the latter want no part of any holdback or common fund fee award.  Counsel have represented that they will work with the NEH to resolve any such administrative difficulties.  This limited burden does not outweigh the risk that complete distribution would extinguish the common-fund remedy before the Court can decide whether it is warranted.

The more substantial concern is the effect on the grantees themselves.  Congress appropriated these funds to support humanities projects, and a reserve would reduce the funds

immediately available to perform the work that NEH approved. As noted above, the ACLS Plaintiffs have already indicated that they want no part of any holdback. The named class representatives in Authors Guild attest that a temporary fifteen-percent reserve would not prevent them from completing their projects. *See* Goldstein Decl. ¶ 2, Dkt. No. 173-1; Balog Decl. ¶ 2, Dkt. No. 173-2; Holtzman Decl. ¶ 4, Dkt. No. 173-3; Kadetsky Decl. ¶ 2, Dkt. No. 173-4; Orlando Decl. ¶ 2, Dkt. No. 173-5. But these five declarations do not establish that every absent class member, or even a majority of them, could absorb the same temporary reduction without jeopardizing an approved project. The class encompasses grants of different sizes, purposes, and remaining balances, and its members have not yet received any notice or an opportunity to object to a fee request.

The possibility that the interests of counsel and class members might conflict puts the Court in a sensitive position. It is true that the common-fund doctrine serves the equitable purpose of preventing those who obtain a litigation-generated benefit from being unjustly enriched at counsel's expense. *See Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 257 (1975). Preserving the possibility of such an allocation encourages capable counsel to undertake representative litigation whose beneficiaries may be too numerous or dispersed to retain counsel individually.

At the same time, the anticipated fee request creates a competing conflict. Class Counsel has an interest in preserving funds for its compensation, while class members have an interest in maximizing the grant funds available to them. Writing for the First Circuit, Judge Selya explained that "the conflict between a class and its attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery." *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991). And this is not the typical

class action; it involves the disbursement of Government grants, most of them in small amounts, supporting the work of individual scholars and nonprofit institutions.

Consistent with that concern, the Court has a fiduciary obligation "to act as a guardian of the rights of absent class members" and must approach any fee award "with an eye to moderation." *McDaniel v. County of Schenectady*, 595 F.3d 411, 414 (2d Cir. 2010) (internal quotation marks omitted); *see also Democratic Central Committee of D.C. v. Washington Metropolitan Area Transit Commission*, 3 F.3d 1568, 1573 (D.C. Cir. 1993) (per curiam) ("[T]he court must act to protect the interests of the class members and to insure that the fee awarded is reasonable.") (citing *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1265–66 (D.C. Cir. 1993)). That obligation is especially important here because the class was certified under Rule 23(b)(2), its members had no opportunity to opt out, and they have not yet been heard on any fee request.

A narrowly tailored reserve that must be disbursed as soon as a fee application can be decided – which is to say, after the appeals process is exhausted – accommodates both interests. It preserves the possibility of a common-fund award without determining that counsel is entitled to any such award, let alone in any particular amount. It does not permanently deprive grantees of funds. And it does not extend the reserve beyond what the eventual fee request can reasonably support.

The balance of equities and the public interest therefore favor interim preservation, but only in the amount discussed below.

5. The Appropriate Reserve Is 2.5 Percent

Plaintiffs ask the Court to reserve fifteen percent of future grant payments for a possible common-fund fee. That figure is excessive.

The object of preliminary relief is not to award Class Counsel its desired fee in advance, but only to preserve a sufficient amount so that the Court can make a meaningful fee determination after the appeal. The reserve should therefore be large enough to protect a realistic potential award, but no larger.

When this motion was filed, Class Counsel represented that it had devoted more than 1,000 hours to the litigation and that it might ultimately seek less than fifteen percent of the asserted fund. *See* Dkt. No. 170-2, Crooks Decl. ¶ 2. But counsel did not submit the amount of fees actually accrued, calculated from the hours recorded and counsel's regular billing rates. That omission was understandable, because no fee application was yet due. Nevertheless, the Court found that it could not evaluate a request to withhold fifteen percent of the grantees' money without some idea of how that figure related to the number of hours worked and the rates for those hours.

The Court therefore directed Class Counsel to submit that information, without any multiplier or enhancement. Counsel's declaration reports that, as of August 5, 2026, five attorneys and two paralegals had recorded 1,814 hours, generating a lodestar of $1,502,764.75 at their regular billing rates. Dkt. No. 179, Crooks Decl. ¶¶ 6, 8. That amount includes 169 hours and $149,518.50 spent on the present fee-preservation motion. *Id.*, ¶ 6. Counsel also anticipates spending between 150 and 600 or more additional hours on the appeal. *Id.*, ¶ 10. These figures neither establish the amount of a reasonable fee nor predict what the Court will ultimately award. They simply provide a point of reference for determining how much should be preserved now.

The Court must be especially cautious because the requested reserve exposes a direct conflict between Class Counsel and the absent class members whom counsel represents. Class Counsel has an interest in preserving as much money as possible for a future fee award; the class members have an interest in receiving the full amounts of the grants restored through this litigation.

As Judge Selya observed, "the conflict between a class and its attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery." *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991).

That concern is heightened here. The class was certified under Rule 23(b)(2), its members had no opportunity to opt out, and they have not yet received notice of any fee application or an opportunity to object. Moreover, the money at issue consists of federal grants awarded for particular scholarly humanities projects, and every dollar withheld is a dollar temporarily unavailable for the work NEH approved. The Court therefore must "act as a guardian of the rights of absent class members" and approach any fee award "with an eye to moderation." *McDaniel v. County of Schenectady*, 595 F.3d 411, 414 (2d Cir. 2010) (quotation omitted); *see also Democratic Central Committee of D.C. v. Washington Metropolitan Area Transit Commission*, 3 F.3d 1568, 1573 (D.C. Cir. 1993) (per curiam) ("[T]he court must act to protect the interests of the class members and to insure that the fee awarded is reasonable.").

The concern is also heightened because Class Counsel were not the only attorneys whose efforts contributed to the result obtained in these consolidated actions. The ACLS Plaintiffs were also ably represented, and their counsel litigated substantially the same legal and factual issues alongside Class Counsel. The Court therefore cannot assume that Class Counsel alone should receive credit for securing the relief that benefited the Authors Guild class. Any eventual common-fund award may have to be reduced to account for work performed by ACLS counsel and to ensure that the class is not charged for duplicative efforts.

Finally, the Court must account for the possibility that Class Counsel will recover fees directly from the Government under § 2412(d) of the EAJA. Any such award would be calculated at the applicable statutory rates rather than counsel's regular billing rates, and Class Counsel

represents that it will credit any EAJA award against any common-fund recovery. *See* Dkt. No. 170-1 at 20–21. The amount of any offset cannot yet be known, because the appeal and the fee proceedings remain to be completed. But its potential availability further confirms that there is no present justification for reserving anything close to fifteen percent of the grants.

The record does not establish the aggregate amount of future payments that will actually be made to members of the Authors Guild class. The Government previously estimated that approximately $49 million in outstanding awards was associated with that class. *See* Dkt. No. 171 at 2 & n.3. Class Counsel now reports that, based on discussions with the Department of Justice, $86,767,406 was associated with class members' grants as of July 21, 2026, excluding grants belonging to ACLS-side organizations and grants reinstated independently of this Court's judgment. Dkt. No. 179, Crooks Decl. ¶ 12. Counsel acknowledges that some portion of that amount has since been disbursed and that it does not know how much remains scheduled for future payment. *Id.*, ¶ 13. The Court need not resolve the discrepancy between the estimates. The reserve will attach only to Covered Disbursements that NEH actually makes and will therefore adjust automatically to the amount ultimately distributed.

If the entire $86,767,406 remained to be disbursed, a fifteen-percent reserve would preserve more than $13 million – *over eight times counsel's current lodestar*. Without in any way prejudging what if any fee the Court would award, I can represent that it will not be a percentage award that equals eight times lodestar, or anything close to that. A 2.5-percent reserve would preserve approximately $2.17 million on the same assumption. The amount actually reserved may well be lower, because some payments on grants subject to this injunction have already been made. But the reserve need not secure payment of counsel's entire lodestar at its regular billing rates.

The purpose of this injunction is merely to preserve a realistic potential common-fund component while the appeal proceeds.

A 2.5-percent reserve accomplishes that purpose. It preserves a meaningful source of payment for a possible common-fund award, including an appropriate cushion for the appellate work counsel anticipates, while allowing class members to receive 97.5 percent of every future disbursement immediately. Coincidentally, it is the same percentage that was ultimately approved for a common fund recovery by the D.C. Circuit in *Puerto Rico v. Heckler*, 745 F.2d 709, 713–14 (D.C. Cir. 1984). Given the fees accrued to date, the work that remains, the possibility of an EAJA offset, the uncertainty concerning future disbursements, and the Court's obligation to protect absent class members, 2.5 percent is sufficient. Anything more would unnecessarily withhold money appropriated for the grantees' projects.

Nothing in this ruling determines that Class Counsel is entitled to a common-fund fee, fixes the amount of any eventual fee, or selects the method by which any fee will be calculated. After the appeal is concluded, Class Counsel will file the fee application contemplated by Dkt. No. 177. The class members will then receive notice and an opportunity to object, and the Court will determine whether fees should be awarded under § 2412(b), § 2412(d), or both, and in what amount. The reserved funds will then be distributed in accordance with that future ruling – to Class Counsel to the extent any common-fund fee is approved, and otherwise back to the grantees from whose payments the funds were withheld.

### 6. No Security Is Required

Federal Rule of Civil Procedure 65(c) directs the Court to require security "in an amount that the court considers proper" to compensate a party later found to have been wrongfully enjoined. The Second Circuit has emphasized that this language vests district courts with "wide

- 25 -

discretion in the matter of security" and permits a court to require no bond "where there has been no proof of likelihood of harm, or where the injunctive order was issued 'to aid and preserve the court's jurisdiction over the subject matter involved.'" *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (quoting *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir. 1961)).

No security is necessary here. The injunction requires NEH only to retain temporarily a portion of funds that it has not yet disbursed. The reserved funds will remain in NEH's possession, and no money will be transferred to Class Counsel absent further order of the Court. The Government has identified no quantifiable monetary loss that a bond would secure. Moreover, the Court retains authority to modify or dissolve the reserve after receiving the required submissions. Because the injunction merely preserves the subject of the anticipated fee proceeding without transferring or depleting the funds, the Court exercises its discretion to require no security.

## Conclusion

For the foregoing reasons, the Authors Guild Plaintiffs' motion for a preliminary injunction is GRANTED IN PART and DENIED IN PART. The terms of the preliminary injunction are set forth in the accompanying Order.

The Clerk of Court is respectfully directed to terminate the motions at Docket Numbers 170 and 176.

This constitutes the Opinion and Order of the Court. It is a written decision.

Dated: August 5, 2026
New York, New York

_____
U.S.D.J.

- 26 -